UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 12-10291-JLT

|  |  |
|---|---|
| BRUCE SMITH, PAUL JOSEPH, JOHN M. JOHNSON, ROBERT TINKER, MARTIN JOSEPH, KIM GADDY, BRIAN KEITH LATSON, MARWAN MOSS, LEIGHTON FACEY, and LATEISHA ADAMS, <br><br>　　Plaintiffs, <br><br>v. <br><br>CITY OF BOSTON, MASSACHUSETTS <br><br>　　Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**MEMORANDUM IN SUPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs are minority police officers who allege that the City of Boston engaged in disparate impact racial discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Title VII') and M.G.L. c. 151B, through its use of a written, rote memory, multiple-choice promotional examination for the position of lieutenant, that failed to test for the most important abilities necessary to perform the job, and which had a severe and pervasive disparate impact on minority candidates.  The City has been well aware of this disparate impact for at least 30 years.  Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't, 780 F.2d 5 (1st Cir. 1985) (extending 1979 consent decree containing affirmative

1

action provisions designed to increase the number of black officers promoted by Boston Police Department).[1]

A disparate impact discrimination analysis (unlike disparate treatment) requires a three-step analysis. Bradley v. City of Lynn, 443 F. Supp. 2d 145, 156 (D. Mass 2006) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i). First, it is Plaintiffs' burden to demonstrate disparate impact through statistical evidence provided through expert testimony. 29 C.F.R. § 1607.5; Gulino v. New York State Educ. Dep't, 460 F.3d 361, 382 (2d Cir. 2006) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)). If disparate impact is demonstrated, the burden shifts to the defendant employer to prove that the test is "job-related and consistent with business necessity," which also must be demonstrated through expert testimony. Id. at 157 (quoting E.E.O.C. v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-01 (1st Cir. 1995). See also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); 42 U.S.C. § 2000e(m) ("The term "demonstrates' means meets the burdens of production and persuasion."). The courts refer to this requirement as "validity." Gulino, 460 F.3d at 384 (citing Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York, 630 F.2d 79, 89 (2d Cir. 1980) (discussing five-part test for determining content validity). If the City can meet its burden of proving that the test was properly validated in accordance with EEOC guidelines, the burden then shifts again to Plaintiffs to demonstrate that there are other "less discriminatory alternatives" that would be equally or more effective in testing for the attributes necessary for the

---

[1] See also, Castro v. Beecher, 459 F.2d 725 (1st Cir.1972) (affirming district court finding that the BPD discriminated against black applicants through the use of entry-level testing procedures that favored whites); Stuart v. Roache, 951 F.2d 446, 452 (1st Cir. 1991) (recognizing that racial discrimination by BPD in entry-level hiring had adversely affected blacks' representation at the rank of sergeant); Boston Police Superior Officers Fed'n v. City of Boston, 147 F.3d 13, 20 (1st Cir. 1998) (finding that the Boston Police Department's historical discrimination against minority officers served to prevent minorities from reaching the level of lieutenant).

2

job.  Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975); Ricci v. DeStefano, 557 U.S. 557, 587 (2009); Bradley, 443 F. Supp. 2d at 157; 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).

Plaintiffs now move for summary judgment as to liability because they have demonstrated the severe disparate impact of the 2008 lieutenant's exam.  Based on data provided by both the City of Boston and the Commonwealth of Massachusetts' Human Resources Division ("HRD"), Plaintiffs' expert Dr. Joel Wiesen, found that minority test takers had significantly lower scores, lower pass rates, lower selection rates even for those who passed the exam, and -- for those who were selected for promotion – significantly longer wait periods before they were promoted and there is clear statistical significance for each of these findings. See Aff. of Joel P. Wiesen.  Indeed, any one of these findings would justify a finding of adverse impact, let alone all four.  Based on these findings, Plaintiffs' expert has opined that there is clear and compelling statistical adverse impact against minority test takers for the 2008 written promotion exam.  Adverse Impact Evaluation: 2008 and 2005 Exams for Promotion to Lieutenant, BPD (Sept. 24, 2014) ("Adverse Impact Report") at p. 24 (attached to Aff. of Joel P. Wiesen).  The City of Boston, meanwhile, has not produced any expert report to counter this evidence or to demonstrate "validity," even though the time for doing so has long since passed.  Accordingly, this Court should grant Plaintiffs summary judgment as to liability.  Fed.R.Civ.P. 56(c) (summary judgment is proper where there is "no genuine issue as to any material fact").

