UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 12-10291-WGY

BRUCE SMITH, PAUL JOSEPH,
JOHN M. JOHNSON, ROBERT TINKER,
MARTIN JOSEPH, KIM GADDY,
BRIAN KEITH LATSON, MARWAN
MOSS, LEIGHTON FACEY, and
LATEISHA ADAMS,

    Plaintiffs,

v.

CITY OF BOSTON, MASSACHUSETTS

    Defendant.

## SECOND AFFIDAVIT OF JOEL P. WIESEN

I, Joel P. Wiesen, do hereby depose and state:

1. I have read and evaluated the affidavit of Dr. Jacobs dated November 17, 2014 and find it to be misleading insofar as it focuses solely on one narrow aspect of adverse impact of the 2008 promotional examination to Lieutenant in the Boston Police Department (BPD), thereby ignoring all the other strong indications of adverse impact due to both the 2008 and 2005 exams. This affidavit updates my report dated September 24, 2014 concerning adverse impact by: (a) showing that Dr. Jacobs accepts difference in average exam score as a valid measure of adverse impact (a measure which I describe in my report and that he does not comment on); (b) showing that Dr. Jacobs accepts as valid the consideration of data from multiple exams to evaluate adverse impact; (c) providing an updated adverse

impact analysis for delay to promotions from the 2008 exam reflecting the two candidates who were promoted on or about November 14, 2014; (d) discussing changes in statistical significance due to additional promotions; (e) explaining why a one-tailed statistical test is the preferred statistical test and interpreting the data based on both the one-tailed and two-tailed approaches; (f) defending the methodology of test aggregation used in my previous report; and (g) commenting on the inconsistencies of Dr. Jacobs' position on interpreting statistical analyses based on either small or large sample sizes.

2. In another court case, Dr. Jacobs put forth and accepted as valid the average exam score as a measure of adverse impact just as I describe in my report.[1] With respect to the 2008 exam, this difference in average exam score is large, as may be calculated from the statistical summary in my original report. The standardized "effect size"[2] for this difference in average 2008 exam score, $d$, equals .97.[3] So, based on his professional publications (example cited above), Dr. Jacobs would have to agree that this statistically significant difference is large and, therefore, indicates adverse impact in accordance with

---

[1] Serving for the defense, Dr. Jacobs wrote, "Given the results regarding adverse impact on the lieutenant exam as a function of race it is instructive to look at additional data regarding differences in test performance. Promotions are based on the cumulative score of candidates across various tests that make up the promotion process. In the case of lieutenant, final placement on the promotion list is a function of scores ... there are no statistically significant differences in the scores on the written knowledge test, the written work sample or the oral board as a function of race. Further, and most importantly, there is no significant difference on the overall score used to place lieutenant candidates on the promotion list. Nothing in the actual test data shows White lieutenant candidates outperformed Black lieutenant candidates on any of the three components of the exam or the exam total score." Howe v. City of Akron, Case: 5:06-cv-02779-JRA Doc #: 122-1 Filed: 10/20/08 2 of 9. PageID #: 3751

[2] The magnitude of this difference may be reported in terms of the exam score itself, or in terms of standardized units. Psychologists often prefer to use the standardized unit approach because it allows comparisons between unlike measures, such as average exam score and delays to promotion.

[3] More specifically, Cohen's d.

his preferred approach to defining adverse impact.[4]

3. In another court case, Dr. Jacobs argued for going beyond one narrow measure of adverse impact to consider the larger picture, which was that there were two similar exams, and he held that the results of those two exams should be considered together, not separately.[5] This argues in favor of considering together the three adverse impact analyses I performed for each of the two exams (2008 and 2005), as I did in my adverse impact report and also do here, which is the proper approach.

4. Since I submitted my report on adverse impact, the BPD made two more promotions to Lieutenant based on the 2008 exam. Dr. Jacobs provides a statistical analysis of the adverse impact of promotional decisions which reflects these two recent promotions, and I comment on his analysis below. Only one of the other statistical analyses in my adverse impact report is affected by the recent promotion of two more Lieutenants by the BPD and next I provide an update to that analysis,[6] maintaining the table numbers of my original report.[7]

5. Adverse Impact Analysis: Date Promoted Based on the 2008 Exam

    a. For each person promoted, I calculated the number of days between the date the

---

[4]Similarly, the effect size for the average grade on the 2005 exam is 1.03 and the difference in average exam scores is highly statistically significant (p=.00003).

