UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRUCE SMITH, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) CIVIL NO. 12-cv-10291-WGY |
| | ) |
| CITY OF BOSTON, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT CITY OF BOSTON'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Fed. R. Civ. P. 52(a), and this Court's order entered on October 23, 2014, the Defendant City of Boston ("City") submits its Proposed Findings of Fact and Conclusions of Law. The City respectfully reserves the right to file amended or supplemental proposed findings of fact and conclusions of law following the conclusion of the trial.

I.    **Introduction.**

Plaintiffs to this action are eight (8) black sergeants in the Boston Police Department ("BPD"). By Second Amended Complaint filed on September 4, 2012 (Doc. # 14), Plaintiffs allege that the promotional procedures for the position of police lieutenant, as administered by the Human Resources Division of the Commonwealth of Massachusetts ("HRD") in 2005 and 2008, had an unlawful disparate impact on black police officers, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII"), and Massachusetts General Laws Chapter 151B ("Chapter 151B"). The City denies that the 2005 and 2008 promotional procedures for the position of lieutenant violated either statute.

Under the well-established legal framework for analyzing claims of disparate impact discrimination under both Title VII and Chapter 151B, plaintiffs must initially show that the selection procedures for the position at issue caused a disparate impact on the basis of a protected characteristic (here, race).  Ricci v. DeStefano, 557 U.S. 557, 576-78 (2009), citing Griggs v. Duke Power Co., 401 U.S. 424 (1971); Cox v. New England Telephone & Telegraph Co., 414 Mass. 375, 390 (1993).  If plaintiffs meet this burden, the defendant must then demonstrate that the selection procedure is valid, i.e., the procedure is job-related and consistent with business necessity. Ricci, 557 U.S. at 576-78, citing 42 U.S.C. § 2000e-2(k)(1)(A)(i).  If defendant meets this burden, plaintiffs may prevail only if they can show that an equally valid, less discriminatory method for selection was available, and that defendant refused to use it. Ricci, 557 U.S. at 576-78.

The City's proposed witnesses include: BPD Commissioner William E. Evans (fact witness); BPD Superintendent Bernard O'Rourke (fact witness); Edward P. Callahan, Chief of the BPD's Bureau of Administration and Technology (fact witness); Jacinto Silva, Ph.D., an industrial organizational psychologist (expert witness); and Michael Campion, Ph.D., an industrial organizational psychologist (expert witness).

II.    **Proposed Findings Of Fact.**

    A.    **Civil Service Rules Extensively Regulate The Promotion Of Police Lieutenants.**

1.    The City is a "civil service" community, meaning that it has accepted the applicability of the civil service laws and rules of the Commonwealth of Massachusetts. (See Mass. Gen.  L. c. 31, §§ 1, 53-55.

2.      The purpose of the civil service system is "to guard against political considerations, favoritism and bias in governmental employment decisions." (<u>Town of Falmouth v. Civil Service Commission</u>, 447 Mass. 814, 824, 857 N.E. 2d 1052, 1059 (2006)).

3.      Underlying the civil service system is the concept of "basic merit principles," the definition of which includes "recruiting, selecting and advancing of employees on the basis of their relative ability, knowledge and skills." <u>See</u> Mass. Gen. L. c. 31, § 1.

4.      Under Chapter 31, "appointing authori[ties]" (defined in Mass. Gen. L. c. 31, § 1) must make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy." (<u>See Town of Falmouth v. Civil Service Commission</u>, 61 Mass. App. Ct. 794, 800, 814 N.E. 2d 735, 739 (2004).

5.      In a civil service community, "promotional appointments in police forces shall be made only after competitive examinations," with exceptions not applicable.  <u>See</u> Mass. Gen. L. Chapter 31, § 59.

6.      The Personnel Administrator of HRD is located within the Executive Office for Administration and Finance, and is responsible for, <u>inter alia</u>, "conduct[ing] examinations for purposes of establishing eligible lists." See Mass. Gen. L. c. 31, § 5(e).

7.      Under Personnel Administration Rules ("PAR.") prepared by HRD's Office of Legal Counsel, "[a]ll selection procedures shall be practical in character and shall relate directly to those matters which fairly determine the relative rankings of the persons examined based on the knowledge, abilities and skills required to perform the primary duties (actual and frequent tasks) of the position, title or occupational group as determined by reliable and representative job information available to the administrator." PAR 06(2)(a), available at http://www.mass.gov/Eoaf/docs/hrd/cs/publications/personneladministratorrulesforonline.doc.

8.     Mass. Gen. L. c. 31, Section 22 provides that "[i]n any competitive examination, an applicant shall be given credit for employment or experience in the position for which the examination is held."

9.     After marking and grading examinations, HRD prepares eligible lists of candidates. PAR 07.

10.     Mass. Gen. L. c 31, § 25, requires HRD to prepare an eligible list of candidates "in the order of their marks on the examination based upon which the list is established." Consistent with the statute, when an appointing authority seeks to fill a position, HRD's Personnel Administrator "shall, if a suitable eligible list exists, certify the names starting highest on such list in order of their places on such list, except as otherwise provided by law or civil service rules." PAR. 08(1); see Mass. Gen. L. c. 31, § 7.

11.     "The passing mark for each examination shall be established by the administrator in accordance with generally accepted selection procedures."  PAR 06(3).

