## Page 1

```
1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

            Civil Action No.:  12-10291-WGY
3
4   BRUCE SMITH, PAUL JOSEPH,
    JOHN M. JOHNSON, ROBERT TINKER,
5   MARTIN JOSEPH, KIM GADDY,
    BRIAN KEITH LATSON, MARWAN MOSS,
6   LEIGHTON FACEY, and LATEISHA ADAMS,
7                    Plaintiff,
8       v.
9   CITY OF BOSTON, MASSACHUSETTS,
10                   Defendant.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11
12
                   DEPOSITION OF
13
            JACINTO M. SILVA, Ph.D.
14
        TAKEN ON BEHALF OF THE PLAINTIFFS
15
16
17   DATE TAKEN:    Thursday, December 11, 2014
18   TIME:          1:03 p.m. - 4:02 p.m.
19   LOCATION:      Esquire Deposition Solutions
                    44 West Flagler Street
20                  Suite 1400
                    Miami, Florida
21
        PAGES:      1-117
22
23
24
              Reported By:
25       Tamra K. Piderit, FPR, RDR, CRR, CLR
```

## Page 2

```
1   APPEARANCES OF COUNSEL
2
    ON BEHALF OF THE PLAINTIFFS:
3
        FAIR WORK, P.C.
4       BY:  Stephen Churchill, Esquire
        192 South Street
5       Suite 450
        Boston, Massachusetts 02111
6       617.607.3262
        steve@fairworklaw.com
7
8
9   ON BEHALF OF THE DEFENDANT:
10      STONEMAN, CHANDLER & MILLER LLP
        BY:  Geoffrey R. Bok, Esquire
11      99 High Street
        Boston, Massachusetts 02110
12      617.542.6789
        617.556.8989 Fax
13      gbok@scmllp.com
14
15
16
17   ALSO PRESENT:
18   Joel Wiesen, Plaintiff's Expert (Via telephone)
19
20
21
22
23
24
25
```

## Page 3

```
1              INDEX OF EXAMINATION
2
    TESTIMONY OF JACINTO M. SILVA, Ph.D.
3
        Direct Examination By Mr. Churchill        6
4
5       Errata                                   115
        Certificate of Oath                      116
6       Certificate of Reporter                  117
7
8
9              E X H I B I T S
10   NO.                                         PAGE
11   Exhibit 1.........................           5
     Report of Jacinto M. Silva, Ph.D.
12
     Exhibit 2........................           28
13   Diagram
14   Exhibit 3........................           28
     Revised Statistical Analysis of Adverse Impact by
15   Employee Age in Karlo et al. v. Pittsburgh Glass
     Works
16
     Exhibit 4........................           32
17   Expert Report of Michael A. Campion, Ph.D.,
     August 30, 2013
18
     Exhibit 5........................           45
19   Biddle Consulting Group, Inc. Adverse Impact
     Toolkit
20
     Exhibit 6........................           53
21   Psychology, Public Policy, and Law Using Effect
     Size Measures to Reform the Determination of
22   Adverse Impact in Equal Employment Litigation
23   Exhibit 7........................           61
     Rebuttal Report of Dr. Jacobs:  Adverse Impact of
24   the 2008 and 2005 BPD Exams for Lieutenant
25
```

## Page 4

```
1              E X H I B I T S
2   NO.                                         PAGE
3   Exhibit 8........................           65
    Chart entitled "2008 Exam"
4
    Exhibit 9........................           76
5   Unintended Consequences of EEO Enforcement
    Policies:  Being Big is Worse than Being Bad
6
    Exhibit 10........................          80
7   Departmental Police Sergeant Examination Boston
    Police Department October 22, 2006
8
    Exhibit 11........................          87
9   NonParametric Statistics for the Behavioral
    Sciences
10
    Exhibit 12........................          93
11  Affidavit of Jacinto M. Silva, Ph.D.
12  Exhibit 13........................          103
    Adverse Impact is Far More Complicated Than the
13  Uniform Guidelines Indicate
14  Exhibit 14........................          107
    Validity, Utility, and Adverse Impact:  Practical
15  Implications From 30 Years of Data
16
17
18
19
20   **Original exhibits retained by the court reporter and
        attached to the original transcript.**
21
22
23
24
25
```



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                               5–8

Page 5

1      P R O C E E D I N G S
2         (Document premarked as Exhibit 1
3           for identification)
4      DEPOSITION OF JACINTO M. SILVA, Ph.D.
5           December 11, 2014
6      Deposition taken before Tamra K. Piderit, Florida
7   Professional Reporter, Registered Diplomate Reporter,
8   Certified Realtime Reporter, Certified LiveNote Reporter,
9   and Notary Public in and for the State of Florida at Large,
10  in the above cause.
11        THE COURT REPORTER:  Do you solemnly swear or
12        affirm that the testimony you are about to give in the
13        matter before you will be the truth, the whole truth,
14        and nothing but the truth?
15        THE WITNESS:  I do.
16           JACINTO M. SILVA, Ph.D.,
17   having been duly sworn, was examined and testified as
18   follows:
19        MR. BOK:  Before you begin, one thing off the
20        record.
21        (Discussion held off the record.)
22        MR. CHURCHILL:  For the record, the parties have
23        agreed to reserve objections, except as to the form of
24        the questions, and motions to strike.  We will waive
25        any notarization requirements to the extent that they

Page 6

1   exist.
2      What do you want to do about reading and signing
3   under these circumstances?
4        MR. BOK:  We will talk with the court reporter
5        about how fast she can produce a transcript, and we
6        will produce it to the witness, and if he has an
7        opportunity to read and sign it, I assume that he can
8        do so without using a notary and can do so under the
9        pains and penalties of perjury.
10           DIRECT EXAMINATION
11   BY MR. CHURCHILL:
12      Q.   Can you please state your name?
13      A.   Jacinto Manuel Silva.
14      Q.   And, Dr. Silva, what is your address?
15      A.   10017 N.W. 24th Place, Gainesville, Florida 32606.
16      Q.   And I know you have been through this a number of
17   times, but just so we are on the same page about how the
18   proceeding will go, if I ask you a question you don't
19   understand, then you can and should ask me for
20   clarification.  Okay?
21      A.   Okay.
22      Q.   It's important that any of your responses be
23   verbal as opposed to nods or gestures, because that's not
24   accurately captured on the transcript.  Okay?
25      A.   Okay.

Page 7

1      Q.   And, likewise, because a transcript is being made,
2   it's important that only one of us speak at a time so we
3   can accurately capture what is being said.
4      A.   Okay.
5      Q.   If you need to take a break for any reason, let me
6   know, and I will be happy to accommodate you.  Okay?
7      A.   Okay.
8      Q.   The one exception is if there is a question
9   pending, you should first answer the question, and then we
10  will take a break.
11      A.   Yes.
12      Q.   All right.  Are you currently employed?
13      A.   I am.
14      Q.   Where are you employed?
15      A.   EB Jacobs.
16      Q.   When did you first start working there?
17      A.   I started working there, I believe, in February of
18  1998.
19      Q.   All right.  Let me show you what has been marked
20  as Exhibit 1.  Do you recognize this document?
21      A.   Yes.
22      Q.   And what is this?
23      A.   It's a report I produced earlier this month.
24      Q.   In connection with the case that we are here on
25  today, Bruce Smith versus City of Boston?

Page 8

1      A.   Correct.
2      Q.   And your CV is attached to this report, is it not?
3      A.   It is.
4      Q.   And that appears at page A-2?
5      A.   Yes.
6      Q.   And as indicated here, as you just testified, you
7   are a senior managing consultant at EB Jacobs, and you have
8   been since January 2004?
9      A.   Right.  The reason I said 1998 is because we were
10  under a different name.  It's the same company, but under a
11  different name.  We started out as Landy Jacobs &
12  Associates.
13        THE COURT REPORTER:  I'm sorry?
14        MR. BOK:  Landy with an "L."
15      A.   And we were purchased by a company called SHL, and
16  we bought ourselves back out of it.  Because the name Landy
17  Jacobs no longer applied because Dr. Landy was no longer
18  with the firm, we renamed ourselves to EB Jacobs.
19      Q.   What is the business of EB Jacobs?
20      A.   We do public, police, fire, bus operators,
21  promotional as well as entry-level testing.
22      Q.   And what role do you play in EB Jacobs?
23      A.   I play a role of -- many roles, actually.  I play
24  a role of project manager, statistician, manager of the
25  analysis and scoring staff.  I also do all of our websites,



Page 9

1  I should say, things that -- job and data collections, as
2  well as candidates' support website, as well as validation
3  collections website.
4       I also basically install and deal with all
5  infrastructure, computer infrastructure and phone
6  infrastructure.  So I have many, many roles.  Program
7  websites as well.
8    Q.   And over the course of your career, have you been
9  involved in the design of police promotional exams?
10   A.   I have.
11   Q.   On how many occasions?
12   A.   Over the last 16 years, I would guess on a
13  magnitude of 25 or more.  I don't know exact numbers, but I
14  would say 25 to 30.
15   Q.   And over the course of your career, have you been
16  involved in the assessment of police promotional exam
17  results?
18   A.   Assessment?  You mean in terms of scoring them?
19   Q.   In terms of evaluating whether they have adverse
20  impact?
21   A.   Yes.
22   Q.   On how many occasions?
23   A.   Every occasion.
24   Q.   And you are currently helping to administer an
25  exam here in Miami?

Page 10

1    A.   I am.
2    Q.   And for what position is that?
3    A.   It's for the fire department, the chief fire
4  officer position.  It's usually known as the battalion
5  chief position.
6    Q.   Okay.  And can you describe just briefly what the
7  design of this exam is?
8    A.   Sure.  It starts with an in basket for all
9  candidates, and then all candidates also go through an oral
10  board assessment, which we basically provide three
11  exercises in.  In this particular one it's a tactical
12  incident command and a group meeting role play exercise,
13  and a subordinate conference role play exercise.
14   Q.   How many candidates are taking this exam?
15   A.   Twenty-five were scheduled, and only 19 actually
16  showed.
17   Q.   It says on your CV on page A-2 in the third
18  sentence, "Provide statistical analysis expertise for use
19  in projects within EB Jacobs and also to defend clients in
20  legal actions."
21   A.   Um-hm.
22   Q.   Did I read that correctly?
23   A.   Yes, you did.
24   Q.   When it says to "defend clients in legal actions,"
25  what do you mean by that?

Page 11

1    A.   Provide assistance in terms of analysis, reports,
2  things that they may need to provide in litigating if there
3  is an issue, or just simply defending the test and any kind
4  of administrative procedure if that occurs.
5    Q.   Have you ever served as an expert for plaintiffs
6  in an adverse impact case?
7    A.   I don't believe so.
8    Q.   And how many times have you served as an expert in
9  adverse impact cases otherwise?
10   A.   Only two.  This one and Lopez.
11   Q.   All right.  And other than serving as an expert,
12  have you provided statistical assistance or other
13  professional assistance to cities or towns that were being
14  sued?
15   A.   Let me revise the last answer.  There was also a
16  lawsuit that was in the City from the 1999 or 2000 Police
17  Lieutenant's Exam, and there was a lawsuit that involved
18  that, and I did assist the City.  I don't remember if I
19  produced any expert report, but I did assist the City with
20  analysis and results to defend against that.
21       It ended up essentially going away, but I did
22  assist the City with preparation for the case.
23   Q.   When you say "the City," which city?
24   A.   City of Miami.
25   Q.   Okay.  And when was that?

Page 12

1    A.   I believe -- well, the exam itself was
2  administered in the 1999-2000 time frame.  I believe the
3  litigation might have started in 2006, and it went through
4  2009.
5    Q.   Okay.  Other than that case, the Lopez case, and
6  this case, have you provided assistance in any other
7  litigation?
8    A.   I don't believe so.  I may have done analyses, but
9  I never was the direct expert.  They may have asked me to
10  do an analysis or two here and there, but nothing in terms
11  of direct involvement.
12   Q.   Okay.  So Exhibit 1 you said is a report that you
13  prepared in connection with this case; is that right?
14   A.   Yes.
15   Q.   And it was prepared on or finalized on December 4,
16  2014?
17   A.   Yes.
18   Q.   And can you describe what you did in order to
19  prepare this report?
20   A.   I was provided with data, summary data, as well as
21  test data and promotion -- the promotions that were made,
22  the race of those that were promoted, the dates that those
23  promotions were made.  And then I was asked to determine
24  whatever I believe the adverse impact was demonstrated, and
25  I did that for both the 2005 as well as the 2008 exam.



JACINTO M. SILVA, PH.D.                                        December 11, 2014
SMITH v. CITY OF BOSTON                                                  13–16

Page 13

1      So I looked at the promotion rate differences in
2   terms of the statistical significance, the four-fifths
3   rule, and because Dr. Wiesen had brought up the promotion
4   order, I also examined that.  I also then took a look at
5   the aggregation that Dr. Wiesen had proposed and made some
6   summary results on that.
7      Q.   If I can direct your attention to the end of the
8   report, on page B-2 you listed six different documents that
9   were provided to you by counsel in preparing your report.
10  Do you see that?
11     A.   Yes, I do.
12     Q.   Were you provided any other materials in
13  connection with the preparation of your report?
14     A.   I don't believe so.
15     Q.   Okay.  Did you rely on any of the materials in the
16  preparation of your report?
17     A.   I relied on these materials.
18     Q.   Any other materials?
19     A.   No.
20     Q.   And on the few pages before that --
21     A.   I should say I looked at Dr. Jacobs' affidavit as
22  well.
23     Q.   Okay.  And by his -- when you say his affidavit,
24  which affidavit are you referring to?
25     A.   The first one.  I'm only aware of one.

Page 14

1      Q.   Are you referring to his expert report from
2   September?
3      A.   No.
4         MR. BOK:  Objection.  Dr. Jacobs hasn't issued an
5      expert report.
6      Q.   I'm sorry, you said Dr. Jacobs' report?
7      A.   Affidavit.
8      Q.   I'm sorry, I misunderstood.
9      A.   I believe November is when I was first contacted
10  to do that affidavit, but I was unavailable, and Dr. Jacobs
11  assisted.
12     Q.   So in addition to the six items listed on B-2, you
13  were also provided with a copy of Dr. Jacobs' affidavit?
14     A.   Dr. Jacobs provided it to me.
15     Q.   Okay.  Did you also have a copy of Dr. Wiesen's
16  report?
17     A.   Yes.
18     Q.   Any other materials that you had or relied on?
19     A.   No.
20     Q.   If you look at page 16 of your report, do you see
21  there is a reference you listed there for the Biddle
22  Consulting Group Adverse Impact Toolkit Manual?
23     A.   Um-hm.
24     Q.   Do you see that?
25     A.   Yes, I do.

Page 15

1      Q.   Did you rely on any other references besides that
2   in connection with the preparation of your report?
3      A.   I probably looked up some, you know, statistical
4   things online just to confirm some things.  I don't recall
5   specifically.
6      Q.   So you don't recall what you looked at?
7      A.   Not right off the top of my head.
8      Q.   Who wrote this report?
9      A.   I wrote it.
10     Q.   And did you decide what to put in the report?
11     A.   Absolutely.
12     Q.   And did anybody else make suggestions to you about
13  what to include in the report?
14     A.   I had my wife look at it and correct it for
15  grammar kind of thing, but that's about it.
16     Q.   Okay.  And in places in your report, you respond
17  to positions that Dr. Wiesen had taken in his report; is
18  that right?
19     A.   Correct.
20     Q.   If you look at page 13 of your report, for
21  example, you have a section there called "Issues Raised by
22  Dr. Wiesen."  Do you see that?
23     A.   Yes.
24     Q.   And earlier in your report you also had addressed
25  issues raised by Dr. Wiesen; is that correct?