Summary judgment for Plaintiffs on liability is proper because the City has no reasonable expectation of proving the essential elements of its validity defense.  Despite having the burden to show validity, the City has produced no evidence on validity and cannot do so without an expert.  See Gulino, 460 F.3d at 383 (quoting Guardians, 630 F.2d at 89) ("The study of employment testing, although it has necessarily been adopted by the law as a result of Title VII

3

and related statutes, is not primarily a legal subject.' Because of the substantive difficulty of test validation, courts must take into account the expertise of test validation professionals."); Bazile v. City of Houston, 858 F. Supp. 2d 718, 721 (S.D. Tex. 2012) ("courts clearly lack expertise in the area of testing validity" and, therefore, must rely on expert testimony); Stout v. Potter, 276 F.3d 1118, 1122 (9th Cir. 2002) (whether an adverse impact exists or whether business necessity defense is available requires expert statistical analysis). Summary judgment should, therefore, be entered for Plaintiffs on liability. See, e.g., Ball v. Wal-Mart, Inc., 102 F. Supp. 2d 44, 54-55 (D. Mass. 2000) (quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711, 575 N.E.2d 734, 738 (1991)) ("A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial" and mandates summary judgment in favor of the moving party.)

Moreover, the City cannot meet its evidentiary burden simply by pointing to the expert testimony on validity in Lopez v. City of Lawrence. The expert testimony from Lopez dealt solely with the validity of the Boston Police sergeant's exam. No expert has ever testified that the challenged exam here properly tested for the abilities needed to perform the much different and more difficult position of Boston Police Lieutenant. Thus, there is no opinion from Lopez that can be gleaned to support the validity of the lieutenant's exam.

**STATEMENT OF FACTS**

Ninety-one police officers took the 2008 Boston Police Lieutenant promotional exam. Pl.'s Statement of Undisputed Material Facts ("SOF"), ¶ 1. Of the 91 officers who took the 2008 Boston Police Lieutenant promotional exam, 65 were non-minorities and 26 were minorities. SOF, ¶ 2. As of September 24, 2014, a total of 31 police officers had been promoted to the rank of lieutenant from based on the 2008 exam. SOF, ¶ 3. As of September 24, 2014, of the 31

police officers promoted to lieutenant from the 2008 exam, four were minorities and 27 were non-minorities.[2]  SOF, ¶ 4.

Based on the numbers of police officers receiving promotions up until September 24, 2014, the selection rate was .15 for minorities and .42 for non-minorities.  SOF, ¶ 5.  The adverse impact ratio for the section of minority candidates for promotion to lieutenant based on the 2008 exam is .37.[3]  This is considered severe disparate impact as it is well below the ratio of 0.80 set out as the rule of thumb under the Uniform Guidelines on Employee Selection Procedures, 43 F.R. 38295, 38314 (Aug. 25, 1978).  Instead, non-minority police officers who passed the 2008 exam were three-times more likely to be promoted than minority police officers who passed the exam.  This disparity is statistically significant because it is highly unlikely that it was the product of chance.  SOF, ¶ 7.[4]

Of the 65 non-minority candidates who took the 2008 exam, 61 passed, for a pass rate of .94.  SOF, ¶ 11.  Of the 26 minority candidates who took the 2008 exam, 18 passed, for a pass rate of .69.  SOF, ¶ 12.  The adverse impact ratio for minorities' pass rates for the 2008 exam

---

[2]      Plaintiffs are aware that on approximately November 7, 2014, the City of Boston promoted one white officer and one white officer to the rank of lieutenant based on the results of the 2008 exam.  While this may slightly alter the adverse impact ratio for minorities who were eventually promoted, it does not alter the conclusion of Plaintiffs' expert, Dr. Wiesen, that the 2008 exam has caused severe adverse impact among minority candidates, including in the rate of selection for minorities.  See Wiesen Aff. at p. 2 n.1.

[3]      Based on the 2005 Boston Police Lieutenant promotional exam, 25 non-minorities were promoted to lieutenant and two minorities were promoted to lieutenant.  SOF, ¶ 9.  The adverse impact ratio for selection from for minorities based on the 2005 exam was .38. SOF, ¶ 10.