[5]"The very foundation of this litigation does not make logical sense. Highly similar examination processes for the two positions, examination processes that were created and implemented in highly similar ways are alleged to have completely opposite outcomes." Case: 5:06-cv-02779-JRA Doc #: 122-1 Filed: 10/20/08 3 of 9. PageID #: 3752

[6]My statistical analyses of the minority/non-minority differences in passing rates and in average exam scores are unaffected by the recent two promotions. Indeed, they are unaffected by any promotional decisions.

[7]The table unique to this report is lettered rather than numbered, to avoid confusion.

first person was promoted and the date of the promotion of that person. I refer to this number below as the "delay to promotion".

b. Of the 33 candidates promoted based on the 2008 promotional exam, 28 were non-minority and 5 were minority (all black). The average delay to promotion for the non-minority candidates was 657 days, and the average delay for the minority candidates was 1,407 days. (See Table 18.) The difference between these two averages is 750 days.

| Table 18. Adverse Impact: Delay to Promotion from the 2008 Exam | | | |
|---|---|---|---|
| Group | Number | Mean Delay to Promotion (in days) | Standard Deviation |
| Minority | 5 | 1407 | 298 |
| Non-Minority | 28 | 657 | 657 |
| Total | 33 | 750 | |

c. The adverse impact just reported is statistically significant. The probability of obtaining averages this disparate by chance is much less than the usual criterion of .05. (See Table 19.)

| Table 19. Adverse Impact: Statistical Analysis of the Delay to Promotion from the 2008 Exam | | | | | | |
|---|---|---|---|---|---|---|
| Test | Difference in Delay to Promotion (in days) | t Statistic | d.f.* | Probability Value (two-tailed) | Standard Deviation Units | d** |
| t Test (unequal variances***) | 750 | 4.28 | 11.08 | 0.001 | 2.9 | 1.2 |

\* d.f. = degrees of freedom (This is used to get the probability for the observed t statistic.)
\*\* $d$ = Cohen's $d$, a widely used and accepted measure of effect size
\*\* If equal variances are assumed, the results are also statistically significant.

    d.    Considering the delay to promotion, the adverse impact of the 2008 exam is 750 days. That is, black candidates who were promoted waited an average of an additional 750 days until they were promoted, as compared with non-minority candidates. There is no corresponding rule of thumb stated in the *Uniform Guidelines*. This discrepancy in delay to promotion is statistically significant. The "effect size" is equal to 1.20. Based on his professional publications, Dr. Jacobs would have to agree that this statistically significant difference is large[8] and, therefore, indicates adverse impact in accordance with his preferred definition of adverse impact. This adverse impact has real practical import beyond lost wages. Seniority date in rank is used to make various job assignment

---

[8]For example, in a professional journal Dr. Jacobs wrote:
"The d statistic describes the difference between groups in terms of standard deviation units, either the pooled standard deviation of the two groups (Cohen d) ... In the social and behavioral sciences, d values of 0.2, 0.5., 0.8, 1.0, respectively, are widely used to describe small, medium, moderately large, and large effects..." Murphy, K. R., & Jacobs, R. R. (2012, February 6). (Page 11)

decisions in BPD, such as which of two (or more) people will be given a desired assignment. So, a delayed date of promotion will have an effect for the duration of a person's (post-promotion) career in the BPD.

6. The change from statistical significance concerning promotions in my original report to the lack of statistical significance as analyzed by Dr. Jacobs after two recent additional promotions is potentially confusing and disturbing to a court of law. To be able to comment concretely on this, I conducted 15 additional adverse impact analyses concerning promotions, one each for the next 15 promotional decisions, assuming promotions were to be made in the order that the names appear on the official HRD eligible list.[9] These analyses show a consistent pattern of adverse impact well below 0.80 (never greater than 0.53). All 15 analyses show statistical significance based on a one-tailed approach, and 13 of the 15 analyses show statistical significance based on a two-tailed approach. Clearly, the lack of (two-tailed) statistical significance based on the 2 recent hires is a blip, not a pattern. The pattern is: no statistical significance when very few promotions were made,[10] strong statistical significance when many promotions are made ($p=0.011$, two-tailed, if 15 additional promotions were to be made), and usually statistical significance in the middle range of appointments. (See Table A.)