12.     "When names have been certified to an appointing authority under PAR 08 and the number of promotional appointees actually to be made is $\underline{n}$, the appointing authority may appoint only from among the first 2n+1 persons named in the certification willing to accept appointment." PAR 09(1); see Mass. Gen. L. c. 31, §§ 7, 27.  Thus, if a city needs to fill one lieutenant slot it gets back from HRD a list of the three highest scoring candidates on the eligibility list.

13.     "If an appointing authority makes [a]…promotional appointment from a certification of any qualified person other than the qualified person whose names appear highest, and the person whose name is highest is willing to accept such appointment, the appointing authority shall immediately file with the [personnel] administrator a written statement of his

4

reasons for appointing the person whose name was not highest." Mass. Gen. L., c. 31, § 27; <u>see</u> also PAR 08(4), (5); 09 (2)).

14.    Applicants who are bypassed, i.e., not selected despite having a higher rank than another applicant, can appeal to the Civil Service Commission, which must decide "whether the Appointing Authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority." <u>See</u> <u>City of Cambridge v. Civil Service Commission</u>, 43 Mass. App. Ct. 300, 304, <u>rev</u>. <u>denied</u>, 426 Mass. 1102 (1997).

15.    Promotional examinations administered by HRD include an education and experience component, which "shall be based on a schedule approved by the administrator which shall include credits for elements of training and experiences related to the position for which the examination is held." PAR 06(1)(b); Mass. Gen. L. c. 31, § 22.

16.    Candidates may appeal to HRD numerous issues pertaining to an examination, including "whether an examination…was a fair test of the applicant's fitness actually to perform the primary or dominant duties of the position for which the examination was held…" Mass. Gen. L. c. 31, § 22.

17.    Chapter 31 provides preferences for certain groups, such as military veterans and children of police officers who died in the line of duty. (See <u>Quinn v. City of Boston</u>, 325 F. 3d 18, 25 (1st Cir. 2003), citing Mass. Gen. L. c. 31, §§ 26, 40.  See also, http://www.mass.gov/?pageID=veteransterminal&L=3&L0=Home&L1=Returning+Veterans&L2=Welcome+Home+Guide%2C+3rd+Edition&sid=Eveterans&b=terminalcontent&f=wh_civilservice&csid=Eveterans, stating that in the promotional setting, a military veteran has "two points added to [his or her] score.").

18.     Municipalities may elect to use the examination prepared annually by HRD, or may conduct their own sergeant promotional examination pursuant to a delegation agreement between HRD and the municipality.  See Mass. Gen. L. c. 31, §§ 9-11.

19.     With respect to the 2005 and 2008 lieutenants promotional examinations at issue, the City opted to use exams prepared and administered by HRD.

**B.    Plaintiffs Have No Viable Claim As To The 2005 Exam.**

20.     Only one of the eight current Plaintiffs, Paul M. Joseph, took the 2005 examination.  The seven remaining current Plaintiffs have no standing or legal right to raise claims against the City with respect to an examination they did not take.

21.     Joseph (who took both the 2005 and 2008 exams) did not file a timely EEOC/MCAD charge with respect to the 2005 exam.  Joseph filed his sole charge of discrimination on March 9, 2010 – well over 300 days after October 24, 2008, the date the City last used the 2005 lieutenants exam results in making a promotion decision, and, therefore the latest date on which the 300-day statute of limitations for discrimination claims based on the 2005 exam began to run.  See 42 U.S.C. § 2000e-5(e)(1); M.G.L. c. 151B, § 5; Lewis v. City of Chicago, 560 U.S. 205, 130 S. Ct. 2191 (2010).

22.     Thus, no current Plaintiff has standing or other legal right to raise any discrimination claim concerning the 2005 examination.

**C.    Those Plaintiffs Promoted To Lieutenant Have No Viable Claim For Disparate Impact Discrimination.**

23.     Based on the results of the 2008 lieutenants promotional examination, Plaintiffs Leighton Facey and Marwan Moss were promoted to the position of lieutenant, on August 23, 2013 and November 8, 2014, respectively.

24.     Given that Plaintiffs Facey and Moss have secured the position that the 2008 exam allegedly prevented them from obtaining, <u>see</u> Second Amended Complaint (Doc. #14) at ¶¶ 20, 26-29, the City cannot be held liable to them on a disparate impact discrimination theory.

**D.      Neither The 2005 Nor 2008 Exam Results Show Disparate Impact Based On Race.**

**1.      The 2005 Exam.**

25.     A total of 127 candidates were administered the 2005 lieutenants promotional written test, 104 of which were white, 22 black and one Hispanic.

26.     A total of 27 candidates were promoted based on their written test scores and education and training scores – 25 whites, one black and one Hispanic.

27.     In measuring the statistical significance of small samples such as the one from 2005, the two-tailed Fisher Exact Test should be employed because it provides the most accurate estimate of statistical significance.  <u>See generally</u> <u>Palmer v. Schultz</u>, 815 F.2d 84, 95-96 (D.C. Cir. 1987).

28.     Applying the two-tailed Fisher Exact Test to examine the promotion disparate impact on minorities based on the 2005 promotion examination yields a 0.158 Probability Value ("p-value") and a 1.41 Standard Deviation Value.

29.     These values indicate that one cannot statistically conclude that minorities and whites were promoted at different rates. One would need a Probability Value below 0.05 to conclude statistically that a difference existed in the promotion rates between the minority and white populations. The 0.05 level is the standard that the vast majority of courts (including the First Circuit), statisticians and other scientists find acceptable for this type of decision.  <u>See generally</u> <u>Jones v. City of Boston</u>, 752 F.3d 38, 43-44 (1st Cir. 2014).