Page 16

1      A.   Right.
2      Q.   Is it fair to say that you responded to whatever
3   you thought was material in Dr. Wiesen's report when you
4   were preparing your report?
5      A.   Yes, the central elements of his report.
6      Q.   Okay.  And that you responded to anything that was
7   material that you disagreed with; is that fair to say?
8      A.   As far as what I saw in the report, the way I
9   interpreted it at that time, yes.
10     Q.   All right.  How would you describe the test that's
11  at issue in this case that you were addressing in your
12  report?
13     A.   I don't know much about the test other than it's,
14  I believe, a 100- or 80-item test.  It's a technical test
15  based on the job sources.  I wasn't given information on
16  the test.
17        MR. BOK:  And to be clear, we are not proffering
18     him as an expert on prong two or three at trial.
19        MR. CHURCHILL:  Okay.
20  BY MR. CHURCHILL:
21     Q.   Would you describe the test as a cognitive ability
22  test?
23     A.   No.
24     Q.   Do you understand it's a multiple choice test?
25     A.   Yes.



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                              17–20

Page 17

1    Q.   And multiple choice, how would you describe it?
2    What type of multiple choice test?
3    A.   It's a job-knowledge, multiple choice test or what
4    might be called sometimes a technical knowledge test.
5    Q.   And what understanding, if any, do you have about
6    the types of questions that are on the exam?
7    A.   Usually from a job analysis we will determine the
8    materials that the sergeant or lieutenant will use on the
9    job.  And then from those sources we will survey current
10   incumbents as to their use of the sources, how important
11   the various subtopics are, how often they use the
12   information, and how they use the information, if it's used
13   as a reference, you know, it might go to a 25 percent of
14   the time, or if it's used more, always, you know, from
15   memory.  Or possibly on the other end, if they use it
16   75 percent or more of the time or more than half the time,
17   that would help us to determine a few things.
18        One, if the item should be tested on the test
19   because it's relevant to their job and it's used frequently
20   and it's important, for example.  And how we should test
21   it, if it's something they should know from memory, or if
22   it's something that they should know because they typically
23   look it up.
24        So if it's something that they typically look up,
25   then we would give it as an open-book test, and if it's

Page 18

1    something that they typically look up, then -- I'm sorry,
2    it's something they typically have to know from memory,
3    then we would give it as a closed-book test.
4    Q.   How would you distinguish cognitive ability test
5    from a job knowledge test?
6    A.   Cognitive ability focuses on things like your
7    verbal comprehension, verbal ability to use logic, and
8    determining solutions and things of that sort.  Arithmetic
9    could be part of it, although not particularly in this type
10   of environment.
11        Quantitative aspects are usually measured.  It
12   could be many different ways.  You can go and look at
13   Fleishman's different categories of cognitive ability and
14   other abilities and measure many different things.
15   Typically they are in the general sense.  We are not asking
16   you to know specific job knowledge information or any kind
17   of specific knowledge other than general knowledge.
18        It might be things like information ordering,
19   understanding the logic of what steps have to happen.
20   That's one of ours that we use.  But it's a general context
21   and a general kind of information.  How you might give, you
22   know -- we try to do this in context when we use it for law
23   enforcement, measure cognitive ability in law enforcement,
24   we try to do it in the context of law enforcement
25   abilities.  Things any person would know, things like

Page 19

1    chasing a burglar, that kind of thing.  What the steps
2    would be, what the order would be, how we communicate that
3    order, those kinds of things.  It's using general
4    information not technical information that are part of the
5    job.
6         So when we look at a promotion exam, we wouldn't
7    ask them to perform in a general cognitive ability test.
8    We would ask them to give us information about how they
9    would perform their job in using the sources and the
10   references that they use currently on the job.
11   Q.   Do you have an understanding with respect to the
12   2005 and 2008 exams at issue in this case how the job
13   knowledge questions were constructed?
14   A.   I do not.
15   Q.   With respect to the data that you analyzed in this
16   case, how would you describe the sample sizes?
17   A.   The 2005 sample size was 126 or 27, depending on
18   where you look.  And then the other one in 2008 was, I
19   believe, 91.  I would consider them small sample sizes.
20   Q.   And do you have in mind a cutoff when you say a
21   small sample size?
22   A.   One hundred.  The actual -- the questions and
23   answers from the Uniform Guidelines actually give an
24   example what they consider to be a small sample.  They
25   actually use an example of 20 minorities and 80 whites, I

Page 20

1    believe, or 80 majority members in their estimation.  So
2    they would consider that a small size.  I believe that that
3    would be, you know, a reasonable number.
4         Certainly if you have 20 or 30, that's, you know,
5    a very small sample, but up to 100 or 130 I would consider
6    it to be small as well.
7    Q.   Okay.  What about 200, do you consider that to be
8    a small sample size?
9    A.   Well, it really depends, you know, what you are
10   doing with the sample.  I mean, if you look at adverse
11   impact and error rates associated with adverse impact, I
12   have seen in the literature that some people feel that up
13   to 400 it gives unstable results.
14        Of course, that all depends on the combination of
15   the individuals.  If you have, you know, 380 whites and
16   20 minorities in that sample, then obviously it's a bigger
17   issue.
18   Q.   But certainly your position is that the two sample
19   sizes here for 2005 and 2008 were small sample sizes?
20   A.   I would consider them, you know, on the small
21   side, right.
22   Q.   Let's talk about statistical significance.  Can
23   you first describe, just so we are on the same page,
24   generally what that means in this type of context?
25   A.   Sure.  Statistical significance you put forth a



JACINTO M. SILVA, PH.D.                    December 11, 2014
SMITH v. CITY OF BOSTON                              21–24

Page 21

1  hypothesis. In this case looking at the proportions, you
2  are postulating the hypothesis that the promotion rates are
3  equal, and you are trying to find evidence to support that
4  the two rates are not equal.
5      You basically come up with a probability through
6  the statistical processes that says that the rates -- that
7  this particular sample, the probability of this particular
8  sample having come from populations which are underlying
9  unequal, and if you find that probability supports only
10  5 percent or less, actually less than 5 percent
11  technically, that you would determine that they are
12  different. If the probability is .05 or higher, then you
13  would determine that the hypothesis would hold, in this
14  case the hypothesis being that the promotion rates are
15  equal would hold.
16      Q.  In this context is the null hypothesis that the
17  promotion rates are equal or the underlying scores are
18  equal?
19      A.  That the promotion rates are equal.
20      Q.  What is the end result of a statistical
21  significance analysis?
22      A.  There is only two possibilities, one is you accept
23  the null hypothesis, and the other is you reject the null
24  hypothesis.
25      Q.  What measures do you do to make that evaluation?

Page 22

1      A.  For this particular scenario, there is many tests
2  for comparing different kinds of things, but for this
3  particular one we use the Fisher's Exact Test.
4      Q.  And that results in a p-value and a standard
5  deviation; is that right?
6      A.  Just a p-value.
7      Q.  Okay. And describe what a p-value means.
8      A.  A p-value is a probability value, and it's
9  essentially the probability that the null hypothesis is
10  true. Basically we are willing to accept a certain
11  probability, a certain error in the probability. So if you
12  find that the probability is less than 5 percent that it's
13  true, you are willing to accept, you are willing to
14  conclude that the null hypothesis does not hold, that the
15  proportions of promotions are different in the two groups.
16  So that it's just basically the probability value of the
17  null hypothesis is true.
18      Q.  Just for an example, a p-value of .05, what does
19  that indicate?
20      A.  It indicates that the two promotion rates could be
21  equal, but there is only a 5 percent chance that the
22  underlying populations have promotion rates that are equal.
23  Basically it says that it's possible, but it's only
24  5 percent of the time if the underlying populations are
25  equal that we would see a result at this level, so with the

Page 23

1  observed values in the current samples.
2      So what we are trying to physically decide is am I
3  going to conclude the null hypothesis is true or the null
4  hypothesis is false, and only when it falls below .05 am I
5  willing to accept that they are not equal.
6      Q.  Okay. And what's the connection, if any, between
7  a p-value and a standard deviation?
8      A.  Well, the p-value corresponds to a z-value on the
9  normal distribution, and so they are essentially the same.
10  It's just that you can either say .05, or you can say
11  1.96 z-score.
12      Q.  Okay. Just for my own purposes to make sure we
13  are on the same page here --
14      A.  Sure. I can draw it out for you.
15      Q.  We will just -- what does that indicate?
16      A.  So if the right side is the higher scores on the
17  z-distribution, then essentially this area here is
18  5 percent, then the normal with this where this line
19  intersects here, this is your z-score essentially.
20      And this -- because this is -- this is two tails,
21  so you actually put .025 there, .025 there. So when you
22  bring this line down, you basically have 1.96 on this axis,
23  and that's the z-score.
24      So they are basically the same. If I shift it
25  here, then this will have a different p-value. And if I --

Page 24

1  this obviously has a different z-value that corresponds to
2  that. It's wherever the line drops for the area.
3      Q.  Just so that I can understand conceptually what we
4  are looking at in terms of the distribution, the general
5  idea here is that if there are -- if there are equal
6  promotion rates, you can have lots of different outcomes if
7  you have the same situation occur?
8      A.  I'm not understanding.
9      Q.  I'm just trying to understand the concept behind
10  the distribution curve here. So the idea is that --
11      MR. BOK:  Can we go off the record?
12      (Discussion held off the record.)
13      MR. CHURCHILL:  Back on the record.
14  BY MR. CHURCHILL:
15      Q.  Just understanding what this distribution is
16  showing us, the underlying concept. So let's say it's a
17  coin toss, for example, and you have an even coin, a fair
18  coin. If you do, say, 1,000 flips, this shows all the
19  different possible outcomes. So in the middle that's going
20  to be where you get roughly 500 and 500, right?
21      A.  Right.
22      Q.  Because that's what you would expect to get since
23  it's a fair coin?
24      A.  Right.
25      Q.  But there are going to be times where you might



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                              25—28

Page 25

1  get -- it would be unlikely, but you might get 900 heads
2  and 100 tails?
3      A.  Right.
4      Q.  That's what's going to be reflected on the tails
5  here, there is an unlikely outcome like that if the coin is
6  fair?
7      A.  Less likely.
8      Q.  Right.  So that's the general idea here, correct?
9      A.  Yes.
10     Q.  And so here the same idea applied to a test as
11 opposed to a coin is that if you assume the promotion rates
12 are equal, most of the time you are going to get equal
13 promotions, equal promotion rates in practice?
14     A.  I wouldn't say exactly equal, but, yeah, you are
15 going to find them close to each other.
16     Q.  It's more likely that they are going to be equal,
17 because that's what's being shown by this Bell curve,
18 right?
19     A.  At exactly equal, you know, 500 and 500, to go
20 back to your thousand coin tosses, very rarely would you
21 ever find exactly 500 and 500, you know, if you did a
22 thousand coin tosses over and over again.  So it's going to
23 be around that.  Less likely, more likely.  499, 498, 497,
24 each of them would have an associated probability with it,
25 and the probability closest to 500 typically if it's

Page 26

1  normally distributed would be the most -- the highest
2  likely, but not necessarily all there.  Most of them
3  actually wouldn't be there at 500.
4      Q.  Understood.  But they are going to be clustered in
5  the middle here because you expect them to be around equal?
6      A.  Closer to 500.
7      Q.  If the actual promotion rates are equal, right?
8      A.  Yes.
9          MR. BOK:  Objection.  I don't understand promotion
10     rates, and you are talking about coins.
11         MR. CHURCHILL:  We switched to promotion rates.
12         MR. BOK:  Okay.
13 BY MR. CHURCHILL:
14     Q.  So in the promotion context, then, having that
15 understanding, when you get to the tail here, and let's say
16 the question is whether blacks were promoted at a lower
17 rate than whites?
18     A.  In the sample.
19     Q.  In the sample, right.
20         So what you are looking at is whether that unequal
21 result, what's the probability that if the underlying
22 condition is that promotion rates are the same, that you
23 would end up with the scenario where it resulted or you
24 ended up with unequal promotion rates in practice?
25     A.  I'm not understanding.

Page 27

1          MR. BOK:  Objection.
2      Q.  Okay.  Explain this to me, then, in the promotion
3  context.  What are you looking at if you have a situation
4  over here in this tail?
5          MR. BOK:  Just to be clear, because we may later
6      be talking about this, this is a document that I
7      assume we will mark at some point, and you are
8      pointing to the right side of the curve.
9          MR. CHURCHILL:  Right.
10         MR. BOK:  And that's what we are talking about.
11     I'm sorry.
12     A.  Essentially it means that the probability of this
13 particular outcome that we observed, are observing in --
14 let's say I'm going to say the 2005 data, let's say, what
15 the probability is that this particular promotion rate, two
16 promotion rates occurring, the difference between them or
17 the ratio between them is going to put it towards the lower
18 end of the probability distribution.
19     Q.  Okay.  So if you have a situation where blacks are
20 promoted at a lower rate than whites, that's going to be
21 over on the, as you understand it, the right side of the
22 distribution?
23     A.  Well, yeah.  The way it's computed I would say
24 yes, it would be towards the right side.
25     Q.  Okay.  And then conversely, if there were a

Page 28

1  situation where whites performed worse in terms of
2  promotion rates, then that would be over on the left side?
3      A.  That's correct.
4      Q.  All right.  So the .05, what is the significance
5  of .05 as opposed to .06 or .04?
6      A.  It's the standard the statisticians use to
7  determine the effect in the curves and if the null
8  hypothesis should be rejected.
9          MR. CHURCHILL:  Can we go ahead and mark this as
10     Exhibit 2 before I forget?
11             (Document marked as Exhibit 2
12              for identification)
13 BY MR. CHURCHILL:
14     Q.  And there are occasions, are there not, when
15 statisticians or industrial organizational psychologists
16 find some type of significance even when the p-value is
17 .05, above .05?
18     A.  The only time would be, I suppose, a priori to the
19 test that you set for yourself a different standard.  I
20 suppose you could do that as a researcher, but that's not
21 usually done.  It would have to be done a priori to the
22 actual analysis.
23     Q.  Okay.  Let me show you another exhibit.
24             (Document marked as Exhibit 3
25              for identification)



Page 29

1       MR. BOK:  I just want to note on the record, if
2    there is information here that says contains
3    information confidential pursuant to court order, I
4    want to make sure that it's clear on the record that I
5    have never seen this document before, and if it's a
6    violation of a court order, it is by plaintiffs'
7    counsel, not by defense counsel.
8       To the extent that the plaintiffs' counsel knows
9    that this information is protected by a court order, I
10   would call upon him to immediately collect it back up
11   and not show it to anybody else.
12   BY MR. CHURCHILL:
13   Q.   All right.  Showing you what's been marked as
14   Exhibit 3, have you seen this document before?
15   A.   I have not.
16   Q.   And you see it is -- at least it's entitled
17   "Revised Statistical Analysis of Adverse Impact By Employee
18   Age in Karvo, et al. versus Pittsburgh Glass Works"?
19   A.   Yes.
20   Q.   And it was prepared by Michael Campion on May 7,
21   2013.  Do you see that?
22   A.   Yes.
23   Q.   Do you understand that Mr. -- I'm sorry,
24   Dr. Campion has also been designated by the defendants as
25   an expert in this case?