[4]      Dr. Wiesen calculated that the selection rate for minorities was more than two standard deviations removed from what was expected and that the probability that the result was the product of chance was less than 3 percent.  See SOF, ¶ 7.  See Palmer v. Shultz, 815 F.2d 84, 92–96 (D.C.Cir.1987) (noting that "statistical evidence meeting the .05 level of significance is certainly sufficient to support an inference of discrimination")

was .74.  SOF, ¶ 13.  This disparity was found to be statistically significant as there was only a 0.4 percent chance that it was the product of chance.  SOF, ¶ 14.[5]  SOF, ¶ 13.

The average score for minority candidates who took the 2008 exam was 76.6, while the average score for non-minorities was 83.2.[6]  SOF, ¶ 17.  The difference in average scores of 6.6 points is highly statistically significant.[7]  SOF, ¶ 18 (finding a 0.15 percent chance that the disparity in scores was the product of chance).

Because minorities had statistically significantly lower scores (the mean difference in scores was over six points) those few minorities that were promoted had to wait twice as long as non-minorities to be promoted off of the 2008 list.  Compare SOF, ¶ 20 (non-minorities who were promoted based on the 2008 exam waited an average of 617 days for promotion) with SOF, ¶ 21 (minorities who were promoted based on the 2008 exam waited an average of 1,323 days).  The adverse impact delay for minorities who were promoted is 706 days, which is severe.  SOF, ¶ 22.  This delay is highly statistically significant as the probability of such a disparity occurring by chance is 0.35 percent.  SOF, ¶ 23.

As a result of the 2008 exam, minorities suffered overwhelming and statistically significant adverse impact in terms of their promotions, SOF, ¶ 25, their pass rates, SOF, ¶ 26,

---

[5] Only 50 percent of minorities who took the 2005 Boston Police Lieutenant promotion exam passed, while 88 percent of non-minorities who took the test pass. SOF, ¶ 15. The adverse impact ratio for the 2005 exam was .57 for minority test takers, which was highly statistically significant, as the chance of such a disparity occurring by chance is a mere 0.005 percent. SOF, ¶ 16.

[6] Each candidate who took the 2008 exam was given a final exam score, with 80 percent of score based on the candidate's written score and 20 percent on a so-called "Education and Experience" rating, which did not significantly affect the results of the 2008 exam. SOF, ¶ 24.

[7] The average score for minority candidates who took the 2005 exam was 69.9, which the average score for non-minorities was 78.7, for a statistically significant average difference in scores of 8.8. points. SOF, ¶ 19. The probability of such a disparity occurring by chance is a mere 0.003 percent. Id.

average written exam scores SOF, ¶ 27, and delay of promotion, SOF, ¶ 28. The written score is the major determinant of the 2008 exam score, regardless of the fact that candidates gain a few extra points for education and experience. SOF, ¶ 29.

## STANDARD OF REVIEW

The standard for summary judgment is well-worn: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir.2011) (citation omitted).

"If the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production in two ways." Fireman's Fund Ins. Co. v. Harley Realty Co., 24 F. Supp. 2d 117, 118 (D. Mass. 1998) (citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991); Celotex Corp. v. Catrett 477 U.S. 317, 331–32 (1986)(Brennan, J., dissenting)). "The moving party may either submit affirmative evidence to negate an element of the nonmovant's claim or the moving party may demonstrate that the nonmovant has no reasonable expectation of proving an element of the claim due to insufficient evidence." Id. (emphasis added). See also Ball, 102 F. Supp. 2d at 54-55 ("A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial" and mandates summary judgment in favor of the moving party."); Genentech, Inc. v. Trustees of Univ. of Pennsylvania, 871 F. Supp. 2d 963, 969 (N.D. Cal. 2012) (citing Celotex, 477 U.S. at 325; Soremekun v. Thrifty Payless, Inc., 509 F.3d 978,

7

984 (9th Cir. 2007) ("Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case.").

## ARGUMENT

Under Massachusetts law, municipal police officers are subject to the state civil service law. See Mass. Gen. Laws ch. 31, § 51.