---

[9]List established 5/15/2009, retrieved from https://www.csexammrd.gtate.ma.us/standings/activeStandings.asp?et=PROM&an=5691, provided to me by counsel.

[10]With few promotions, it is not possible to see a pattern. As an analogy, proving a coin is biased based on a small number of tosses is not possible, even when the coin is quite biased.

| Table A. Adverse Impact Analyses for Additional Hiring | | | | | |
|---|---|---|---|---|---|
| Number of Additional Promotions | Minority Candidates Reached | Non-Minority Candidates Reached* | Adverse Impact | p Value (two-tailed) | p Value (one-tailed**) |
| 1 | | James Blake | 0.43 | 0.031 | 0.019 |
| 2 | Paul Joseph | | 0.52 | 0.062 | 0.045 |
| 3 | | Richard Lewis | 0.5 | 0.058 | 0.034 |
| 4 | | Joel McCarthy | 0.48 | 0.036 | 0.025 |
| 5 | | Daniel Tracy | 0.47 | 0.033 | 0.019 |
| 6 | | Thomas Brennan | 0.45 | 0.02 | 0.013 |
| 7 | | Joseph McNiff | 0.44 | 0.018 | 0.01 |
| 8 | | James Meredith | 0.43 | 0.01 | 0.007 |
| 9 | | MaryAnn Riva | 0.42 | 0.006 | 0.005 |
| 10 | Nora Baston | | 0.49 | 0.02 | 0.012 |
| 11 | | Joseph Dahlbeck | 0.47 | 0.011 | 0.009 |
| 12 | | Joseph Freeman | 0.46 | 0.01 | 0.006 |
| 13 | Kim Gaddy | | 0.53 | 0.021 | 0.015 |
| 14 | | Michael Hanson | 0.51 | 0.019 | 0.011 |
| 15 | | David Kiley | 0.5 | 0.011 | 0.007 |
| Values in First Wiesen Report | | | 0.37 | 0.026 | 0.014 |
| Values as of Jacobs Report | | | 0.45 | 0.052 | 0.027 |

\* Note that the next two candidates on the list are white: Charles MacKinnon and Kevin Sweeney.
\*\* The one-tailed p value is not always exactly equal to 1/2 the two-tailed p value.

7.  Prior to describing the results of one-tailed tests of statistical significance as applied to the promotions from the 2008 (and 2005) exams, I will give a brief overview of "one-tailed" and "two-tailed" statistical tests. The term "one-tailed test" may be defined as follows:

> a statistical test of an experimental hypothesis in which the expected direction of an effect or relationship is specified.[11]

This may be compared to the definition of the term "two-tailed test":

> a statistical test of an experimental hypothesis that does not specify the expected direction of an effect or a relationship.[12]

A one-tailed test is also known as a "directional test" and a two-tailed test is also known as a "non-directional test". The term "directional test" may be defined as follows:

> a statistical test of a directional hypothesis.[13]

The term "directional hypothesis" may be defined as follows:

> a scientific prediction stating (a) that an effect will occur and (b) whether that effect will specifically increase or specifically decrease, dependent on changes to the independent variable."[14]

In the matter at hand, the independent variable is group membership: minority or non-

---

[11]American Psychological Association (2007) APA Dictionary of Psychology. Washington, D.C.: Author. (Page 645)

[12]APA Dictionary of Psychology (2007) (Page 963)

[13]American Psychological Association (2014) APA Dictionary of Statistics and Research Methods. Washington, D.C.: Author. (Page 96)

[14]APA Dictionary of Statistics and Research Methods. (Page 96)

Page 8

minority. The term "non-directional test" may be defined as follows:

> a statistical test of an experimental hypothesis that does not specify the expected direction of an effect or a relationship.[15]

The choice of whether to use a one-tailed or two-tailed statistical test of adverse impact should rest on the nature of the question being asked. If the question asked is whether there is adverse impact against minority candidates, then a one-tailed test should be used. If the question asked is whether there is adverse impact against either minority or non-minority candidates, then a two-tailed test should be used. From my evaluation, it is my opinion that the question being asked at this stage of this legal proceeding is one-directional (i.e., "Was there adverse impact on minority candidates"),[16] so the best statistical approach is one-tailed.[17,18] Using a two-tailed approach when a one-tailed approach is logically the better option has the effect of making the criterion for statistical significance considerably more stringent, thus making it much more likely to reach a