30.    The Standard Deviation Value is also used to measure statistical significance. When courts and statisticians use the Standard Deviation Value instead of the Probability Value in determining the existence of adverse impact, they usually require a Standard Deviation Value of 1.96 (which corresponds to a 0.05 Probability Value) or more.  The Standard Deviation Value for the 2005 exam promotions was 1.41 – well below the required minimum 1.96 to conclude that a difference exists in the promotion rates between minorities and whites.  See generally Jones v. City of Boston, 752 F.3d 38, 43-44 (1st Cir. 2014).

31.    When applied to statistically small samples – such as the 2005 exam – the four-fifths rule has a very high error rate.  The error rate can be very accurately estimated for a specific sample using the "Monte Carlo simulation," a statistical analysis tool.  The results from the Monte Carlo simulation based on the 2005 data show that in about eight out of ten times (78%) one would erroneously conclude that adverse impact existed against either white or minority test takers and that in about four out of ten times (43%) one would erroneously conclude that adverse impact existed against minorities.  Well above the generally accepted 5% error rate, the four-fifths rule is not a fair determinant of whether white and minority promotion rates differed in 2005.

32.    Using the number of days between promotions to determine the impact of date promoted on ethnic minorities is not the appropriate way to examine this issue because the number of days between promotions is not a function of the test, it is a function of when the positions open up.  The test is only responsible for the order in which the promotions are made. Instead, the number of days between promotions are (at most) useful only in determining damages if liability is found.

33.    Where (as in 2005) there are ties in the rank order of the promotions, the most appropriate test is the two-sample, two-tailed Kolmogorov-Smirnov test, which measures the probability that the two distributions of promotion rank order are equal to one another.  In using the Kolmogorov-Smirnov test, a Probability Value of 0.05 (five percent) indicates that there is a 5% chance that the two promotion rank order distributions are equal.  The result of the Kolmogorov-Smirnov test on the 2005 promotions was a Probability Value of 0.36, indicating that no measurable difference exists in the promotion rank order between whites and minorities for the promotions made based on 2005 exam.

34.    Plaintiffs cannot establish "statistical significance" for disparate impact based on the results of the 2005 examination.

**2.    The 2008 Exam.**

35.    A total of 91 candidates were administered the 2008 written test, 65 of whom were white, 25 black and one Hispanic.

36.    A total of 33 candidates were promoted based on their written test scores and education and training scores, 28 of whom were white and five black.

37.    Using the two-tailed Fisher Exact Test on the 2008 exam data yields a 0.052 Probability Value (which is greater than the 0.05 cutoff) and a 1.94 Standard Deviation Value (which is less than the 1.96 cutoff).  Based on these results, one cannot statistically conclude that minorities and whites were promoted at different rates on the basis of the 2008 exam.

38.    With respect to the four-fifths rule, the results from the Monte Carlo simulation based on the 2008 data show that about one-third of the time (34%) one would erroneously conclude that adverse impact existed against either white or minority test takers and that about two out of ten times (18%) one would erroneously conclude that adverse impact existed against

minorities.  Well above the generally accepted 5% error rate, the four-fifths rule is not a fair determinant of whether promotion rates of whites and minorities differed in 2008.

39.    With respect to promotion rank order based on the 2008 exam, the Kolmogorov-Smirnov test resulted in Probability Value of 0.06 – above the 5% cut-off – indicating that no measurable difference exists in the promotion rank order between whites and minorities for the promotions made.

40.    Plaintiffs cannot establish "statistical significance" for disparate impact based on the results of the 2008 examination.

41.    Aggregating the candidate scores across the 2005 and 2008 exams and computing adverse impact on the combined data set is not a statistically appropriate way to measure adverse impact.  First of all, Plaintiffs have no viable claim as to the 2005 exam, numerous people took both the 2005 and 2008 exams, and there is no statistically significance to the promotion rates by race for either the 2005 and 2008 exams – making the combining of their data inappropriate.  In addition, such aggregation of data produces problems associated with "Simpson Paradox" – where the aggregation of data sets produces misleading results especially when the pass rates and exam sizes differ between the two exams.  Thus, and just as Judge O'Toole found in the Lopez case, there should not be any aggregation of two sets of separate exam results for purposes of attempting to show adverse impact in this case.

42.    While an average exam score difference can be an indicator that adverse impact will occur or not occur during the promotion process, it is not, by itself, an indicator of adverse impact.  A large difference in average scores may or may not lead to adverse impact depending on the number of promotions and the positioning of candidates by ethnicity within the score range from which the promotions will be made, whereas a lack of difference in average scores

between ethnic groups also does not guarantee a lack of adverse impact when promotions are made.

43.    Of those not promoted based on the 2005 exam, minorities retested at a 48% (10/21) to 50% (10/20) rate in 2008 while whites retested at only a 28% (22/79 or 22/78) rate in 2008.  Performance on the 2005 exam thus had no chilling effect on future minority participation in the 2008 promotion exam.

   **E.    The 2005 And 2008 Exams Are Job-Related And Consistent With Business Necessity.**

44.    Industrial organizational psychologists refer to a selection instrument that is job related and consistent with business necessity as one that is "valid" for the selection process. The proper procedures for validating employment tests are highly developed in the field of Industrial and Organizational Psychology and are sufficiently agreed upon such that they are documented in government and professional guidelines, specifically, The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 *et seq*. ("Uniform Guidelines"), and the Principles for the Validation and Use of Personnel Selection Procedures, Society for Industrial and Organizational Psychology (4th ed. 2003) (available at http://www.siop.org/_principles/ principles.pdf) ("Principles").