Page 30

1    A.   I am aware of that.
2    Q.   Do you know him?
3    A.   Not personally.  I know of him.
4    Q.   Okay.  And do you know of his reputation?
5    A.   I know he is well respected in the field.
6    Q.   So if you can direct your attention to page 10,
7    and the page numbers I'm referring to are the ones in his
8    report as opposed to the stamp at the top.
9    A.   Oh, I'm sorry.
10   Q.   Yeah.
11   A.   Here.  Ten.  Okay.
12   Q.   And you see at the end of that first paragraph
13   there -- feel free to --
14   A.   The first full paragraph or the end of the
15   paragraph?
16   Q.   Why don't you go ahead to the page before, page 9,
17   just so you see that sentence in context.  Just read that
18   paragraph and let me know when you are done.
19   A.   (Witness reviews document.)
20       It's a little confusing.  Okay.
21   Q.   And you see at the end of that paragraph, there is
22   a sentence that reads, "The ratio is .68, but the standard
23   deviation at the 40 level falls just short of the 2.0 at
24   1.54, which is significant at the 13 percent level
25   (two-tailed test)."

Page 31

1       Do you see that?
2    A.   I do.
3       MR. BOK:  I think you said 1.54, and it's 1.51.
4       THE WITNESS:  No.  It's 1.54.
5       MR. BOK:  I apologize.  I was looking at the page
6    before.  I apologize.
7    BY MR. CHURCHILL:
8    Q.   And so would you agree with me that Dr. Campion
9    appears to be finding statistical significance at the
10   13 percent level here?
11   A.   Yeah, I'm seeing that, yes.
12   Q.   And then in the next paragraph, which starts
13   Analysis 5, just read that to yourself.
14   A.   (Witness reviews document.)
15       Um-hm.
16   Q.   And looking at the last sentence there, which
17   says, "The ratio is .66, but the standard deviation at the
18   40 level falls just short of the 2.0 at 1.72, which is
19   consistent at the 9 percent level two-tailed test."
20       Do you see that?
21   A.   I do see that.
22   Q.   Would you agree with me that he is finding
23   statistical significance at the 9 percent level?
24   A.   That's what he is saying.
25   Q.   At the end of this page it says, "In conclusion,

Page 32

1    these revised results suggest that there is evidence of
2    adverse impact based on employee age in the RIF conducted
3    at PGW."
4       Do you see that?
5    A.   I do.
6    Q.   Is it your opinion that Dr. Campion was incorrect
7    to find significance at the 13 percent and 9 percent
8    levels?
9    A.   Based only on what I have read, yes, it is
10   inappropriate.  Of course, maybe there was an agreement
11   that the significance level would be accepted at that level
12   by plaintiffs' counsel as well, so it's not at all -- I
13   would have to look at the whole thing, but in standard
14   practice that would be clearly not significant.
15   Q.   And why is that?
16   A.   Because it does not fall below 5 percent.
17       (Document marked as Exhibit 4
18       for identification)
19   BY MR. CHURCHILL:
20   Q.   Showing you what's been marked as Exhibit 4, do
21   you recognize this document?
22   A.   No, I do not.
23   Q.   Do you see this, according to its title, is an
24   expert report of Michael Campion, Ph.D. dated August 30,
25   2013?



JACINTO M. SILVA, PH.D.                                            December 11, 2014
SMITH v. CITY OF BOSTON                                                      33–36

Page 33

1    A.  Yes.
2    Q.  If you can go to page 22 of his report.
3    A.  Okay.
4    Q.  If you look at the bottom in paragraph C, do you
5  see that?
6    A.  I do.
7    Q.  Can you read that to yourself, please?
8    A.  (Witness reviews document.)
9       Okay.
10   Q.  And would you agree with me that Dr. Campion in
11 this analysis is finding statistical significance at the
12 p = .103 level?
13   A.  Well, he is saying marginally significant on
14 page 23.  At the bottom of the paragraph he says marginally
15 significant, which I don't understand what that exactly
16 means.  But, yeah, he seems to be indicating that it's
17 statistically significant.
18   Q.  When you are evaluating the p-value or calculating
19 the p-value, and you get a result that's .05 something, at
20 what point is it reasonable to round up or down?
21   A.  No.
22   Q.  I'm asking at what point.
23   A.  When it's below .05, it's significant.  When it's
24 not below .05, it's not significant.
25   Q.  So what if it's .0500001?

Page 34

1    A.  Not significant.
2    Q.  And that's because you would use an absolute
3  cutoff of .05?
4    A.  It has to be below .05.
5    Q.  All right.  When you are calculating the p-value,
6  one of the variables that goes into that analysis is the
7  sample size; is that right?
8    A.  That's correct.
9    Q.  So when you have statistical significance, does it
10 matter or does it not matter what the size of the sample
11 is?
12   A.  For statistical significance it does not matter.
13   Q.  All right.  And the p-value is also affected by
14 the selection rate; is that right?
15   A.  You are speaking to the adverse -- I'm sorry, the
16 comparison of the two proportions?
17   Q.  Yes.
18   A.  You are asking if the selection ratio has impact
19 on whether you are likely to find significance or not?
20   Q.  Well, actually, right now I'm asking about a test.
21      MR. BOK:  Why don't you ask the question again so
22   we can be clear on the record.
23      MR. CHURCHILL:  I am.
24 BY MR. CHURCHILL:
25   Q.  So for a test of statistical significance, not an

Page 35

1  AI ratio, but a test of statistical significance, is that
2  analysis affected by the selection rate?
3    A.  It is.
4    Q.  Okay.  And is it also affected by something called
5  the effect size?
6    A.  The difference between the two groups in terms of
7  the promotion rates?  Yes, absolutely.  That's the major
8  determining factor.
9    Q.  All right.  What does that term mean in this
10 context, effect size?
11   A.  It means the actual difference that's observed.
12   Q.  When you say actual difference, what do you mean
13 by that?
14   A.  So if you have a promotion rate of 90 percent, and
15 you have a promotion rate of 80 percent, the difference
16 between the two promotion rates would be 10 percent.
17 That's your effect size.
18      Now, it can get more technical and, say, put this
19 in a standard form, and you can call that a d statistic or
20 d effect or effect size.  Essentially it's in a
21 standardized form, but it still represents the difference
22 between the two proportions, in this case the two promotion
23 rates, just in a standardized form.
24   Q.  Are there other ways of looking at effect size
25 besides what you described, the difference between the two

Page 36

1  selection rate percentages?
2    A.  You can standardize into what's called an effect
3  size that's often called Cohen's d or d.  It's just a
4  fancier way of showing the difference.
5    Q.  So I guess what I'm asking is you identified or
6  you defined effect size in the context of promotion rates;
7  is that right?
8    A.  I did not I don't believe.  The effect size I look
9  simply at the actual observed differences between the
10 promotion rates.
11   Q.  All right.  So I guess what I'm trying to
12 understand is what is the -- what does that term "effect
13 size" mean in this context?
14   A.  It's usually a function of the variance associated
15 with the sample.  So it's just a converted of the actual
16 effect size in its original scaling to a standardized or
17 based on a standard deviation associated with the
18 particular statistic that you are dealing with.
19      So, for example, I give you an example in terms
20 of, say, averages.  If you have an average of 75 in one
21 group, and you have an average of 70 in another group, and
22 the variance associated with the combined group is
23 5 points, then that difference would be one standard
24 deviation apart, those two groups would be one standard
25 deviation apart.



Page 37

1    You might call that an effect size of 1 that
2 represents, you know, in terms of the standard deviation
3 rather than in terms of the actual raw scores. In the
4 actual raw scores it's 5 points, and in the effect size
5 terminology it would be effect size of 1.
6    Q. Okay. And when you say an effect size of 1, are
7 you referring to a d value?
8    A. Yes.
9    Q. Okay. And a d value of 1 is a large -- would be
10 described as large?
11    A. Different context, different things, but, yeah,
12 generally 1 is considered fairly large.
13    Q. Okay. In your report you look at -- you evaluated
14 adverse impact based on the promotion rates based on the
15 promotions that have occurred to date; is that right?
16    A. Yeah, that's the only way I know how to do adverse
17 impact.
18    Q. Okay. Well, wouldn't you agree that it's
19 appropriate to look at the broader context to evaluate
20 whether there is adverse impact in a given situation?
21    A. Well, in terms of concluding or not concluding
22 that there is different promotion rates, no, because the
23 promotion rates are a function of who was promoted only.
24 Obviously the scores of the individuals go into that
25 decision, but, you know, they are useful for other

Page 38

1 purposes. For example, to determine if large differences
2 are present, they are more likely to lead to a future
3 adverse impact.
4    Q. Just let me stop you there. When you say when
5 large differences are present, what do you mean by "large
6 differences"?
7    A. Let's say a difference of 1.
8    Q. In terms of what?
9    A. D effect. Effect size, d.
10    Q. But large difference in?
11    A. In the test scores, I guess, is what you are
12 trying to get to, right?
13    Q. No. I'm trying to understand what you are talking
14 about when you say "differences."
15    A. I'm trying to give you some information as to how
16 we might think in this particular situation. If you have
17 means on scores that are, for example, candidates go
18 through, they get a score, that score is used to make a
19 decision as to whether they are promoted or not, you might
20 find some differences there. And you would want to know
21 what those differences are because you would want to use
22 that information for future decisions as to how you test in
23 the future and so forth to ameliorate that situation, if
24 that's possible.
25    So you always want to be aware of the entire

Page 39

1 context. But in terms of promotion rates or if minorities
2 are impacted adversely, you will only look at the promotion
3 rates actually.
4    Q. All right. It's well known among industrial
5 organizational psychologists that multiple choice tests
6 like the one at issue in this case tend to have an
7 adverse -- that blacks tend to do worse on those types of
8 tests; is that right?
9    A. As a general rule we find that, yes.
10    Q. So it's predictable that when a test like this is
11 given, that blacks are going to do worse on the test?
12    A. Yeah, it's predictable typically. Not in every
13 sample, but, you know, if we have large samples, that would
14 be an expected stable result that we would expect.
15    Q. Are you aware of any situations where a test such
16 as this had a result where whites performed worse than
17 blacks?
18    A. I'm not aware of one off the cuff. I could
19 probably come up with one if I look at data, but right off
20 the cuff I can't.
21    Q. All right. And to what extent have you had any
22 involvement in the past with any exams given in
23 Massachusetts?
24    A. I haven't had any involvement other than the
25 development of a makeup test. I don't even remember. I

Page 40

1 think it was for fire lieutenants years ago. I managed the
2 processes. I wasn't actually involved in the development,
3 I just helped to manage the processes.
4    Q. Okay.
5    A. We developed items, not the test. They asked us
6 to develop items to help create this makeup test.
7    Q. And do you know when the last police promotional
8 exam was given in the City of Boston?
9    A. I believe there is one currently going on. I
10 don't know if it's for police sergeant or police
11 lieutenant, or maybe it was just finished. I'm not sure.
12 I wasn't involved in it. I know that EB Jacobs has the
13 contract for developing some police promotionals.
14    Q. You anticipated my next question, which is have
15 you had any involvement with --
16    A. No.
17    MR. BOK: Let him finish the question.
18    THE WITNESS: I'm sorry.
19 BY MR. CHURCHILL:
20    Q. First of all, did you have any involvement with
21 the development of the exam?
22    A. No.
23    Q. Okay. Have you undertaken any steps to analyze
24 the results of that exam?
25    A. No, I haven't seen any data.



JACINTO M. SILVA, PH.D.
SMITH v. CITY OF BOSTON

December 11, 2014
41–44

Page 41

1    Q.   And when you testified earlier about -- I think
2    you said that every time you have been involved in the
3    development or design of an example, you were also involved
4    in the evaluation of the exam results in some way?
5    A.   I mean, the ones that are my projects, yes.
6    Q.   All right.  And more specifically you were
7    involved in the analysis to determine whether there was
8    adverse impact; is that right?
9    A.   Right.
10   Q.   And in those cases, what type of analysis did you
11   do to determine whether there was adverse impact?
12   A.   I typically used the four-fifths rule as well as
13   significance testing if it became a legal matter.  But
14   those two would be the ones that I would use.
15   Q.   All right.  And what exactly, with respect to
16   either one of those measures, the four-fifths rule or
17   significance test, what were you looking at?
18   A.   I was usually doing a running adverse impact list
19   as well as conducting a Fisher's Exact Test to determine if
20   the difference was more statically significant where the
21   final promotion was made.  Often, you know, we stopped
22   being involved with the client for that particular exam
23   before the final promotion is made, so I can't really look
24   at that, but I can look at a running adverse impact list.
25   You provide that to the client so they can see what the

Page 42

1    potentials are for adverse impact within their
2    organization, what the numbers are going to look like.
3    Q.   When you say a "running adverse impact list," what
4    do you mean by that?
5    A.   So for at every -- so let's say you organize the
6    list in top-down final score.  So that there is multiple
7    test components, you have a final score that's a
8    combination of all the different components weighted in
9    some fashion, and you organize that list top-down order so
10   the highest scores are listed first.  And then you on each
11   row, on each candidate, you compute the adverse impact
12   number on that, and you can also compute the statistical
13   significance number on that.
14       So at each one you would be aware that if you
15   stopped the list there, if there were going to be that many
16   promotions, one promotion, two promotions, you can look
17   anywhere on that line and examine the adverse impact ratio,
18   potential significance, and potential -- I guess that's it,
19   potential significance and adverse impact.
20       You can look at it for multiple groups within that
21   row.  So if you had Hispanics and blacks, you can look at
22   them separately as well as combined.
23   Q.   All right.  Do you ever analyze passing rates?
24   A.   No.
25   Q.   Do you ever analyze average test scores?

Page 43

1    A.   Yes.
2    Q.   Why do you do that?
3    A.   Because we want to know what kinds of impact our
4    measures are having to see what the best way to look at it
5    is.  For example, in police sergeant, when we administered
6    a writing exercise that was recommended by the DOJ, we were
7    quite concerned that it would have strong adverse impact
8    because of the cognitive aspect, verbal written aspect of
9    the exercise.  We were pleasantly surprised to see that it
10   did not have any kind of adverse impact.  Actually,
11   minorities, blacks, tended to perform better on that test.
12   Q.   When you say it didn't have any adverse impact,
13   what do you mean?
14   A.   That minorities were not -- by using that
15   particular component, it did not decrease the number of
16   minorities that were promoted.
17   Q.   Okay.  So I don't understand, then, why you were
18   looking at the average scores in that context.
19   A.   Because we used the average scores as indicators
20   of potential problems.
21   Q.   And why would an average score be an indicator of
22   potential problem?
23   A.   Because they can lead to a legal situation with a
24   client if they don't get the right promotions in place to
25   avoid differential promotion rates.  There is various

Page 44

1    indicators that we use as indicators of future potential
2    adverse impact.  One of them is the average score
3    differences in the components.  Others are the selection
4    ratio or the promotion rate that we have.  Another is the
5    base rate or the percentage of minorities that are present
6    in the sample.  So those all exhibit to the actual
7    translation into what might exist as adverse or different
8    promotion rates.
9        Other things that we might look at is the
10   distribution of scores and where those scores are in the
11   tails, especially in the upper tail where the minorities
12   are.  So where the individuals are going to be selected
13   from.  So we want to look to see where the minorities are
14   clustered and where the likely promotions are likely to
15   stop.  So we would have an idea of where, you know, where
16   the client is likely to have an adverse impact issue or not
17   in the end.
18   Q.   What knowledge, if any, do you have about the
19   adverse impact that the City of Boston's sergeant exams
20   have had?
21   A.   I believe they had a statistical significance
22   adverse impact.  The promotion rates were statistically
23   significantly different and fell below the .05 levels, so
24   they were able to reject the hypothesis that they were
25   equal.