The City may use promotional examinations developed by HRD, or it may seek approval from HRD to develop and use their own promotional exams.[8] See Mass. Gen. Laws ch. 31 § 5(l) (giving HRD power to delegate administrative functions to cities and towns). Based on a 100-point scale, a candidate needed a score of 70 or above to pass the exam. Participants are then ranked by their score, and HRD then prepares and certifies an "eligibility list" for each appointing jurisdiction, identifying those test-takers who may be considered for appointment to existing vacancies. Id. § 25. The number of names on the eligibility list is determined by the formula 2n+1, where n is the number of vacant positions. Id. § 27. Thus, if a municipality had one job vacancy to which the list was applicable, the list would contain the candidates with the three highest scores (2x1+1=3). If there were three vacancies, the eligibility list would have the

---

[8] For 2005 and 2008, the City chose to rely on HRD-designed and administered exams for lieutenant. These exams consisted of two elements: a written, closed-book exam consisting of 80 multiple-choice questions, and an "education and experience" ("E&E") rating. The E&E rating principally took account of relevant prior employment and academic coursework that a candidate had either taken or taught. Candidates also received extra points for military experience. M.G.L. c.31, §§ 26 (veterans), 59 (long-service employees). Dr. Wiesen found, however, that the E&E scores and military experience points did have a significant impact on the final scores. Rather, Dr. Wiesen found that the correlation between an applicant's written score and his final score was 95 percent. SOF, ¶ 24.

candidates with the top seven scores (2x3+1=7). In all years, including 2005 and 2008, the City of Boston made selections based on strict rank order according to the HRD eligibility list.

I.     **THERE IS NO MATERIAL DISPUTE OF MATERIAL FACT AS TO THE DISPARATE IMPACT CAUSED BY THE 2008 BOSTON POLICE LIEUTENANT'S PROMOTIONAL EXAM.**

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, prohibits any employment practice that has "a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i).  Unlike claims of disparate treatment, disparate impact claims do not require proof of an intent to discriminate.  Ricci, 557 U.S. at 577; Bradley v. City of Lynn, 443 F. Supp. 2d 145, 155 (D. Mass. 2006); see also, Sch. Comm. of Braintree v. Mass. Comm'n Against Discrim., 377 Mass. 424, 428 (1979) (addressing claims under MG.L. c. 151B). The purpose of a disparate impact claim is to "'root[] out 'employment policies that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Bradley, 443 F. Supp. 2d at 155 (quoting EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 600-01 (1st Cir. 1995)).

A claim for disparate impact racial discrimination is subject to a three-part analysis. First, the plaintiff has the initial burden of proving that a challenged employment practice has disparate impact. Bradley, 443 F. Supp. 2d at 156 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). Second, once a plaintiff has demonstrated disparate impact, the employer has the burden of proving that the challenged practice is "job-related and consistent with business necessity." Id. at 157 (quoting Steamship Clerks, 48 F.3d at 600-01. See also 42 U.S.C. § 2000e-2(k)(1)(A)(i) (requiring employer to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"); 42 U.S.C. § 2000e(m) ("The term

"demonstrates' means meets the burdens of production and persuasion."). Third, even if the employer meets this burden, a plaintiff can still prevail by demonstrating that there is "another selection device without a similar discriminatory effect that would also serve the employer's legitimate interest." Bradley, 443 F. Supp. 2d at 156.

To establish disparate impact, the courts have not held plaintiffs to a high threshold. Bradley, 443 F. Supp. 2d at 170 (citing Beecher, 504 F.2d at 1020-21). A plaintiff need not prove to a scientific degree of certainty that a challenged employment practice caused disparate impact; rather, the plaintiff must proffer evidence "which reveals a disparity substantial enough to raise an inference above causation."[9] Id. at 157 (citations omitted). The purpose of the prima facie test is merely to determine whether the employer should shoulder the burden of justifying its use of a challenged business practice; a "burden a public employer should not be unwilling to assume." Beecher, 504 F.2d at 1020 (citation omitted).

Moreover, the proper focus of a disparate impact analysis is on the question of equal opportunity, not bottom-line promotion statistics. Connecticut v. Teal, 457 U.S. 440, 441, 450-51, 453 n.12 (1982). Rather than simple statistics, the relevant harm in an adverse impact case is the "inability to compete on an equal footing." Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002). When looking at disparate impact, the "question is whether the test denied applicants equal protection of the laws by creating 'built-in headwinds.'" Beecher, 504 F.2d at 1021.