---

[15] APA Dictionary of Statistics and Research Methods. (Page 235)

[16] The protection provided by the 1964 CRA is for "protected classes" and thus assumes a one-tailed approach. The 1964 CRA passed when there were race riots in America. In any case, almost all Title VII cases concerning minority candidates ask if minority candidates fared less well than non-minority.

[17] I used a two-tailed approach in my adverse impact report because the conclusion of the one and two-tailed approaches was the same and the two-tailed approach avoids the possibly contentious use of the one-tailed approach. With the addition of two more promotions, the two approaches do not lead to the same conclusion.

[18] Dr. Jacobs wrote that a two-tailed test is "most appropriate" but did not provide any rationale for that position. In a professional journal article he authored Dr. Jacobs summarizes the facts of a court case saying, "This difference in test outcomes was also statistically significant; a Fisher's exact probability test yields a one-tailed p value of less than .01." Nowhere in this 24 page article does he suggest the one-tailed test was inappropriate. Murphy, K. R., & Jacobs, R. R. (2012, February 6). (Page 4)

conclusion that there was <u>no</u> adverse impact.[19,20,21]

8. The one-tailed approach is the most proper one to use to test the statistical significance of the adverse impact in this matter. Using the one-tailed approach, the probability (i.e., the p value) associated with the test of statistical significance of the promotions from the 2008 exam is 0.027 and the probability associated with the test of statistical significance of the promotions from the 2005 exam is 0.027, both less than 0.05; therefore, they are both statistically significant. In both cases, the question is whether the adverse impact on minority candidates could reasonably be viewed as arising by chance. Further, this question need not be answered based on one statistical test alone. Since the promotions are driven by both the passing rate and the exam score, and since both show large, statistically significant adverse impact, the proper statistical conclusion is that there was adverse impact in promotions, both for the 2008 and the 2005 exams.[22]

9. Dr. Jacobs criticized my aggregating the results of the 2005 and 2008 exams, but he seems to have misunderstood my approach. First, when I analyzed each test separately, I

---

[19]The one-tailed approach involves using one "rejection region" in the direction of the difference anticipated. This one rejection region is larger than the rejection region in that direction using a two-tailed approach. For example, see Keppel, G. & Wickens, T. D. (2004) *Design and Analysis; A Researcher's Handbook* (4th ed.) Upper Saddle River, NJ. (Fig. 4.1, page 74)

[20]One respected textbook says, "Directional tests are best suited for applied research ... directional tests are not well suited to basic or theoretical research." Keppel & Wickens (2004) (pages 74-75)

[21]Both one and two-tailed statistical tests are appropriate, depending on the situation. A respected statistics textbooks says, "Many times an experimenter goes into a problem without a clearly defined notion of the direction of difference to expect...without any specification of expected direction" Hays, W. L. (1988) Statistics (4th ed.) Fort Worth: Holt, Rinehart and Winston. (Page 274)

[22]To use a coin fairness analogy, let's say a coin was tossed 10 times and came up 8 heads and 2 tails. That is not enough data to yield statistical significance but might still leave one doubtful about the fairness of the coin. (Assume no more coin tosses were possible.) If there were precise physical measurements of the balance of the coin that had been shown to be related to coin fairness, these measurements might be considered together with data on the number of heads and tails to reach a conclusion about the fairness of the coin.

was not aggregating over the two tests. Second, when I did aggregate, I used a procedure that did not double count any candidate. In my aggregated analysis, I considered the candidate pool to include any candidate who took either the 2008 or the 2005 exam, or both. I considered as promoted any candidate who was promoted from either exam. With this approach, the potential problem of "Simpson's Paradox"[23] is avoided. Further, Dr. Jacobs only says that it is possible that Simpson's paradox could be operative. He did not show that it was operative.[24] That is because he could not show that Simpson's Paradox was operative. I note that the adverse impact ratios for the 2008 and 2005 exams, regarding promotion, are close to each other, .45 and .38, and both are well below the .80 rule of thumb. This pattern is not consistent with the conditions that produce Simpson's Paradox.