45.    One way to show an exam's validity is through "content validation," where the exam is shown to be a representative sample or simulation of important behaviors, aspects, or products on the job, or otherwise a direct linkage is demonstrated between the content of the exam and important work behaviors, activities, worker requirements, or outcomes on the job. See Uniform Guidelines at §§ 1607.5(B) and 1607.14(C)(4); Principles at 21.

46.    When the selection procedure measures a knowledge, skill, or ability (KSA) that can be clearly operationally defined, the KSA is an essential prerequisite to important work

behaviors or successful job performance, and the procedure is a representative measure of the KSA. The Uniform Guidelines and the Principles identify a number of conditions that must be met in order to demonstrate content validity, as well as a number of other recommendations that bear on the topic of content validation, but are not necessarily essential.

47.     As detailed in the expert report of Michael A. Campion, Ph. D., the 2005 and 2008 lieutenant promotional exams meet the conditions and recommendations identified by the Uniform Guidelines and the Principles in order to demonstrate content validity.

**1.     The Exams Are Content Valid Under The Uniform Guidelines.**

48.     With respect to the Uniform Guidelines, the exams are content valid because:

a.     The exams measure a representative sample of the KSAs necessary to successful job performance (§ 1607.14(C)(4)) through clearly defined by job analyses (see 1991 Validation Report (Lopez Exh. 40) at 105-06; 2000 Job Analysis Report at 576-59), specific knowledge sources (see BPD Source Compilation by KSA (2008) (with details); Reading List Announcement; Test Outlines (2008); Reading List Announcement (2005); Suggested Reading List (2005); and Suggested Reading List Special Orders"), subject matter expert ("SME") confirmation that KSAs tested were "necessary prerequisites" to the job (1991 Validation Report (Lopez Exh. 40) at 9-10; 2000 Job Analysis Report at 48-49, and exam questions that came directly from sources that document the knowledge base that governs police work. The exams measure a large portion of that knowledge base as evidenced by the number of questions on the examinations (100), the number of topics covered (13), and the number of tasks and knowledge areas linked to the exams. 1991 Validation Report (Lopez Exh. 40) at 102-08.

b.     The exams do not measure KSAs that will be learned after a brief period on the job (§§ 1607.5(F) and 1607.14(C)(1)) because both the relevant job analyses collected

ratings from incumbents to ensure that the exams only measured knowledge needed at the time of hire. 1991 Validation Report (Lopez Exh. 40) at 10; 2000 Job Analysis Report at 48-49.

       c.    The exams are based directly on job analyses of the work behaviors and tasks and their relative importance (§ 1607.14(C)(2)). The 1991 Validation Report (Lopez Exh. 40) and the 2000 Job Analysis Report both describe the job behaviors and tasks in great detail, used SMEs to identify the important tasks used to define the job requirements, explained the content of KSAs in terms of declarative or procedural knowledge and work tasks, described extensive linkage analyses between tasks and KSAs through SMEs and social scientists, described the work setting, and describe the complexity or difficulty level of the KSAs.

       d.    The exams measure work behaviors constituting important parts of the job (§ 1607.14(C)(8)) through the job analyses' descriptions of how the most important tasks and KSAs were selected to define the job (the 1991 Validation Report (Lopez Exh. 40 and the 2000 Job Analysis Report).

       e.    The exams measure KSAs that can be operationally defined and are necessary prerequisites to the performance of important work behavior (§ 1607.14(c)(4)) because the job analyses' knowledge statements described declarative and procedural knowledge that is learned from a range of police documents, the knowledge was determined to be important and needed at time of entry to the job, and the knowledge statements were linked to the job tasks by SMEs (1991 Validation Report (Lopez Exh. 40 and the 2000 Job Analysis Report).

       f.    The exams are measurable as reliable using statistical estimates (§ 1607.14(C)(5)) in that the Internal Consistency Reliability – the appropriate reliability estimate for a multiple-choice exam – was determined to be .79 (1991 Validation Report (Lopez Exh. 40) at 134), well above the minimally acceptable level of .6 or .7. Although the specific reliability

was not reported for the 2005 and 2008 exams, it is very likely to be comparable since the exams were highly similar in terms of the content and number of items, which are the primary determinants of this type of reliability.

       g.    The exams are based on job analyses showing that a higher score is likely to result in higher job performance or that the procedure measures aspects that differentiate among levels of job performance (§ 1607.14(C)(9)) in that the 2000 job analysis collected ratings on the extent to which the KSAs both differentiated performance and were required to perform effectively (2000 Job Analysis Report at 48-49), and only those meeting both criteria were used to develop the exam.

    49.    Thus, both the 2005 and 2008 lieutenant promotional exams meet the Uniform Guidelines' conditions for content validity.