Page 45

1    Q.  For which years was that true?
2    A.  I'm not exactly certain, but I believe it was
3  in -- I think it dealt with 2005 and 2008 data or exam
4  results.  I don't recall the magnitude or anything like
5  that, but there were statistical significance.
6    Q.  And do you have any understanding about the
7  overlap, if any, between the sergeant's exam and the
8  lieutenant's exam in Boston?
9    A.  Yeah.  My understanding is that there were, I
10  think, a certain number of items, I don't recall the
11  number, might have been as high as 60 or 80, I don't
12  recall, that overlap the two exams.
13    Q.  And in your mind what bearing, if any, does the
14  fact that the sergeant's exam had a statistically
15  significant adverse impact have on the evaluation of the
16  lieutenant's exam?
17    A.  To me none.
18    MR. CHURCHILL:  Can you mark this as the next
19    exhibit, please?
20        (Document marked as Exhibit 5
21          for identification)
22    Q.  Showing you what's been marked as Exhibit 5, do
23  you recognize this document?
24    A.  I do.
25    Q.  And this is the Biddle Consulting Group adverse

Page 46

1  impact that you referenced in your report, is it not?
2    A.  Yes, it is.
3    Q.  All right.  If you turn to page 4, please.
4    A.  Okay.
5    Q.  And in the middle of the page, you see there is a
6  heading that says "Uniform Guidelines, Section 4D"?
7    A.  I do.
8    Q.  It says, "Where the user's evidence concerning the
9  impact of a selection procedure indicates adverse impact
10  but is based upon numbers which are too small to be
11  reliable, evidence concerning the impact of the procedure
12  over a longer period of time and/or evidence concerning the
13  impact which the selection procedure had when used in the
14  same manner in similar circumstances elsewhere may be
15  considered in determining adverse impact."
16        Did I read that --
17    A.  Yes, you did.
18    Q.  Do you agree with that?
19    A.  Yes.
20    Q.  And in this case do you believe that you
21  considered all evidence about the impact which the
22  selection procedure had when used in the same manner in
23  similar circumstances elsewhere?
24    A.  I'm not exactly sure of what your question is.  In
25  terms of the conclusion of adverse impact, or talking about

Page 47

1  the average differences?
2    Q.  In your report, did you give any consideration to
3  the historical impact that these types of tests have had on
4  black candidates?
5    A.  No.
6    MR. BOK:  Objection.
7    Go ahead.
8    Q.  All right.  Did you give any consideration to the
9  fact that the sergeant's exam had a statistically
10  significant adverse impact in the City of Boston?
11    A.  I did not.  My belief is that adverse impact is a
12  function of the selection processes and the selection
13  ratio, the base rates, number of promotions available.  It
14  is only to some degree based on differences that exist
15  between individuals.  Each sample is different.
16    Q.  Let me ask you about one tail versus two tail.
17    A.  Um-hm.
18    Q.  First of all, going back to this chart that you
19  marked as Exhibit 2, I think you touched on this earlier,
20  but if you are doing a one-tail analysis, you just look at
21  the probability reflected over on the right side?
22    A.  That's correct.
23    Q.  And if you are doing a two-tail, you would look at
24  probability both over on the right side of the tail and the
25  number on the left side?

Page 48

1    A.  That's correct.
2    Q.  So if you are doing a two-tail analysis in this
3  particular context, the context of this case, that means
4  you are considering both a possibility that blacks
5  performed worse, and you are also considering the
6  possibility that whites performed worse, right?
7    A.  That's correct.
8    Q.  All right.  And is it your view that there is ever
9  an occasion when it's appropriate to use a one-tail test?
10    A.  Never say never, but in this particular context if
11  that's what you are asking, I would say it's inappropriate.
12    Q.  Well, I'm asking in any context.  Do you believe
13  there is any context where it's appropriate to use a
14  one-tail test?
15    A.  If it's established a priori, I suppose you would
16  be okay if that was the agreement, that was the setup that
17  you set up in your experimental design or procedure, then,
18  yeah, that would be appropriate.
19    Q.  All right.  And in your view, when would it be
20  appropriate a priori to establish a one-tail test as
21  opposed to a two-tail test?
22    A.  If there was no chance whatsoever in any way that
23  the other side could be true.
24    Q.  So in this context, that would mean there is no
25  chance whatsoever whites would perform worse than blacks on



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                              49–52

Page 49

1  this test, right?
2     A.  That's correct.
3     Q.  Is it your view that there was a chance that
4  whites would perform worse than blacks on this test?
5     A.  Yes.
6     Q.  Have you ever seen that result anywhere in your
7  years of experience?
8     A.  No, I haven't, but in small samples anything can
9  happen.  You may have 25 minorities that are, you know,
10  exceptionally good, and they all be in that sample.  It's
11  unlikely, but it's possible.
12     Q.  Since you have it in front of you, looking at
13  Exhibit 5, which is the adverse impact tool kit, if you
14  turn to page 5?
15     A.  Um-hm.
16     Q.  Just reading the last part there it says, "It
17  would seem appropriate to use a one-tail test for adverse
18  impact analyses if the plaintiff can make a showing that
19  the employer's actions were overtly discriminatory.  Such
20  actions on the part of the employer would justify a
21  one-tail test because the researcher would have good cause
22  to suspect that the overt discriminatory actions lead to
23  some unequal outcome, hence the use of a one-tail test
24  would only look for what was suspected to exist based on
25  credible evidence."

Page 50

1     Do you see that?
2     A.  I do.
3     Q.  Do you agree with that?
4     A.  Yes.
5     Q.  Looking at that last part where it says something
6  that was suspected to exist based on credible evidence,
7  given what you testified earlier that it's well recognized
8  that blacks perform worse on this type of test, wouldn't
9  you agree that it's reasonable to suspect that blacks would
10  do worse on this test here?
11     MR. BOK:  Objection.
12     A.  I would agree that it's reasonable to think that
13  it might happen, yes.
14     Q.  And so wouldn't that support the use of a one-tail
15  test in this context?
16     A.  No, because the requirement is that it be overt
17  discriminatory actions.  I believe we are talking about
18  situations where an employer is, for example, not
19  recruiting minorities to test or is making the processes
20  somewhat difficult or has a biased evaluator, something of
21  that sort.  Something very overt that is clearly
22  inappropriate.
23     Q.  All right.  If you can turn to your report, which
24  is Exhibit 1, and go to page 2.
25     A.  Okay.

Page 51

1     Q.  Here you say that you base your support for a
2  two-tailed test on three arguments.  Do you see that?
3     A.  Sorry, where is that?
4     Q.  At the bottom of page 2.
5     A.  Okay.  Yes.
6     Q.  And it says, "My first argument is a rational one.
7  A one-tailed test implies that there is no chance that the
8  direction of a promotion rate difference will ever favor
9  minorities."
10     A.  Right.
11     Q.  "This is not accurate."
12     A.  Right.
13     Q.  "I have observed instances where the direction of
14  adverse impact favors the minority group."
15     Do you see that?
16     A.  Yes.
17     Q.  And what instances were you referring to?
18     A.  Here in Miami there are times when, for example,
19  in some of the role-play exercises we actually see
20  minorities performing better than -- by minority it gets a
21  little confused here in Miami because the majority is
22  actually Hispanic.  I'm actually talking about whites and
23  Hispanics.  Let's say that the Hispanics perform better
24  than whites.  That happens on some exercises.  I have seen
25  that over the years.

Page 52

1     Q.  But you would agree with me that you have never
2  observed an instance where the direction of adverse impact
3  favors the minority group with the kind of test at issue in
4  this case?
5     A.  I didn't say that earlier.  What I said is I never
6  observed the average difference favors whites.
7     Q.  I'm asking you now.
8     A.  No, I wouldn't agree to that.  I have seen when it
9  has favored one group, the minority group.
10     Q.  When?
11     A.  I can pull up some tests from Miami where that's
12  happened.
13     Q.  So you are talking about a -- the kind of test
14  that's at issue in this case?
15     A.  No, I'm talking about a test where there are
16  assessments that are involved.
17     Q.  I'm asking about the kinds of tests at issue in
18  this case in the City of Boston that was used for the
19  promotional decisions for lieutenants.  Have you ever
20  observed instances where that kind of test favored the
21  minority group?
22     A.  I believe in the Akron fire -- well, that had an
23  assessment as well, and it actually favored blacks in that
24  case, I believe.  But it wasn't -- it was an assessment
25  center, I think.



JACINTO M. SILVA, PH.D.

December 11, 2014

SMITH v. CITY OF BOSTON

53–56

Page 53

1    I can't recall off the top of my head, but I don't

2  think so.

3    Q.  All right.  Are you aware of any situations where

4  industrial organizational psychologists have used

5  one-directional tests in the discrimination context where

6  there wasn't overt discrimination, allegations of overt

7  discrimination?

8    A.  Have I personally observed that?

9    Q.  Yeah.

10    A.  No.  By personally I have never been involved

11  where I have said it or not that I know of anyone that said

12  it that works closely with me.

13      MR. CHURCHILL:  Can we mark this as 6, please?

14        (Document marked as Exhibit 6

15          for identification)

16  BY MR. CHURCHILL:

17    Q.  Showing you what's been marked as Exhibit 6 --

18    A.  Um-hm.

19    Q.  -- this is an article entitled "Using Effect Size

20  Measures to Reform the Determination of Adverse Impact in

21  Equal Employment Litigation."

22    A.  Um-hm.

23    Q.  You are familiar with this article, are you not?

24    A.  I'm not.

25    Q.  You see it was authored by Kevin Murphy and Rick

Page 54

1  Jacobs?

2    A.  Yes, I do.

3    Q.  And Jacobs is the Jacobs in EB Jacobs?

4    A.  Right.

5    Q.  You work for him?

6    A.  I do.

7    Q.  If you go to page 4?

8    A.  Okay.

9    Q.  And the second paragraph begins, "U.S. versus

10  Commonwealth of Massachusetts."

11      Do you see that?

12    A.  Yes.

13    Q.  Can you just read that paragraph to yourself and

14  let me know when you are done?

15    A.  (Witness reviews document.)

16      I see it.

17    Q.  And the last sentence in this paragraph says,

18  "This difference in test outcomes was also statistically

19  significant; a Fisher's exact probability test yields a

20  one-tailed p value of less than .01."

21      Do you see that?

22    A.  Yes.

23    Q.  There is no indication here, would you agree, that

24  Dr. Jacobs in this report concluded that the use of a

25  one-tailed test in that case was inappropriate?  Would you

Page 55

1  agree with that?

2    A.  I agree.

3    Q.  Are you familiar with that case?

4    A.  I believe I might have been involved in that case

5  early on, but I don't recall.  Yeah, that was probably the

6  case I was involved.  This is for the corrections officers,

7  right?  Yes.

8    Q.  What involvement did you have?

9    A.  Just doing analysis for that case.

10    Q.  Did you do that analysis he is referring to?

11    A.  No, I did not.

12    Q.  Do you know who did?

13    A.  No, I do not.

14    Q.  All right.  So in this case, one thing --

15      MR. BOK:  I'm sorry, "this case" being which case?

16  The Smith case?

17      MR. CHURCHILL:  Yeah, the Smith case.  It probably

18    would have been evident in my question, but thanks for

19    the clarification.

20  BY MR. CHURCHILL:

21    Q.  In the Smith case, we know, do we not, that there

22  were average score differences between blacks and whites

23  for both the 2005 and 2008 exams?

24    A.  I didn't do those, but according to Dr. Wiesen, it

25  appears that there are differences.

Page 56

1    Q.  And you have no reason to question that?

2    A.  I have none.

3    Q.  And that result doesn't surprise you, does it?

4    A.  It's more typical than atypical, yeah.

5    Q.  And you understand that the differences are also

6  statistically significant for both of those years, right?

7    A.  Yes, I'm aware of that from Dr. Wiesen's report.

8    Q.  So knowing that there are average score

9  differences, why doesn't that suggest that you would expect

10  to see in terms of promotion rates it would be a

11  one-directional test?  That is, you would expect that

12  blacks would do worse in terms of promotion rates knowing

13  that they have a lower average score?

14    A.  Because when we look at data, before you look at

15  data, you have to make the decisions to how you are going

16  to look at it, and once you have any knowledge of data,

17  obviously, then you know.

18      All these kinds of statistical decisions have to

19  be done a priori.  So when you already know there are mean

20  differences, it would be inappropriate to basically stack

21  your test in the direction that you already observed the

22  data to go in.

23    Q.  I'm sorry, I didn't understand that.  So you are

24  saying it's inappropriate to consider data that you already

25  know to exist when conducting an analysis?

Page 57

1    A.   It's inappropriate to determine the direction of
2 the test based on the knowledge of the data.  If you had no
3 knowledge of the data, then you can choose to go one
4 directional or not.  If you have knowledge of the data
5 already, then it's, obviously, you know, you are kind of
6 distorting your error rate then.
7    Q.   But doesn't the very decision about whether to use
8 a one-direction or two-direction test require that you
9 consider the broader context whether you expect there to be
10 a result in a certain direction?
11    A.   If you do it a priori, yes.
12    Q.   Is there any reason not to consider whatever
13 information is available when making a determination about
14 whether to use a one-tail or two-tailed test?
15    A.   If it's based on other data, yes.  But in this
16 particular case, you know, you have to go with the data
17 that's present.
18    Q.   What does that mean?
19    A.   If you already looked at the data, then you can't
20 really make that decision at that point.
21    Q.   If you already looked at which data?
22    A.   If you have already analyzed the promotion data,
23 for example, the promotion rate data, and you have done it
24 with a two-tail test, and you didn't find significance, and
25 you say, geez, there wasn't much chance that it was the

Page 58

1 other way, so why did I do that, let me put a one-tailed, I
2 have significance.  It kind of distorts the true error
3 rate.
4    Q.   I'm asking a different question.
5    A.   Okay.
6    Q.   Which is when you are initially deciding whether
7 to do a one-tail or two-tail, why is it not appropriate to
8 consider all of the data that you have available to you,
9 including what you know to be different average scores?
10    A.   It's just a basic statistical concept that you
11 never really -- you don't design your statistical tests
12 around data that you already observed not in a statistical
13 sense.  You can do it in an exploratory sense, for
14 exploratory purposes to determine if you might want to run
15 the research study in a different way to see what might
16 happen.
17        But if you, for example, ran the study, and you
18 found that it was significant one tail, and you believe
19 that there was absolutely no way by design that that could
20 happen the other way, then you would collect another data
21 set and look at that data set.
22    Q.   But in this case doesn't every available piece of
23 information suggest that you would expect the direction to
24 be one way, that is, that blacks would do worse than
25 whites?