---

[9]   Asking whether a plaintiff has established a prima facie case of disparate impact discrimination is different than asking whether an employer will be held liable for such discrimination. See Ricci, 557 U.S. at 587 (describing a prima facie showing of disparate impact as "essentially a threshold showing of a significant statistical disparity . . . and nothing more"); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir. 1985) (a prima facie showing of disparate impact exists where "statistical tests sufficiently diminish chance as a likely explanation").

10

There is no "single test" to establish disparate impact. Langlois v. Abington Hous. Auth., 207 F.3d 43, 50 (1st Cir. 2000) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 995-96 n.3 (1988) (plurality opinion)). Instead, "courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis." Watson, 487 U.S. at 995 n.3.

One commonly used benchmark for identifying and measuring disparate impact is the "four-fifths rule," articulated in the Uniform Guidelines on Employee Selection Procedures (1978) ("Uniform Guidelines") adopted by the Equal Employment Opportunity Commission ("EEOC"). 29 C.F.R. § 1607.4(D). The First Circuit has approved of using the four-fifths rule as "pertinent benchmark in the employment context." Langlois, 207 F.3d at 50 (citing Boston Police Superior Officers, 147 F.3d at 21). Under this rule, "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact."[10] 29 C.F.R. § 1607.4(D).

Additionally, "[w]here the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact." Id.

---

[10] Even where the four-fifths rule has not been met, courts may still find adverse impact. As the Uniform Guidelines state, "Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant." 29 C.F.R. § 1607.4(D).

Beyond statistical models, courts may simply look for "differences between what is expected and what is observed." Bradley, 443 F. Supp. 2d at 161. Under generally accepted standards, when there is a less than 5 percent likelihood that a particular outcome occurred by chance, one can make a "statistically significant" inference that the outcome was cause by something other than chance.

There can be no doubt here that the 2008 exam cause disparate impact. As Judge O'Toole recognized in the Lopez decision, "It is widely recognized among industrial organizational psychologists, including the four experts who testified at trial, that minority candidates as a group tend to perform less well relative to non-minority candidates as a group on written multiple-choice examinations." Lopez v. City of Lawrence, No. 07-11693-GAO (D. Mass. Sept. 5, 2014) Order at p. 14 (attached as Ex. A). In fact, in Lopez, the City of Boston conceded that the 2005 and 2008 sergeant's exams had "significant adverse impact on black and Hispanic test-takers." Order at p. 20. It should come as no surprise then, that the results of the 2008 lieutenant's exam were clearly skewed against minorities.

Minorities had a much lower pass rate. SOF, ¶¶ 11-14. Minority applicants also, on average, scored more than six points lower than the average score for non-minorities. SOF, ¶¶ 17-18. As a direct consequence of achieving both a lower pass rate and lower average scores on the 2008 exam, as of September 24, 2014, of the 31 officers promoted from that exam only four were minorities. SOF, ¶ 4. Based on the number of officers who passed the exam, the selection rate for minority officers was three times lower than the selection rate for non-minorities who passed the exam. SOF, ¶ 5. Plaintiffs' expert calculated that the adverse impact for minority offered as to their selection for promotion was .37, which is much lower than the four-fifths rule

of thumb laid out under the Uniform Guidelines. The probability that such a disparity would occur is statistically significant. SOF, ¶ 7.

Furthermore, because promotions were made on strict rank order based on exam scores, minorities who passed the 2008 exam had to wait, on average, twice as long as non-minorities who passed, an average wait of almost two years. SOF, ¶¶ 20-23. Dr. Wiesen found this delay in promotions to be a statistically significant adverse impact. SOF, ¶ 23.

Today, the City of Boston has argued in its motion for summary judgment that the statistical evidence of disparate impact is not "statistically significant."[11] Plaintiffs, however, should be awarded summary judgment as to this issue as they have presented uncontroverted evidence showing that minorities suffered statistically significant adverse impact as a result of the administration of the 2008 exam, see Vélez—Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir.2006) (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir.1992)) (a dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party"), and the City of Boston has failed to prove the test's validity.