10. In his report, Dr. Jacobs opines that "It is very common for test results involving a relatively small number of test takers (e.g., less than 200) to appear on their face to show a disparate impact when in fact, this disparate impact is not statistically significant but when evaluated using statistical testing no such conclusion can be drawn." Yet, in professional publications, Dr. Jacobs has decried statistical significance based on large samples, writing:

> Very large samples will routinely produce differences of more than two standard

---

[23]Simpson's paradox is "a phenomenon that can occur when data from two or more studies are merged, giving results that differ from those of either study individually. For examples, two studies, each showing a correlation of .00 between two variables, x and y, may show a strong positive correlation between variables x and y when the data are merged." APA Dictionary of Statistics and Research Methods. (Page 337)

[24]I note that there was no expert testimony presented in Lopez that Simpson's Paradox was, in fact, operative.

errors (indicative of a probability less than .05) in selection rates, even if the differences in selection rates are trivially small.[25]

It is not clear to me what size group Dr. Jacobs considers appropriate for adverse impact analyses. It is my opinion that the statistical test takes into account sample size, so a statistically significant finding based on a small sample is not to be ignored simply because the sample was not large. Also, a statistically significant finding based on a large sample should not be dismissed because the sample was large.[26]

11. In professional, scholarly publications, Dr. Jacobs has described the statistical power (the ability of statistical tests to detect differences when they actually exist) as follows:

> even when samples run in the hundreds, the power to detect small-to-moderate differences in selection ratios can be quite low."[27]

This low power to detect real differences in adverse impact ratios of selection rates is exactly the reason that I conducted statistical tests of the passing ratios and the average exam scores. (I analyzed the length of time to promotion because delay to promotion is an adverse impact in itself.) I found statistical significance in all three of these areas and quite large effect sizes in average exam scores and length of delay to promotion.

12. In print, Dr. Jacobs has decried small differences between groups being called evidence of adverse impact. For example, in a professional journal he wrote:

> Rather than relying on rules of thumb or statistical tests alone, we propose that

---

[25]Murphy, K. R., & Jacobs, R. R. (2012, February 6). (Page 5)

[26]Statistical analysis using large samples can reveal relatively small differences that have practical import.

[27]Murphy, K. R., & Jacobs, R. R. (2012, February 6). (Page 6)

assessments of adverse impact should incorporate effect size measures.[28,29]

Yet, in the only analysis Dr. Jacobs reports for this case, he ignores the large size of the adverse impact effect (adverse impact ratio of 0.45) and instead focuses only on the lack of statistical significance of one test of one facet of adverse impact and, without explanation, ignores the statistical significance and effect sizes[30] of other facets of adverse impact. In short, his affidavit is not an objective evaluation of the evidence of the existence of adverse impact in the 2008 examination.

13. In summary, there is strong, statistically significant evidence of adverse impact against minority test takers for both the 2008 and 2005 exams, and some of the adverse impact is quite severe.

Signed under the pains and penalties of perjury on this 24th day of November, 2014.

_____
Joel P. Wiesen, Ph.D.

---

[28]Murphy, K. R., & Jacobs, R. R. (2012, February 6). Using Effect Size Measures To Reform The Determination Of Adverse Impact In Equal Employment Litigation. *Psychology, Public Policy, and Law*. Advance online publication. doi: 10.1037/a0026350. (Page 10)

[29]Also, in a professional publication, Dr. Jacobs has described precisely the type of analysis I present below as his ideal definition of adverse impact, writing:
> We recommend that a new standard for detecting the potential for adverse impact be established, in particular that the conclusion that some test, policy, or procedure has adverse impact should not be considered unless differences between ... a two-group situation, unless d = .20). We also recommend that effect size measure be combined with tests of statistical significance, either through the joint reporting of effect sizes and p values ... when evaluating adverse impact.

Murphy, K. R., & Jacobs, R. R. (2012, February 6). (Page 20)

[30]Easily calculated from the statistical summaries in my report and reported below for delay to promotion and average exam score.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has been served on counsel for all parties through the ECF system on this date.

DATED: November 24, 2014                     /s/ Stephen Churchill
                                             Stephen Churchill