### 2.    The Exams Are Content Valid Under The Principles.

    50.    The exams are content valid under the Principles for the Validation and Use of Personnel Selection Procedures ("Principles") because:

       a.    The job content sampled is clearly defined (Principles at 20) in that: 1) the job analyses exhaustively identified the tasks and KSAs (see the 1991 Job Analysis, Lopez Exh. 40 at 8-10) (describing 136 tasks and 187 KSAs); 2000 Job Analysis at 14, 49 (describing 302 tasks and 149 KSAs)); 2) all knowledge areas were linked to the exams (1991 Validation Report (Lopez Exh. 40) at 104-08); 3) the knowledge areas excluded were judged as not important or not needed at time of entry to the job (1991 Validation Report (Lopez Exh. 40) at 8; 2000 Job Analysis Report at 13-14); 4) the knowledge was described by statements that explained them and linked them to job tasks (1991 Validation Report (Lopez Exh. 40) at 104-08; 2000 Job Analysis Report at 57-59); and 5) the knowledge required was converted into test outlines to

guide the development of the exams and communicate their content to candidates so they could

prepare.  BPD Source Compilation by KSA (2008) (with details), Reading List Announcement,

Test Outlines (2008), Reading List Announcement (2005), Suggested Reading List (2005), and

Suggested Reading List Special Orders.

        b.      Job content domains were defined on the basis of accurate and thorough

information about the job, including both tasks and KSAs, based on the judgments of informed

persons (Principles at 21) because both job analyses collected extensive information on tasks and

KSAs (136 tasks and 187 KSAs in 1991 and 302 tasks and 149 KSA in 2000 as cited above), and

were based on the judgment of informed persons (samples of 824 and 681 job incumbents

representative of the various jurisdictions in 1991 (9-10) and 12 subject matter experts in 2000

(10).

        c.      Careful job analyses were conducted (Principles at 5) in both 1991 and

2000, and the sources for job analysis information were credible (Principles at 5) in that they

were based on existing information on the jobs (e.g., job descriptions), surveys of other

jurisdictions, past job analyses, reviews of the literature, surveys of incumbents, reviews and

linkages by subject matter experts, all of which are highly credible sources of information about

the job.

        d.      Scales to evaluate tasks and KSAs have reasonable psychometric

properties (Principles at 5) because the large samples of incumbents (824 for the task survey and

681 for the KSA survey) in the 1991 Validation Report will ensure highly reliable data and

because the 2000 Job Analysis (at 14 and 49) used the Content Validity Ratio to ensure that the

agreement among the SMEs is statistically significant and eliminate any lack of consensus

issues.

e.    The job analyses collected extensive information on the KSAs required to perform the tasks (Principles) – 187 KSAs in the 1991 Validation Report and 149 KSAs in the 2000 Job Analysis.

f.    The choice of job analysis methods was based on the objectives and constraints of the situation (Principles at 6) in that starting the job analysis by collecting background information on the jobs makes sense when the jobs are well established, conducting surveys of incumbents makes sense to get input from a large sample to ensure that any differences that exist within the job are captured, using SMEs in a rating panel rather than using another broad survey in 2000 made sense because the goal was to confirm the earlier job analysis findings rather than start from scratch, including critical incident focus groups in the 1991 Validation Report made sense to capture additional insights into the job to create the initial exams, and so on.

g.    Job content domains were defined in terms of what an employee needs to do or know without training or experience on the job (Principles at 22) because both job analyses evaluated KSAs as to whether they were needed at entry to the job and then based the exams only on those KSAs.  1991 Validation Report (Lopez Exh. 40) at 9-10; 2000 Job Analysis Report at 48-49.

h.    The job content domain were restricted to critical or frequent activities or to prerequisite KSAs, and irrelevant sources of variance should be minimized (Principles at 22) because the exams were based on only the important knowledge areas, which also helped prevent measuring any irrelevant sources of variance in the form of other unimportant KSAs.  Moreover, the influence of reading level was examined to ensure that it matched the job and was not an irrelevant source of variance, i.e., not too high.  1991 Validation Report (Lopez Exh. 40) at 98.

i.      The exams have appropriate measurement properties (Principles at 23) because reliability was examined in the 1991 Validation Report (at 134) and determined to be adequate (.79).  Also, the 1991 Validation Report reported an item analysis that involved confirming the correct answers (scoring keys), examining items that were too difficult, making sure distractor answers were clearly incorrect, going back and reconfirming answers with the source documents as necessary, responding to candidate complaints about specific questions, and making any necessary changes to the scoring (p. 80).  The item analysis process after the exam ensures that any poor quality questions do not hurt candidate scores.

j.      The SMEs involved were qualified (Principles at 24), as when they were used, their credentials were documented.  1991 Validation Report (Lopez Exh. 40) at 103; 2000 Job Analysis Report at 12.

k.      Candidates were provided test orientation information (Principles at 55) in the form of detailed reading lists (Reading List Announcement, Test Outlines (2008) and Reading List Announcement (2005)) and consultants to provide tutoring for interested candidates (see Lopez Decision at 34).

51.     Thus, both the 2005 and 2008 lieutenant promotional exams meet the Principles' conditions for content validity.

### 3.      The 1991 And 2000 Job Analyses Are Sufficiently Current.

52.     The job analysis conducted in 1991 and updated in 2000 were used to develop the 2005 and 2008 exams and were thus 5 to 8 years old at the time.  Although rules-of-thumb for how often a job analysis should be updated are often quoted that range from 5 to 10 years, there are no professional or government standards or any credible scientific research on this issue.  It all depends on whether the jobs have changed in any meaningful way.

53.    The lieutenants job at issue has involved some slight modification due to new technology (i.e., computerization), but the fundamental tasks and KSAs of the job have not changed significantly over this time period.  Indeed, the BPD's basic job description for the position of police lieutenant has not changed since 1979.  <u>See</u> BPD Rule 105.