Page 59

1    A.   As I said earlier, there are lots of components
2 that go into determining adverse impact or the promotion
3 rate difference.  One of them is the average, so it does
4 suggest it would go in that direction.  Other things that
5 affect it are going to be the selection ratio, the base
6 rate of minority representation, the distribution of the
7 scores, the minority and the white scores within the score
8 distribution for each group, especially at the end where
9 the selection is going to be made or promotion is going to
10 be made.
11    Q.   Okay.
12        MR. CHURCHILL:  Why don't we take a quick break.
13        MR. BOK:  Sure.  That would be fine.
14        (Recessed at 2:23 p.m.)
15        (Resumed at 2:30 p.m.)
16        CONTINUED DIRECT EXAMINATION
17 BY MR. CHURCHILL:
18    Q.   So I want to talk about promotion rates now.
19    A.   Okay.
20    Q.   So, first of all, you would agree that
21 Dr. Wiesen's analysis in his September 24th report found
22 statistically significant difference in terms of promotion
23 rates, even with the two-tail test?  Do you agree with
24 that?
25    A.   Right, based on the promotions at that time,

Page 60

1 that's correct.
2    Q.   And --
3    A.   In the 2008 data.
4    Q.   Right.  Yeah, we are talking about 2008.
5    A.   Okay.
6    Q.   And in connection with that determination, what is
7 the significance from an industrial organizational
8 psychologist's perspective concluding that there is adverse
9 impact like that?  What does that mean?
10        MR. BOK:  Objection.
11    A.   It means that the difference in the promotion
12 rates at that particular point are statistically
13 significant, that they are truly different, they appear to
14 represent difference in the underlying population with that
15 particular subsample.
16    Q.   And then is there a conclusion that falls from
17 that?  Is there something that means you have to do?
18    A.   That I have to do?
19    Q.   That anybody has to do?  What's the point of doing
20 the analysis?
21    A.   For me it's to inform the client.
22    Q.   All right.  Do you understand if there is a legal
23 consequence to finding adverse impact?
24    A.   If there is a lawsuit, and they can show there is
25 adverse impact, that was the final number of promotions



Page 61

1 made, then that means there is adverse impact that the
2 promotion rates are different in the underlying
3 populations.
4    Q.   And that the jurisdiction would then have to prove
5 the validity of the exam, right?
6    A.   Yes.
7    Q.   Okay.  So you would agree that as of September 24,
8 2014, if that was the end of the road, the City of Boston
9 would have had to prove the validity of its exam?
10   A.   Absolutely.
11   Q.   All right.
12       MR. CHURCHILL:  Are we up to 7?
13       THE COURT REPORTER:  Yes, we are.
14           (Document marked as Exhibit 7
15            for identification)
16 BY MR. CHURCHILL:
17   Q.   Showing you what has been marked as Exhibit 7,
18 which is a rebuttal report to Dr. Jacobs dated December 9,
19 2014, have you seen this before?
20   A.   I reviewed it this morning.
21   Q.   Okay.  And if you turn to page 6, do you see the
22 Table A that appears there?
23   A.   I do.
24   Q.   And have you had a chance to review this?
25   A.   Yes, I cited it in my report.

Page 62

1    Q.   Okay.  And you see that what Dr. Wiesen did here
2 was calculated the adverse impact ratio in the p-values
3 both two-tailed and one-tail that would exist as future
4 promotions were made.  Do you see that?
5    A.   I do.
6    Q.   And you see with respect to the p-value for
7 two-tailed, the next promotion it would drop down to .031.
8 Do you see that?
9    A.   I do.
10   Q.   And that would be statistically significant,
11 right?
12   A.   Yes.
13   Q.   Because a black candidate would be promoted next,
14 for the next two promotions, the p-value two-tailed would
15 rise above .05, right?
16   A.   That's correct.
17   Q.   And then for the next ten promotions, the p-value
18 for two-tailed would all be below .05.  Do you see that?
19   A.   I do.
20   Q.   So first of all, it's fair to say that as new
21 promotions are made, the p-value jumps around?
22   A.   Yes.
23   Q.   Right?
24   A.   It would be, yes.
25   Q.   In this case most of the time it jumps around in a

Page 63

1 way that it is statistically significant even at the
2 two-tailed test, right?
3    A.   You said the majority of the time?  For this
4 particular possible remaining promotions, yes.
5    Q.   So at what point is a determination supposed to be
6 made about whether there is adverse impact such that a city
7 or town has to prove the validity of its exam?
8    A.   It would be at the last promotion that's going to
9 be made from that list.
10   Q.   And why is that?  Why should a Court ignore all
11 the other instances where the p-value for promotions is
12 less than .05?
13   A.   They should -- well, I'm not sure the Court should
14 ignore it.  I don't presume to tell the Court anything.
15 But the determination of whether promotion rates are
16 different from each other is made at the point when all the
17 promotions have been made.
18   Q.   So if in this case hypothetically the City of
19 Boston made one more promotion, and that was James Blake,
20 who is white, it would be your opinion that there would be
21 statistically significant adverse impact, right?
22   A.   Absolutely.
23   Q.   And that the City would have to prove the validity
24 of its exam?
25   A.   Yes.

Page 64

1    Q.   And then if a week later the City promoted Paul
2 Joseph, then the p-value would go above .05, and at that
3 point the City would not have to prove the validity of its
4 exam?
5    A.   That's true.
6    Q.   That would be your opinion?
7    A.   Yes.
8    Q.   All right.  Do you agree with the notion that a
9 delayed promotion causes harm?
10   A.   Sure.  I would like to get promoted earlier rather
11 than later.
12   Q.   Everybody would, wouldn't they?
13   A.   Yes.
14   Q.   It costs money in terms of -- you don't get higher
15 pay if you are not promoted, right?
16   A.   Right.
17   Q.   And you don't get -- you lose out in terms of
18 seniority, right?
19   A.   I suppose you can depending on how your department
20 or agency is organized.
21   Q.   Right.  In your experience you understand that in
22 most police departments seniority matters, right?
23   A.   Typically.
24   Q.   It matters in terms of the assignments that you
25 get?



JACINTO M. SILVA, PH.D.
SMITH v. CITY OF BOSTON

December 11, 2014
65–68

Page 65

1    A.  I suppose.  I'm not familiar with assignments, but
2  I am familiar with number of years on the job affects pay.
3  I suppose assignments sounds about right.  I guess you
4  would get more experience and be able to perform more
5  things and may be able to qualify for additional
6  assignments.
7    Q.  Right.  That's another point, too.  In some
8  situations like Boston, you have to be in a certain
9  position for a number of years before you can apply for the
10  next level, right?
11    A.  Typically most departments have some requirement.
12  I'm not familiar specifically with Boston.
13    Q.  Right.  In your analysis did you take account of
14  the effect of delayed promotions?
15    A.  Right.  I looked at the order that the promotions
16  are made for 2005 and 2008.
17    Q.  Right.  And -- all right.
18       (Document marked as Exhibit 8
19         for identification)
20  BY MR. CHURCHILL:
21    Q.  I'm showing you now what's been marked as
22  Exhibit 8, and I will just represent to you this is not
23  something you have seen before because it's something that
24  I created just so I can ask questions about it.
25       Just to explain what this shows, the column on the

Page 66

1  left is just the number of promotion.  The "Actual" column
2  shows what actually happened in this case.
3    A.  Um-hm.
4    Q.  In terms of the order of promotions, W obviously
5  is white, and B is black.
6       Skipping the hypothetical for a moment, the "Date"
7  column shows the date that the promotions were made, and
8  then the "Delay" column shows the number of days that have
9  passed from the date that first promotion was made on
10  January 30, 2010.  Are you with me?
11    A.  Yes.
12    Q.  So in terms of the --
13       MR. BOK:  Excuse me, Counsel.  Could you at least
14     explain what hypothetical means there?
15       MR. CHURCHILL:  I was just about to.
16  BY MR. CHURCHILL:
17    Q.  So turning now to the "Hypothetical" column, would
18  you agree that that "Hypothetical" column the black
19  promotions are more or less evenly spaced?
20    A.  From a layman's perspective, visual patterns,
21  yeah, it looks to be about every six or seven.
22    Q.  Would you generally agree that if there were no
23  average score differences between blacks and white, you
24  would be more likely to see a pattern as shown in the
25  "Hypothetical" column?

Page 67

1    A.  Or likely probably.  I agree it's probably more
2  likely.
3    Q.  Now, the p-value that you calculated, if one
4  calculated the p-value for the hypothetical, it would be
5  exactly the same here, all else being equal, as the
6  "Actual" column because the number of blacks and whites
7  promoted are the same.  Would you agree with that?
8    A.  I'm sorry, I didn't understand your question.
9    Q.  Okay.  So in the "Actual" column, this is the
10  actual data --
11    A.  Um-hm.
12    Q.  -- through today?
13       And you previously calculated the p-values under a
14  two-tail test as .052, right?
15    A.  Yes.
16    Q.  And the p-value for the hypothetical, if you
17  calculated that with the same number of candidates, black
18  and white would be exactly the same?
19    A.  The p-value would be exactly the same as .052?
20    Q.  Right.  The p-value for the "Hypothetical" column
21  would be the same as the p-value for the "Actual" column?
22    A.  Yes.
23    Q.  Is that right?
24    A.  In terms of promotions?
25    Q.  Yes.

Page 68

1    A.  Promotional rates?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Okay.  Now, in the "Hypothetical" column, would
5  you agree that in this hypothetical situation, the -- if
6  the order was the same, that is, the black -- the five
7  blacks were promoted, if it was the same five blacks, and
8  they were promoted the first black, and hypothetical is the
9  first black in the actual, that in the hypothetical each of
10  those black candidates would be better off in the
11  "Hypothetical" column than they would have been in the
12  "Actual" column?
13    A.  Not all of them, but, yeah.  But the top three
14  would have been better.
15       MR. BOK:  Counsel, I just want to make sure that
16     you said that because I think the black that is under
17     number 26 under your "Hypothetical," I'm no math whiz,
18     would have been promoted in March 2014 under either
19     scenario.
20       MR. CHURCHILL:  Right.
21       MR. BOK:  I'm objecting, but I wanted to tell you
22     the basis because I don't think you meant to trick the
23     witness.
24       MR. CHURCHILL:  Fair enough.
25  BY MR. CHURCHILL:



Page 69

1    Q.  And you identified that, I think.  So the first
2  black in this scenario, in the hypothetical scenario, would
3  have been promoted May 1st, whereas in the actual they were
4  promoted September 8, 2012, right?
5    A.  That's right.  I mean, 19 and 23 would have been
6  promoted on the same day regardless.  And then, of course,
7  28 and 29 would have been promoted also on 3/29, which is
8  what you show in your "Hypothetical."
9    Q.  Just to be clear here, so --
10    A.  So only the top two would have been positively
11  impacted by your scenario.
12    Q.  Okay.  Let me just ask you about that.  So in the
13  actual scenario, the first black was promoted September 8,
14  2012.  Do you see that?
15    A.  Yes.
16    Q.  That same black, if the order were the same, would
17  have been promoted on May 1, 2010, right?
18    A.  So you are moving this guy up to there.  Okay.
19    Q.  And by "this guy" you are referring to the top?
20    A.  Number 23 up to number 7.
21    Q.  Right.
22    A.  Okay.
23    Q.  So he would be better off in the hypothetical
24  scenario, right?
25    A.  He would have been promoted earlier, yes.

Page 70

1    Q.  And 24 in the "Actual" would have moved up to 13
2  in the "Hypothetical," right?
3    A.  That's correct.
4    Q.  And so he would have been better off?
5    A.  He would have been promoted, yes, earlier.
6    Q.  Twenty-eight in the "Actual" column would have
7  moved up to 19, and he would have been better off, right?
8    A.  That's correct.
9    Q.  Would you agree with me that the average score
10  differences have an effect in terms of when a black
11  candidate is likely to be promoted?
12    A.  It may have an effect, but not necessarily have an
13  effect.
14    Q.  Okay.  You would agree that scores, the exam
15  scores affect the ranking, right?
16    A.  Yeah, absolutely.
17    Q.  And you would agree with me that ranking affects
18  promotions?
19    A.  Yes, but a mean score difference doesn't mean that
20  there is not some minorities.  These three blacks could
21  have been at the high end of the score range, and then
22  have, you know, other people at the bottom end.  You could
23  have had more blacks at the top, and these three would have
24  still come out earlier.
25    Q.  Right.

Page 71

1    A.  That's not controlled by the mean.  It's specific
2  distribution.
3    Q.  Right.  I think I'm just asking for some simple
4  propositions here.  One is that scores affect ranking,
5  right?
6    A.  Right, scores determine ranking.
7    Q.  And ranking affects promotions in the City of
8  Boston?
9    A.  They do.
10    Q.  So can you not conclude from that that scores
11  affect promotions?
12    A.  They are likely to affect promotions, yes.  But it
13  depends on the specific distribution within the sample
14  where the minorities are located.  If they are located at
15  the upper end of the distribution, and I'm pointing to the
16  graph that we drew earlier, Exhibit --
17    MR. BOK:  Two.
18    A.  -- 2, if you have those three blacks up there,
19  regardless of where the means are, you can still get those
20  promotions in.  So while the average does give you a
21  likelihood of whether that happens or not, but it doesn't
22  determine it.
23    Q.  Well, if you think of the group as a whole, so
24  blacks as a whole and whites as a whole, and if the blacks
25  as a whole have lower average exam scores, and it's a

Page 72

1  statistically significant difference, wouldn't you agree
2  that in that situation blacks are less likely to get
3  promoted as quickly as whites?
4    A.  If we are looking at a fixed group of individuals
5  that are going to get promoted, because we are looking at
6  this chart -- am I going from this chart? -- I don't know
7  exactly where they are going to be.  I might think that
8  they might show up later on the distribution if I go simply
9  by the averages.
10    So there is a greater likelihood that that's true,
11  this statement you made is true, but it depends where those
12  individuals are.  And because they could really be anywhere
13  in that distribution, when it comes to actual promotions,
14  we don't really know.  It's just it may point to that, but
15  it doesn't determine it.  It may suggest it, but it doesn't
16  determine it.
17    Q.  Before when we talked about effect size, you
18  referenced a measure known as d?
19    A.  Yes.
20    Q.  D as in dog?
21    A.  Yes.
22    Q.  And that's also known as Cohen's d?
23    A.  That's correct.
24    Q.  Do you have in mind a level of Cohen's d that you
25  would believe to be significant?