Courts have recognized that, even where the four-fifths rule has been met, statistical tests should also be used to determine whether a four-fifths rule violation is the product of chance. See Stagi v. Nat'l R.R. Passenger Corp., 391 F. App'x 133, 137 (3d Cir. 2010) ("[t]he most widely used means of showing that an observed disparity in outcomes is sufficiently substantial to satisfy the plaintiff's burden of proving adverse impact is to show that the disparity is sufficiently large that it is highly unlikely to have occurred at random.") (citation omitted); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir.1985) (recommending that

---

[11] While plaintiffs will address this issue in their opposition to the City of Boston's motion for summary judgment, and in their reply brief, a close reading of City of Boston's just-filed motion makes clear that it essentially admits the severe disparate impact of the exam.

courts " require a showing that the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof."); Clady v. Los Angeles Cnty., 770 F.2d 1421, 1428 (9th Cir. 1985).  Under such statistical tests, "courts frequently accept a .05 probability 'to rule out the possibility that the disparity occurred at random.'"  Bazile, 858 F. Supp. 2d at 764-65 (citing Stagi, 391 Fed.Appx. at 137–38; Page v. U.S. Indus., Inc., 726 F.2d 1038, 1047 n. 5 (5th Cir.1984) (noting that in Castaneda v. Partida, 430 U.S. 482, 496–97 n. 17, (1977), the Supreme Court's "guidance" was that "a disparity in the number of minority workers in upper and lower level jobs is statistically significant if the difference between the expected number of minority employees in higher level positions exceeds the actual number by more than two or three standard deviations"); Palmer v. Shultz, 815 F.2d 84, 92–96 (D.C.Cir.1987) (noting that "statistical evidence meeting the .05 level of significance is certainly sufficient to support an inference of discrimination" (citation, internal quotation marks, and alterations omitted)); Waisome v. Port Auth. of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991) ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation must be accounted for by some factor other than chance." (citation omitted)).

      Here, Dr. Wiesen makes clear that for each category of disparate impact that he found such adverse impact was statistically significant.[12]  See SOF, 7, 14, 18. 23, 25-30.  There can be no dispute of fact, therefore, that minorities suffered disparate impact directly attributable to the City's use of the 2008 multiple-choice lieutenant's exam.

---

[12]    Indeed, Dr. Wiesen used the Fisher exact test to determine statistical significance, the test favored by the courts.  Bazile, 858 F. Supp. 2d at 765 (experts should use Fischer exact test).

### III. THE CITY OF BOSTON HAS NO REASONABLE EXPECTATION OF PROVING THAT THE 2008 LIEUTENANT PROMOTIONAL EXAM WAS VALID.

Once the plaintiff has established disparate impact, the burden shifts to the employer to demonstrate that the exams themselves are valid; that the exams are job-related and consistent with business necessity. Bradley, 443 F. Supp. 2d at 170 (citations omitted). The employer must ask the court to do more than "undertake a leap of faith." Id. at 171 (citations omitted). Rather, the court should look at the Uniform Guidelines to determine if the test has been validated. Id. As this Court has previously explained, "[d]isparate impact cases thus shift the burden of persuasion to the respondent on the second prong [validity] if the claimant establishes the first prong [disparate impact]." United States v. Massachusetts, 781 F. Supp. 2d 1, 4 n.5 (D. Mass. 2011) (citing Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971)). "This is sharply different from the protocol articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which shifts only the burden of production to the defendant upon proof of the plaintiff's prima facie case." Id.

The Guidelines describe three methods of validation: criterion validity, content validity, and construct validity. 29 C.F.R. § 1607.5(A). "A criterion-related-validity study analyzes whether test results correlate to 'criteria that [are] predictive of job performance.'" Bazile, 858 F. Supp. 2d at 726 (quoting Mark R. Bandsuch, *Ten Troubles with Title VII and Trait Discrimination Plus One Simple Solution (A Totality of the Circumstances Framework),* 37 Cap. U.L. Rev. 965, 1089 (2009)). A content-validity study "analyzes whether test results correlate to 'the knowledge, skills, and abilities related to that job."[13] Id. A construct-validity study

---

[13] The test for content validation is whether "the content of the selection procedure is representative of importance aspects of performance on the job for which the candidates are to be evaluated." 29 C.F.R. 1607.5(B).