54.    Moreover, the 1991 and 2000 job analyses show few if any changes to the core knowledge requirements at time of entry.  Furthermore, before the exams, the currency of the job analysis information was confirmed by having groups of subject matter experts formally review and rate the task and KSA lists.  BPD Lieutenant Task Ratings (2008); BPD KSA Ratings (2008).  Finally, the documents upon which the exams were developed were the latest versions as of the time of the exams, and candidates were given explicit instructions as to which versions of each document to read (<u>see</u> 2008 State Exam Reading List).  The knowledge measured by the exams was the most current knowledge at the time.

**4.    Best Practices In Test Development Were Used In Creating The Exams.**

55.    The 2005 and 2008 exams were developed using the best practices in test development because:

a.    HRD conducted an analysis of the job in 1991, supplemented and updated by the City in 2000, that identifies the tasks and the KSAs, including measures of their importance and performance at time of entry to the position, so that the hiring requirements were defined in detail;

b.    HRD evaluated alternative test methods that would most validly measure the KSAs needed at time of hire and provided many good reasons for using a written exam (1991 Validation Report (<u>Lopez</u> Ex. 40) at 15; 17 and Appendix EE);

c.    HRD converted the job analysis results into a test plan to ensure a direct

and strong relationship between the job analysis and the exam (State Exam Outline 2005; Boston

Exam Outline 2005; Tables and Exam Outlines (2005); 2008 State Exam Outline; 2008 BPD

Outline); 1991 Validation Report (Lopez Exh. 40) at 76-77);

       d.     HRD created the exam items following good item-writing procedures, as

described in Appendix JJ to the 1991 Validation Report describes the guidelines followed for

writing the test items;

       e.     HRD conducted confirmatory validation analyses involving the judgment

of SMEs and results in selection and/or improvement of test items based on relevant factors (e.g.,

importance, accuracy, difficulty, edits for clarity, etc.) (see 1991 Validation Report (Lopez Exh.

40) at 102-08) and confirmed again for the 2005 exam (see SMEs' Review of Test Items (2005)

and 2005 Boston Promo Items SME Review) and the 2008 exam (see Test Outlines (2008);

       f.     HRD conducted statistical analyses to ensure the quality of the test scores

by way of an item analysis (1991 Validation Report (Lopez Exh. 40) at 80) to ensure that any

poor quality questions did not hurt candidate scores, a reliability analysis, which was found to be

adequate (Id. at 134), an adverse impact examination to evaluate items that might be more

difficult for minorities, an assessment of potential cultural bias (Id. at 82-89), and an analysis of

the reading level of the exam to ensure that it matched the job and was not more difficult (Id. at

98);

       g.     HRD recommended the proper administration of the test (e.g., mode of

testing, testing conditions, time limits, etc.) and the use of the test scores for decision making

(e.g., cut scores, ranking, bands, weighting, etc.) that considers the context (e.g., needs of the

organization, number of candidates and openings, adverse impact, etc.) (see 1991 Validation

Report (Lopez Exh. 40) at 101, 133, 134) and Mas. Gen L. c. 31 re: police promotion

requirements, including competitive examinations and rank-order listing).

56.    Thus, the 2005 and 2008 lieutenant exams were created in accordance with the best practices in test development.  (Lopez decision of Judge O'Toole).

57.    The positions of BPD sergeant and lieutenant are very similar in terms of the KSA's and tasks necessary to perform the job.  See Appendix R to the 1991 Validation Report (Lopez Exh. 41) (noting 62 knowledge areas needed at the time of entry to the positions in common between sergeants and lieutenants, and lieutenants require 10 additional knowledge areas); Table 8 of 2000 Job Analyses for Sergeant and Lieutenant (showing 42 of the knowledge requirements for each job were identical or highly similar, and the lieutenant job included about 12 additional knowledge requirements, only five of which that logically differ between the jobs). See also, Occupational Information Network ("O*NET") (found at http://www.onetonline. org/) (treating both sergeant and lieutenant as alternative job titles of the same occupation ("First-Line Supervisors of Police and Detectives," occupational code 33-1012.00)).

58.    Furthermore, the 2005 and 2008 lieutenant exam has the same first 80 items as the sergeant exam, but also includes 20 additional items – 10 or 11 items on police administration and management and 10 or 9 additional items on the common category of police supervision. 1991 Validation Report (Lopez Exh. 40) at 76-77; 2008 State Exam Outline.

59.    Thus, while there are some slight differences in the knowledge requirements of the jobs, this does not threaten the validity of the exams as found for the sergeants exams in the Lopez case.  They are highly similar exams for highly similar jobs developed based on the exact same job analysis, test development, and validation procedures.  There are no meaningful additional skill or ability requirements of the lieutenant job that would suggest the need for different or additional selection procedures to those upheld in Lopez.

**F.    Plaintiffs Have Identified No Available Equally Valid, Less Discriminatory Alternative That the City Refused To Use.**

60.    Plaintiffs have not and cannot show that there was a particular alternative selection method available to the City in 2005 and 2008 that would have reduced adverse impact on minorities candidates for promotion to lieutenant in the BPD.

61.    Job knowledge examinations are generally valid for purposes of making promotions from police sergeant to lieutenant.  The use of a job knowledge exam is perhaps the most common process used in police promotions and the City's use of this process is consistent with the practices of other cities.

62.    The 2005 and 2008 exams at issue are made up of more than a written test, include a rating of experience and education, which accounts for 20% of a candidates' final score.