Page 73

1    A.  Well, significance is a function of the sample
2  that that d is measured on.  But you mean substantial?
3    Q.  Yeah.
4    A.  Yes, one is substantial.
5    Q.  What if you had a d of .9?
6    A.  Still substantial.
7    Q.  What about .5?
8    A.  More on the moderate size.
9    Q.  Where do you draw the line between moderate and
10 substantial?
11   A.  Probably around .5, .6, would be starting to get
12 to these larger numbers.  I do it by my context.  When we
13 look at, for example, assessment centers, we sometimes find
14 data sets as low as -- actually, let me tell you about
15 entry-level testing.
16       In the old days when we used just cognitive type
17 ability tests, we would find d's with 1.8 to 1, I would
18 say.  Today with the inclusion of bio data, personal
19 measures, we get that d down to probably in the .2 to
20 .3 range.  I consider that to be low relatively speaking
21 historically.  And .5 would be, you know, moderate.
22       If we were to go back to the old days, you know,
23 and just use cognitive testing for entry level, that would
24 be, you know, .6 or anything above .5, .5, .6 would be
25 considered large because it would be back to the old way of

Page 74

1  doing it, which is cognitive ability testing.
2    Q.  Okay.  So you worked for the military or
3  Department of Defense at some point; is that right?
4    A.  I did.
5    Q.  And was there a situation where the military
6  learned that it had been incorrectly scoring its entry
7  examinations for military people?  Did you ever hear about
8  that?
9    A.  No, I did not.
10   Q.  All right.  Going back to Exhibit 6, this is the
11 Murphy and Jacobs article.  If you can go to page 13,
12 please.
13   A.  Okay.
14   Q.  And you see the heading where it says "Small
15 Effects Should Not Constitute Evidence of Adverse Impact"?
16   A.  I do.
17   Q.  Let me just read it.  It says, "The simplest and
18 most effective protection against mistaking a trivially
19 small difference in outcomes for systematic adverse impact
20 is to accompany significance tests with measures of effect
21 size.  We propose the following definition of adverse
22 impact in selection:  The use of a test, assessment or
23 other systematic selection procedure has adverse impact on
24 the employment opportunities of members of a protected
25 group when:  1.  The selection ratio for that group is

Page 75

1  significantly different from the selection ratio for the
2  group with the highest selection ratio, and 2.  The
3  difference between groups is greater than an agreed-on
4  minimum that would represent a trivially small difference.
5  Effect size measures such as d or PV can be used to define
6  this threshold."
7       Did I read that correctly?
8    A.  You did.
9    Q.  With respect to that second point, how would that
10 be applied in the context of a case like this?
11   A.  I guess, you know, once you find that you have
12 significant differences, the question becomes is the
13 magnitude large enough to warrant a conclusion that we have
14 a substantial effect.  So the idea is that with very large
15 sample sizes, you know, you may have a statistical
16 difference where d might be .05 or something like that,
17 fairly small, but yet is statistically significant.
18       So I think what the authors are looking at is, you
19 know, once you find significance of the difference, then
20 you would need to -- or the effect size in this case, you
21 would need to have at least an effect size of a certain
22 value for it to be considered substantial or of practical
23 concern, let's say.
24   Q.  What would the effect size mean in the context of
25 this kind of case, our case?

Page 76

1    A.  I think it would mean the selection ratio -- the
2  promotion rates.  The d associated with the promotion
3  rates.
4       I think what they are concerned with is large
5  samples that -- I haven't read this article, by the way,
6  but I think what they are concerned with is large samples
7  that may lead to significance with a very small effect
8  size.
9    Q.  And you yourself have written on large samples,
10 have you not?
11   A.  Yes.
12       (Document marked as Exhibit 9
13         for identification)
14 BY MR. CHURCHILL:
15   Q.  This is an article that you authored along with
16 Rick Jacobs and Kevin Murphy; is that right?
17   A.  That's correct.
18   Q.  And it's entitled "Unintended Consequences of EEO
19 Enforcement Policies:  Being Big is Worse than Being Bad."
20   A.  Correct.
21   Q.  What's the central premise of this article?
22   A.  I haven't read this in a while, but it's basically
23 that with large sample sizes, you can get significance
24 results, and yet it's, you know, a relatively small
25 difference in promotion rates.



Page 77

1    So the practical significance is small in terms of
2  promotion rates, for example, but that the large sample
3  size makes it a statistically significant result, meaning
4  that it says that the promotion rates no matter how small
5  they are, the difference between them is that they are
6  different, the underlying populations.
7    Q.  That's because when you have a larger sample size,
8  it's more powerful, right?
9    A.  That's correct.
10    Q.  Now, we don't have that situation in this case,
11  right, because the sample sizes are not large?  Would you
12  agree with that?
13    A.  Yes.
14    Q.  If you can turn to page 469 in your article.
15    A.  Okay.
16    Q.  And you see where it says "Simulation
17  Implications"?
18    A.  Yes.
19    Q.  I'm going to ask you something about a sentence in
20  that paragraph, but it would be unfair to not have you have
21  the context.  If you can read that paragraph to yourself.
22    A.  Okay.  (Witness reviews document.)
23    Okay.
24    Q.  In the last sentence there it says, "We have
25  chosen for many years to 'oversimplify' our definition and

Page 78

1  assessment of adverse impact to a point where we are likely
2  to conclude that virtually all very large organizations
3  discriminate and that virtually no small organizations
4  discriminate."
5    Do you see that?
6    A.  I do.
7    Q.  And why is it that virtually no small
8  organizations discriminate?  Why is that the conclusion
9  that you come to?
10    A.  Well, I think it's based on the idea that with
11  small samples you are less likely to find statistical
12  significance with differences in promotion rates.
13    Q.  And we have samples in this case, right?
14    A.  You do.
15    Q.  And if you turn to the next page, page 470, the
16  first full paragraph that begins "Effect size
17  calculations," do you see that?
18    A.  I do.
19    Q.  If you go five lines down, there is a sentence
20  that begins, "The upshot of current practice."
21    A.  Um-hm.
22    Q.  Do you see that?
23    A.  Yes, I do.
24    Q.  It says, "The upshot of current practice is that
25  it allows for the possibility that sufficiently small

Page 79

1  organizations may be unmotivated to correct even the most
2  glaring inequities in their systems, safe in the knowledge
3  that the lack of statistical power renders them essentially
4  immune from a finding of systematic adverse impact."
5    Did I read that correctly?
6    A.  Yes, you did.
7    Q.  Do you agree with that?
8    A.  Yes.
9    Q.  When it says that "organizations may be
10  unmotivated to correct even the most glaring inequities,"
11  what does that refer to in terms of inequities?
12    A.  Promotion rates, I presume.  I didn't read the
13  entire paragraph, but I think that's talking about the
14  promotion rates.
15    Q.  And this article actually references the
16  Murphy-Jacobs article that we looked at earlier, does it
17  not?
18    A.  Let me see.
19    MR. BOK:  Counsel, are you referring to page 471?
20    There is a citation there.
21    MR. CHURCHILL:  Yeah.
22    A.  Yes, it does.
23    Q.  You saw in Dr. Wiesen's report that he found
24  statistically significant differences with respect to
25  passing rates of blacks and whites; is that right?

Page 80

1    A.  I read that in his report, yes.
2    Q.  And that was true for both the 2005 and 2008
3  exams?
4    A.  I don't recall, but I believe it was.
5    Q.  Okay.  And you did not address that issue in your
6  report, did you?
7    A.  No, I did not.
8    Q.  Why not?
9    A.  Because it didn't impact the issue of promotion
10  rates.
11    Q.  Is it your view that it's inappropriate to look at
12  passing rates when evaluating adverse impact?
13    A.  Yes.
14    Q.  And do you believe that's the view of all
15  industrial organizational psychologists?
16    A.  Not Dr. Wiesen's, but -- so not all, no.
17    MR. CHURCHILL:  Can we mark this as the next one,
18    please.
19    (Document marked as Exhibit 10
20    for identification)
21  BY MR. CHURCHILL:
22    Q.  Showing you what's been marked as Exhibit 10, do
23  you recognize this document?
24    A.  No, I haven't seen this documents that I recall.
25    Q.  If you can turn to the second page, which is



Page 81

1 stamped 1964 on the bottom.

2    A.   Yes.

3    Q.   Would you agree that in the middle of the page
4 here they are doing an analysis of the pass/fail rate
5 between blacks -- well, minorities, which is defined here
6 as blacks and Hispanics, and white group members?

7    A.   You are talking about the non-protected versus
8 protected group there?

9    Q.   Yeah.

10   A.   Okay.  (Witness reviews document.)
11        This is for the police sergeant or police
12 lieutenant?

13   Q.   This is police sergeant.

14   A.   I'm sorry, at the top.

15   Q.   So if you go to page 2?

16   A.   Right.

17   Q.   In the middle there do you see where it says under
18 the second table "The pass/fail rate between Protected and
19 Non-Protected group members differed at a statistically
20 significant rate; namely," and then it lists the numbers
21 there.  Do you see that?

22   A.   I see that.

23   Q.   It says, "The nominal adverse impact ratio at the
24 cut score of 70 is 59.9."

25        Do you see that?

Page 82

1    A.   I do see that.

2    Q.   You would agree this is the analysis of adverse
3 impact based on passing rates?

4    A.   Yeah, it compares the percentages of the passing
5 rates between protected and non-protected group members,
6 yes, at the 70 score cutoff.

7    Q.   And if you can look at Exhibit 5, which is the
8 adverse impact tool kit.

9    A.   Page 5 you said?

10   Q.   Exhibit 5, page 1.

11   A.   Okay.

12   Q.   And you see in the section where it says
13 "Overview"?

14   A.   Yes.

15   Q.   And the second sentence there says, "Adverse
16 impact is a statistical concept that is generally used to
17 mean there is a 'substantially different passing rate'
18 between two groups on a practice, procedure, or test."

19   A.   Um-hm.

20   Q.   Do you see that?

21   A.   I do see that.

22   Q.   Do you agree with that?

23   A.   No.  I mean, if he means promotion, then I would
24 agree with it.  Substantially different promotion rate, I
25 would agree with that.  If he means bypassing promotion,

Page 83

1 then I would agree with that.  But passing rate, I'm not
2 sure passing what.

3    Q.   Would you agree that passing the Police
4 Lieutenant's Exam is a necessary condition of getting
5 promoted?

6    A.   Yes, by definition it is.

7    Q.   What do you mean "by definition"?

8    A.   No one who doesn't pass is eligible for promotion.
9 My understanding.

10   Q.   All right.  So let's talk about the delay to
11 promotion issue.  Now, you took issue with the test that
12 Dr. Wiesen conducted, is that right, for the analysis that
13 he did?

14   A.   Yes.  I believe that the use of days was
15 inappropriate since the test doesn't control how many days
16 there are between individuals.  Obviously if there is
17 unlawful discrimination, then the damages would, you know,
18 obviously deal with number of days.

19        But the test itself as to whether the test could
20 potentially contribute to damages to minority individuals,
21 I think that's a function of the order that the promotions
22 are made and not the number of days that are between.  A
23 test can't control when positions open up.  A test can
24 control who it feeds next to the promotion processes.

25   Q.   Well, tests can affect average scores, can't they?

Page 84

1    A.   Tests can affect the average scores?  Yeah, I
2 mean, you can compute average scores on tests.

3    Q.   So tests can affect ranking, right?

4    A.   Right, the order, yes.

5    Q.   And ranking affects promotions, right?

6    A.   That's correct.

7    Q.   Now, wouldn't you agree that you have to look at
8 how a test is used when evaluating adverse impact and
9 validity?

10        MR. BOK:  Objection to the use of "validity."
11    This is our validity expert.

12   Q.   Would you agree that it's appropriate to look at
13 how a test is used when you are assessing adverse impact?

14   A.   It's essential.  You have to know if it's a
15 straight down list or if it's a rule of three or how it's
16 being done, yes.

17   Q.   And how it's done here is in strict rank order,
18 right?

19   A.   That's correct.

20   Q.   Now, you also -- you took issue with Dr. Wiesen's
21 use of a Mann-Whitney test; is that right?

22   A.   That's correct.

23   Q.   And what was your criticism in that regard?

24   A.   Well, essentially it's less appropriate.  There
25 are a lot of ties.  The test does correct for ties using



Page 85

1  the SM tie, the distribution.  But one of the problems is
2  that when there are unequal variances in the two groups,
3  that the unequal variance can actually lead to an increase
4  or more liberal estimate of the p-value, so that the
5  p-value is lower than it would otherwise be.
6      I ran a comparison of the variance associated with
7  the two groups, and I found that there is a statistically
8  significant difference in the variance.
9      Q.  Meaning what?
10     A.  Meaning that the variance, the spread in the
11  order, do differ substantially between the two groups.
12     Q.  So what conclusion do you draw from that?
13     A.  That the standard deviation of the two groups in
14  that particular two sets of data is different.  Variance is
15  different.
16     Q.  And it's a significant difference?
17     A.  It is.
18     Q.  Right.  And so what does that tell you in lay
19  terms?
20     A.  It's more likely that you are going to find -- to
21  estimate the p-value to be lower than it should be.
22     Q.  Okay.
23     A.  There is a liberal bias in technical terms.
24     Q.  And are you saying that there is a liberal bias
25  because there are ties?

Page 86

1      A.  Well, I mean, function of the ties as well as the
2  function of the variance.
3      Q.  Okay.  So let me ask this --
4      A.  Ties can make variance more different.
5      Q.  Just to make sure I understand, does your
6  criticism of Dr. Wiesen's use of the Mann-Whitney test go
7  to the fact that there are ties?
8      A.  Well, the variance are usually a function -- the
9  variance differences are usually a function of ties, yes.
10     Q.  So your criticism is that because there are ties
11  in this population, that the Mann-Whitney test would be
12  more plaintiff favorable or more defendant favorable?
13     A.  More plaintiff favorable.
14     Q.  What resource or reference do you rely on to reach
15  that conclusion?
16     A.  There has been, I think, some research on that
17  specifically.  I'm trying to remember the name of the
18  article.  I think it's Nachar 2008 comes to mind.  I think
19  it's spelled N-A-C-H-A-R.
20     Q.  Did you cite that in your report?
21     A.  I did not.
22     Q.  Why not?
23     A.  I was not -- I mean, I just said it was
24  inappropriate, less appropriate than other tests.  You are
25  asking me now, so I'm telling you now.  But, you know, I

Page 87

1  apologize I didn't have it in there.
2      MR. CHURCHILL:  Can you mark this as the next
3  exhibit, please?
4          (Document marked as Exhibit 11
5              for identification)
6  BY MR. CHURCHILL:
7      Q.  I have handed you what's been marked as
8  Exhibit 11.  This is an excerpt from a book as indicated on
9  the front page, "Nonparametric Statistics For the
10  Behavioral Sciences."
11     Do you see that?
12     A.  I do.
13     Q.  Do you know this text?
14     A.  I do not.
15     Q.  If you look at the table of contents under
16  Chapter 6?
17     A.  Um-hm.
18     Q.  Do you see in Section 6.4 there is a discussion of
19  Wilcoxon-Mann-Whitney test?
20     A.  Right.
21     Q.  And that's what you are talking about, right?
22     A.  Um-hm.
23     Q.  If you go to the next page, which is page 136,
24  just read the first full two paragraphs there to yourself.
25     A.  (Witness reviews document.)