15

examines whether test results correlate to "general characteristics important to job performance." Id. It is anticipated that the City will rely on content validation.[14]

The City of Boston has failed to meet its burden as to validity as it has failed to produce expert evidence on this issue, even though validity cannot be established without an expert. Bazile, 858 F. Supp. 2d at 721 ("courts clearly lack expertise in the area of testing validity" and must rely on expert analysis); Gulino, 460 F.3d at 383 (quoting Guardians, 630 F.2d at 89) ("'The study of employment testing, although it has necessarily been adopted by the law as a result of Title VII and related statutes, is not primarily a legal subject.' Because of the substantive difficulty of test validation, courts must take into account the expertise of test validation professionals."); Allen v. City of Mobile, 464 F. Supp. 433, 438-39 (S.D. Ala. 1978) (to demonstrate validity, city was required to produce "statistical analyses (not just raw data)").[15] Summary judgment in favor of Plaintiffs, therefore, is required. Ball, 102 F. Supp. 2d at 54-55

---

[14] To establish validity, the first step for content validation is a recent job analysis. 29 C.F.R. 1607.14(C)(2); Bradley, 443 F. Supp. 2d at 172 (experts agree that "a validity study should be conducted every five years"). The next step is to ensure that there is a link between the selection procedure and the critical knowledge, skills, and abilities necessary for successful performance of the job (as identified by the job analysis). 29 C.F.R. 1607.14(C)(4). The use of a ranking device requires a separate demonstration that there is a relationship between higher scores and better job performance. 29 C.F.R. § 1607.14(C)(9).

[15] As the Second Circuit explained:

> The study of employment testing, although it has necessarily been adopted by the law as a result of Title VII and related statutes, is not primarily a legal subject. It is part of the general field of educational and industrial psychology, and possesses its own methodology, its own body of research, its own experts, and its own terminology. The translation of a technical study such as this into a set of legal principles requires a clear awareness of the limits of both testing and law. It would be entirely inappropriate for the law to ignore what has been learned about employment testing in assessing the validity of these tests. At the same time, the science of testing is not as precise as physics or chemistry, nor its conclusions as provable. While courts should draw upon the findings of experts in the field of testing, they should not hesitate to subject these findings to both the scrutiny of reason and the guidance of Congressional intent.

Guardians, 630 F.2d at 89.

("A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial" and mandates summary judgment in favor of the moving party."); Genentech, 871 F. Supp. 2d at 969) (citing Celotex, 477 U.S. at 325; Soremekun, 509 F.3d at 984 ("Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party, but on an issue for which the opposing party will have the burden of proof at trial, the party moving for summary judgment need only point out "that there is an absence of evidence to support the nonmoving party's case.").

Moreover, the City of Boston may not rely on expert testimony from the Lopez trial to meet its burden on validity. The expert testimony on validity in the Lopez trial went only to the validity of the sergeant's exam, not the lieutenant's exam.

Moreover, as summarized by Judge O'Toole, the expert testimony in Lopez suggests that the lieutenant's exam was not valid.

> Dr. [James] Outtz, the industrial psychologist, opined at trial that the tests as administered for Boston in 2005 and 2008 were "minimally valid." He acknowledged the utility of a written job knowledge test in selecting candidates for promotion to sergeant, but noted that use of such a test by itself would not support a conclusion of validity, because it could not measure some skills and abilities (as distinguished from knowledge) essential to the position, such as leadership, decision- making, interpersonal relations, and the like. However, because he thought that such skills and abilities were attested to by the E&E component, the threshold of validity was crossed.

Lopez, Order at p. 35-36. Because the duties of lieutenants differ from sergeants in that they require even more supervisory capabilities, which are much less quantifiable through multiple-choice testing, Dr. Outtz's testimony would not support the City of Boston's case, if it ever chooses to make one, for the validity of the lieutenant's exam. In short, if Dr. Outtz believed that the sergeant's exam was not valid, certainly he would have found even less validity for the Lieutenant's exam.

17

Respectfully submitted,

BRUCE SMITH, et al.
By their attorneys,


/s/ Harold Lichten
Harold Lichten, BBO#549689
Benjamin Weber, BBO#673736
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02114
(617) 994-5800
hlichten@llrlaw.com
bweber@llrlaw.com


Stephen Churchill
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3262
steve@fairworklaw.com

DATED: November 17, 2014

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has been served on counsel for all parties through the ECF system on this date.

DATED: November 17, 2014                     /s/ Harold Lichten
                                                             Harold Lichten