63.    Municipalities often add "assessment center" components to the overall selection method that have the same validity as written job knowledge tests – that is, methods that select the better qualified applicants for promotion over lesser qualified – but have a lesser adverse impact on minority candidates in the aggregate.  Assessment centers components can include oral interviews, role-playing exercises, writing samples, in-basket exercises, and group exercises.

64.    Assessment centers are generally used only as a supplement to, rather, than a substitute for, written job knowledge exams because: 1) civil service regimes – like Massachusetts' – general require public employer to use written exams as a merit selection tool, see Mass. Gen. L. c. 31, § 59; 2) of the many of the KSAs required for the job, written knowledge tests are highly valid and thus the preferred to other possible ways of assessing those KDAs; and 3) assessment center exercises can require considerably more resources to administer, including both money and personnel, and thus are cumbersome and expensive

21

making the practicality of their use inversely proportionate to the number of job candidates to be assessed.

65.    In 2002, the City, through a delegation agreement with HRD, created its own lieutenants' promotional exam (along with sergeants and lieutenants), which included, in additional to a multiple choice test, many of the "assessment center" type tests Plaintiffs claim should have been used to reduce adverse impact in 2005 and 2008.

66.    The City spent more than $1.2 million to develop and administer the 2002 promotional results for sergeant, lieutenant and captain.  In addition other expenses included transporting, housing and training a substantial number of police officials from around the country who acted as assessors for the assessment center exercises.

67.    Based on the results of the 2002 examination process, the City promoted 26 candidates to lieutenant, consisting of 21 whites, 3 Hispanics, 1 black and 1 Asian.  Thus, even with the inclusion of the assessment center in the 2002 exam results, there remained a substantial difference in the promotion rates of minority and non-minority candidates.

68.    When the 2005 and 2008 exams were being contemplated, BPD was operating under budgetary constraints.  The BPD adopted various measures to deal with its budget issues, including offers of early retirement as a means to avoid the necessity of layoffs of younger officers and the reduction or elimination of various programs, including its cadet and mounted unit programs.  In both 2005 and 2008 there were no funds available for the City to administer exams with assessment centers.

69.    The failure to 2002 exam to result in material improvement in minority lieutenant promotions made it doubtful that similar efforts would have had greater success in 2005 or 2008.

70.    Plaintiffs have not and cannot offer any evidence that repeating the 2002

experiment in 2005 or 2008 would have been equally valid a test and likely have reduced adverse impact and increased minority promotions.

III.    **Proposed Conclusions Of Law.**

Within the context of the legal framework for disparate impact discrimination cases set out above (see pp. 1-2), the City proposes that court reach conclusions of law in this matter as follows:

1.    Plaintiffs have no viable claim for disparate impact discrimination based on the results of the 2005 lieutenants promotional examination.  See 42 U.S.C. § 2000e-5(e)(1); M.G.L. c. 151B, § 5; Lewis v. City of Chicago, 560 U.S. 205, 130 S. Ct. 2191 (2010).

2.    Plaintiffs Facey and Moss, having been promoted to the position of lieutenant based the results of the 2008 promotional exam, have no viable claim for disparate impact discrimination based on the 2008 exam.

3.    The case of Jones v. City of Boston, 752 F.3d 38 (1st Cir. 2014), governs whether Plaintiffs can meet their initial burden of proving that any seeming disparate impact in test results based upon race is "statistically significant."  See Id. at 38, 43-44.  See also, Ricci v. DeStefano, 557 U.S. 557, 587 (2009) (a *prima facie* showing of disparate impact is "essentially a threshold showing of a significant statistical disparity.").  Under Jones, to establish "statistical significance" in a disparate impact case, Plaintiffs must use the two-tailed Fisher Exact Test to show that the probability that any seeming racial disparity in test results was achieved by chance is less than five-percent – that is, a probability value of less than 0.05 (or five percent) or a standard deviation value (a statistical concept directly related to p-value) of greater than 1.96. Jones, 752 F.3d at 43-44 & 47 & n. 9 (collecting and citing cases).

23

4.      Applying the two-tailed Fisher Exact Test to examine the promotion disparate impact on minorities based on the 2005 exam yields a 0.158 Probability Value (above the .05 cutoff) and a 1.41 Standard Deviation Value (below of 1.96 cutoff).  Applying the two-tailed Fisher Exact Test to examine the promotion disparate impact on minorities based on the 2008 exam yields a Probability Value of 0.052  (above the .05 cutoff) and a standard deviation of 1.94 (below the 1.96 cutoff).  Thus, under Jones, Plaintiffs' claims about the 2005 and 2008 exams fail because the alleged disparate impact is not statistically significant.

5.      The Jones Court rejected the use of the four-fifths rule as a method of proving or disproving disparate impact in the First Circuit.  See Jones, 752 F.3d at 51-52 & n.16.

6.      The 2005 and 2008 exams are job related and consistent with business necessity (i.e., "valid") under the Uniform Guidelines' standards for content validity.  See 29 CFR § 1607.14(c)(1)-(9).  "At minimum, to demonstrate content validity an employer must show that its testing procedures accurately test important skills at a level commensurate with that legitimately required by the job." Legault v. aRusso, 842 F. Supp. 1479, 1488 (D. N.H. 1994).  "This type of demonstration necessarily begins with a thorough job analysis in which the employer breaks down the job into its component tasks, breaks those tasks down into a set of component skills, and then determines the relative importance of those skills and the degree of performing required in each. The employer must then demonstrate that its procedures accurately and reasonably test the skills identified in the job analysis in accordance with their relative importance." Id. (citation omitted).