Page 88

1      Okay.
2      Q.  And you see in the second paragraph here they are
3  talking about a correction in terms of correcting for ties,
4  right?
5      A.  Right.
6      Q.  And it says in the second sentence, "Therefore,
7  when we do not correct for ties our test is 'conservative'
8  in that the associated probability will be slightly
9  inflated compared to that for the corrected z."
10     Did I read that right?
11     A.  Yes, you did.
12     Q.  That says the opposite of what you said?
13     A.  It says that ties don't have an effect in terms of
14  increasing the p -- I'm sorry, decreasing the p-value
15  further, but that doesn't take into account the differences
16  in the variances whereas it actually becomes more
17  statistically significant.
18     Q.  Okay.  According to this textbook, when you do not
19  correct for ties --
20     A.  This textbook is from 1988.
21     Q.  All right.  Has that math changed since 1988?
22     A.  Well, what I'm citing is an article from 2008 by
23  Nachar that specifically finds when there are unequal
24  variances, that the Mann-Whitney tends to be an overly
25  liberal or liberally biased estimator of the p-value.



Page 89

1  Q.  Okay.  But just to make sure I'm interpreting this
2  correctly, this textbook says that when you do not correct
3  for ties, it's actually more defendant friendly, right?
4  A.  Yes.
5  Q.  Okay.  And you understand that Dr. Wiesen did not
6  correct for ties when he did the Mann-Whitney test?
7  A.  I wasn't -- I'm not aware of that, no.
8  Q.  Were you aware that at some point around 2008,
9  EB Jacobs was involved with a potential banding issue in
10  the City of Boston?
11  A.  Yes.
12  Q.  And did you have any involvement with that?
13  A.  Yes.  I was asked to prepare an explanation of
14  what banding was and to -- I also made a trip up to Boston
15  to present -- it wasn't so much to present, but to be there
16  to help the City explain to members, I think of the
17  department, as well as to -- I think the media was also
18  there, they were interested in that issue.  So I basically
19  prepared this explanation of banding and was present for
20  the explanation to be made public essentially.
21  Q.  When you say you prepared an explanation, did you
22  prepare something in writing?
23  A.  It's been a while, but I would think I would have,
24  yeah.
25  Q.  Was that to be handed out to members of the police

Page 90

1  department, or was it for some other use?
2  A.  I don't know what they did with it, but I did
3  provide it, I believe, to the department.
4  Q.  Do you still have what you prepared for banding?
5  A.  I might.
6  Q.  Let's talk about aggregation.  Is it your view
7  that it's always inappropriate to aggregate data when
8  analyzing adverse impact?
9  A.  There is many times that -- by aggregation are you
10  talking about combining actual data or aggregating results
11  to come to conclusions?
12  Q.  What's the distinction?
13  A.  Well, if you have, like, for example, two studies
14  or three studies on a given subject, you can do analysis
15  combining the studies using a methodology called
16  metanalysis that looks at effect sizes associated with
17  different studies and analyze that subject.  Therefore, you
18  know, you might conclude that, you know, you build a
19  distribution around that effect size and try to establish
20  the significance of the average effect size, and that would
21  be appropriate, yes.
22  Q.  What about in the second situation?
23  A.  Where you actually combine data sets?
24  Q.  Yes.
25  A.  That could be much more problematic.

Page 91

1  Q.  Is it ever appropriate?
2  A.  I would say no because the biggest problem can be
3  that -- you know, possibly.  I think if you had no overlap
4  whatsoever between the two data sets, you didn't have any
5  subject in one and subjects in the other, that might be
6  okay.
7  The problem is that, you know, if you have two
8  subjects -- like in this case, you can have a 2005
9  candidate take the 2008 as well, and then essentially that
10  candidate has two chances to be promoted.  And the other
11  candidates that did not retest from 2005, they only had one
12  chance to be promoted.  So you have a differential
13  probability matrix there.
14  You know, that's with respect to other parameters
15  that I mentioned in my report, the sample size differences
16  between the two exams here as well as the difference, and I
17  think there was a 40 percent difference in the sample
18  sizes, and there was, I believe, a 60 percent difference in
19  the selection ratios and a 70 percent difference in the
20  minority representation.
21  So when you have the differences on those three
22  parameters to that extent, you are not reasonably sure what
23  you are getting when you combine things.  And then you mix
24  in the fact that one person can have a higher probability
25  of being promoted just because they took the test two times

Page 92

1  and some don't.  It really becomes very difficult to come
2  to any conclusion.
3  Q.  Does this all relate to Simpson's Paradox?
4  A.  Well, those kinds of parameters about the data
5  that you are combining can have an impact in the direction
6  of whatever it is that you are analyzing.  It can actually
7  reverse it.  When we talk about Simpson's Paradox is when
8  there is actually a reversal of the conclusion.  It's a
9  paradox because there is no effect, and then when you
10  combine there is an effect, so that's the paradox aspect of
11  it.  It's these factors that contribute to whether you are
12  likely to move towards a Simpson's Paradox situation.
13  Q.  All right.  So just to be sure I understand, the
14  paradox in Simpson's Paradox is where if you can combine
15  two data sets, for example, individually they might say the
16  opposite of what they say when combined?
17  A.  Right.
18  Q.  But here wouldn't you agree that the 2005 and the
19  2008 exams when evaluated individually lead to the same
20  result that they do when combined?
21  A.  No.  In one you have -- in both you have a
22  non-statically significant effect.  You are combining
23  getting a significant statistical effect.  I would venture
24  that even if you kept the AI ratio where it is for any one
25  of the samples and simply recomputed the statistics there,



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                              93–96

Page 93

1  you would probably find that there would be significance
2  just by increasing our sample size.
3     Q.  And that relates to the issue you talked about
4  earlier, that large sample sizes are more powerful?
5     A.  Right.  You always want to have higher sample
6  sizes for the test of significance.
7     Q.  In terms of AI impact, the AI ratio, sorry, you
8  would agree that there was -- the AI ratio was well below
9  .8 for both the 2005 and 2008 exam?
10    A.  The observed ratios are in the high 30s, let's
11  say.
12    Q.  And then when they are combined, they are at a
13  relatively similar ratio?  A little higher, actually,
14  right?
15    A.  Right, a little bit higher.
16    Q.  So there is no Simpson's Paradox there?
17    A.  There is no reversal conclusion.
18        (Document marked as Exhibit 12
19          for identification)
20  BY MR. CHURCHILL:
21    Q.  Showing you now what's been marked as Exhibit 12,
22  and you recognize this as the affidavit you signed in this
23  case on November 23, 2014?
24    A.  Yes.
25    Q.  And you wrote --

Page 94

1        MR. BOK:  Just so long as it's clear that there
2     were attachments to this, which are not included.
3        MR. CHURCHILL:  Yes.  I agree.
4        MR. BOK:  Okay.
5  BY MR. CHURCHILL:
6     Q.  And who wrote this affidavit?
7     A.  I did.
8     Q.  All right.  If you can turn to page 4, and
9  starting at paragraph 15, you see you start talking about
10  the four-fifths rule there?
11    A.  Um-hm.
12    Q.  Do you see that?
13    A.  Yes, I do.
14    Q.  You would agree that the four-fifths rule is
15  commonly used to evaluate adverse impact, right?
16    A.  Yes.
17    Q.  And it's provided for in the uniform guidelines?
18    A.  Yes.
19    Q.  And it's been a rule that's been used for decades,
20  right?
21    A.  Yeah, I believe decades.
22    Q.  And it's still in place, right?  The four-fifths
23  rule?
24    A.  From a legal standpoint.
25    Q.  It's still being used?

Page 95

1     A.  We use it to gauge the amount of the difference in
2  the promotion rates, yes.
3     Q.  When you say "we," what do you mean?
4     A.  Biopsychologists.
5     Q.  So it's something that you would still use today?
6     A.  Sure, because it captures the essence of observed
7  differences.
8     Q.  What do you mean by that, the essence of the
9  observed differences?
10    A.  Well, if I see a point A has an adverse impact
11  ratio, I would know it's 80 percent, the minority rate is
12  80 percent of the majority rate, so it's a quick summary
13  measure.
14    Q.  All right.  In paragraph 15 in your second
15  sentence there it says, "Unfortunately, the 'four-fifths'
16  rule when applied to small samples (e.g., less than 200)
17  can have very large error rates that often greatly exceed
18  the 5 percent error rate employed in statistical
19  significance testing."
20        What do you mean by error rates there?
21    A.  Very simply that if you have two populations that
22  showed no difference in and had exact equal distribution,
23  so they were normally distributed, they just basically were
24  to draw one distribution for minorities, and you were to
25  draw one distribution for whites, they would be exactly the

Page 96

1  same.  So there is no difference in either the means, the
2  shape of the distributions, or, you know, what percentage
3  in the tails and so forth, all that would be impacted the
4  same.
5        If you were to do that, you know, and you selected
6  a certain number of people from that group, that a certain
7  percentage of the time you would find even then that the
8  four-fifths rule would fall below .8 or the four-fifths
9  rule would be what we call violated in terms of a legal
10  term, and it would be an error.
11        It would be an error simply because the underlying
12  populations are exactly identical, so there should be no
13  violations of the four-fifths rule.  Because it is, you
14  know, sampling from those two equal populations in small
15  numbers, that there will be times when the four-fifths rule
16  is triggered.
17        What I did in my affidavit here is basically
18  compute the percentage of time that you would actually
19  trigger a violation of the four-fifths rule where there is
20  none in the underlying populations.
21    Q.  Okay.
22    A.  That would be the error.
23    Q.  And when you did your Monte Carlo analysis, you
24  assumed the populations were the same, right?
25    A.  I don't recall.  Normally distributed.



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                              97–100

Page 97

1   Q.   And by the same, that meant that they had the same
2   test scores, right?
3   A.   Yes.  There was no difference whatsoever in their
4   underlying characteristics.
5   Q.   Meaning their test scores?
6   A.   Their test scores.
7   Q.   And so by error you meant a determination used in
8   the four-fifths rule that there was adverse impact when, in
9   fact, the test scores were the same?
10  A.   Right.
11  Q.   So in that case you are using as your, quote,
12  underlying reality the fact that there was no difference
13  with respect to test scores?
14  A.   That's right.  If the underlying reality if there
15  is no difference in any manner in the populational shape or
16  in any, you know, either the tails or the overall
17  distribution, and the average is the same, the variance,
18  the spread is exactly the same, then any deviation from,
19  you know, that falls below .8 would be an error.
20  Q.   Okay.  Here the underlying reality we know is that
21  there are different average test scores, right?
22  A.   Yes.
23  Q.   So the assumption that goes into your Monte Carlo
24  analysis is not true in this case?
25  A.   Well, the purpose for my assumptions and for

Page 98

1   creating these equal populations is to demonstrate that the
2   four-fifths rule contains a substantial amount of error.
3   Q.   With that assumption?
4   A.   Well, that's how you estimate error.  You have to
5   assume that you know what's underneath, and that's how you
6   know what's underneath is you say, okay, this is something
7   that I know, and even with no difference, I'm going to find
8   a certain amount of error rate.  That's the error rate of
9   the statistic.  This statistic has a very high underlying
10  error rate.
11  Q.   And did you do a Monte Carlo analysis where the
12  assumption was there actually was a score difference, as
13  there is here?
14  A.   Well, no.  There I would expect to find that it
15  would be most likely triggered.  As we discussed earlier,
16  the larger the differences, the more likely that you are
17  going to trigger adverse impact.
18  Q.   And by "differences" you mean average score
19  differences?
20  A.   Right.
21  Q.   So is it fair to say that basically what you are
22  saying through this Monte Carlo analysis is that you can't
23  infer from an AI ratio that there was a difference in test
24  scores?
25  A.   No.  What I'm saying is that the four-fifths rule

Page 99

1   is inherently error prone with small samples.
2   Q.   And, therefore, it's not reliable?
3   A.   Well, if we use it as our standard 5 percent error
4   rate as an acceptable error rate, as we do in statistical
5   significance testing, we find error rates of 18 percent and
6   higher for the two exams, then clearly we are accepting if
7   we use the four-fifths rule, we are accepting error rates
8   that substantially exceed the 5 percent acceptable rate.
9   Q.   But the error there in terms of it not being
10  reliable is that because of the problem with small samples,
11  as you identified, if you have an AI ratio of under .8,
12  what you are saying is that you can't reliably conclude
13  that there actually was an underlying difference?  Isn't
14  that what you are saying?
15  A.   You can't conclude it with 5 percent error rate.
16  You can conclude it with -- I believe for the 2008 exam it
17  would have an error rate of 18 percent, somewhere in that
18  range, and I think higher for the 2005.
19  Q.   Okay.  You may have answered your question, I'm
20  not sure as you said it.
21  A.   It's complicated.
22  Q.   What I'm trying to understand is what you are
23  saying is that because of that problem you identified with
24  the AI ratio with small samples, that when you have a small
25  sample as we do here, that if it's below .8, you can't

Page 100

1   safely conclude from that that there actually is a
2   difference in underlying scores, right?
3   A.   Yeah, you can't reliably conclude that the
4   difference between the two groups is difference in
5   promotion rates.  You can only do it if you are willing to
6   accept those error rates, which are, as I stated in my
7   report, around, say, 18 and 20 something percent.
8   Q.   I guess what I'm not understanding is when you
9   talk about error in this context, what you are comparing it
10  to is the underlying score difference, because your
11  assumption when you are doing the Monte Carlo analysis is
12  that the scores are the same?
13  A.   Right.
14  Q.   If you make that assumption, you can make an error
15  by getting an AI ratio that's under .8, and the error is
16  that it seems like there is a difference, but there is
17  really not?
18  A.   Right.  That's correct.
19  Q.   So basically you are saying that you can't use the
20  AI ratio to conclude that there is an underlying score
21  difference?
22  A.   I'm not sure that I can say it in the opposite
23  direction.  The way it's set up it's to use the equality of
24  the two populations to conclude that the particular
25  statistic that we are using does lead to error rates that



JACINTO M. SILVA, PH.D.                                December 11, 2014
SMITH v. CITY OF BOSTON                                        101–104

1 exceed that 5 percent level.  And if we are willing to
2 accept those error rates, you know, willing to accept, say,
3 for 2008 we were willing to accept an error rate of
4 20 percent, then you could conclude that there is adverse
5 impact in the four-fifths rule, but you would have to
6 accept an error rate of 20 percent or whatever it is in
7 this case.  I think it might be 16 or 18 percent.  So you
8 would have to accept that.
9       At that level of error, whether the Court does or
10 doesn't, that's not really my decision.  I can only point
11 out that there are, you know, substantial error rates
12 associated with this particular measure.
13 Q.  All right.  If you can go to paragraph 23.
14 A.  Um-hm.
15 Q.  And in the first sentence -- I'm sorry, the second
16 sentence you say, "By chance, 18 and 43 percent of the
17 time, respectively for the 2008 and 2005 exams, one would
18 erroneously conclude that adverse impact against minorities
19 was demonstrated where none actually existed."
20     Do you see that?
21 A.  Yes, I do.
22 Q.  When you say "where none actually existed," what
23 are you referring to?
24 A.  To the two equal populations that were simulated.
25 Q.  So in other words you would -- another way of

1 reading this is one would erroneously conclude that adverse
2 impact against minorities was demonstrated where there were
3 no score differences?
4 A.  Depends on what you mean by "score differences."
5 I prefer to use the distributions.
6 Q.  But that was based on the scores, right?
7 A.  Yes.  How about we say score distributions or
8 score distribution differences.
9 Q.  Okay.  And then in the next sentence you say,
10 "Given that the minority and white candidates performed
11 identically in the simulations," and by there you mean test
12 scores, right?
13 A.  Um-hm.
14 Q.  Right?
15 A.  Yes.  These distributions are identical.
16 Q.  Right.  "... there are about 1 in 3 and 8 in
17 10 chances, respectively for the 2008 and 2005 exams, based
18 on the 'four-fifths' rule, we would wrongly conclude that
19 adverse impact existed against one of the groups even when
20 the groups performed identically."
21 A.  Right.
22 Q.  Again, "performed identically" means having the
23 same test scores, same test score distribution?
24 A.  Same scores.
25     (Document marked as Exhibit 13

1     for identification)
2 BY MR. CHURCHILL:
3 Q.  Showing you what's been marked as Exhibit 13, and
4 this is an article that you coauthored entitled "Adverse
5 Impact Is Far More Complicated Than the Uniform Guidelines
6 Indicated," right?
7 A.  That's correct.
8 Q.  And you coauthored it with Jim Jacobs and Paige
9 Deckert?
10 A.  I did.
11 Q.  If you can turn to the second page, page 559?
12 A.  Um-hm.
13 Q.  And if you look in the right column up at the top?
14 A.  Okay.
15 Q.  Do you see there is a sentence that says, "We must
16 stop confusing others"?  It's about six lines down.
17 A.  Okay.
18 Q.  It says, "We must," and "must" is emphasized, do
19 you see that?
20 A.  Yes, I do.
21 Q.  "We must stop confusing others with analyses that
22 sound alike but are very different, and we must focus on
23 analyses that actually tell us something about the
24 magnitude of the difference," right?
25 A.  Yes.