7.      The 2005 and 2008 lieutenant promotional exams administered by HRD for BPD met these standards.  HRD conducted a comprehensive job analysis for the lieutenant position in 1991, identifying the requisite KSAs for the position. Further, HRD linked these KSAs to the

two components of the exam (written test, Education & Experience), and ensured that the test plan addressed a representative sample of the KSAs identified.  Following HRD's 1991 job analysis and validation report, the City retained the consulting firm of MMI to conduct a further job analysis for lieutenants, and to prepare a promotional exam, administered in 2002.  In preparation for that exam, MMI analyzed the lieutenant position, and identified numerous KSAs for the position.

8.    In preparing the lieutenant promotional exams administered in the City in 2005 and 2008, HRD utilized SMEs to ensure that the prior job analyses were up to date, and to ensure that the test plan and test questions measured a representative sample of KSAs.  Likewise, the E&E component of the 2005 and 2008 exams, which is required by state statute and predated the 1991 validation study, was validated as part of the 1991 process. At that time, SMEs reviewed and updated the component parts of the E&E. Moreover, specific KSAs were linked (in a "Testability Analysis") to the E&E as identified in the analysis.

9.    Finally, Plaintiffs cannot show that an equally valid, less discriminatory method for selection was available, and that the City failed to use it.  42 U.S.C. §2000e-2(k)(1)(A)(ii). "[T]he statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it." Adams v. City of Chicago, 469 F. 3d 609, 613 (7th Cir. 2006), cert. denied, 550 U.S. 919 (2007) (citations omitted).  Plaintiffs must further "demonstrate that [the employer] 'refuse[d] to adopt such alternative employment practice.'" Id. (citations omitted). In other words, Plaintiffs are "required to specify an alternative, prove that the alternative was equally valid and prove that the alternative was less discriminatory." Allen v. City of Chicago, 351 F. 3d 306, 316 (7th Cir. 2003).

10.    In deciding which selection procedure to use, "[a]n employer is not required to choose the selection device with the least adverse impact on minority applicants." Clady v. County of Los Angeles, 770 F. 2d at 1432. "That requirement would prohibit any exam with any disparate racial impact because random selection would always be a procedure with less adverse impact." Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York, 630 F. 2d 79, 110 (2nd Cir. 1980), cert. denied, 452 U.S. 940 (1981). Indeed, an employer is "justified in making a prudential judgment based on its prior experience" with alternate procedures. Allen, 351 F. 3d at 314.

11.    "[F]actors such as cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals." Watson v. Forth Worth Bank and Trust, 487 U.S. 977, 998 (1988). Accord, Nash, 895 F. Supp. at 1552 (plaintiffs must establish existence of "an alternative selection device which has equal validity and less adverse impact and does not have a burden upon the City in terms of greatly increased costs") (emphasis added).

12.    Plaintiffs have not and cannot show that the City should have utilized a selection procedure that would have resulted in reduced adverse impact. No such procedure has been or can be identified.

13.    Furthermore, due to civil service laws and the applicable collective bargaining agreement, the City is severely restricted in the types of alternative selection procedures that it could adopt for a lieutenants promotional exam. Plaintiffs, who have the burden of identifying such a procedure that the City refused to adopt, has not and cannot set forth what procedure the City should have followed, despite these restrictions.

14.     The City spent more than $1.2 million to create a lieutenants' promotional exam (along with exams for sergeants and captains), which included, in additional to a multiple choice test, many of the "assessment center" type tests Plaintiffs claim should have been used to reduce adverse impact in 2005 and 2008.

15.     Even with the inclusion of the assessment center in the 2002 exam results, there remained a substantial difference in the promotion rates of black and white candidates.

16.     In both 2005 and 2008 there were no funds available for the City to administer exams with assessment centers.  Furthermore, the failure to 2002 exam to result in material improvement in minority lieutenant promotions made it doubtful that similar efforts would have had greater success in 2005 or 2008.

17.     Plaintiffs have not and cannot offer any evidence that the inclusion of an assessment center type components to the 2005 and 2008 exams would have resulted in an equally valid exam that was likely to have reduced adverse impact and increased minority promotions.

**IV**.     **Conclusion.**

Based on the City's proposed findings of fact and conclusions of law, the Court should enter an order concluding that Plaintiffs have failed to prove their claims of disparate impact discrimination under 42 U.S.C. § 2000e-2(k) and enter judgment in favor of the City.

Respectfully submitted,

CITY OF BOSTON,

By its attorneys,


/s/Kay H. Hodge
Kay H. Hodge (BBO # 236560)            Amy E. Ambarik, BBO#637348
John M. Simon (BBO#645557)             Nicole I. Taub, BBO#663517
Stoneman, Chandler & Miller LLP        Boston Police Department
99 High Street                         Office of the Legal Advisor
Boston, MA 02110                       One Schroeder Plaza
(617) 542-6789                         Boston, MA 02120
khodge@scmllp.com                      (617) 343-4550
jsimon@scmllp.com                      AmbarikA.bpd@cityofboston.gov
                                       TaubN.bpd@cityofboston.gov

Dated:  December 12, 2014



                         Certificate of Service

        I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and that paper copies will be sent by first class mail, postage prepaid, to those indicated as non-
registered participants on December 12, 2014.


                              /s/John M. Simon
                              John M. Simon