1 Q.  And then if you go over on the left column, it's
2 around there (indicating), there is a sentence that begins,
3 "There are several well-known, widely accepted."
4     Do you see that?
5 A.  Yes.
6 Q.  "There are several well-known, widely accepted,
7 and easily interpreted measures of the size of the
8 difference between two groups that are truly based on
9 standard deviations rather than standard errors, most
10 notably the d statistic," right?
11 A.  Yes, that's correct.
12 Q.  We talked about that earlier?
13 A.  Yes, we did.
14 Q.  And then if you go down to the bottom of that
15 column, there is a sentence that begins, "For example."  Do
16 you see that?
17 A.  I do.
18 Q.  "For example, White-Black differences in average
19 scores on cognitive ability tests are typically described
20 as large (d = .80 to 1.00)."
21     Do you see that?
22 A.  I do.
23 Q.  Do you agree with that?
24 A.  Yes.
25 Q.  And then it goes on and it says, "whereas



JACINTO M. SILVA, PH.D.                                December 11, 2014
SMITH v. CITY OF BOSTON                                        105–108

Page 105

1  White-Black differences in measures of job performance are
2  typically described as small to medium in size
3  (d = .20-.30...)."
4       Do you see that?
5  A.  I do.
6  Q.  Do you agree with that?
7  A.  Yeah.
8  Q.  Incidentally, when you said in Miami there were
9  some test elements where minorities performed better than
10 whites, what elements were those?
11  A.  Usually they are role plays; subordinate
12 conference or group meeting, citizen meeting.  So those are
13 all role plays, either interacting with a group of
14 individuals in the department or citizens or interacting
15 with a subordinate, for example, as having performance or
16 disciplinary issues.
17 Q.  How were those types of exercises rated?
18 A.  By assessors.
19 Q.  And is that a carefully controlled process?
20 A.  Very.
21 Q.  If you can go to the bottom of the right-hand
22 column, page 559.
23 A.  Okay.
24 Q.  It says, "To assume."  Do you see that?
25 A.  Yes.

Page 106

1  Q.  It says, "To assume that we suspend our many
2  decades of research and expect no differences on tests that
3  have a long history of differences is to deny reality."
4       Do you see that?
5  A.  I do.
6  Q.  Do you agree with that?
7  A.  Yes.
8  Q.  And as you said before, you would agree that there
9  are decades of research indicating that blacks tend to do
10 worse on the type of examination at issue in this case?
11  A.  Right, and they tend to perform worse on most
12 types of testing.  And even when we find a component that
13 may have less impact, it tends to have very little impact
14 on the adverse ratio because it's still, you know, there is
15 other components to the test that also set the foundation
16 for the promotions.  So we often don't see that it has as
17 much positive effect as we had hoped for early on when we
18 began using these kinds of assessment centers.
19 Q.  There is no footnote to that effect here, is
20 there, that says what you said after that sentence?
21 A.  I don't believe so.
22 Q.  Okay.  And what you just talked about in terms of
23 performing worse on different types of tests really goes
24 back to the d measure, right?
25 A.  Yes.

Page 107

1  Q.  All right.  And even though there might be
2  differences, it's well recognized that the d measure for
3  the kinds of test at issue in this case are among the
4  highest d measures there are in terms of black-white
5  performance?
6  A.  The .8 to 1?
7  Q.  Yes.
8  A.  Yes.
9       (Document marked as Exhibit 14
10       for identification)
11 BY MR. CHURCHILL:
12 Q.  Just showing you what's been marked as Exhibit 14,
13 and this is an article that you coauthored entitled
14 "Validity, Utility, and Adverse Impact:  Practical
15 Implications From 30 Years of Data"; is that right?
16 A.  That's correct.
17 Q.  And you coauthored this with Wayne Cascio and Rick
18 Jacobs?
19 A.  That's right.  Pronounced Cass e o.
20 Q.  Sorry.  Fortunately in the transcript it will not
21 show one way or the other.
22       If you go to page 272.
23 A.  Um-hm.
24 Q.  There is a section that says "Broadening the Scope
25 of Characteristics Tested Improves and Reduces Adverse

Page 108

1  Impact."
2       Do you see that?
3  A.  I do.
4  Q.  I'm going to read part of this.  It says, "In our
5  specific area of inquiry, there is a long and rich history
6  of testing.  For decades, civil service and other
7  public-sector organizations found that testing large pools
8  of candidates for a variety of positions was done best by
9  assessing knowledge or cognitive abilities via written,
10 multiple-choice tests.  In some of these applications, the
11 tests were simply broad, fact-based devices tapping
12 everything from geography to current events.  Others took
13 more ability-based approach and measured math, vocabulary,
14 and reasoning.  Whatever the underlying factors measured,
15 to the extent that the predictors focused on cognitive
16 abilities or, more specifically, verbal abilities, one
17 outcome was highly likely:  White candidates significantly
18 outperformed African American candidates."
19 Q.  Do you agree with all that?
20 A.  Um-hm.
21 Q.  Is that a yes?
22 A.  Yes, I'm sorry.
23 Q.  It goes on, "As these tests became more and more
24 tailored to specific job characteristics, the difference
25 between the two groups began to shrink, but the difference



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                         109–112

Page 109

1  remained large, and any selection process based solely on
2  test scores that were predominantly the result of assessing
3  cognitively abilities, would certainly lead to adverse
4  impact."
5       Did I read that correctly?
6    A.  Um-hm.
7    Q.  Do you agree with all that?
8    A.  Yes.  I mean, that certainly might be an
9  overstatement, but it would be very likely if you based it
10  on cognitive ability that would be the case.  We are
11  talking here about entry-level testing.
12     Q.  And then it goes on and says -- I'm going to read
13  two more sentences -- "Since the 1980s, many agencies have
14  adopted a much broader definition of jobs, and the
15  corresponding areas identified for selection testing have
16  expanded.  In police officer selection, it is no longer the
17  accepted practice to assess only cognitive abilities."
18      Did I read that correctly?
19    A.  Yes.
20    Q.  Okay.
21       MR. CHURCHILL:  Why don't we take another break.
22  I'm nearing the end.
23       MR. BOK:  That would be fine.
24       (Recessed at 3:47 p.m.)
25       (Resumed at 3:56 p.m.)

Page 110

1            CONTINUED DIRECT EXAMINATION
2  BY MR. CHURCHILL:
3    Q.  If you can go to your report, which is Exhibit 1,
4  and page 6.
5    A.  Okay.
6    Q.  And in the second paragraph under the section
7  where it says "Promotion Order"?
8    A.  Um-hm.
9    Q.  In the sentence that starts, "However," "However,
10  number of days between promotions is not the appropriate
11  way to examine this issue because the number of days
12  between promotions is not a function of the test, it is a
13  function of when the positions open up."
14       Did I read that right?
15    A.  Yes.
16    Q.  In fact, the number of days between promotions is
17  a function of both, isn't it?  Because it certainly matters
18  when a position opens up, right?
19    A.  The order does, yes.  Not the number of days
20  between promotions.  Obviously, if there is an adverse or,
21  you know, if there is an adverse impact to the -- I'm not
22  talking about the technical term "adverse impact," but
23  adverse impact to candidates that can be demonstrated to a
24  significance test and that the Court determines that there
25  is not a valid selection process in place, then obviously

Page 111

1  the number of days is important in computing damages
2  because these plaintiffs have been damaged as a function of
3  the number of days.
4       But the test does not control or in any way impact
5  the number of days that will occur between promotions.  It
6  only impacts the order in which the promotions are made.
7    Q.  Okay.  So I guess what I'm saying is if you look
8  at Exhibit 8, which is this chart, this "Delay" column here
9  on the far right it starts 89 days, 91 days, 140 days, et
10  cetera?
11    A.  Um-hm.
12    Q.  That's a function, first of all, of when the
13  promotions are made, right?
14    A.  Yes.
15    Q.  And that depends on when the positions open up
16  presumably, right?
17    A.  Yes, the order in which they open up.
18    Q.  But in terms of the number of days that any person
19  experiences, that's the function of ranking, right?
20    A.  Well, the order will effect the number of days
21  that someone -- that it takes someone -- because if there
22  is promotions only at certain points in time, then clearly
23  someone will be affected adversely by having to wait, say,
24  you know, 488 days.  If there is no promotions from 4/28 to
25  6/2, it adds, you know, another 25 days to their wait.

Page 112

1  Yes, obviously, you know, that's the case.  When you wait
2  longer, there is more days that go by, and, therefore, you
3  are affected for more days, yes.
4    Q.  All right.
5    A.  As far as what the test contributes to that, it
6  doesn't contribute.  It doesn't know when promotions are
7  going to be made.  It only knows the order.  It can only
8  impact the order.
9    Q.  I guess the point that I'm trying to understand is
10  that the order is determined by the exam score, right?  The
11  rank order is determined by the exam score?
12    A.  Yes.
13    Q.  And so here the number of days that any person
14  experiences is a function of where they are in the ranking,
15  right?
16    A.  Yes, absolutely.  Of course.
17    Q.  Okay.
18    A.  But when it comes to what the test actually
19  determines, the test only determines the order in which the
20  promotions are made.  It does not determine how many days
21  are going to elapse before that slot opens up, the slot
22  that you are in.
23       Let's say you got the third highest score.  So you
24  are going to be promoted third in the order.  But whether
25  you are promoted that same day as number one or number two



JACINTO M. SILVA, PH.D.
SMITH v. CITY OF BOSTON

December 11, 2014
113–116

Page 113

1  or number three, it doesn't tell you.  So you can be
2  promoted at the same time as number one and number two.  In
3  this case that's the case, the order is one, two, three.
4        Actually it's one, two, three, four, five, they
5  are all promoted on the same date.  Essentially that's zero
6  days' wait for number two, zero days' wait for number
7  three, zero days' wait for number four, and so forth.  It
8  still should be the order.  It's still one, two, three,
9  four.
10       It could have been that there would have been a
11  wait for the second person to promote.  Maybe a month or
12  two would have gone by before the second person would have
13  been promoted.  But it would have been inappropriate to say
14  that the person got promoted with, you know, more days or
15  less days.  They just got promoted second in the order.
16  That's really all that the test can determine.
17  Q.  Okay.
18       MR. CHURCHILL:  I have no further questions.
19       MR. BOK:  I have no questions of this witness.
20       (Discussion off the record.)
21       MR. CHURCHILL:  We are starting trial on Monday.
22       THE COURT REPORTER:  So when do you need the
23  transcript?
24       MR. CHURCHILL:  What are the options?
25       THE COURT REPORTER:  You tell me.  You are

Page 114

1  starting trial on Monday.
2       MR. CHURCHILL:  Sunday?
3       MR. BOK:  I assume you can do it electronically?
4       THE COURT REPORTER:  Absolutely.  You just tell me
5  when you want it, and I will make sure you have it.
6       MR. BOK:  Whatever he says, I'm happy with.
7       MR. CHURCHILL:  Sunday?
8       THE COURT REPORTER:  So Sunday by noon?
9       MR. CHURCHILL:  That's fine.
10       (Thereupon, the proceedings were concluded
11              at 4:04 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 115

1                    ERRATA SHEET
2  RE:        Bruce Smith, et al.
                        v
3            City of Boston, Massachusetts
   DEPO OF:   Jacinto M. Silva, Ph.D.
4  TAKEN:     December 11, 2014
5      DO NOT WRITE ON THE TRANSCRIPT.  ENTER ANY CHANGES
   HERE.
6  Page    Line              Correction
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19
   Please forward the original signed errata sheet to this
20  office so that copies may be distributed to all parties.
   Under penalty of perjury, I declare that I have read my
21  deposition and that it is true and correct subject to any
   changes in form or substance entered here.
22
23
   _____                    _____
24  Date                              Signature
25

Page 116

1                CERTIFICATE OF OATH
2
3  STATE OF FLORIDA          )
4  COUNTY OF MIAMI-DADE      )
5
6
7      I, Tamra K. Piderit, Florida Professional
8  Reporter, Registered Diplomate Reporter, Certified Realtime
9  Reporter, Certified LiveNote Reporter, and Notary Public in
10  the State of Florida, certify that JACINTO M. SILVA, Ph.D.
11  personally appeared before me on the 11th day of December,
12  2014, and was duly sworn.
13
14      Signed this 13th day of December, 2014.
15
16
17
18
                        Tamra K. Piderit
19                      Florida Professional Reporter
                        Registered Diplomate Reporter
20                      Certified Realtime Reporter
                        Certified LiveNote Reporter
21                      Notary Public, State of Florida
                        My Commission #EE133698
22                      Expires January 19, 2016
23
24
25



JACINTO M. SILVA, PH.D.                                    December 11, 2014
SMITH v. CITY OF BOSTON                                                 117

Page 117

```
1                    CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA     )
4    COUNTY OF MIAMI-DADE )
5
6           I, Tamra K. Piderit, Florida Professional
     Reporter, Registered Diplomate Reporter, Certified Realtime
7    Reporter, and Certified LiveNote Reporter, do hereby
     certify that I was authorized to and did stenographically
8    report the deposition of JACINTO M. SILVA, Ph.D.; that a
     review of the transcript was requested; and that the
9    foregoing transcript, pages 1 through 114, is a true record
     of my stenographic notes.
10
11          I further certify that I am not a relative,
     employee, or attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
13   financially interested in the action.
14
             Dated this 13th day of December, 2014.
15
16
17
18
19           Tamra K. Piderit
             Florida Professional Reporter
20           Registered Diplomate Reporter
             Certified Realtime Reporter
21           Certified LiveNote Reporter
22
23
24
25
```

