1              UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 12-cv-10291-WGY

4

5    BRUCE SMITH, et al
              Plaintiffs
6

7    vs.

8

9    CITY OF BOSTON,
              Defendant
10

11                         * * * * * * * * *

12

13

14                      For Trial Before:
                    Judge William G. Young

15

                         Bench Trial
16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Tuesday, January 6, 2015

20

21                         * * * * * * * *

22

              REPORTER: RICHARD H. ROMANOW, RPR
23                   Official Court Reporter
                 United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                     bulldog@richromanow.com
25

1                    A P P E A R A N C E S

2

3    HAROLD L. LICHTEN, ESQ.
     BENJAMIN WEBER, ESQ.
4        Lichten & Liss-Riordan, P.C.
         100 Cambridge Street, 20th Floor
5        Boston, MA 02114
         Email: Hlichten@llrlaw.com
6    and
     STEPHEN S. CHURCHILL, ESQ.
7        Fair Work, P.C.
         192 South Street, Suite 450
8        Boston, MA 02111
         Email: Steve@fairworklaw.com
9        For plaintiffs

10

     GEOFFREY R. BOK, ESQ.
11   KAY H. HODGE, ESQ.
     JOHN M. SIMON, ESQ.
12       Stoneman, Chandler & Miller
         99 High Street
13       Boston, MA 02110
         Email: Gbok@scmillp.com
14       For defendant

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LEAETTA M. HOUGH | | | | |
| By Mr. Lichten: | 5 | | 80 | |
| By Mr. Simon: | | 45 | | |
| | | | | |
| EDWARD P. CALLAHAN | | | | |
| By Ms. Hodge: | 85 | | 156 | |
| By Mr. Lichten: | | 141 | | |

E X H I B I T S

EXHIBIT 83........................................   5

        * * * * * * *

EXHIBIT M........................................  54

EXHIBIT N........................................  70

EXHIBIT O........................................ 140

```
 1          P R O C E E D I N G S

 2          (Begins, 9:00 a.m.)

 3          (LEAETTA M. HOUGH, sworn.)

 4          THE COURT:  This is an expert witness?

 5          MR. LICHTEN:  Yes.

 6          THE COURT:  And there's a report?

 7          MR. LICHTEN:  Yes, there is.  I have it right

 8     here, your Honor.

 9          THE COURT:  Do I have a copy?

10          MR. LICHTEN:  No, I'd like to give it to you.  May

11     I?

12          THE COURT:  Yes.  And will this be marked as an

13     exhibit as we did with the others?

14          MR. SIMON:  Well, your Honor, we do have an

15     objection to the extent that it's duplicative of what

16     Dr. Wiesen provided.  It was our understanding that

17     Dr. Hough would be an expert only to the extent that she

18     wasn't duplicating what he had already said.

19          THE COURT:  Well, there's something to that, but

20     as an evidentiary matter, um -- then why don't you --

21     actually that makes some sense.  So why don't we do it

22     this way.  Why don't I admit it as an exhibit and if

23     there are identifiable portions of it which are

24     duplicative, you move to strike them and we can deal

25     with that.  I do not intend to allow this witness to go
```

1   back over what Dr. Wiesen testified, but I'll handle

2   that on a question by question basis having in mind your

3   objections.  But that would be most in keeping with how

4   we've handled this case.

5          So no objection to proceeding that way?

6          MR. SIMON:  No, your Honor.

7          THE COURT:  Very well.  So we will mark this with

8   the next number, which is what?

9          THE CLERK:  83.

10          THE COURT:  All right.  So this is Exhibit 83 in

11   evidence.

12          (Exhibit 83, marked.)

13          THE COURT:  The witness is sworn and, Mr. Lichten,

14   you go right ahead.

15

16          * * * * * * * * * * * * * * * *

17          LEAETTA M. HOUGH

18          * * * * * * * * * * * * * * * *

19

20   DIRECT EXAMINATION BY MR. LICHTEN:

21   Q.    Good morning.  Could you state your full name for

22   the record, please.

23   A.    Leaetta Marie Hough.

24   Q.    And how do you pronounce your last name, so I

25   don't get it wrong?

1    A.    Hough.

2    Q.    Okay.  Now, you submitted a report in this case

3    that the Court just took, is that correct?

4    A.    Yes.

5    Q.    Okay.  And attached to that report, I believe, is

6    your Curriculum Vitae, is that correct?

7    A.    Yes.

8    Q.    And it starts on Page 53, is that right?

9    A.    One second.  I'm checking.  (Looks.)  Yes.

10   Q.    Okay.  You hold a PhD?

11   A.    Yes.

12   Q.    In what area of endeavor?

13   A.    Industrial organizational psychology.

14   Q.    And where did you receive that PhD from?

15   A.    University of Minnesota.

16   Q.    Okay.  Now, to save time I'm not going to ask you

17   much of what is in your vitae, but let me ask you a

18   couple of questions.

19         Have you served as president of any society or

20   organizations involved in the field of industrial

21   psychology?

22   A.    Yes.

23   Q.    And what is that?

24   A.    The Society for Industrial Organizational

25   Psychology.

1    Q.    That's SIOP?

2    A.    Correct.

3    Q.    Okay.  Any others?

4    A.    Yes, and organization called FABBS, Federation

5    Association with Behavioral and, um, Brain Sciences.

6    Q.    And have you been on any advisory committees to

7    any of these organizations?

8    A.    Yes, I have.  I was on the ATA committee on

9    psychological tests and assessments that oversaw the

10   development of the revision of the APA standards and I

11   was also on the advisory committee to the SIOP

12   principles when they were revised.

13   Q.    And those are the SIOP principles that are at

14   issue in this case?

15   A.    Correct.

16   Q.    Okay.  Have you provided expert help and reports

17   for the United States government?

18   A.    Yes.

19   Q.    Okay.  And can you briefly tell us what those

20   occasions were?

21   A.    I've been an expert witness for the Department of

22   Justice on cases involving adverse impact against

23   members of protected groups.

24   Q.    And do some of those involve police and fire?

25   A.    Yes.

1   Q.    Okay, I'm just going to quickly go down some of

2   the things on your resume.

3   Minneapolis, have you been involved in cases involving

4   the Minneapolis Fire Department?

5   A.    Yes.

6   Q.    How about the Nassau County Police Department?

7   A.    Yes.

8   Q.    And can you tell the Court what your role was with

9   respect to the Nassau County Police Department case?

10  A.    Yes, I was an expert witness for the Department of

11  Justice and we were arguing that, um, the tests had

12  adverse impact, um, unnecessarily so, and, um, the

13  decision was that indeed that was the case, and then the

14  team of the experts, both plaintiff and defendants, were

15  charged with developing a new selection system.

16  Q.    And you were part of that?

17  A.    Yes, I was.

18  Q.    Belleville, Illinois?

19  A.    That was -- I was an expert witness for the

20  Department of Justice and, um --

21  Q.    Police or fire?

22  A.    Both.

23  Q.    Okay.

24  Los Angeles, California?

25  A.    Yes.

1  Q.     And what did you do in that case?

2  A.     In that case, um, I did write a report and I also

3  developed -- examined their -- some of their tests, um,

4  multiple choice tests that were personality and bio data

5  related, and identified ways in which they could reduce

6  the adverse impact and retain criteria-related validity.

7  Q.     And that was in police or fire?

8  A.     I think that was fire.

9  Q.     Okay.

10  Torrance, California?

11  A.     Um, that was the Department of Justice and, um, as

12  I recall I came in as kind of a support person for the

13  Department of Justice.

14  Q.     Okay.

15  Chicago, Illinois?

16  A.     That was fire.

17  Q.     Okay.  And that was the Lewis vs. The City of

18  Chicago case?

19  A.     Yes.

20  Q.     Okay.

21  Garland, Texas, what was that?

22  A.     I was an expert witness for the Department of

23  Justice and, um --

24  Q.     Police or fire?  Sorry.

25  A.     Oh, sorry, that was police.

1    Q.    Okay.

2    New York City Fire Department?

3    A.    Yes.

4    Q.    And what was -- what was your involvement in that

5    matter?

6    A.    It was similar to Nassau County in that I was an

7    expert witness for the Department of Justice and the

8    Department of Justice prevailed, and the, um -- and the

9    judge ordered that, again, both sets of experts work

10   together to develop a new selection system.

11   Q.    And you were part of that group that did that?

12   A.    Yes, I was.

13   Q.    Okay.

14   Pittsburgh, Pennsylvania?

15   A.    Um, I'm working with the City to -- I looked at

16   and examined their police entry-level testing and, um,

17   recommended some strategies that they could use to

18   reduce the adverse impact and maintain criteria-related

19   validity, and, um, I'm kind of overseeing working with

20   EB Jacobs company, um, to do that.

21   Q.    Okay.  Now, I noticed on your resume there was a

22   project you did for, I believe it was the Department of

23   Justice, involving community policing, did I see that

24   correctly on your resume?

25   A.    Yes, you did.

1    Q.    Can you tell me what that project was, please?

2    A.    The Department of Justice was, um, interested in

3    developing a prototype selection system for police work

4    that focused on community-oriented policing.

5    Q.    Okay.  And when was this approximately?

6    A.    The report was written in 2002.  So it would have

7    been a little bit prior to that.

8    Q.    Okay.  So you were paid by the Department of

9    Justice to do this project?

10   A.    Correct.

11   Q.    Okay.  And what did you have to study in order to

12   do this project?

13   A.    Um, I had to find out what it meant to be

14   community-oriented policing, what those activities were,

15   so that involved talking with people, focus groups, it

16   involved significant literature review, reading anything

17   I could find on community-oriented policing, and then

18   defining the, um, skills and abilities that were needed

19   for that.  And then developing, um, reviewing the

20   literature again to identify strategies in which those

21   skills and abilities could be measured that would have

22   criterion-related validity and have less adverse impact.

23   Q.    Okay.  And then I noticed in your report in this

24   case you mentioned, um, something in 1975 for the LEAA.

25   First, can you tell us what the "LEAA" is for those of

1    us who might not go back that far?

2    A.    Yes, if I can remember it correctly, the "Law

3    Enforcement" --

4          THE COURT:  -- "Assistance Administration."

5          THE WITNESS:  Thank you.

6    A.    It was also within the Department of Justice.

7    Q.    Okay.  And were you personally involved in that

8    project?

9    A.    Yes, I was.

10   Q.    And what was your role in the project?

11   A.    My role was to develop -- helping develop the

12   assessments and also gathering the data on performance

13   on the job.

14   Q.    Okay.  Now, what was the purpose of this project

15   that you were involved in for the LEAA?

16   A.    The purpose of that project was to develop a

17   criterion-valid selection system for entry-level and

18   promotional, um, for sergeants, lieutenants, and above.

19   Q.    Okay.  And with respect to who this would be used

20   for, was this for municipal police departments around

21   the country or for the federal government police

22   departments or what?

23   A.    It was for, around the country, any and all police

24   departments.

25   Q.    I see.  And in order to do that did you have to

1   study the work of middle-level police supervisors?

2   A.    Yes.

3   Q.    And, um, was there any criterion-validity study as

4   part of this project?

5   A.    Yes, there was.

6   Q.    And can you explain to the judge what you mean by

7   that?

8   A.    Criterion-related validity is when you administer

9   the exams, the tests, the assessments, and then you also

10  obtain performance appraisal information from, for

11  example, supervisors, um, and then you mathematically

12  statistically correlate the scores on the tests, the

13  scores on the job and performance, to demonstrate that

14  in fact higher scores are associated with higher better

15  job performance.

16  Q.    And were you doing this in connection with

17  specific types of test batteries that might be used in

18  your final recommendations?

19  A.    Yes, um, there are all kinds.

20  Q.    Okay.  Now, as a result of that work did your team

21  recommend a series of tests that would be appropriately

22  administered based upon the criterion-validity work that

23  you did in municipal police departments that would have

24  significant validity?

25       THE COURT:  I don't understand the question.

1    You'll have to ask it again.

2         MR. LICHTEN:   Sure.

3    Q.    As a result of the work that you did on that

4    project, did the team recommend a specific group of test

5    batteries to be used in municipal police departments for

6    the position of police lieutenant?

7    A.    Yes, we did.

8    Q.    And what was recommended?

9    A.    There was a situational judgment, there was, um,

10   interests, there were personality and bio data scales.

11   Q.    Okay.  Now, were cognitive ability tests or

12   knowledge tests considered as part of the test batteries

13   to be given?

14   A.    Yes, that was included in our preliminary test

15   battery but we found that it did not have -- the

16   cognitive ability tests that we included did not have

17   sufficient criterion-related validity to be included in

18   the test battery.

19   Q.    Okay, now just so I'm clear, in this project that

20   you were involved in was your team looking for what was

21   most predictive of success in a police supervisory

22   position or what would reduce adverse impact at most?

23   What were you looking for?

24   A.    We were looking to predict job performance,

25   effective performance as a lieutenant and all the other

1    levels that I mentioned.

2    Q.    And this test battery that you recommended without

3    the cognitive ability test, did your team reach a

4    conclusion as to whether that would provide significant

5    validity to the process?

6    A.    Yes.

7    Q.    And was that based on criterion validity or

8    content validity?

9    A.    Criterion, the empirical evidence that higher

10   scores are associated with higher job performance.

11   Q.    And why was the cognitive ability test not

12   utilized in the final battery?

13   A.    Because it did not have that kind of relationship

14   with job performance.

15   Q.    Okay.  Let me move on to something else.

16   Your resume lists a number of publications that you've

17   been involved in, is that correct?

18   A.    Yes.

19   Q.    Have you authored book chapters?

20   A.    Yes.

21   Q.    And have you authored books themselves?

22   A.    Yes, I've been an editor of the four-volume

23   "Handbook of Industrial Organizational Psychology."

24   Q.    I see.  And have you written articles on the issue

25   of the detection and amelioration of adverse impact in

1    personnel selection?

2    A.    Yes.

3    Q.    And is there one article in particular that's

4    often cited in the literature?

5    A.    Yes.

6    Q.    And can you tell us what that article is, please?

7    A.    Yes, it was in 2001 and it's the, um -- I don't

8    remember the exact title, but it was with Fred Oswald

9    and Ployhart and it was "The Detection and Amelioration"

10   -- "The Determination, Detection and Amelioration of

11   Adverse Impact against Protected Groups."

12   Q.    And that was in the "International Journal of

13   Selection and Assessment"?

14   A.    Yes, and it's also, um, one of the references in

15   the SIOP principles.

16   Q.    That is it's referenced in the SIOP principles?

17   A.    Correct.

18   Q.    Okay.  Let me move on to something else.

19   What has your life's work been devoted to?

20   A.    The development and evaluation of personnel

21   selection in promotion systems that have criterion-

22   related validity with reduced or less adverse impact

23   against minorities or protected groups.

24   Q.    Okay.  And have you worked in the private sector

25   developing such selection systems?

```
1    A.    Yes.
2    Q.    And can you very briefly give us some of the
3    companies that you provided work for with respect to
4    promotional systems?
5    A.    Um, Nynex, um, Microsoft, um, Library of Congress,
6    the Federal Trade Commission General Accounting office,
7    um, and several others.
8    Q.    All right.  Now -- and how long have you been
9    doing this for?
10   A.    Um, my entire professional career which is a
11   little over 40 years.
12   Q.    Okay.  And based upon your work in the field, um,
13   have you been able to achieve equal or greater validity
14   in selection procedures for promotional positions while
15   reducing adverse impact than had previously existed in
16   the organizations?
17   A.    Yes.
18   Q.    And do you believe it can be done?
19   A.    Oh, certainly.
20   Q.    And have you done it?
21   A.    Yes.
22   Q.    And have you been able to do it in every instance
23   where you've tried?
24   A.    Yes.
25   Q.    Okay.  Now, in your, um -- in your report you
```

1    mention an article by Borman and Brush as one of the

2    things that you looked at in this case, can you tell me

3    what that is, please?

4    A.    Yes, they reviewed the literature on the

5    performance requirements for managerial jobs, and I

6    don't  recall the exact number of studies they looked

7    at, but they ended up with a list of about 18

8    performance dimensions or skills and abilities needed to

9    perform effectively as a supervisor or manager.

10   Q.    And those are listed in your report?

11   A.    They are.

12   Q.    Okay.  In addition in this case did you look at

13   anything else to try to determine what the skills and

14   abilities are that are necessary to be a successful

15   police lieutenant for the City of Boston?

16   A.    Yes, I looked at their job analysis, I also looked

17   at the mission statement for the Department, and I also

18   looked at the, um, the statement that the Police

19   Commissioner has on their website.

20   Q.    Okay.  Now, you mentioned you looked at the job

21   analysis, is this the 2000 job analysis by the firm of

22   Morris and McDaniel?

23   A.    Yes.

24   Q.    And when you looked at that job analysis did it

25   seem reasonable to you, that is the tasks and skills and

1     abilities that they identified in the job analysis as

2     being important to performing the job of a lieutenant,

3     did they seem reasonable to you?

4     A.     Yes.

5     Q.     Okay.  And there were approximately 145 such

6     knowledges, skills, and abilities listed?

7     A.     Yes.

8     Q.     Okay.  And were their results consistent with

9     studies you've done in the area?

10    A.     Yes.

11    Q.     And are you aware of the system for testing that

12    the Boston Police Department used in this case, the

13    multiple choice job knowledge test?

14    A.     Yes.

15    Q.     And did you look at the exam announcement and what

16    people were supposed to do, the instructions?

17    A.     Yes, I did.

18    Q.     Okay.  And based upon that do you have an opinion

19    to a reasonable degree of scientific certainty as to

20    whether or not the important and necessary skills and

21    abilities required to be a successful police lieutenant

22    were tested by the Boston Police Department in 2008?

23           MR. SIMON:  Objection.

24           THE COURT:  Isn't that what Wiesen testified to?

25           MR. LICHTEN:  Well --

1          THE COURT:  That's what he testified to.  I said I

2     wasn't going to go back over all of this.

3          MR. LICHTEN:  Well, your Honor, you're not going

4     to allow her to render her opinions in this matter?

5          THE COURT:  I didn't say that.

6          MR. LICHTEN:  What?

7          THE COURT:  I didn't say that.  She seems like an

8     eminently-qualified person.  And I'll tell you what I'm

9     interested in.  I want to know whether there was

10    available, in 2008, better tests that both would have,

11    um, better tested for the duties of Boston police

12    lieutenant and would -- actually they don't have to be

13    better, but they have to be at least as good, and would

14    have reduced disparate impact.  Now, that's why I

15    thought you were calling her.

16         MR. LICHTEN:  Well, I'm certainly going to go

17    there, your Honor.

18         THE COURT:  Well, let's go there, because you had

19    Wiesen on whether there was disparate impact and I think

20    you have Wiesen on whether the tests that were used was

21    any good.

22         Now, I don't go back on my orders.  I make orders

23    for perfectly sufficiently reasons and I've allowed you

24    well out of time to call this expert and that's what I'm

25    interested in.  So let's go there.  Maybe I'll let you

1    back up.  Maybe they will make the mistake of cross-

2    examining her so broadly that we'll have to let you ask

3    more.  She's testified before and I haven't had a chance

4    to read this report, but I imagine she's spoken to that

5    and I'm very interested in it.  So let's go there.

6            MR. LICHTEN:  Yes, your Honor.

7            THE COURT:  If you fail as to the first prong, you

8    fail on the basis of Wiesen's testimony, and I'm not

9    going to let her bolster it.

10           Now I take it that was your objection, Mr. Simon?

11           MR. SIMON:  Yes, it was, your Honor.

12           THE COURT:  I figured it was.

13           Go ahead.

14           MR. LICHTEN:   Thank you, your Honor.

15   Q.    Okay.  Let me ask you.  In your report you cite a

16   book on police administration, um, by I think a

17   Dr. Gains, is that right?

18   A.    Yes.

19   Q.    All right.  Can you tell me why you reviewed the

20   book on police administration?

21   A.    Um, because it was a document, a book that

22   indicated some of the testing that was done, um, in that

23   period of time, the book was printed in, um, I don't

24   recall, but they had a table in it, for example, that

25   appears on Page 26 of my report, and indicates, um, the

1    various kinds of assessments that were being used in

2    2003, um, to select police officers and they include a

3    variety of assessments.  They also talk about

4    promotional kinds of assessments that are done in which

5    they include situational judgment tests, um, interviews

6    or oral boards, assessment centers, written exams

7    including personality and bio data, um, performance

8    appraisal, and, um, discipline, for example if someone

9    has been disciplined within X amount of time they're not

10   able to apply, and similarly for someone with under a

11   minimum number of years of service.

12   Q.    Now, during the course of your career you devised

13   numerous test batteries for promotional positions, is

14   that correct?

15   A.    Yes.

16   Q.    And have you used yourself many of these

17   techniques?

18   A.    Yes.

19   Q.    For example, I want to ask you specifically about

20   some of these.

21   There's been some testimony in this case about

22   situational judgment tests?

23   A.    Okay.

24   Q.    Have you used situational judgment tests?

25   A.    Yes.

1    Q.    And have they been used in some of these cases in

2    which you've been an expert in police and fire?

3    A.    That we've developed, yes.

4    Q.    And can you describe to the Court what you mean by

5    "situational judgment tests" and can you contrast those

6    to the type of multiple choice job knowledge test we're

7    talking about in the Boston Police Department case in

8    this matter?

9    A.    Yes, situational judgment tests are an assessment

10   which you describe a situation and then you ask -- a

11   work-related situation and then you ask the applicant to

12   describe what they would do, what they should do, a

13   variety of response options, and the evidence is that if

14   you ask an applicant to describe what they would do you

15   have less adverse impact than if you describe -- if you

16   ask them to describe what they should do more on a

17   knowledge-based kind of an approach.

18   Q.    And --

19         THE COURT:  Better is to say, "What would you

20   do?" rather than say, "What should you do?"

21         THE WITNESS:  Correct.

22         THE COURT:  Which has the connotation of some

23   exterior standard against which the judgment is

24   measured?

25         THE WITNESS:  Correct.

1      THE COURT:  But if you ask them, given their whole

2  life experience, training, background, everything that

3  goes into making them the officer they are, "All right,

4  what would you do?"

5      THE WITNESS:  Right, it's an application of

6  problem solving, it's discretionary, "What would you do?

7  What have you done?"

8      THE COURT:  And it's your opinion that that

9  reduces adverse -- it reduces disparate impact?

10      THE WITNESS:  Yes, it does and it's not just my

11  opinion, there's a meta analysis that indicates that

12  indeed is the case.  And it also is true that if you

13  have video of the scenario, you'll have less adverse

14  impact as well.

15      THE COURT:  Why?

16      THE WITNESS:  I don't know why.

17      THE COURT:  When we teach trial advocacy, um, the

18  National Institute of Trial Advocacy always teaches by

19  you let the lawyer, acting as Mr. Lichten, the actual

20  lawyers, conduct an examination, a mock examination that

21  has various problems in it and then critiquers,

22  experienced counsel and judges critique it, but also

23  they, that institute, videotapes it, and then much like

24  a football team looking at the players, the person has

25  to look at themselves doing the, um, examination and

1    aided by, we hope, a supportive critique about where it

2    went wrong and where it was effective and it is

3    believed, and I will tell you I believe it, that that is

4    a very effective teaching tool for the multifaceted job

5    that attorneys have to do.

6              Is some of that relevant here?

7              THE WITNESS:  Yes, definitely.

8              THE COURT:  Why?  Well, you just said, "We don't

9    know," you just say it works?

10             THE WITNESS:  Right, it's practical experience,

11   you learn from doing.

12             THE COURT:  It's hard to look at yourself do it

13   and fall on your face.

14             THE WITNESS:  That, too, your Honor.

15             THE COURT:  All right.  All right.

16             Go ahead, Mr. Lichten.

17             MR. LICHTEN:  Yes.

18   Q.   Now, turning to the question of the validity of

19   these types of situational judgment tests that you've

20   just described where you asked the person, "What would

21   you do?"  are there studies which demonstrate whether

22   these kinds of situational judgment tests asked in that

23   manner, with let's say video, have validity?

24   A.   Yes, definitely.

25   Q.   And how would you characterize that validity?

1  A.    Um, the validity is in the 30s, it's very good,

2  it's higher than cognitive ability tests for police

3  work.

4         THE COURT:  You said the validity is in the 30s?

5         THE WITNESS:  Yes, it's higher than -- police work

6  that -- the criterion-related validity studies that are

7  done in police settings indicate that cognitive ability

8  tests have quite a bit significantly less validity than

9  they do in general.

10        THE COURT:  But the 30s again has reference to

11  some measure and I just want you to key me into that

12  measure because I have other testimony here that I have

13  to wrestle with.

14        THE WITNESS:  Okay.  On a range from minus 1 to

15  plus 1, it's in the 30s, and that's --

16        THE COURT:  .30?

17        THE WITNESS:  Excuse me, yes, .35, .37, something

18  like that, which is higher than the criterion-like

19  validity of cognitive ability tests.

20        THE COURT:  Thank you.

21  Q.    Okay.  And I think, as you said, if you present

22  that situational judgment in a video exercise, you would

23  reduce adverse impact even more?

24  A.    Yes.

25  Q.    But I think you just said why that is nobody

1    knows?

2    A.    Right, not scientifically, but we all have ideas

3    about it.

4    Q.    Okay.  Are there methods in the literature,

5    studies that have been done that demonstrate that these

6    situational judgment tests can be given in a fair and

7    appropriate method to prevent cheating and/or bias from

8    creeping into them?

9    A.    Yes, um, having structured, scored strategy that

10    indicates a response of X warrants the score of Y.  It's

11    better than just letting whoever's evaluating the

12    responses decide on their own.  So more structure

13    results in greater validity.

14    Q.    Okay.  Now, you mentioned that back in 1975 the

15    project that you worked on for mid-level police

16    supervisors, the project for the LEAA, that had

17    situational judgment parts to it?

18    A.    Yes, it did and it was available to whoever --

19    whatever police department would want to use it.

20    Q.    And by 2008 how far had the literature and the

21    studies developed on this use of situational judgment

22    tests on particular ways that you mention that it can be

23    given to reduce adverse impact, how available was that

24    information in 2008?

25    A.    Well, by 2008 there were meta analyses on these

1    situational judgment tests and strategies for, um,

2    administering them.  So, yes, that information was

3    available.

4    Q.    Okay.  Now, on the Page 27 of your report and in

5    Footnote 19 you comment on the fact that candidates had

6    already passed a technical knowledge test in order to be

7    in a sergeant position to begin with, is that correct?

8    A.    Yes.

9    Q.    How is that relevant to the issue that we're

10   talking about about alternatives that would have had as

11   much validity and less, um, discriminatory effect with

12   respect to the Boston Police Department exam in 2008?

13   A.    Well, they had already been tested for their

14   knowledge and, um, presumably they were doing --

15   hopefully they were doing well on the job sufficiently,

16   um, and -- I'm sorry, would you ask that question again?

17   Q.    Yes.

18   You mentioned back in 1975 that, when you eventually

19   came out with a test battery for supervisors, you did

20   not have a job knowledge cognitive ability test as part

21   of that, is that correct?

22   A.    Correct.

23   Q.    And what was the reason for that?

24   A.    The reason was that it did not criterion validate

25   it, it did not relate to job performance, um, and in

1    this, um -- if they're already tested for knowledge, you

2    would assume that if that test was doing its job, it had

3    in fact screened out people that were unable or did not

4    know the knowledge and therefore the people who were on

5    the job would have that knowledge and the -- the

6    variation, the range that the officers might have on

7    that would not be a good way to predict future job

8    performance because they already have that knowledge,

9    they've already demonstrated, there's minimal variation

10   in their scoring.

11        THE COURT:  And just so I'm getting this, and

12   that's because there's been this sergeant's qualifying

13   procedure?

14        THE WITNESS:  Yes.

15        THE COURT:  Go ahead.

16   Q.    And just to take it a step back.  In order to get

17   on the police department they had to have a very very

18   high score on the cognitive ability test, the

19   entry-level test, would that affect your opinion in any

20   way?

21   A.    Yes, they've already been screened for cognitive

22   ability so they should have that already.  So the sorts

23   of skills and abilities that are important for the

24   lieutenant job are other things, they are things --

25   well, teamwork, integrity, there's delegation, there's

1    guiding and teaching and mentoring your subordinates,

2    all of those things are important and should be tested

3    for.

4    Q.    Okay, let me move on to something else.

5    In your report you also mention some other testing

6    procedures that have been used and one of those is

7    structured interviews.  So I want to turn to that and

8    ask you first if you could explain to the Court your

9    definition of a structured interview and what it's

10   looking for and what it's trying to assess?

11   A.    A structured interview is, um, quite often a

12   one-on-one or sometimes it's a panel and in the

13   interview you will ask the individual a variety of

14   questions and the more structure there is the more

15   job-relevant those questions are, um, and the greater

16   the criterion-related validity, and similarly the

17   greater the structure in scoring the responses to the

18   interview, the greater the criterion-related validity.

19   Q.    Okay, now let me ask you a couple of questions.

20   First, as of 2008 had structured interviews advanced to

21   the point where, um, professionals devising these tests

22   could be sure that things like bias and cronyism would

23   not be -- would not affect the outcomes?

24   A.    Yes.

25   Q.    Okay.  Can you explain how that would be done?

A.     Um, meta analyses, for example, indicate that the

structured interview is one of the most criterion-valid

methods of assessment in predicting and the extent to

which you structure the information, the scoring of the

information you gather, you would reduce, you ensure

that, um, there is no bias in the ratings.

Q.     Okay.  And when you say they have shown a high

validity, could you give us what the ranges are for

structured interviews, their validities?

A.     Yes, they're in the 50s.

Q.     And that's quite high?

A.     Yes.

Q.     And how does that compare, in a police setting, to

cognitive ability tests?

A.     They're significantly higher.  Substantially.

Q.     Now, have there been studies in the literature,

criterion-validity studies based on meta analytical

studies, as to what the adverse impact is for structured

interviews as opposed to multiple choice cognitive

ability tests?

A.     Yes, less adverse impact.

Q.     And are measures in place that can significantly

reduce the adverse impact for structured interviews, are

there methods to do that that were known in 2008?

A.     Yes.

1    Q.     Would you explain what some of those were?

2    A.     Well, structuring the -- having a response

3    evaluation system that is structured is significant.

4    Q.     Okay.   Now, in your report you mention -- I think

5    it's on Page 44, um, these concepts of "fluid

6    intelligence" and "crystallized intelligence" -- I feel

7    like my intelligence is probably "fossilized

8    intelligence," so let's just go with "fluid

9    intelligence" and "crystallized intelligence" that you

10   mention in your report.

11        Would you explain to the Court what these concepts

12   are?

13   A.     "Crystallized" -- well, cognitive ability tests

14   can be divided into essentially two types, "crystallized

15   intelligence" and "fluid intelligence" tests and

16   "crystallized intelligence tests" are job knowledge

17   tests, they're fact-based, they're things that science

18   achieves, they're things you learn in school or in a

19   training session or that you've read or that you've

20   learned from some kind of structured training situation.

21   Q.     Okay.

22   A.     "Fluid intelligence" is reasoning, um, it is

23   problem solving, um, it is, um -- well, it's problem-

24   solving reasoning.

25   Q.     Okay.   And what if anything does the literature

1   tell us, and based on your experience also, as to

2   what -- as to which of these intelligences are more

3   important for the job of a police supervisor?

4   A.    Um, fluid intelligence, the reasoning of knowledge

5   is significant on the job and, um, interestingly

6   reasoning tests have less adverse impact than, for

7   example, job knowledge tests, "crystallized

8   intelligence."

9   Q.    That was going to be my next question.

10         THE COURT:  What has less adverse impact?  I'm

11   sorry.

12         THE WITNESS:  "Fluid intelligence," reasoning.

13         COURT THE:  Testing reasoning has less adverse

14   impact --

15         THE WITNESS:  Yes, problem solving.  Yes.

16         THE COURT:  -- than testing crystallized

17   intelligence?

18         THE WITNESS:  Yes.

19   Q.    And do we know why that is?

20   A.    No.

21   Q.    And are there studies that demonstrate that

22   difference?

23   A.    Yes.

24   Q.    Okay.  And on a multiple choice job knowledge test

25   in which you read text and then have a multiple choice

1    question where one of the answers comes out of that text

2    or rule, what kind of knowledge is that teaching, in

3    your opinion?

4    A.    That's a crystallized, it's a sort of

5    regurgitation of a reciting of something rather than

6    actually applying the knowledge.

7    Q.    And are there other ways of getting at that same

8    information that you believe could have been done by the

9    Boston Police Department in 2008 that would have had

10   less adverse impact on minority candidates by doing it a

11   different way?

12   A.    Yes.

13   Q.    Can you describe what you mean by that?

14   A.    Well, the interview or the situational judgment,

15   um, test could have been used.

16   Q.    Okay.

17   A.    To have similar if not greater validity, um, to

18   have greater criterion-related validity and less adverse

19   impact.

20   Q.    Okay.  Now I want to turn to something else.

21   In your report you mention performance -- I think you

22   say "performance appraisal systems," is that correct?

23   A.    Yes.

24   Q.    And have you yourself been involved in the

25   devisement of performance appraisal systems?

1    A.     Yes, dozens.   Hundreds.

2    Q.     In fact how prevalent is that in private industry?

3    A.     It's typical to use that.

4    Q.     And why is it, why do we care about performance

5    appraisal systems in deciding promotions?

6    A.     Because you want to know how effectively someone's

7    actually performed on the job and that is your best

8    predictor of future performance.

9    Q.     Well, that's my next question.

10   Are there studies that demonstrate the validity of

11   performance appraisal systems in predicting successful

12   job performance in the promoted position?

13   A.     Yes.

14   Q.     And are there ways of structuring performance

15   appraisal systems so they're fair and reasonable and

16   again discount cronyism and bias?

17   A.     Yes.

18   Q.     And can you describe some of the ones you've been

19   involved in and how you've done it?

20   A.     Well, a performance appraisal, one way to do it is

21   a supervisory evaluation and, um, an important part of a

22   supervisory evaluation is to have structured, um, rating

23   scales such that everyone uses the same standards for

24   performance and you can also ask the supervisor to

25   provide examples of, um, what the person did in a

1    particular area that was effective.  You can also gather

2    performance appraisal information from peers,

3    subordinates, um, and you can actually ask the

4    individual to perform that information in a structured

5    way, an accomplishment record sort of way.

6    Q.    Can you verify the truthfulness of the

7    accomplishment record?

8    A.    Of course, you can ask the individual, for

9    example, to provide names of people who can verify that

10    the information is accurate.

11    Q.    Okay.  And do performance appraisal systems, in

12    your opinion, have validity with respect to performance,

13    um, in the higher-level position?

14    A.    Oh, definitely.

15    Q.    And to bring it to the Boston Police Department,

16    do you believe that a well-structured performance

17    appraisal system would have had validity in predicting

18    the better candidates for the position of Boston police

19    lieutenant than the multiple choice test used in this

20    case?

21    A.    Yes.

22    Q.    And as you sit here today do you know what the --

23    what the general validity is of performance appraisal

24    systems in the literature?

25    A.    No, I don't.

Q.     Okay.

THE COURT:  But it is your opinion that they're
better than multiple choice tests?

THE WITNESS:  Yes.

(Pause.)

Q.     Now, in a police --

THE WITNESS:  I would say better than a multiple
choice tests of knowledge or cognitive abilities.

Q.     Now, you're aware of the -- of what was tested for
by the Boston Police Department in 2008, is that
correct?

A.     I'm sorry?

Q.     You're aware of what the test actually was -- not
the actual questions, but you're aware of what the test
was in 2008 by the Boston Police Department?

A.     Yes.

Q.     And with respect to the skills and abilities that
were not tested for in the Boston Police Department 2008
exam, do you have an opinion as to whether or not those
skills and abilities would have been more predictive or
less predictive of the knowledges, skills, and abilities
tested for by the multiple choice job knowledge test?

A.     They would have been more predictive.

Q.     And can you tell us why that was?

A.     Because the job of police lieutenant consists of a

1    very large number of, um, skills and abilities that are

2    simply not tested by a job knowledge test.

3    Q.    Now, um, I want to turn quickly to -- you mention

4    in your report personality characteristics, bio data,

5    and things of that nature, is that correct, that's in

6    your report?

7    A.    Yes.

8    Q.    And you yourself are published widely on this

9    issue?

10   A.    Yes.

11   Q.    Okay.  But first can you explain to the Court the

12   terminologies, on the same page, what "bio data" means,

13   what "personality characteristics" mean, just so we

14   understand each other?

15   A.    Okay.  "Bio data" is a form of assessment, it's a

16   type of assessment, it's asking for information about

17   your past and you can measure virtually anything with

18   bio data as long as it's occurred, you could measure

19   cognitive ability, for example, you could measure, um --

20   "personality characteristics" is a set of variables and

21   there are a variety of ways of measuring personality,

22   um, one of which is a self-report multiple choice.  But

23   there are several ways of measuring personality

24   characteristics and personality characteristics such as

25   conscientiousness, um, extroversion, emotional stability

1    or adjustment, emotional self-control, and those are

2    characteristics, and personality is not the measurement

3    method, it is a set of variables.

4    Q.    Got you.

5          Are there criterion-validity studies that tell us

6    how validly such characteristics predict ultimate job

7    performance in a promoted position?

8    A.    Yes.

9    Q.    And what do we know about that?

10         THE COURT:  Well, this is at a level of generality

11   that I'm a little unclear that I'm following.

12         As a lay person I would imagine a police

13   lieutenant in Boston has to have -- and I've had

14   testimony as we've gone along here, has to have a

15   variety of interpersonal skills, the ability to

16   communicate, and I'm thinking whether it's an extrovert,

17   it's someone who is comfortable with dealing with other

18   people.

19         THE WITNESS:  Yes.

20         THE COURT:  I would also imagine that the person

21   has to have a certain degree of, um -- I don't know what

22   you'd call it, but inner toughness so you can make

23   personnel decisions without favoring your buddy with

24   whom you were a police sergeant or who came out of the

25   police academy with you, but rather for the greater good

1    to objectively evaluate them and their performance in

2    discharging their job.  I don't know what you call that,

3    but one would think that that was necessary.

4         Are those things what you're talking about here?

5         THE WITNESS:  Exactly, integrity, principle,

6    self-control, getting along with others, um,

7    interpersonal effectiveness, interpersonal -- those are

8    personality traits.

9         THE COURT:  And you have some confidence that you

10   can measure that?

11        THE WITNESS:  Oh, definitely.

12   Q.    In fact, Doctor, has that been a large part of

13   your professional research?

14   A.    Yes.

15   Q.    And have you yourself been able to successfully

16   measure this for large companies for whom you contract

17   with?

18   A.    Yes.

19   Q.    And how about for cities where they're hiring

20   police and firefighters?

21   A.    Yes.

22   Q.    And do you believe to a reasonable degree of

23   scientific certainty that these things can be tested for

24   in a way that significantly reduces the potential for

25   bias and cronyism and things of that nature?

A.     Yes.

Q.     And with respect to validity, do we know from the literature and the research that you've done whether or not these types of tests have validity for promoted positions?

A.     Yes.

Q.     And I'm talking about -- I just want to be clear, I'm talking about criterion-validity.

A.     Yes, I am, too.

Q.     Okay.  And what do we know?

A.     We know from the literature that personality characteristics, especially when they're combined with a couple of things like integrity, conscientiousness, self-control, when combined together they predict leadership effectiveness in the high 40s, whereas cognitive ability tests have criterion-related validities for police work in the mid 20s.

Q.     So --

       THE COURT:  Do you do any of these studies in the military?

       THE WITNESS:  Yes.  Yes.  In fact in the 1980s the Army had been using just the ASVAB, which is the -- I forget what it's called, it's a cognitive ability test, and they were interested in expanding their set of predictors that, um, they would use to predict

1    performance as a soldier and it was a massive 10-year

2    project, millions of dollars, and the thing that added

3    to their prediction of job performance was personality

4    characteristics, and we develop -- and I was the lead

5    person, developing those measures.

6         THE COURT:  I'm going to ask one question because

7    we're under time pressure here and it's largely out of

8    curiosity as one who just -- just my interest, I read a

9    fair amount of military history, and I could imagine --

10   having served in a peace-time army, I could imagine that

11   -- and I've seen your colleagues in this area, that you

12   probably can do pretty well in, um, predicting

13   performance in the peace-time military, but considerably

14   less well, if we look at the historic record, when the

15   forces are committed to combat because -- or not

16   because, I would say, it appears from reading military

17   history that those people who emerge as the most

18   effective combat leaders very frequently have not done

19   well in the peace-time military at all.  I guess I'll

20   make two questions because I don't want to waste time

21   and I don't know if this really deals with police

22   lieutenants.

23        But, one, do you think that's true?

24        THE WITNESS:  There is research on it and

25   emotional stability is an important predictor as is

1    resiliency and hardiness, and those are very important

2    for the non-garrisoned or the at-war military.

3            THE COURT:  All right.  And you think you can

4    measure that?

5            THE WITNESS:  Oh, yes, we can.  We have evidence

6    of it.

7            THE COURT:  Thank you.  Thank you.

8    Q.    Okay.  So my final question.

9            If in 2008 or 2007 you had been -- well, strike

10   that.  Actually let me ask two questions first.

11   In 2008 could the City of Boston use the job analysis

12   that Morris and McDaniel did in 2000 as the basis for

13   then devising tests for various skills and abilities?

14   A.    Yes.

15   Q.    Okay.  And would that have saved them a boat-load

16   of money?

17   A.    Um, well, certainly knowing that there's a

18   lawsuit, it would have saved a boat-load of money.  But

19   I suspect also that in terms of citizen complaints and

20   poor performance on the job, really critical incidents,

21   it was a huge amount of money.

22   Q.    Well, that's not really what I'm saying.

23   A.    Oh, I'm sorry.

24   Q.    And I didn't mean to be flip about it.

25   But part of the cost of what you all do when you are

1    retained by a company to put together, um, a series of

2    test batteries for promotion is a job analysis, is that

3    correct?

4    A.     Uh-huh.

5    Q.     And that's -- is that an expensive part of the --

6    A.     Oh, very.

7    Q.     Okay.  So assuming the Boston Police Department

8    had decided, "Well, we'll use the 2000 job analysis to

9    at least identify the tasks, skills, and abilities that

10   we want to test for, would that have saved them money?

11   A.     Oh, yes.

12   Q.     Okay.  In 2007, if you had been consulted by the

13   Boston Police Department, do you have an opinion to a

14   reasonable degree of scientific certainty as to whether

15   or not you would have been able to devise a promotional

16   procedure for the Boston Police Department that would

17   have increased validity and have reduced adverse impact?

18   A.     Definitely.

19   Q.     And you hold that opinion to a reasonable degree

20   of scientific certainty?

21   A.     Yes.

22          MR. LICHTEN:  That's all I have, your Honor.

23          THE COURT:  Thank you.

24          Mr. Simon?

25

CROSS-EXAMINATION BY MR. SIMON:

Q.    Good morning.

A.    Good morning.

Q.    Nice to meet you in person finally.

A.    Yes.

Q.    Now, Dr. Hough, you have never personally constructed a selection procedure for a police promotional exam, correct?

A.    I was involved as a team, a private team.

Q.    And this is the thing we were talking about back in the '70s?

A.    Yes.

Q.    Okay.  And that wasn't for any specific police department, correct?

A.    That was country-wide, nation-wide.

Q.    All right, but essentially what you were doing in that situation was making recommendations about what police departments should do, correct?

A.    It was a -- it was a set of instruments that were available for use that wasn't just what you should do, it was --

Q.    Okay.  But you don't know whether anyone did use those, correct?

A.    Oh, yes, they did.

Q.    And who did?

1    A.    I don't know.

2    Q.    And what were the results in terms of validity and

3    in terms of adverse impact?

4    A.    I don't know.

5    Q.    Doctor, you've never testified before in a police

6    promotional exam case, have you?

7    A.    No, I don't think so.

8    Q.    So you've never provided expert testimony on this

9    subject before, correct?

10   A.    Well, I think I've provided expert witness

11   testimony --

12        THE COURT:  Well, you so testified to it.  But

13   he's making a distinction that I didn't get from your

14   direct examination, which is what about this Nassau

15   police, I thought that was a --

16        THE WITNESS:  That wasn't promotion.

17        THE COURT:  That wasn't promotion?

18        THE WITNESS:  That was entry-level.

19        THE COURT:  Thank you.  Thank you.  And I

20   appreciate the distinction.

21        MR. SIMON:  And that is the distinction I'm

22   drawing, thank you, your Honor.

23        THE COURT:  Yes.  Thank you.

24   Q.    Okay.  Now -- and a related question is you're not

25   personally familiar with what it is that police

1    departments actually do in terms of promotional

2    selection procedure, are you?

3    A.    I think I'm informed of what they do use.

4    Q.    Well, you're certainly not based upon your own

5    personal experience, correct?

6    A.    In my work with police departments I do learn some

7    things about what they do, so I do have some experience.

8    Q.    Okay.  Well, your work with police departments is

9    primarily at the entry-level stage, correct?

10   A.    Right, but you talk to a lot of people when you're

11   doing that work, that kind of project, with other

12   members of the police department, you look virtually at

13   the entire -- the entire organization, the rank up to

14   the chief, and one learns a variety of things.

15   Q.    Okay, I'm going to --

16         MR. SIMON:  May I approach, your Honor?

17         THE COURT:  You may.

18   Q.    I'm going to show you a document, Doctor, which is

19   the transcript of your deposition.  Do you remember when

20   I took your deposition the other day?

21   A.    I do.

22   Q.    And I'm going to direct your attention to Pages 90

23   and 91.

24   A.    (Turns.)  Okay.

25   Q.    And at the bottom of Page 90 I asked you a

1    question -- we were talking about, at the time,

2    personality tests, and I asked you, "Do you know of any

3    police department that uses personality testing for

4    purposes of promotion?"  Do you see that?

5          MR. LICHTEN:  Your Honor, I don't think this is

6    a -- that's -- my understanding of cross-examining with

7    a deposition is that first you have to ask a proposition

8    and then if there's a contradiction, but this is --

9          THE COURT:  I think I'm satisfied with this way of

10   proceeding.  I agree that he's pointing out not an

11   inconsistency but what he thinks he's got her on an

12   infirmity and I'll allow him to examine about it.

13         Yeah, do you know of anyone, any police department

14   that uses personality testing for promotion?

15         THE WITNESS:  I don't know.

16         THE COURT:  Okay.

17   Q.    And in fact your response was a little different,

18   on the top of Page 91, you responded to that question by

19   saying, "I'm not familiar with what is in use in

20   most" -- I'm sorry, "in police promotional exams, so I

21   can't" -- "I don't know."  Right?

22   A.    Well, I went on to say that I -- that it's from

23   information that I have read in some of the literature

24   by Rick Jacobs, for example.

25   Q.    Oh, okay, so then you said, "I know about this

1   stuff because of what Rick Jacobs said about it,"

2   correct?

3   A.    Yes.

4   Q.    Okay.

5         MR. SIMON:  May I approach?

6         THE COURT:  You may.

7         (Hands up.)

8         THE COURT:  Do I get one?

9         MR. SIMON:  Oh, I'm sorry.

10        (Hands up to judge.)

11  Q.    Okay.  Now, Dr. Hough, I just handed you a

12  document which is called "The Handbook of Police

13  Psychology," do you see that?

14  A.    Yes.

15  Q.    And this is in fact the book you were referring to

16  when you spoke about Rick Jacobs and what you would

17  review for purposes of the deposition, correct?

18  A.    Yes.

19  Q.    And you stated that based upon what Rick Jacobs

20  said in his chapter in this book that you had an idea

21  about what police departments are using in the police

22  promotional context, right?

23  A.    Yes.

24  Q.    Okay.  I'm going to ask that you look at -- well,

25  let's do it this way.

```
 1      If we go through from Page 193, where the chapter
 2      starts, do you see where they talk about "Selecting
 3      Employees, an overview"?
 4      A.    Yes.
 5      Q.    And then they go on to describe things -- and I
 6      say "they" because Rick Jacobs isn't the only author of
 7      this chapter, but in any event they go on to describe
 8      various tests and batteries including interviews, moving
 9      on to work sample tests, situational judgment tests,
10      integrity tests, do you see all of that?
11      A.    Yes.
12      Q.    That's in the entry-level selection process,
13      correct?
14      A.    Um, yes.
15      Q.    He's not talking about the promotional context
16      there, is he?
17      A.    Um -- (Looks.)
18      Q.    I'll make it easy for you.
19      A.    Selection systems are often -- promotional systems
20      are also selection systems.  I'm not sure that this
21      is -- that this is just entry-level.
22      Q.    Okay.  Well, then let's turn to Page 202 of this
23      document.
24      A.    (Turns.)
25      Q.    Do you see where I am?
```

```
1   A.    Yes.

2   Q.    So having started with "Selecting Employees, a

3   Brief Overview," Dr. Jacobs, et al then has a section

4   entitled "Promotional Testing, a Brief Overview," do you

5   see that?

6   A.    Yes.

7   Q.    Do you think he's drawing a distinction between

8   the two?

9   A.    I think so.

10  Q.    Okay.  Now, if we move on to Page 204 of this

11  article.

12  A.    (Turns.)

13  Q.    Dr. Jacobs goes on to describe, in the first

14  paragraph there, what it is that police departments are

15  actually doing, and I'm starting with the sentence

16  "Typically," in the first paragraph there.

17       THE COURT:  You're on 204?

18       MR. SIMON:  204.

19       THE COURT:  I -- Oh, I see it.  Thank you.

20       THE WITNESS:  It's in the middle of the paragraph.

21       THE COURT:  It's in the middle of the paragraph,

22  right.  Thank you.

23  A.    Okay.

24  Q.    And so what he says about this is, "Typically

25  applicants are given a job-knowledge test assessing
```

```
 1    their expertise on laws, rules, and procedures," right?
 2    A.    Yes, I see that.
 3    Q.    He goes on to say, "This test is often followed by
 4    a formalized panel interview in which candidates are
 5    asked to respond to situations typical of what they
 6    would" -- "presented in written format."
 7          Did I read that correctly?
 8    A.    Yes.
 9    Q.    And that's all he says about promotional testing,
10    isn't it?
11    A.    I don't know if that's all he says.
12    Q.    You don't know?
13    A.    I'd have to read it again before I say that.
14    Q.    Okay.  Well, at least with respect to this section
15    of the book what he's talking about is the fact that
16    police departments use these multiple choice job
17    knowledge tests, yes?
18    A.    Yes.
19    Q.    And that often they use sort of an interview panel
20    procedure?
21    A.    Yes.
22    Q.    And do you see anything else, moving on, that he
23    mentions?
24    A.    (Looks.)  Um, some system's performance appraisal,
25    the next paragraph.
```

1    Q.    Right, and what he says about that is

2    interestingly that's rarely used, and that's the first

3    full sentence of the second paragraph there.

4    A.    Uh-huh.

5    Q.    Do you see anything else that he mentions with

6    respect to what it is that police departments use in the

7    promotional testing context?

8    A.    (Looks.)  No, I don't believe he does.

9    Q.    And this was an article that was published in

10   2011, correct?  And I direct your attention to the third

11   page of the document.

12   A.    Yes.

13   Q.    And you, um, prior to your deposition, reviewed

14   this document, right?

15   A.    Yes.

16   Q.    And you did so because you considered this to be

17   an authoritative document with respect to police

18   testing?

19   A.    Well, I wouldn't say "authoritative," but there

20   was another book, a handbook of police psychology that

21   also described promotional systems.

22   Q.    Okay.  Now, let's go to your report, please, and

23   to Exhibit 83.

24   A.    (Turns.)

25   Q.    And I'm interested in Table 7.

```
 1   A.     (Turns.)
 2   Q.     Page 26.
 3          THE COURT:  Say again the page?
 4          MR. SIMON:  Page 26.
 5   A.     Okay.
 6   Q.     Okay.
 7          THE COURT:  You've gone to a different document
 8   and I've lost you.  I'm sorry.
 9          MR. SIMON:  The expert report, your Honor, I'm
10   sorry, Page 26.
11          THE COURT:  Oh, thank you.  My fault.  26.
12          MR. SIMON:  And if I may take a step back, I would
13   like to introduce the Rick Jacobs article as an exhibit
14   for identification.
15          THE COURT:  For identification.  It may be
16   received for identification.  It will be M for
17   identification.  Yes.
18          MR. SIMON:  Thank you.
19          (Exhibit M, marked.)
20   Q.     Now, Dr. Hough, you offer Table 7 for purposes of
21   showing that there are these alternatives out there that
22   police departments use, right?
23   A.     Yes.
24   Q.     And this in fact is a table that's authored by,
25   um, is that Gains and Morell?
```

1    A.    Yes.

2    Q.    Are those the authors?

3    A.    Yes, it is.

4    Q.    And in fact that's the other publication you were

5    talking about when you just said that in addition to the

6    Rick Jacobs chapter there this book?

7    A.    No, this is the same book as the Rick Jacobs, I

8    believe.

9    Q.    Oh, okay.  And what was the other book you were

10   talking about?

11   A.    The other book was the Gains and Morell and, um --

12   wait a minute, that is --

13   Q.    I believe I said that.  I'm confused now.

14   A.    I'm confused now, too.

15         The, um, "Handbook of Police Psychology" is, um --

16   (Turns page.)  I have to find you a reference.  (Looks.)

17   Gains and -- well, apparently, um, another page -- other

18   pages, other chapters -- um, refer to promotion and they

19   list the same -- the list is on Page 29, um, the tests

20   that are often used for promotion in police departments,

21   that's the same book.  And as I sit here I thought that

22   was the "Handbook of Police Psychology."

23   Q.    But now you don't think that's true?

24   A.    Oh, no, the "Handbook of Police Psychology" is the

25   chapter that the, um, Rick Jacobs chapter is in.

```
 1    Q.    Okay.
 2    A.    It's "Police Administration" that is what this
 3    table is from and my reference is on 27.  So I think you
 4    have the two -- I think you --
 5    Q.    Someone has the two mixed up, that much I'll give
 6    you.
 7    A.    Okay.
 8    Q.    Now, in any event those two sources were where you
 9    got the information from with respect to what it is
10    that's out there in the police promotional testing
11    world, correct?
12    A.    Yes.
13    Q.    And you don't have personal knowledge of that
14    stuff because you haven't done it yourself, correct?
15    A.    I have tangential knowledge and that's personal.
16    Q.    Okay.  Let's talk about Table 7.
17    A.    Okay.
18    Q.    You included Table 7 in your report to show that
19    there exists alternatives out there in police testing,
20    correct?
21    A.    Yes.
22    Q.    And Table 7 shows the kinds of alternatives that
23    are out there, at least according to these authors,
24    right?
25    A.    Yes.
```

1   Q.    Things like personal interview, medical exam,

2   psychological evaluation, et cetera?

3   A.    Yes.

4   Q.    Now, um, this table is reflective of entry-level

5   police testing, correct?

6   A.    Yes, as of 2003.  Yes.

7   Q.    As of 2003, right.  And you don't know what Boston

8   does with respect to entry-level testing, do you?

9   A.    Correct.

10  Q.    So you don't know whether Boston does anything?

11  A.    Well, no, I know for promotional lieutenants,

12  right, correct.

13  Q.    All right.  So you don't know whether or not

14  Boston tests for psychological evaluation upon hire, do

15  you, or prior to hiring I should say?

16  A.    I don't know.

17  Q.    You don't know whether they do personality

18  inventories?

19  A.    Correct, I don't know.

20  Q.    And you don't know whether they do physical

21  agility tests or medical exams or anything, correct?

22  A.    Correct.

23  Q.    All right.  Now, I also point out that in the

24  field where Boston fits in -- I believe you pointed this

25  out in your expert report, the column -- the row rather,

1    the 500,000 to 999,000 people?

2    A.    Yes.

3    Q.    That 84 percent of cities within that category use

4    written aptitude tests upon hire, correct?

5    A.    Yes, and 48 percent use personality inventories.

6    Q.    Right.  And again you don't know whether Boston

7    does or doesn't do that?

8    A.    Correct.

9    Q.    Now let's talk about that for a second.

10   Personality testing is, um, reliable, correct?

11   A.    Yes.

12   Q.    You believe that you can measure these things, um,

13   you can measure people's personality characteristics by

14   using these types of tests, right?

15   A.    Yes.

16   Q.    And it's fairly static, right?

17   A.    Fairly.

18   Q.    So in other words --

19           THE COURT:  Fairly "static"?  It's fairly

20   "static"?

21           MR. SIMON:  That was a bad question, your Honor,

22   and what I mean is --

23           THE COURT:  Well, is that the word you used?

24           MR. SIMON:  I'm sorry.  What I'm trying to ask

25   here is whether or not people's personality

1    characteristics will vary over time.

2         THE COURT:  Okay, fine, I just want to be sure I'm

3    hearing it.

4         All right.  So is that your question?

5         MR. SIMON:  That's my question.

6         THE COURT:  Yeah, I'm interested in that.

7         Do their personality characteristics vary over

8    time?

9         THE WITNESS:  Somewhat as you age you tend to

10   become more conscientious and less risk-taking.

11        THE COURT:  More conscientious and less

12   risk-taking.

13        THE WITNESS:  Uh-huh.

14   Q.   All right.  But in any event, to the extent that

15   Boston police officers are already tested for

16   personality upon hire, there is no need to test them

17   again upon promotion to lieutenant, correct?

18   A.   Um, I would say if, um, there has been assessment

19   of personality, um, I would say that, um, some of the

20   characteristics might be different for, um, the

21   lieutenant position.  I don't -- since I don't know what

22   was tested, it's difficult to answer that question.

23        THE COURT:  Let me interject again.  Can't people

24   learn relevant interpersonal skills through experience?

25        THE WITNESS:  Yes, and that's why I said "fairly

1   static."  You can change some of your behaviors and

2   become more interpersonally effective, for example.

3         THE COURT:  Okay.

4         Go ahead, Mr. Simon.

5   Q.    Okay.  Now, um, let's take a turn back to Page 25

6   of your report, Doctor, and this deals with -- I'm

7   sorry, I'm on page -- I'm on Page 27 now.

8   A.    (Turns.)

9   Q.    And in this you're referring to that Gains and

10  Morell booklet that we just looked at the table from,

11  correct?

12  A.    Yes.

13  Q.    And as you point out with the bold face in this

14  quote that you take from the top of the page, "An agency

15  should spare no expense and effort in selecting

16  officers," correct?

17  A.    Yes.

18  Q.    And in their opinion, going to the first sentence

19  of that -- of that quote, "The selection process is the

20  most important component in the human resources system."

21  A.    That's what they say, yes.

22  Q.    And you agree with that, right?

23  A.    It's certainly one of the most important.

24  Q.    And the reason why it's so important is because if

25  you don't put good effort in selecting people you're

1    going to be stuck with bad apples, right?

2    A.    Yes.

3    Q.    And you don't want that?

4    A.    Correct.

5    Q.    And that's why they say you should spare no

6    expense when undertaking to do that actually?

7    A.    I think so, yes.

8    Q.    Okay.  And you don't know again what Boston does

9    in terms of selecting its police officers?

10   A.    Correct.

11   Q.    (Pause.)  Now, you have offered various

12   alternatives for what you believe the City should have

13   done back in 2008 for purposes of promotional testing

14   for police officers, correct?

15   A.    Could have, yes.

16   Q.    Okay.  Now, you don't know anything about the

17   Massachusetts civil service laws, do you?

18   A.    No.

19   Q.    And so you don't know whether they even apply to

20   promotional testing for police officers, right?

21   A.    Right.

22   Q.    You don't know what the law requires or what it

23   prohibits?

24   A.    Right.

25   Q.    And you don't know how those laws work, right?

1   A.    Correct.

2   Q.    Now, you've also made these recommendations

3   without any knowledge of Boston's testing history,

4   correct?

5   A.    Correct.

6   Q.    You don't know what it is that --

7   A.    Well, I do know what they did in 2008.

8   Q.    Okay.  But with respect to previous years and what

9   it was that Boston did for promotional testing or didn't

10  do, you have no knowledge of that either, correct?

11  A.    Correct.

12  Q.    So you don't know whether or not in 2002, for

13  example, we used an assessment center?

14  A.    Correct.

15  Q.    And you certainly don't know what the results of

16  that was?

17  A.    Correct.

18  Q.    And, as we've discussed, um, you've recommended

19  these alternatives without being at least personally

20  familiar -- and I don't mean to beat this, but

21  personally familiar with what it is police departments

22  actually do in terms of promotional testing, again

23  you're relying on the books that you've cited?

24  A.    And the work in the '70s --

25  Q.    Okay.

1    A.      -- that I was involved in.

2    Q.      Okay.  But aside from that work in the '70s, you

3    haven't had personal experience with implementing police

4    promotional exams?

5    A.      Correct.

6    Q.      Now --

7    A.      Well, there was the Library of Congress, they did

8    have special police, and, um, I was the lead person in

9    developing a promotion -- a selection and promotion

10   system.

11   Q.      And when was that?

12   A.      During the '80s.

13   Q.      But aside from those two, you haven't had any

14   experience, correct?

15   A.      Right.

16   Q.      And, um -- now, one of the recommendations you

17   have made for alternative testing are personality tests,

18   correct?

19   A.      Yes.

20   Q.      And these are tests that measure personality

21   characteristics and that at least you believe are

22   required or are necessary for police lieutenant, right?

23   A.      I think the job analysis says that they are, so it

24   wouldn't be just that I believe that, but I do believe

25   that.

1    Q.    Well, let's talk about that job analysis for a

2    minute.  You're referring to the 2000 job analysis,

3    correct?

4    A.    Yes.

5    Q.    For the lieutenant position?

6    A.    Yes.

7    Q.    And --

8    A.    And also, I guess, the Borman and Brush article

9    that listed or researched and identified the dimensions

10   of characteristics, skills, and abilities for managerial

11   supervisory positions.

12   Q.    Okay.  But that Borman and Brush article had

13   nothing to do with the City of Boston police

14   lieutenants, correct?

15   A.    Well, to the extent that the lieutenants are

16   supervisors and managers, yes, it would.

17   Q.    But it didn't reference them specifically, right?

18   A.    Pardon?

19   Q.    It didn't reference Boston specifically, correct?

20   A.    Um, not that I know of.

21   Q.    Okay.  Now, let's get back to this issue of

22   personality testing.

23   Personality tests are often written, correct?

24   A.    Um, written?  What do you mean?

25   Q.    I mean they're written exams.

1    A.    Um, are they -- they're -- yes, okay.  Pretty

2    much.

3    Q.    What I mean is you get a piece of paper with

4    particular questions or statements on them and you agree

5    with it or you disagree with it?

6    A.    Okay, it could be computerized, um, it could be,

7    um, an interview, it could be a variety of -- it could

8    be bio data, past history kinds of things.  It varies.

9    Q.    All right.  But in any event -- and I believe you

10   may have answered this and if so I apologize, but you're

11   not aware of any jurisdiction that uses personality

12   tests for police promotions, right?

13   A.    Well, Gains and Morell says those are -- um, no,

14   I'm not.  Well, let me think.  I don't know.

15   Q.    Okay.  But you're not aware of it certainly?

16   A.    Personally I'm not aware of it.

17     (Pause.)

18         MR. SIMON:  May I approach, your Honor?

19         THE COURT:  Yes.

20   Q.    Now, Dr. Hough, I've handed you an article called

21   "Reconsidering the use of personality tests in the

22   Personnel Selection Context."  Do you see that?

23   A.    Yes.

24   Q.    And you're familiar with this article, right?

25   A.    Yes.

1    Q.    This article was published in 2007, correct?

2    A.    Yes.

3    Q.    Now, um, let's flip to Page 720 of this article,

4    the conclusion section.

5    A.    (Turns.)  Yes.

6    Q.    Let's start with Subparagraph D there.  They say,

7    "We must not forget that personality tests have very low

8    validity for predicting overall job performance."

9          Do you see that?

10   A.    No.  Oh, D, okay.

11   Q.    Yes, you see that?

12   A.    I see that.

13   Q.    And that's true, right?

14   A.    Well, no, it's not.

15   Q.    At least these -- at least the authors think

16   that's the case, right?

17   A.    Right, but we also know that, for example, the,

18   um, Schmidt and Hunter 1998 psychological bulletin

19   article it summarized the validities, the

20   criterion-related validities of a variety of selection

21   systems or tests and assessments and indicated that

22   integrity tests, which are personality tests, predict

23   job performance very highly.

24   Q.    And there are other studies that repeat that,

25   correct?

1   A.     Meta analyses?  No.

2   Q.     Isn't it fair to say that those questions are up

3   for debate in the industrial psychology community?

4   A.     I would say that if you look at the

5   criterion-related validities, the meta analyses of those

6   studies, you will find that personality tests predict

7   job performance and very important work-related criteria

8   very effectively.  Service orientation tasks, for

9   example, predict service orientation, um, integrity

10  tests, and I think the key is that these authors were

11  looking at individual personality scales and finding

12  that the validities are what they regard as low, but if

13  you combine those characteristics and those personality

14  scales you increase the criterion-related validity to

15  substantial levels, and I think that's an oversight on

16  this review, this article.

17       THE COURT:  This article appears to use the

18  adjective "self-report" personality tests.  Are there

19  any other kinds?

20       THE WITNESS:  Oh, yes, yes, and I was referring to

21  validities for self-report, but other kinds are other

22  reports which have higher criterion-related validity

23  that would be asking someone to describe me or you and

24  those assessments have higher validity.  And, um, you

25  can do an interview and get better validities for the

1    individual characteristics, but again combining the

2    characteristics, the form of compound personality

3    characteristics, increases the validity to substantial

4    levels.

5         For example, um, when it comes to leadership, a

6    meta analysis by Judge looked at the criterion-related

7    validity and personality variables and when he combined

8    or they combined these scales these characteristics, the

9    validities, were in the high 40s, whereas when they

10   looked at cognitive ability tests they were

11   significantly -- they were lower, significantly lower.

12   Substantially lower.  Now that's predicting leadership

13   effectiveness.

14   Q.   Now, Doctor, one of the other issues that I think

15   the judge put his finger on has to do with the ability

16   to fake on these kinds of self-reporting tests, right?

17   A.   That's an issue.

18   Q.   Yes, and you've written about that?

19   A.   Yes.

20   Q.   Now, um -- well, first of all, let me take a step

21   back and note that one of the authors of this article is

22   Michael A. Campion.  Do you see that on the front page?

23   A.   Yes.

24   Q.   And you know Dr. Campion, correct?

25   A.   I do.

1    Q.    And he's very well-respected in the field anyway?

2    A.    Yes.

3    Q.    Okay.  Now, with respect to this issue of faking,

4    um, that's always an issue with these kinds of tests,

5    correct?

6    A.    The self-report, yes.

7    Q.    Yes.  And that's because you're essentially asking

8    the people to rate themselves?

9    A.    Yes, or to report, not necessarily rate.

10    Q.    Oh, okay.  And that doesn't apply just to

11    personality tests, but that applies to other kinds of

12    tests as well, bio data tests, for example?

13    A.    Yes.

14    Q.    In which you ask people to talk about things that

15    they've done in the past, right?

16    A.    Yes.

17    Q.    And in this integrity testing that you've been

18    talking about, which is a type of personality testing,

19    correct?

20    A.    Yes.

21    Q.    And that measures, what, people's honesty and

22    their ability to -- well, you tell me, what does that

23    measure?

24    A.    Yes.

25    Q.    Okay.  Now --

1    A.    There's also a significant amount of research done

2    on ways to ameliorate or reduce faking, um, that are

3    very effective strategies.

4         MR. SIMON:  Your Honor, I move that this Morguson

5    article be admitted for purposes of identification.

6         THE COURT:  It may be admitted Exhibit N for

7    identification.

8         (Exhibit N, marked.)

9         MR. SIMON:  May I approach?

10        THE COURT:  You may.

11   Q.    Now, Dr. Hough, I've handed you a document that

12   has a table on it.  Do you see that table there?

13   A.    I do.

14   Q.    And what that table, um, discusses or contains are

15   questions from particular personality tests, correct?

16   A.    Yes.

17   Q.    And these are tests that you have in fact

18   recommended that the City of Boston should have been

19   using as part of its testing procedure?

20        MR. LICHTEN:  Objection, that's not her testimony.

21        THE COURT:  I haven't heard it, but this is cross-

22   examination and he may ask the question.

23        Have you recommended that these tests be used?

24        THE WITNESS:  I suggested they were available and

25   could have been used.

1    Q.    And you think that was a good idea, right?

2    A.    Yes.

3    Q.    Or you wouldn't have mentioned all of those?

4    A.    Correct.

5    Q.    And one of those tests is the "California

6    Psychological Inventory," right?

7    A.    Yes.

8    Q.    And this table shows various examples of the types

9    of statements that are contained in that test, right?

10   A.    Some of them, yes.

11   Q.    Okay.

12   A.    But there are about over 300, as you can see,

13   items, so I don't -- I presume that these are chosen for

14   your purposes.

15   Q.    Well, now, let's look at some of these.  Let's

16   look at Number 6.  And that states, "I have a very

17   strong desire to be a success in the world."

18   Do you see that?

19   A.    Yes.

20   Q.    So that's an example of a question that's on this

21   exam that would be given to candidates for police

22   lieutenant in a testing circumstance, right?

23   A.    Yes.

24   Q.    And that kind of a statement begs an obvious

25   answer, does it not?

1   A.      Probably.

2   Q.      You don't think a lieutenant or a sergeant --

3   A.      A lieutenant?  Yes.

4   Q.      A sergeant who's trying to --

5   A.      Yes, I think a sergeant or lieutenant would see

6   that as obvious.

7   Q.      Okay.  And that's what we're talking about when

8   we're talking about fakability, correct?

9   A.      Okay.

10  Q.      I'm asking you.  Correct?

11  A.      Ask me again then.

12  Q.      Well, whether or not a sergeant who was testing to

13  become a lieutenant believed this statement or not about

14  themselves, they're going to say, "Yes, that's true,

15  that's me"?

16  A.      If it's not true and they're faking, they would

17  say, "Yes," that's true.

18  Q.      Right.  So the answer to this question is an

19  obvious one?

20  A.      Yes, more or less.

21  Q.      And the same thing for the next one, 14, "I always

22  follow the rule 'business before pleasure'"?

23          THE COURT:  Well, we can keep going here, I'm

24  reading these, um, and if your point is, um, it seems to

25  me that the desire to answer is not too difficult to

1    discern, um, I get that point.

2         MR. SIMON:  Okay.  Thank you, your Honor.

3         THE COURT:  Well, I mean I don't know what this

4    is.  I don't know who put it together.  I'm assuming

5    it's accuracy.

6         MR. SIMON:  Well, I think the --

7         THE COURT:  I don't think that I would answer, for

8    any job, 105, "I am fascinated by fire," if that's a

9    test.

10        (Laughter.)

11        MR. LICHTEN:  Except the firefighter position.

12        THE COURT:  It's not one that I would go to.  I

13   don't know what I'd do with 100, "I prefer a shower to a

14   bathtub," I think I'd give an honest answer to that.

15   But 44 is one I'd stay away from, "Sometimes I feel like

16   smashing things?"

17        (Laughter.)

18        THE COURT:  I mean we could go on here, but I'm

19   not sure that -- I think --

20        Well, what is this, what do you represent this is?

21        MR. SIMON:  These are questions off of this

22   personality test.

23        THE COURT:  You put them together?

24        MR. SIMON:  I did not, no.

25        THE COURT:  Well, who did?

1          MR. SIMON:  They came out of a treatise of some

2     sort.  I don't know what it was but --

3          THE COURT:  Okay, it's just a treatise of some

4     sort.

5          Okay.  You may use this as a document to examine

6     her.  But if that's her point, and you're representing

7     they come out of the tests, then we'll see what she says

8     about it.

9          MR. SIMON:  I believe she's already agreed to

10     that.

11     Q.    Are you disputing that, Doctor?

12     A.    What?

13     Q.    Are you disputing that these are in fact questions

14     out of these tests?

15     A.    I don't know for sure.  I would assume they are.

16     Many of them look like they might be.

17     Q.    Okay.  But you have no reason to believe that

18     they're not?

19     A.    Right.

20          THE COURT:  Over here on -- I can't resist this

21     now that I see it.

22          Gilford Zimmerman.  "Do you often run upstairs

23     taking two steps at a time?"

24          There was a time when I would have answered that

25     "Yes."  Today I'd be faking it.

1          (Laughter.)

2          THE COURT:   "Would you rather be a forest ranger

3     than a dress designer?" We're not interested in my

4     answer.

5          Go ahead, Mr. Simon.

6          MR. SIMON:   Thank you, your Honor.

7     Q.    But along those lines, Dr. Hough, these tests are

8     also problematic in the sense that candidates don't

9     react well to them, correct?

10    A.    I don't know that for sure.  I think the

11    literature's mixed on that.

12    Q.    Well, I think as the judge has just pointed out,

13    asking questions about running up flights of stairs and

14    fascination with fire and things of that nature, um,

15    it's hard -- it's hard to figure how those relate to

16    being a police lieutenant, correct?

17    A.    It depends on -- well, yes, but it depends on what

18    scales these might be scored on if they're even scored

19    at all.  It also -- when people do research on

20    preferences for kinds of assessments, it depends on what

21    the other assessments are as to what they will say.

22    Again I'm aware of research that indicates that

23    personality questionnaires like this are preferred to

24    some of the other kinds of assessments.

25    Q.    Questions about preferring a shower to a bathtub?

1    A.    I guess so.

2    Q.    Now --

3    A.    I think it's taken as a whole that they prefer,

4    the research that I'm referring to.

5    Q.    Okay.  Now, do these kinds of questions raise

6    issues of invasion of privacy, do they not?

7    A.    They could, um, that's possible.

8    Q.    And they also raise questions with respect to

9    disability discrimination, no?

10   A.    Um, if they -- if the exam or the personality

11   inventory was developed to measure psychological

12   illness, then it would be considered a medical exam and

13   it would be precluded from a preoffer selection system

14   under the Americans with Disabilities Act.

15   Q.    In any event, um, you don't know of any police

16   department that uses these kinds of tests in promotion,

17   I think we've established that, right?

18   A.    I don't know of any precise, but I do know that

19   there are organizations that sell these to police

20   departments, they have, um, practices in which this is

21   their livelihood, so I know that they are used.

22   Q.    Well, you're assuming that they are used, right?

23   A.    They're still in business.

24   Q.    Okay.  Now, these kinds of off-the-shelf testing

25   procedures, they raise their own problems, don't they?

```
1    A.    Tell me, please?

2    Q.    Well, for example, problems with test security?

3    A.    Um, they can, yes, but less than probably

4    cognitive ability or job knowledge tests though.

5    Q.    Well, because people can get their hands on them

6    and they can know what's coming, right?

7    A.    Yes.

8    Q.    Okay.  They also raise problems with validity,

9    don't they?

10   A.    No.

11   Q.    Well, they're generally not as valid, right?

12   A.    No.

13   Q.    But --

14   A.    I've mentioned instances meta analyses that

15   indicate the opposite.

16   Q.    But these are generic tests that don't relate

17   specifically to a jurisdiction at issue, right?

18   A.    They are generic tests but the meta analyses that

19   I've described included tests like these.

20   Q.    Now, these meta analyses that you've been talking

21   about, um, they involve all kinds of testing, right?

22   A.    It depends on the meta analysis.

23   Q.    But they don't necessarily reflect police testing

24   in any way, correct?

25   A.    Oh, yes, some of the meta analyses by Hersh and
```

1    Northrup and Frank Schmidt was specifically related to

2    police and that was cognitive ability and then there's

3    -- and that was validity substantially lower than for

4    the general kind of work.  And then there's, for

5    personality, there's meta analyses, one was by Berrick

6    and Blount, another one was Delgado, and another one was

7    done by O'Brien, and they all concluded that personality

8    tests had criterion-related validity for police work.

9    And it's actually at a higher level when you combine

10   those characteristics than cognitive ability tests.

11   Q.    Now --

12   A.    And that's all police work, specific to police

13   work.

14   Q.    Let's talk about interviews briefly.

15   Interviews -- and we talked about this before, I

16   believe, but it raises --

17        THE COURT:  It's a proper time to ask you about

18   how much more do you have for this witness?

19        MR. SIMON:  Um, I don't have a whole lot more, but

20   a break would be welcome.

21        THE COURT:  All right, then we'll take the morning

22   recess then at this time for one half hour.  We'll

23   recess until 11:15.  We'll recess.

24        (Recess, 10:45 a.m.)

25        (Resumed, 11:15 a.m.)

```
 1           THE COURT:  Mr. Simon, you may continue.
 2           MR. SIMON:  Your Honor, having a chance to read my
 3   notes, I have no further questions at this time.  I
 4   would however like to formally move to strike those
 5   portions of Dr. Hough's expert report that are
 6   duplicative of Dr. Wiesen.
 7           THE COURT:  Well, what are they?
 8           MR. SIMON:  They are Pages 5 through 24.
 9           THE COURT:  Just a moment, so I have the report in
10   front of me.
11           (Pause.)
12           THE COURT:  5 through 24?
13           MR. SIMON:  Yes, sir.
14           THE COURT:  Just a moment.
15           (Pause.)
16           THE COURT:  Why shouldn't I do that, Mr. Lichten?
17   You didn't ask about it.
18           MR. LICHTEN:  Well, no, your Honor, but two
19   things.
20           First, the agreements that the parties had was
21   that all the expert reports were going in.  We didn't
22   object to any of their expert reports going in.
23           Secondly, your Honor, if you remember the history,
24   we did not get an expert report from them on validity,
25   which is their burden, until December 1st, and Dr. Hough
```

1    went to great pains to get her rebuttal report in within

2    21 days after that.  And therefore the fact that

3    Dr. Wiesen may have had a little more time and was able

4    to get a report out a little quicker I don't think

5    should preclude us from providing very valuable

6    information on a very important issue in this case,

7    which was very timely provided given when we first got a

8    report from them on validity, which is their burden.

9         THE COURT:  I'll take the motion under advisement

10   and compare this section of her report to his report and

11   maybe make a more nuanced ruling.  But I'll take it

12   under advisement.

13        So nothing further for this witness, is there,

14   Mr. Lichten?

15        MR. LICHTEN:  I just have a very brief --

16        THE COURT:  Very well.

17

18   REDIRECT EXAMINATION BY MR. LICHTEN:

19   Q.    Dr. Hough, do you have the "Handbook of Police

20   Psychology" with you?

21   A.    I have the chapter that was presented as an

22   exhibit.

23   Q.    Yes.  And could you go to, um, Pages 203 and 204,

24   the section on police promotions, Dr. Jacobs' article.

25   A.    (Turns.)  Yes.

1   Q.    Okay.  And, by the way, if you go to Page 202, it

2   says "Promotional Testing, a Brief Overview."

3   Do you see that?

4   A.    Yes.

5   Q.    Would you agree that three or four pages on the

6   issue of police promotions is a very brief review?

7   A.    Yes, definitely.

8   Q.    Okay.  Now, going to Page 2004 of his report, the

9   first paragraph.

10  A.    (Turns.)

11  Q.    Do you see where -- about the third sentence down,

12  it says "Typically applicants are given a job knowledge

13  test."

14  Do you see that?

15  A.    Yes.

16  Q.    And then followed by that, "This test is often

17  followed by a formalized panel interview in which

18  candidates are also asked to respond to situations

19  typical of what they would find should they assume the

20  next mid-level position," is that correct?

21  A.    Yes.

22  Q.    And was that done with respect to the Boston

23  Police Department in 2008, as far as you know?

24  A.    Not as far as I know.

25  Q.    Okay.  Now, he then goes on, he goes to the next

1    paragraph, he talks about, "Interestingly enough one

2    piece of potentially valuable information has rarely

3    seen its way into the promotional process."

4    Do you see that?

5    A.    Yes.

6    Q.    And he's talking about "performance review," is

7    that correct?

8    A.    Yes.

9          THE COURT:  Give me a page reference again?  I'm

10   sorry.

11         MR. LICHTEN:  Page 204, second paragraph.

12         THE COURT:  Yes, now I have it.  Thank you.

13         MR. LICHTEN:  And I'm reading about three

14   sentences in, halfway into the paragraph.

15         THE COURT:  Yes.

16   Q.    "Since in most police organizations the move from

17   one position, police officer, to the next position,

18   police sergeant, often involve many of the same

19   responsibilities and tasks, using past performance makes

20   sense because it gives us a clear indication on how the

21   officer will perform on part of the new job if

22   promoted."

23   Do you see that?

24   A.    Yes.

25   Q.    And he also says, "It is important to note that

1    this is an untapped informational pool to promote

2    promotional systems."

3    Do you see that?

4    A.    Yes.

5    Q.    Do you agree with that?

6    A.    Yes.

7    Q.    And some of the things you were being asked about,

8    some of these characteristics you were being asked about

9    cannot be assessed through this method that Dr. Jacobs

10   talks about, um, in this page about using information

11   about past performance?

12   A.    Yes.

13         MR. LICHTEN:  That's all I have, your Honor.

14         THE COURT:  Nothing further, Mr. Simon?

15         MR. SIMON:  Nothing further, your Honor.

16         THE COURT:  You may step down.

17         Is that the plaintiffs' case?

18         MR. LICHTEN:  Yes, your Honor, the plaintiffs

19   rest.

20         THE COURT:  Defense?

21         MR. BOK:  Your Honor, just a brief motion, if I

22   could, and I could do it either in writing or orally,

23   under Rule 52(c) for a judgment.  I know that it's

24   discretionary, but did your Honor --

25         THE COURT:  No, no, it's timely and you've made

1    it.  Are you going to put on any further affirmative

2    evidence?

3         MR. BOK:  Um, we are going to be providing further

4    -- further witnesses, yes.  In fact a witness is here.

5         May I file a --

6         THE COURT:  Well, that's fine.  Then for the

7    purposes of this case, the motion is denied.

8         MR. BOK:  Well, should I file a written motion or

9    is this --

10        THE COURT:  No, your rights are saved with the

11   oral reference that you've made.  I desire to hear all

12   the evidence.

13        And you may call your next witness.

14        MR. BOK:  Thank you, your Honor.

15        THE COURT:  Thank you.  You may step down.

16        THE WITNESS:  Thank you.

17        THE COURT:  Call your next witness.

18        MR. BOK:  If I may approach with some materials

19   that he will need up on the stand?

20        THE COURT:  Of course.

21        And you may proceed, Mr. Bok.

22        (EDWARD P. CALLAHAN, sworn.)

23

24             * * * * * * * * * * * * * * * * *

25             EDWARD P. CALLAHAN

```
1              * * * * * * * * * * * * * * * * *

2

3    DIRECT EXAMINATION BY MS. HODGE:

4    Q.    Could you please state your full name for the

5    record, please.

6          THE COURT:  Oh, it's Ms. Hodge.  I'm sorry.  Go

7    ahead.

8          And your full name?

9    A.    My name is Edward P. Callahan.

10   Q.    And by whom are you employed?

11   A.    I'm employed by the Boston Police Department.

12   Q.    And what position do you currently hold?

13   A.    My title is Bureau Chief of the Bureau of

14   Administration and Technology.

15   Q.    And could you briefly describe your duties and

16   responsibilities?

17   A.    I'm responsible for managing about eight divisions

18   of the Department including the finance division, the

19   human resource division, the facilities management

20   division, um, and numerous other divisions.

21   Q.    And when were you first hired by the Boston Police

22   Department?

23   A.    I was first employed by the BPD in September of

24   1986.

25   Q.    And what role did you serve at that time?
```

1  A.    I was appointed as Human Resources Director.

2  Q.    And were you subsequently -- and did your position

3  change?

4  A.    Yes, it did.

5  Q.    And what did it change to?

6  A.    In January of 2005 I was appointed to be the

7  assistant chief of the Bureau of Administration and

8  Technology.

9  Q.    And you subsequently became Chief?

10 A.    Yes, in June of 2010.

11 Q.    Okay.  Now, what if any responsibility did you

12 have and have you continued to have with regard to

13 police promotional examinations?

14 A.    Well, since my initial employment with the

15 Department I have been involved with handling

16 administrative and logistical aspects of promotional

17 testing.

18 Q.    And has that continued to this day?

19 A.    Yes, it has.

20 Q.    And you testified in *Lopez*?

21 A.    Yes, I did.

22 Q.    Now, aren't police officers, just the regular

23 patrolmen, represented by a union?

24 A.    Yes, they are.

25 Q.    And are officers above that rank, sergeants,

1    lieutenants, and captains, represented by a union?

2    A.    Yes, they are as well.

3    Q.    And what union?

4    A.    They're represented by the Boston Police Superior

5    Officers Federation.

6    Q.    And what if any involvement have the Superior

7    Officers Federation have in the promotional practices of

8    the Boston Police Department for Lieutenant?

9    A.    Well, of course they have a great interest in the

10   promotional process.  They're involved in the day-to-day

11   activities of developing exams.  Some of their members

12   serve as subject matter experts.  But from the union

13   perspective we do indeed brief the unions as to our

14   activities prior to administering any exams.

15   Q.    And has the Superior Officers Federation been

16   involved in any litigation regarding promotional exams?

17            MR. LICHTEN:  Objection, relevancy.  This is Title

18   VII, your Honor --

19            THE COURT:  No, no, if I need argument I will ask

20   for it.

21            What is the relevancy?

22            MS. HODGE:  The relevancy is that it comes full

23   circle back to some of the business necessity issues

24   that certainly they take into consideration as they're

25   developing exams.

1          THE COURT:  Well, let's come to those issues and
2     then you can work out from there.  Sustained.  Without
3     prejudice to you're getting back to it if it's
4     necessary.
5     Q.     Has the Federation been involved in any litigation
6     regarding police promotional exams to the rank of
7     lieutenant?
8          MR. LICHTEN:  Objection, relevancy.
9          THE COURT:  Well, I'm interested in that
10    litigation back in 2002 as to what happened there.  Um,
11    so sustained, but you can ask a more precise question.
12    Q.     With regard to -- well, with regard to the 2002
13    examination, was the Federation involved in any
14    challenge to the content of a police promotional exam
15    for lieutenant?
16    A.     Yes, they were.
17    Q.     And can you please describe what happened?
18    A.     The police department attempted to administer a
19    performance review as part of the 2002 promotional exam.
20    The Superior Officer Federation litigated against that
21    plan at the Civil Service Commission.
22    Q.     And do you know what the outcome was?
23    A.     The outcome of the issue was that the Department
24    did not administer a performance review system as part
25    of the 2002 promotional exam.

1        THE COURT:  As you understand the actual

2   litigation I've got some evidence here that a justice of

3   a Superior Court entered a preliminary injunction.  Now

4   that was in that litigation?

5        THE WITNESS:  No, I don't believe so, your Honor,

6   I think that the matter was before the Civil Service

7   Commission at that time.

8        THE COURT:  Okay, before the Civil Service

9   Commission, so it was litigation, but it's

10  administrative litigation with the responsible state

11  agency.

12       And that agency did what as you recall?

13       THE WITNESS:  The Civil Service?

14       THE COURT:  Yes.

15       THE WITNESS:  Well, what happened eventually was

16  that the City withdrew the component they were proposing

17  to administer after hearings.

18       THE COURT:  Yeah, why?

19       THE WITNESS:  I don't think they -- I think the

20  City didn't believe it was going to prevail at the Civil

21  Service Commission.

22       THE COURT:  So in essence -- and I just want to

23  understand, I'm not putting words in your mouth.

24       So the union comes in before the Civil Service

25  Administration, which is the appropriate body to make

1    your attack if you're the union, the City responds, the

2    procedure is pending before the Civil Service

3    Administration, the policy-makers within the City think,

4    and I'm not being glib here, but the gain is not worth

5    the candle, they withdraw rather than expend money that,

6    in the judgment of the policy-makers, isn't going to get

7    the City where it wants to go?

8         THE WITNESS:  That's my understanding, your Honor,

9    yes.

10        THE COURT:  All right.

11   Q.   (Pause.)  Could you describe briefly how the Human

12   Resources Division of the Civil Service -- um, the civil

13   service requirements works in the promotional context, I

14   mean what does HRD do?

15   A.   Well --

16        THE COURT:  Within the Boston Police Department?

17        MS. HODGE:  No, HRD, the Massachusetts Human

18   Resources Division, which used to be the Department of

19   Personnel Administration.

20        THE COURT:  Thank you.  All right.  And he

21   understands the question.  And you may answer it.

22        THE WITNESS:  Thank you, your Honor.

23   A.   Yes, the state's HRD, the Human Resource Division,

24   has oversight authority for promotional testing for both

25   police and firefighter positions throughout the

1    Commonwealth.

2    Q.    And what is that oversight responsibility, I mean

3    what are they trying to do?

4    A.    Well, they're trying to ensure that we have a

5    competitive merit-based promotional process that we

6    implement.  We have both delegated exams and

7    non-delegated exams and the oversight remains pretty

8    much the same.

9    Q.    And we have talked about the delegation process

10    and so let's talk about an HRD-administered examination.

11    A.    Yes.

12    Q.    What if any responsibility does the Boston Police

13    Department have with an HRD-administered examination?

14    A.    Well, we have responsibility for assisting HRD in

15    constructing the exam.

16    Q.    Now, do other municipalities participate

17    similarly?

18         MR. LICHTEN:  Objection, relevancy.

19         THE COURT:  Sustained.

20    Q.    So with regard to -- so HRD examinations for

21    lieutenant are Boston-specific, would that be correct?

22    A.    There is a Boston-specific component to those

23    exams, yes.

24         (Pause.)

25         THE COURT:  And just so we're clear, I sustained

1   that objection because since you put the *Lopez* record in

2   and I'm increasingly familiar with it, it's clear that

3   HRD occupies much the same position throughout the

4   Commonwealth, that's its job.  All right.

5        MS. HODGE:  Your Honor, I'm just trying to

6   distinguish that we don't just buy them, we don't just

7   --

8        THE COURT:  And you did, you asked a specific

9   question and he gave an answer and I'm following.

10       MS. HODGE:  Okay.

11  Q.   So with regard to the work that has gone into

12  various exams you also mentioned a "delegated exam."

13  Can you explain that?

14  A.   Yes, on occasion we have administered exams that

15  we refer to as a "delegated exam" and that means that

16  we've administered exams that go beyond a technical

17  knowledge written exam and we include other components

18  into the examination process.

19  Q.   And we're focusing here on more recent history,

20  but prior to the year 1991, had Boston engaged in

21  delegated examinations?

22  A.   Yes, we had.

23  Q.   And so had Boston utilized other "components," if

24  you will, with an assessment center?

25  A.   Yes.

1  Q.    All right.  Directing your attention then to the

2  more recent history.  Has Boston requested a delegation

3  agreement, um, for 2000 -- for the year 2000 -- for the

4  year 2002 exam?

5  A.    Yes, we did.

6  Q.    And so that distinguishes it from the exams

7  immediately before and the exams immediately after?

8  A.    That's correct.

9  Q.    The exams at issue here are the 2005 and 2008

10 exams and would it be fair to say that those are

11 HRD-administered exams and not delegated?

12 A.    That's correct.

13 Q.    (Pause.)  Now, in the context of the civil service

14 requirements, after an exam has occurred what rights do

15 individuals have to challenge -- individuals to

16 challenge the determination of who gets promoted?

17 A.    Well, in the first instance, I believe, the

18 candidates for promotion have an opportunity to

19 challenge the exam itself, whether it's a procedural

20 challenge or a computational challenge.  And then of

21 course if they're not selected and they were in

22 contention to be selected we're at a bypass, and, I'm

23 sorry, they could challenge a bypass.

24 Q.    And so what does Boston receive on an

25 HRD-administered examination from which it can make the

1   selection of who it's going to promote?

2   A.    It would receive what's referred to under civil

3   service law as the "eligible list."

4   Q.    And is the eligible list in any order?

5   A.    Yes, it is.

6   Q.    And what is that order?

7   A.    There's a rank order from top to bottom.

8   Q.    And when you say "rank order," how is that ranking

9   determined?

10  A.    By score, testing.

11       MR. LICHTEN:  Your Honor, in fairness this is all

12  in the *Lopez* record, it is not in dispute, it's in the

13  statute.

14       THE COURT:  That appears to be so.

15       MS. HODGE:  I will move along, your Honor, but I

16  --

17       THE COURT:  Please.

18       MS. HODGE:  But I just want to start -- I want to

19  put it -- there's a particular context that I want to

20  get into.

21       THE COURT:  You go right ahead.

22  Q.    And with regard to a selection an individual might

23  challenge if they were jumped over, correct?

24  A.    If they were rejected, yes.

25  Q.    And so if I have a higher score and you pick

1    someone with a lower score, would that be the basis of a

2    "bypass," as you understand it?

3    A.    Yes, it would.

4    Q.    Now, generally when Boston has utilized an

5    HRD-administered exam, are the exams, both to bypass as

6    well as to various questions, challenged as to questions

7    that were asked on the exam?

8    A.    I'm sorry?

9    Q.    Have you seen, in an HRD-administered examination,

10   challenges both as to a bypass matter but also to the

11   specific items that are tested?

12        MR. LICHTEN:  I object to the compound nature of

13   that question.

14        THE COURT:  Sustained.  Sustained.  She can ask

15   another question.

16        MS. HODGE:  Okay.

17   Q.    Mr. Callahan, with regard to HRD-administered

18   exams, have you had challenges because someone was

19   bypassed?

20   A.    Yes.

21   Q.    And have those challenges -- do you have any --

22   have you reached any conclusion as to, um -- strike

23   that.  I will withdraw that question.

24        With regard to the specifics of the questions

25   asked on an HRD-administered examination, have you had

1   challenges to that?

2   A.   Depending upon the component, um, there often are

3   questions or items that are challenged, yes.

4   Q.   Now, when Boston has received a delegation, what

5   challenges have been raised in that context?

6   A.   Well, there have been challenges against the

7   components, the weighting schemes attached to the

8   components, that sort of thing.  So it's not unusual at

9   all.

10  Q.   We have received and we have been hearing

11  information here about the concept of rank order and the

12  concept of banding.  Are you familiar -- you're familiar

13  obviously with rank order, but are you familiar with the

14  concept of banding?

15  A.   I'm somewhat familiar with the concept of banding,

16  yes.

17  Q.   And, as you understand it, what is "banding"?

18  A.   "Banding" was a scheme or a plan at one point to,

19  um, put candidates in prescore advantage.  Any candidate

20  with a prescore arrangement would have been presumed to

21  have the same score given the statistical difference

22  between the scores.

23  Q.   Okay.  So if you had a score of 99, 98, and 97,

24  are those the three score bans that you're talking

25  about?

1    A.    That would be a ban, yes.

2    Q.    And within that band how were the individuals with

3    different scores treated?

4          MR. LICHTEN:  Objection.

5          THE COURT:  I -- when was this done?

6          MS. HODGE:  These are -- well, you will recall,

7    your Honor, that there has been discussion about, "Well,

8    you could have banded."

9          THE COURT:  Right.

10         MS. HODGE:  And what he has suggested -- I'm just

11   trying to say, "What is the consequence if you had

12   banded?"

13         THE COURT:  "Banded," as I understand it, then the

14   policy-maker can choose from anyone within that band.

15         MS. HODGE:  That is correct.

16         THE COURT:  Well, I understand that.

17         MS. HODGE:  Okay.  And without a bypass.

18         THE COURT:  Well, I mean if you got that approved,

19   if that was delegated, then within that band you can

20   choose, and that's susceptible to choice based upon --

21         MS. HODGE:  Any reason.

22         THE COURT:  well, any reason, and if we look in

23   the literature that you have supplied, um, the -- it's

24   interesting that that's criticized, um, because it may,

25   um, the goals seem to be then that you are achieving

1    some racial goal or the like.  But I do understand it.

2           MS. HODGE:  Okay, with that being said then.

3    Q.    With regard to tie groups, are tie groups much

4    like a band?

5    A.    Yes, they're similar to a band, yes.

6    Q.    So you can select within the tie group, everyone

7    with the same score?

8    A.    Right, the first of that is the equal eligibility

9    rule, um, within a tie group.

10   Q.    And the judge just mentioned a case that went on

11   to the Superior Court with regard to a previous exam.

12   Do you recall that?

13   A.    Yes.

14   Q.    And was that regarding banding?

15   A.    I believe it was, yes.

16   Q.    And how often has the Commonwealth attempted to

17   band?

18          MR. LICHTEN:  Objection.  Foundation.

19          THE COURT:  Well, no, I'm going to allow that, if

20   he knows.

21          MR. LICHTEN:  But it's the Commonwealth, not the

22   City of Boston.

23          THE COURT:  I understand that.  But if he knows.

24   A.    On two occasions.

25   Q.    And do you know what position Boston took with

1    regard to banding?

2    A.    I believe the City was --

3          MR. LICHTEN:  Your Honor, I don't know what --

4          THE COURT:  No, it's sustained at this level of

5    generality.

6          When were those two occasions?

7          THE WITNESS:  1995 and 2009.

8          THE COURT:  And 2009?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  And in 1995, what position did the

11   City take?

12         THE WITNESS:  To the best of my recollection the

13   City wasn't formally enamored with the notion of

14   banding.

15         THE COURT:  Okay.  Did they take a formal

16   position?

17         THE WITNESS:  I don't recall that.

18         THE COURT:  In 2009?

19         THE WITNESS:  I believe the City was in favor of

20   banding.

21         THE COURT:  Okay.

22   Q.    And did banding occur?

23   A.    No, it did not.

24   Q.    And whose decision was it not to impose banding or

25   not to have banding?

1  A.    I believe it was the Civil Service Commission's

2  decision.

3  Q.    In **Lopez** you testified regarding the hiring

4  process of police officers.  Do you recall that?

5  A.    I do.

6  Q.    And I believe that you testified with regard to

7  the components that you consider in hiring a police

8  officer, correct?

9  A.    Yes.

10  Q.    And one of those components was you engage in

11  psych or personality examinations, is that correct?

12  A.    That's correct.

13  Q.    What psych or personality examinations does the

14  Boston Police Department impose on police -- on new

15  recruits?

16  A.    Well, there are two psychological tests we

17  administer, one is the MMPI2 and the other is the PAI.

18  Q.    And do you know what "PAI" stands for?

19  A.    "Personality Assessment Inventory."

20  Q.    And are those tests given routinely to all

21  potential candidates for police officer positions?

22  A.    Yes, they are.

23  Q.    And are they used in the -- and are they used in

24  the determination of whether or not that individual will

25  in fact be made an offer of employment?

1    A.     Yes, they are.

2    Q.     Now, when a -- there has been some testimony

3    between the difference between a promotional examination

4    and an initial hire circumstance.  Does a new hire in

5    the police department take any kind of written paper and

6    pencil examination?

7    A.     They take a civil service exam, which is a written

8    paper exam.

9    Q.     And do you know is that based on the content of

10   the job of police officer or is it based on something

11   else?

12   A.     I believe it's based on general knowledge rather

13   than police content.

14   Q.     And when Boston requests, does -- I assume Boston

15   requests a list from the Civil Service Commission of

16   individuals to fill police officer positions, correct?

17   A.     That's correct.

18   Q.     Okay.  And how -- how many police officers does

19   Boston receive?

20   A.     Well, depending upon the number of vacancies that

21   we have, um, there's a formula that the Commonwealth

22   uses to provide the names for us to consider, it's

23   called the "2N plus 1" formula.

24   Q.     And what is that?

25   A.     Well, if we had 50 vacancies, um, they would give

1    us 50 -- they would give us 101 names theoretically, and

2    potentially a lot more if the 101st first person is a

3    tie grouping, then we get the whole tie-grouping.

4    Q.    So is 2N plus 1 always -- or does 2N plus 1 allow

5    Boston to select a candidate out of rank order within

6    that group?

7    A.    No.

8    Q.    So could you explain what information Boston

9    receives?

10   A.    With respect to the list itself?

11   Q.    The 2N plus 1 group.

12   A.    Oh, yeah, we would get -- we would get -- if we

13   had 50 vacancies we'd get 101 names and we'd have to go

14   through the list in rank order.  It would be from rank

15   order down.

16   Q.    And "rank order" again it would be how they did on

17   the written test?

18   A.    Yes, that's correct.

19   Q.    And is the same true for promotions?

20   A.    Yes.

21   Q.    So you would get a 2N plus 1 list but you would

22   still have a -- how they did on the test, and you would

23   go down with that rank, right?

24   A.    That's correct.

25   Q.    Okay.  Now, I'm going to direct your attention to

1    1991.

2          Were you involved at all in the job analysis for

3    sergeants, lieutenants, and captains?

4    A.    I was.

5    Q.    And was this a test administered by HRD?

6    A.    Yes, it was.

7    Q.    Now, Boston is, um -- so what was Boston's

8    involvement?  I just want you to walk through kind of

9    what Boston was involved in doing along with HRD.  Could

10   you briefly describe generally your role?

11   A.    My personal role?

12   Q.    Yes.

13   A.    My role would have been fairly simple, it would

14   have been to, um, work with the police commissioner to

15   select individuals to participate as subject matter

16   experts, um, to work with HRD to conduct a job analysis.

17   Q.    And so did you do that in 1991?

18   A.    Yes.

19   Q.    And in 1991, um, and I believe it's the Exhibit

20   Number 71, there is a validation report dated October 1,

21   1991.  And is that the product, if you will, of your

22   work?

23          MR. LICHTEN:  Objection.  "Your work?"  There's

24   been no evidence that he's done anything.

25          THE COURT:  The objection's sustained.  She'll put

1   another question.

2   Q.    Was that the product of HRD with input from the

3   Boston Police Department SMEs?

4   A.    Yes.

5   Q.    Okay.  Now, I'm going to direct your attention

6   first to Exhibit 71, if you would, please.

7   A.    (Looks.)

8         THE COURT:  Exhibit 71?

9         MS. HODGE:  Yes, your Honor.

10        (Pause.)

11  A.    I have that.

12  Q.    Okay.  Now, looking at the table of contents

13  because there's one there, in Exhibit 71, could you

14  briefly describe the areas in which Boston SMEs would

15  have been involved, from your knowledge, of what they

16  did in 1991?

17        MR. LICHTEN:  Objection.  Foundation.

18        THE COURT:  Overruled.  I think an adequate

19  foundation's been laid.

20        What page are you on?

21        THE WITNESS:  Your Honor, I have a blank page.  I

22  don't have Exhibit 71.

23        THE COURT:  All right.

24        Want to give him a copy?

25        MS. HODGE:  I believe -- (Looks.)

1          MR. BOK:  Your Honor, may I approach the witness?

2          THE COURT:  Of course.

3          (Mr. Bok gives it to witness.)

4          THE COURT:  All right, now he has it.  Go ahead.

5    Q.    I mean with regard to Page --

6          MS. HODGE:  And I believe it's 00248, or it's the

7    third page of that document, the cover page

8    introduction, the table of contents.

9          THE COURT:  All right.  Go ahead.

10   Q.    And just briefly -- would you briefly describe the

11   areas, from your knowledge, where SMEs would have been

12   involved?

13   A.    Well, they would have been involved in identifying

14   specific KSAs and all skills and abilities of the

15   lieutenant's position.  They would have been involved in

16   linking to those tasks and all the skills and abilities

17   developing a reading list.  They would have been

18   involved in rating the tasks, whether they were, um,

19   frequently performed or whether they were important or

20   not so important, that sort of thing.  So they would

21   have been involved in really a fairly intense review of

22   the actual KSAs that were developed.

23   Q.    And then I would direct your attention also to

24   Exhibit Number -- and this would be *Lopez* Exhibit Number

25   41, which are the appendices.

1    A.    (Looks.)

2    Q.    I believe it's right there.  (Indicates.)

3    A.    You said Item Number 41?

4    Q.    The other two volumes.

5    A.    Yeah, rather than these.  Okay.  All right.  Okay.

6    Okay.  Now I have that.

7    Q.    Okay.  So again I'd like you to look at the

8    attachments or the list of attachments and again if you

9    could briefly describe where subject matter experts with

10   the Boston Police Department would have been involved in

11   providing input?

12        MR. LICHTEN:  Objection, again where "they would

13   have been involved," there's no evidence that they --

14        THE COURT:  Where they were.

15   Q.    Where they were, based upon your knowledge?

16        MR. LICHTEN:  Again there's no foundation that he

17   knows.

18        THE COURT:  It's adequate foundation given his

19   responsibilities.

20        But I need the page reference again?

21        THE WITNESS:  I believe it's 3566, your Honor.

22        THE COURT:  Thank you.  You may answer.

23   A.    Well, it's a lengthy list of responsibilities the

24   SMEs would have been involved in, everything from

25   looking at a reading list, um, the SME identification of

1    sheets, classification, availance report of important

2    KSAs that required an appointment, um, a report linking

3    tasks and KSAPs.  These are types of responsibilities

4    that the SMEs -- the BPD SMEs would have been reviewing

5    under management of HRD.

6    Q.    So are you looking at, for example, Attachment ST

7    as examples of the kinds of reports that --

8    A.    Yes.

9    Q.    -- Boston SMEs were involved in?

10   A.    That's correct.

11   Q.    Okay.  Now, has the job of lieutenant changed

12   significantly since 1991?

13          MR. LICHTEN:  Objection, foundation.

14          THE COURT:  No.

15          Well, how long have you been the director?

16          THE WITNESS:  Well, I've had various jobs, your

17   Honor, but I've been with the Department since 1986.

18          THE COURT:  Since 1986, you've been with the

19   Department?

20          THE WITNESS:  Yes.

21          THE COURT:  And in that Administration and

22   Technology Division?

23          THE WITNESS:  Yes.  I'm not a police officer.

24          THE COURT:  Right.

25   Q.    And you've had responsibility for Human Resources

1    throughout that time, is that correct?

2    A.    To one degree or another, yes.

3    Q.    And does Boston have sort of job descriptions,

4    general job descriptions for the position of lieutenant?

5    A.    Yes, we do.

6    Q.    And does Boston have a general job description for

7    the position of deputy supervisor?

8    A.    Yes.

9    Q.    And I'm going to direct your attention to Exhibit

10   Number 23 in those books to the side.

11   A.    (Looks.)

12   Q.    And I ask you to review --

13   A.    Oh, I have that.

14   Q.    Okay.  And Exhibit 23, can you describe it,

15   please?

16   A.    It's Boston Police Department Rule 105 dated June

17   4th of 1979.  It is a job description for the position

18   of lieutenant.

19   Q.    And is that the current job description for the

20   position of lieutenant?

21   A.    Yes, it is.

22   Q.    And directing your attention to the third page of

23   that exhibit.

24   A.    (Turns.)  Yes.

25   Q.    And what is that?

1  A.    It's Rule Number 106 dated November 6th, 1986,

2  which is a job description for the lieutenant's role of

3  duty supervisor.

4  Q.    And, um, is that the current job description for

5  the duty supervisor role?

6  A.    Yes, it is.

7  Q.    To your knowledge has HRD used the 1991 job

8  analysis for subsequent exams?

9  A.    Yes, I believe they used it for the 2002 exam, um,

10  in particular.

11  Q.    Okay.  Well, have they also used -- well, okay,

12  2002.  With regard to *Lopez* -- strike that.

13  Had Boston done its own job analysis since the 1991

14  exam?

15  A.    Yes.

16  Q.    And when was that?

17  A.    We did a job analysis for the position of

18  lieutenant in 2000 and we just did a very comprehensive

19  job analysis in 2014.

20  Q.    With regard to the job analysis done in 2000, um,

21  who performed that job analysis?

22  A.    That would have been the, um, consulting firm of

23  Morris and McDaniel.

24  Q.    Now, why did you do a job analysis in the year

25  2000?

1   A.     I did it at the recommendation of Dr. David

2   Morris.

3   Q.     And, um, what exam -- were you looking to use an

4   HRD-administered exam or a delegated exam?

5   A.     At that point we were looking to administer a

6   delegated exam.

7   Q.     And do you know what components were going to be

8   included?

9   A.     Well, initially there was one set of components

10  that was revised at some point, but ultimately we

11  administered a technical knowledge written exam, we used

12  the state's E & E scoring component, and we administered

13  it in an assessment center.

14  Q.     And what was in the assessment center?

15  A.     The assessment center was a videotaped recording

16  with scenarios that were presented to the candidates for

17  the position of lieutenant, their responses were

18  recorded, and eventually we flew in assessors from

19  around the country to rate the videotapes of the actual

20  responses.

21  Q.     And when you say you "flew them in," did they sit

22  in a room together and rate?

23  A.     Yes, they did, in groups of three.

24  Q.     With regard to the 2000 -- the job evaluation that

25  resulted, I understand, in the 2002 exam, was that the

1    examination where the job performance complement was

2    initially considered and then, um, was not included?

3    A.    Yes.

4    Q.    Now, during this whole process was the development

5    of a delegated examination, which included a written

6    exam, an assessment center, and the E & E component,

7    what if any role did HRD play?

8    A.    When?  I'm sorry, Counsel.

9    Q.    2002.

10   A.    Well, they played a significant-enough role in

11   terms of overseeing the whole process.

12   Q.    And when you say "overseeing the whole process,"

13   how did that happen?

14   A.    Well, they were on site at the time we

15   administered the exams, um, so they were actively

16   engaged in the planning and the administration of these

17   exams.

18   Q.    (Pause.)  Did HRD certify a list for promotion?

19   A.    Yes, they did.

20   Q.    And I'm going to direct your attention to Exhibit

21   Number 38 and ask you if that's the list that was

22   produced by HRD?

23   A.    (Looks.)  Yes, that would have been the eligible

24   list that was produced for the results of the 2002 exam.

25   Q.    And did Boston select lieutenants from that list?

```
1    A.     Yes, we did.

2    Q.     And how many black candidates were selected?

3    A.     I recall one black lieutenant's candidate was

4    selected to be a lieutenant.

5    Q.     And do you know what the assessment center process

6    cost?

7    A.     The total cost for that process was about $1.3

8    million.

9    Q.     And without belaboring it, in the *Lopez* case

10   you've put in the invoices, is that correct?

11   A.     I believe I did, yes.

12   Q.     And what did that $1.3 million cover?

13          THE COURT:  I thought you said 1.2, is that right?

14          THE WITNESS:  1.3.

15          THE COURT:  Oh, yeah, 1.3.

16          Okay.  Let me ask this question.  How does that

17   compare with the cost of a written exam and assessing

18   the experience element?

19          THE WITNESS:  Well, in terms of -- for the City's

20   cost there is no cost whatsoever for the nondelegated

21   written exam with the union component, none whatsoever.

22          THE COURT:  But here with delegation comes fiscal

23   responsibility?

24          THE WITNESS:  Yes, your Honor, it does.

25          THE COURT:  All right.  So you tried it in 2002
```

1    and it cost the city 1.3 million?

2            THE WITNESS:  Yes, your Honor.

3            THE COURT:  Okay.

4    Q.    And what did that 1.3 million cover?

5    A.    Well, it covered all the expenses related to the

6    exam, you know, we had the consulting fees, of course,

7    from Morris and McDaniel, the flying-in of the assessors

8    -- I think we brought in the 65 assessors from around

9    the country and that was an expensive bit of business,

10   we housed them, transported them, provided them meals,

11   per diems.  And so the total tally was $1.3 million.

12   Q.    Now, after the 2002 examination, when was the next

13   promotional exam for lieutenant?

14   A.    That would have been in 2005.

15   Q.    And what -- what was the nature of that exam?

16   A.    The 2005 exam was a nondelegated written exam

17   only, again with the E & E component attached.

18   Q.    Was there any interest on the part of the Boston

19   Police Department to have an assessment center

20   complement?

21   A.    Yes, there was.

22   Q.    And who would have been -- and from whom did that

23   desire or that interest arise?

24   A.    The then Police Commissioner Kathleen O'Toole.

25   Q.    And she testified in the *Lopez* case, isn't that

1    correct?

2    A.    As I understand, yes.

3    Q.    And what role did you play in effectuating what

4    her desires were or what she wanted to do?

5    A.    Well, I spoke to the, um -- in my role, I was

6    Assistant Bureau Chief at the time, um, I spoke to the

7    City about the availability of funding for such an

8    endeavor, um, and the City chose not to fund the exam --

9    um, funding a multiple component exam.

10   Q.    Why did you have to go to the City?

11   A.    Because the City funds the police department.  We

12   don't have independent finances.

13   Q.    Now, by the way, in 2002 had any individuals

14   challenged the, um, the assessment center examination?

15   A.    Yes, there was a challenge.

16   Q.    And how many individuals were involved?

17   A.    I think there were six or seven lieutenant

18   candidates who challenged the 2002 lieutenant exam,

19   particularly the assessment center component.

20   Q.    And do you know what happened to those

21   individuals?

22   A.    They prevailed in their challenge and were

23   ultimately, um, the Commonwealth's Human Resource

24   Division -- I'm sorry, the Civil service Commission

25   placed them on the top of the 2008 lieutenant's list.

1         THE COURT:  Now, just so I'm clear, um, they made

2    a challenge to the Civil Service Commission?

3         THE WITNESS:  Yes, your Honor.

4         THE COURT:  Based on what happened in 2002?

5         THE WITNESS:  Yes.

6         THE COURT:  The Civil Service Commission adopted

7    their position and as a remedy did what?

8         THE WITNESS:  They placed their names, I believe

9    there were six of them, on top of the 2008 lieutenant

10   exam.

11        THE COURT:  In other words those were the first

12   eight names that you got after the 2008 exam?

13        THE WITNESS:  That's correct.

14        THE COURT:  Yeah.  Okay.

15   Q.   So in 2005, did you use an HRD-administered

16   examination?

17   A.   Yes, we did.

18   Q.   And what if any role again did you play in the

19   development of the 2005 exam?

20   A.   Well, we provided HRD with some assistance once

21   again with subject matter experts, specifically

22   individuals who had obtained the rank of captain, as we

23   usually do.  They assisted with, um, you know, with the

24   reading list, with item review, um, that sort of thing.

25   Q.   Okay, I'm going to direct your attention to --

1      MS. HODGE:  From here on, for purposes of this

2  portion, I mean I can direct your attention to specific

3  exhibits or we could have the witnesses go through and

4  identify them?

5      THE COURT:  It's your case.  You proceed.

6      MS. HODGE:  Okay.

7  Q.    Well, with regard to the reading list review, um,

8  would that be -- is that an example in Exhibit Number

9  34?

10  A.    (Looks.)  Yes,'s a document from the

11  Commonwealth's Human Resource Division from Sally

12  McNeilly.  It indicates that there was -- there was

13  provided a reading list.

14  Q.    And with regard to, um -- is there any linkage

15  between sort of the competence -- um, the competency

16  areas and the reading list?

17      MR. LICHTEN:  Objection.

18      THE COURT:  And the grounds for that objection?

19      MR. LICHTEN:  Um, foundation, the background.

20      THE COURT:  Yeah.

21      Aren't you asking him for an opinion there?

22      MS. HODGE:  No, I am not, I'm asking him whether

23  or not he had --

24      THE COURT:  Well, no, I think you are, in that

25  form.  So sustained.  You can ask another question.

1    Q.    Were the SMEs involved in providing information

2    regarding linking the reading list to specific

3    competency?

4    A.    Yes.

5    Q.    And, um, I'm going to direct your attention to

6    Exhibit Number 32.

7    A.    (Looks.)  I have it.

8    Q.    And is that an example of such -- of the linkage

9    between the reading list and the competency areas?

10        MR. LICHTEN:  Objection, your Honor, it speaks for

11   itself.

12        THE COURT:  No, she may ask that question.

13   A.    Yes, it is.

14   Q.    And with regard to education and experience, um,

15   again did Boston play any role in assisting HRD with

16   getting information about experience and education?

17   A.    Yes, we did.

18   Q.    And would that be -- an example be Exhibit Number

19   21?

20   A.    (Looks.)  Yes, we were notifying the candidate of

21   what the E & E component, what they had do to

22   participate.

23   Q.    And ultimately with regard to, um, sort of the

24   final test, um, when an SME provides information

25   regarding KSAs or regarding tasks and how they rate

1    those, um, that information, is that put into any

2    outline or any other kind of documentation of the test

3    itself that you're aware of?

4         MR. LICHTEN:  Objection, your Honor, there's no

5    evidence that this person was involved in that process

6    at all, it was done by HRD.

7         THE COURT:  Well, I think -- well, does he know?

8         Do you know?

9         THE WITNESS:  Well, I believe that that would be

10   the case, your Honor, yes.

11        THE COURT:  Well, what's your belief based on?

12        THE WITNESS:  Documents that I would see.

13        THE COURT:  All right.  I'll let that stand.

14   Q.   And did you receive such an outline?

15   A.   I would not have received such an outline, no.

16   Q.   Okay.  How many lieutenants were selected from the

17   2005 exam?

18   A.   I think there were a relatively small number, um,

19   perhaps 29, 30.

20   Q.   And how many were black?

21   A.   I believe only one.

22   Q.   With regard to 2005 -- well, after the 2005 exam,

23   what was the next promotional exam for lieutenant?

24   A.   The next exam was held in October of 2008.

25   Q.   And again, um, what was that, an HRD-administered

1   or a delegated examination?

2   A.     That was a HRD-administered exam.

3   Q.     And why -- I mean was there any interest in having

4   an assessment center or a delegated examination?

5   A.     Oh, yes, I believe there was.

6   Q.     And what if any steps did you take in an effort to

7   achieve that goal?

8   A.     I spoke with the City's financial team about the

9   situation, about the potential costs.  At that point --

10  we were beginning laying off employees at that point.

11         MR. LICHTEN:  Your Honor, the question was "What

12  did you do?"  That's been now answered.

13         THE COURT:  It now has been.  His answer may

14  stand.

15  Q.     What if any role did you play in the development

16  of the 2005 exam which was administered by HRD?

17         THE COURT:  Well, haven't you asked about that?  I

18  thought you had.

19         MS. HODGE:  This is 2008.

20         THE COURT:  You just said 2005.

21         MS. HODGE:  I'm sorry, I misspoke, 2008.

22         THE COURT:  All right.  Go ahead.  2008.

23  Q.     What role did you play --

24  A.     Well, personally very little but obviously I would

25  have worked with, um, the Police Commissioner on getting

1   subject matter experts to participate.

2   Q.    And were you -- was your role, at that time,

3   responsible for what others did?

4   A.    Yes.

5   Q.    Okay.  So -- just so we're clear, you were -- you

6   were deputy bureau chief, I think, at that point,

7   correct?

8   A.    Yes, the assistant chief.

9   Q.    The assistant chief.  And reporting to you, was

10  there anyone from Human Resources?

11  A.    Yes, there would have been the North End Human

12  Resource Director, Robin W. Hunt.

13  Q.    And who would have engaged in most of these

14  detailed activities?

15  A.    Yes, she would.

16        MR. LICHTEN:  Your Honor, I let it go, but every

17  question is a leading question.

18        THE COURT:  Every question is a leading question.

19        MR. LICHTEN:  So I object.

20        THE COURT:  Well, that one was too late.

21        (Laughter.)

22  Q.    So with regard to the 2008 lieutenant's exam, was

23  there a job analysis prepared?

24  A.    No, there was not.

25  Q.    If I -- I'm going to ask you to look at Exhibit

1  Number 39 and ask you --

2  A.    I thought you said the 2008 exam, counsel?

3        THE COURT:  She did.

4        MS. HODGE:  I did.

5  A.    Oh, but this was 2000.

6        THE COURT:  All right, you're pointing it out to

7  her.  Thank you.

8  Q.    (Pause.)  Now, with regard to the 2008

9  examination, um, did subject matter experts get involved

10  in reviewing the reading list?

11  A.    Yes, they did.

12  Q.    I'm going to direct your attention to Exhibit

13  Number 11.

14  A.    (Looks.)  I have that.

15  Q.    Okay.  And can you describe what that is?

16  A.    It's a 2008 reading list that was promulgated by

17  the Commonwealth's Human Resource Division for

18  promotional exams for sergeant, lieutenant, and captain.

19  Q.    And what role would Boston have played?

20  A.    We would have had a role in producing the reading

21  list, particularly as it related to the Boston component

22  of the exam.

23  Q.    And would that be on the bottom of the first page,

24  for example, the Boston rules and regulations and

25  special orders?

1    A.    That's correct.

2    Q.    And did Boston also play a role in the second

3    page, which lists the kind of texts and the kinds of

4    things that were listed?

5    A.    Yes.

6    Q.    (Pause.)  Now, I'm going to direct your attention

7    to Exhibit Number 53.

8    A.    (Looks.)

9    Q.    And ask you if you could identify that document?

10   A.    (Looks.)  This is a police chief's assessment of

11   the textbooks on the reading list for the Department's

12   promotional examination.

13   Q.    And what is it?

14   A.    It appears to be a guide that the Commonwealth

15   used, um, certain police chiefs around the Commonwealth

16   as well, as BPD subject matter experts.

17   Q.    And this is Exhibit Number 53?

18   A.    Yes.

19   Q.    Okay.  And did SMEs play any role in

20   evaluating -- well, does this reflect any role played by

21   SMEs from Boston?

22   A.    Yes, as indicated they would have been involved in

23   the reading list production, make recommendations

24   regarding the reading list.

25   Q.    And does this document sort of reflect their

1    involvement?

2    A.    I think so.

3    Q.    And with regard to KSAs, what if any role did

4    subject matter experts play in 2008 regarding KSAs?

5    A.    I believe they would have been involved in

6    reviewing KSAs that produced some previous job analyses.

7    Q.    Okay.  Directing your attention to Exhibit Number

8    54.

9    A.    (Looks.)

10   Q.    What is that?

11   A.    I don't believe I have a --

12         MR. LICHTEN:  Objection.  Foundation, your Honor.

13         THE COURT:  What I have is "Boston Police

14   Sergeants, Lieutenants, and Captains, Exam Outline

15   categories with KSA Descriptors Listed."

16         MR. LICHTEN:  Your Honor, before the witness said

17   he had never seen the outline and now he's being asked

18   what the document is.

19         THE COURT:  Well, first of all, does he have it?

20         THE WITNESS:  I do not have it.

21         THE COURT:  Well, he can't answer unless someone

22   shows it to him.

23         THE WITNESS:  I have 55, but not 53.

24         THE COURT:  All right.

25   Q.    I'm going to direct your attention to Exhibit

1    Number 55.

2         THE COURT:  All right.

3    Q.    And again I'm also going to ask you to look at 56

4    and also look at 55.

5         (Pause.)

6    A.    (Looks.)  I have those.

7    Q.    What?

8    A.    I have those.

9    Q.    Okay.

10   All right.  With regard to Exhibit Number 55 and 56, I'm

11   going to ask you if, um, does this reflect any, um --

12   what does 55 reflect?

13        MR. LICHTEN:  Objection.

14        THE COURT:  What does 55 reflect?

15        Do you recognize the document?

16        THE WITNESS:  I do recognize this document.

17        THE COURT:  Yes, what is it?  You may identify it.

18   A.    It is a compilation of task ratings, um, so it

19   appears that the SMEs would have rated these tasks.  It

20   looks like they would have been BPD employees who did

21   it.

22   Q.    Okay.  And I'm going to direct your attention to

23   the top line, it says "task number," and then in the

24   next it says -- it has "RT SME."

25        Would that be your subject matter expert?

1        MR. LICHTEN:  Leading, your Honor.

2        THE COURT:  Sustained.

3    Q.    What does "RT SME" mean?

4    A.    "SME" means "Subject Matter Expert."  "RT"?  I

5    don't know what it means.

6    Q.    What about "MH," do you know who "MH" is?

7    A.    I believe that that would have been the captain,

8    Mark Hayes, that we asked to participate in this

9    process.

10   Q.    Well, first let me ask the question.

11   Did you ask individuals or assist in the selection of

12   individuals to be subject matter experts for the 2008

13   examination?

14   A.    I was involved in making recommendations for

15   individuals to participate.

16   Q.    Okay.  Do you know who actually participated?

17   A.    Yes, I do.

18   Q.    And who were they?

19   A.    It would have been Captain Purvis Ryan.

20   Q.    And directing your attention to Exhibit Number 55,

21   would that be the, um, "PRY"?

22   A.    I believe so.

23   Q.    Okay.  And who else?

24   A.    It would have been Captain Genevieve King.

25   Q.    And are her initials reflected on Exhibit Number

1    55?

2    A.    Yes.

3    Q.    And would that be the "GK"?

4    A.    Yes.

5    Q.    And who else?

6    A.    Um, looks like the next individual would have been

7    Captain William Evans.

8    Q.    And would that be the William Evans who's now

9    currently the Commissioner?

10   A.    Yes.

11   Q.    And directing your attention to the first block,

12   to your knowledge did you know whether Mark Hayes

13   participated or not?

14   A.    I believe he did participate, yes.

15   Q.    So how many SMEs did the Boston Police Department

16   provide to HRD to assist in the development of the

17   lieutenant's 2008 exam?

18   A.    Four.

19   Q.    And they are the individuals you just reflected --

20   you just named, correct?

21   A.    Yes.

22   Q.    Okay.  Directing your attention to Exhibit Number

23   56.

24   A.    (Looks.)

25   Q.    Is this also -- have you seen this document

1    before?

2    A.      I have seen it recently, yes.

3    Q.      And what is it?

4         MR. LICHTEN:  Objection.  He said he only saw it

5    recently, your Honor.

6         THE COURT:  Yeah, well, he may tell us what it is.

7         What is it?

8    A.      It is -- again it's a rating list of KSAs and all

9    skills and abilities.

10   Q.      And do you know who completed this document?

11   A.      I would have believed it would have been the

12   subject matter experts that I indicated had

13   participated.

14        MR. LICHTEN:  Move to strike.

15        THE COURT:  No, that may stand.

16   Q.      And I'm going to direct your attention then to --

17   as a result of the information that is provided by the

18   subject matter experts, is that information, to your

19   knowledge -- to your knowledge compiled by the Boston

20   Police Department and/or HRD?

21   A.      It would have been compiled by HRD.

22   Q.      And I'm going to direct your attention to Exhibit

23   Number 57.

24   A.      (Looks.)  Okay.

25   Q.      And what is that?

1    A.    It says "Boston Police Department SLC Exam 2008,

2    Source Compilation by KSA with details."

3    Q.    And is this an example of the type of compilation

4    that you've seen before?

5    A.    Yes, it is.

6    Q.    (Pause.)  Now, in 2008 -- well, in 2008 what if

7    any study assistance did Boston provide to its sergeants

8    for the lieutenant's exam?

9    A.    We provided a substantial amount of tutorial

10   information to all the candidates for all three ranks

11   that were participating in the 2008 exam.

12   Q.    And to your knowledge was there any particular --

13   did it take any particular form?

14   A.    It did.

15   Q.    And what was that?

16   A.    Well, we provided tape lectures from Attorney John

17   Sheff who synopsized the reading list, provided, um,

18   practice questions for the written exam -- well,

19   obviously there wasn't only a written exam, but we

20   provided a lot of information and mailed to the homes of

21   every candidate.

22   Q.    And how many individuals approximately were

23   promoted as a result of the 2008 exam?

24   A.    I think it was about -- well, it continues to

25   today, um, the total number, I believe, is 38 or 39 --

1    um, 38, I believe.

2    Q.    And how many blacks?

3    A.    I believe there were five, five black sergeants

4    who were promoted to lieutenant off the 2008 exam.

5    Q.    Do you know of any -- do you know if HRD ever

6    approved any municipal police department promotional

7    exam which did not involve a written exam -- a written

8    test?

9    A.    No, not to my knowledge.

10   Q.    Based on your experience with the 2002 exam, which

11   involved an assessment center, did you draw any

12   conclusions about whether the use of the assessment

13   center and alternative selection procedures were less

14   discriminatory or had lower adverse impact?

15        MR. LICHTEN:  Objection, your Honor.

16        THE COURT:  Well, he's not an expert.

17        MS. HODGE:  No, I'm asking him just from his own

18   personal experience.

19        THE COURT:  Well, the question's compound.

20        MS. HODGE:  All right.

21        THE COURT:  So ask it again.

22        MS. HODGE:  Okay.

23   Q.    Based on your experience, did you -- as a Human

24   Resource professional, did you draw any conclusions

25   about whether the assessment center, um, was better than

1    or worse than the HRD exam?

2          MR. LICHTEN:  Objection.

3          THE COURT:  Well, doesn't that call for expert

4    testimony?

5          MS. HODGE:  It calls for an expert conclusion,

6    your Honor.  I concede.

7          THE COURT:  It is.  It does.  All right, it's

8    withdrawn.

9    Q.    Okay.  At any time did any of the plaintiffs who

10   were involved in this case, or their attorneys, ever

11   bring to your attention, um, in 2000 -- in preparation

12   for the 2005 promotional exam, any alternatives that

13   they wanted you to consider adding to the exam?

14         MR. LICHTEN:  Objection, your Honor.

15         THE COURT:  Sustained.  Leading.

16   Q.    Well, did you hear anything from anyone about how

17   you should compose or how to change the 2005 exam before

18   it was given other than within the police department

19   hierarchy?

20   A.    No.

21   Q.    Did any individuals or attorneys or groups come to

22   you and ask you to add something to the exam?

23   A.    No.

24   Q.    Did anyone come and ask you to add something to

25   the 2008 exam?

1    A.    No.

2    Q.    Did they ask you to change the 2008 exam in any

3    way?

4    A.    No.

5    Q.    You know, in 2014 I believe you testified that

6    you've done a new job -- that prior to the 2014

7    examination, that you did a full assessment center, or

8    you did a full job analysis, is that correct?

9    A.    Yes.

10   Q.    Um -- why?

11   A.    Well, I think, first of all, it was recommended by

12   our test developer that we do that.  It had been quite a

13   long time since we had produced a full comprehensive job

14   analysis, I believe it's 2000, and so it's 14 years old.

15   So we did a very comprehensive job analysis in 2014.

16   Q.    Were there any --

17   A.    I'm sorry, it was 2013, actually.

18         THE COURT:  But looking toward a 2014 exam?

19         THE WITNESS:  That's correct.

20   Q.    And with regard to doing that did you have any --

21   what facts did you consider?

22         MR. LICHTEN:  Objection to the form of the

23   question.  I don't know what that means?

24         THE COURT:  Well, I do.  We'll get his answer.

25   Overruled.

1   A.    Well, in terms of --

2         THE WITNESS:  I'm somewhat confused by the

3   question, your Honor.

4         THE COURT:  All right.  That's fine.  She'll ask

5   another.

6   Q.    Okay.  With regard to the decision to go and -- to

7   go with the full assessment center, what facts did you

8   have about, um, whether it would impact diversity or

9   not?

10        MR. LICHTEN:  Objection.

11        THE COURT:  Yeah, you're asking him things that

12  may -- let's try this and see if anyone objects to this.

13        How did it come about, from your understanding,

14  that it was determined in 2014 to do a full assessment

15  center from home?

16        THE WITNESS:  I had spoken with some test

17  developers at some point, your Honor, who thought that a

18  14-year-old job description is just too antiquated.

19        THE COURT:  Okay.

20        THE WITNESS:  And so when we produced our RFP, one

21  of the things we included was a full job analysis.

22        THE COURT:  All right.  So your RFP required a

23  full job analysis?

24        THE WITNESS:  Yes.

25        THE COURT:  Her question was a little different.

```
 1              In 2014 you're using an assessment center, it's a
 2    delegated examination and you're using an assessment
 3    center?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Now I don't want to get into substance
 6    because we're in the midst of the examination, as I
 7    understand it?
 8              THE WITNESS:  It's been administered at this
 9    point, but not fully scored.
10              THE COURT:  Right, and that, I don't think, is my
11    business, but what happened is.
12              So I think her question is how did it come about
13    that an assessment center was part of that examination?
14              THE WITNESS:  After the job analysis was
15    completed, um, it was the responsibility of our test
16    developer, um, EB Jacobs Company, to make a
17    recommendation to Police Commissioner Evans regarding
18    their, um -- their recommendations regarding which
19    components would have been used.  So that the use of the
20    assessment center was based on EB Jacobs' analysis of
21    the job -- the job analysis, and from that voluminous
22    document they thought that the most appropriate way to
23    test, in 2014, was the use of an assessment center.
24              THE COURT:  And I take it -- you know I'm filling
25    in some blanks here, but if I've got something wrong,
```

 1    tell me.

 2         So do to do that, um, you, I guess, would have to

 3    get a delegation from HRD?

 4         THE WITNESS:  Yes.

 5         THE COURT:  And before you went to get the

 6    delegation from HRD, internally within the city, the

 7    City would have to agree to fund it?

 8         THE WITNESS:  That's correct.

 9         THE COURT:  So, um, you, or the appropriate people

10    within the Boston Police Department, approached the

11    fiscal people and the Mayor's office about funding it,

12    got approval?

13         THE WITNESS:  That's correct.

14         THE COURT:  And we'll go step by step.  And with

15    the availability of funds, approached HRD to get the

16    delegation and got it?

17         THE WITNESS:  Yes, that's exactly right.

18         THE COURT:  And so far no litigation?

19         THE WITNESS:  So far so good.

20         THE COURT:  Okay.  We don't know the results yet.

21    All right.

22         THE WITNESS:  We don't.

23         THE COURT:  All right.  Go ahead now.  You go

24    ahead.

25         MS. HODGE:  Okay.  If I could approach, please?

1    THE COURT:  You may.

2  Q.    Okay.  Mr. Callahan, um, what if any

3  responsibilities do Human Resources and the finance

4  department have for maintaining records regarding when

5  employees work or when they don't?

6  A.    Well, we retain records of, um, the work histories

7  of all of our employees.

8    MS. HODGE:  May I approach, your Honor?

9    THE COURT:  You may.

10  Q.    Mr. Callahan, what is this document that looks

11  like it has months and it has the name on the top in

12  handwriting?

13  A.    This is a photocopy of a time card, a departmental

14  time card.

15  Q.    And where is the -- and where does a departmental

16  time card like this reside?

17  A.    Um, during the year when this is in use it's held

18  in the district where the employee works.

19  Q.    Okay.  And at the end of the year?

20  A.    It's stored at the Human Resource Division.

21  Q.    And that's part of your responsibility, correct?

22  A.    Yes, it is.

23  Q.    And can you identify to whom this time card

24  relates?

25  A.    It's a time card of, um, Sergeant Bruce Smith

1    assigned to Beat 2, District Beat 2 for the county, in

2    2008.

3    Q.    And is that the year of the exam that we're

4    talking about here?

5    A.    Yes.

6    Q.    And do you know whether or not he was a candidate

7    for lieutenant?

8    A.    Yes, he was.

9    Q.    And he's a plaintiff in this lawsuit?

10   A.    That's what I understand, yes.

11   Q.    And I'm going to direct your attention to --

12         MS. HODGE:  I'm going to move that this document

13   be received as an exhibit.

14         MR. LICHTEN:  Objection, relevancy.

15         MS. HODGE:  I believe that Mr. Smith testified.

16         THE COURT:  He did testify.  Why is it relevant?

17         MS. HODGE:  Well, because what the individual

18   testified to is that he studied very hard for the exam,

19   and I think that I'm just putting this into evidence to

20   form the factual basis regarding, um, what he did just

21   before the exam.

22         THE COURT:  I mean I take it the inference is that

23   when we look at the work history of Commissioner Davis,

24   he took time off, et cetera, et cetera, up in Lowell

25   years ago, but Mr. Smith, for 2008, appears to have been

1    working his regular shifts in that period.

2          Is that what this is about?

3          MS. HODGE:  That's what this is about, yes.

4          THE COURT:  Okay.

5          MS. HODGE:  And the second document that I handed

6    up was a list of all the overtime that he worked

7    including the overtime that he worked in the months

8    immediately preceding the examination up to the actual

9    examination.

10         MR. LICHTEN:  Your Honor --

11         THE COURT:  All right.  I understand that.  And so

12   what?  You're saying that that impeaches him, that he

13   could have studied very hard or are you saying that the

14   performance --

15         He's been the only plaintiff who's testified?

16         MS. HODGE:  He is the only plaintiff, correct.

17         THE COURT:  That the performance is a function of

18   studying?  I'm still not clear as to the relevance.

19         MS. HODGE:  I think the relevance is that that

20   witness testified in response, I believe, to -- that

21   witness testified that he believed that studying

22   mattered on the examination and that he did poorly and

23   he felt that the exam did not test the skills that he

24   needed to be a lieutenant.

25         THE COURT:  And this is his time card?

1          MS. HODGE:  No, this is a totality of when did he

2   work versus when did he take time off, and the second

3   document, your Honor, is the overtime that he worked,

4   which is just a listing by date.

5          THE COURT:  Yeah, he did so testify.  I remember

6   his testimony.  Well, I think it --

7          Why doesn't it pass the minimal threshold of

8   relevance?

9          MR. LICHTEN:  For this reason, your Honor.  This

10  is a disparate impact case, and I've been doing these

11  cases for 20 years, your Honor.  In disparate impact

12  cases -- these are a statistical analyses of disparate

13  impact.  There's no evidence on a meta-analytic basis

14  that blacks work hard and don't study for the test and

15  whites do.  And absent that evidence, it's clearly

16  statistically irrelevant because you're not looking in

17  this case at Bruce Smith.

18         THE COURT:  I hear that.  I hear that and I think

19  I understand it.

20         What's your response to that, he's right, isn't

21  he?

22         MS. HODGE:  Well, I think at some level, but I

23  think that when you say that you're going to take into

24  consideration all the general facts and circumstances,

25  are you going to -- Mr. Smith came and testified as to

```
1    what he --
2          THE COURT:  Well, no, that's not an answer,
3    respectfully.  Mr. Lichten is right --
4          MS. HODGE:  He is right that --
5          THE COURT:  He is right in -- well, let me state
6    what I think the law is, because that's very significant
7    here.
8          In order for a federal court even to get involved
9    here, on Prong 1, there has to be a disparate impact
10   demonstrated on a statistical basis.  Now, it may be
11   more than statistics, but absent an adequate statistical
12   basis, um, I have nothing to say here, and I've said
13   before and I'll repeat today as we come to the close, I
14   hope, that's very much in play here.  The City might
15   well prevail on that.  But on this particular exhibit,
16   it seems to me it adds nothing to that statistical
17   basis.
18         Now, once -- let's say the plaintiffs prevail,
19   then we're into issues that have nothing to do with
20   Officer Smith -- Sergeant Smith, isn't that right?
21         MS. HODGE:  Well, your Honor, I think I'm
22   responding to the fact that we have presented the
23   statistical math and I think there's agreement that the
24   math is accurate, but you have indicated that whether
25   you will rule on that first prong will depend on looking
```

1    at additional circumstances.

2         THE COURT:  I told you that is why I refused to

3    grant summary judgment.

4         MS. HODGE:  You did.  And so for those reasons --

5         THE COURT:  But now understand, now I've held the

6    -- what hopefully is coming to the end of this case.

7    And so now I'm in a much better position to make a

8    finding and a ruling.  And upon reflection I think this

9    is not legally material.  I don't say that it's not

10   accurate.

11        I will mark it for identification, but I am not

12   admitting it in evidence.  It's Exhibit O for

13   identification.

14        MS. HODGE:  Can we make the two documents

15   together?

16        THE COURT:  Yes, Exhibit O for identification.

17        MS. HODGE:  And if I could have a minute, your

18   Honor, please?

19        THE COURT:  Yes.

20        (Exhibit O, marked.)

21        (Pause.)

22        MS. HODGE:  I have nothing further.

23        THE COURT:  Thank you.

24        Any questions for this witness, Mr. Lichten?

25        MR. LICHTEN:  May I have a moment to confer with

1    my co-counsel?

2          THE COURT:  Of course you may.

3          (Pause.)

4

5    CROSS-EXAMINATION BY MR. LICHTEN:

6    Q.    There's some papers up here and I don't think

7    they're mine, but I don't want to steal the family

8    jewels.

9    A.    I'm sure they aren't that important.

10   Q.    Okay.  All right.

11   Good afternoon, Mr. Callahan.  How have you been?

12   A.    Good, counsel.  Thank you.

13   Q.    I feel like I've been examining you for many many

14   years.

15   A.    You have.

16   Q.    Okay.  Now, quickly, with respect to the training

17   and experience rating, the Boston Police Department

18   plays no role in determining how to allocate those

19   points, that's something that the Commonwealth of

20   Massachusetts has been doing for many years, is that

21   correct?

22   A.    Yes, that's correct.

23   Q.    And it's stayed the same for many years, is that

24   correct?

25   A.    Yes.

1  Q.    So when Morris and McDaniel did their study and

2  when Jacobs recently did their study, the E & E has

3  stayed exactly the same, right?

4  A.    Yes.

5  Q.    Okay.  Now, you talked about the, um, various

6  promotions from the 2005 exam.  I think you said in 2005

7  there was only one minority or black promotion.  Do I

8  have that right?

9  A.    That's my recollection, yes.

10  Q.    Right.  And I think you also said that the list

11  only remained in effect about 2 1/2 years, from 2005 to

12  2008?

13  A.    Yes.

14  Q.    Okay.  And that is the normal course of events, is

15  it not, historically exams are given every two or three

16  years?

17  A.    Yes.

18  Q.    And therefore historically you normally only get,

19  um -- when promotional exams are given every two or

20  three years, you only get about 25 promotions at most

21  because they don't last that long, these lists, right?

22  A.    Depending on the rank.

23  Q.    Right.  Okay, for lieutenant then?

24  A.    Oh, about 6 vacancies per year.

25  Q.    So 18.  Okay.

1    Now, and this is not just happenstance, the statute --
2    the civil service statute requires you to have exams
3    every several years, is that correct?
4    A.    Yes.
5    Q.    And you have to get permission from HRD to extend
6    the list, is that correct?
7    A.    Yes.
8    Q.    And extraordinarily, um, based upon the 2008 exam,
9    you extended the list I think on three or four occasions
10   so it lasted 6 years or over 6 years, much more than any
11   list had ever lasted before, is that correct?
12   A.    That's correct.
13   Q.    And you had to go to HRD every year, with hat in
14   hand, and ask for an extension, is that correct?
15         MS. HODGE:  Objection.
16         THE COURT:  Well, we can strike out "the hat in
17   hand," but the fact is, um, I'll allow him to testify.
18         Was that occasioned by applications for extension
19   for 6 years?
20         THE WITNESS:  But not yearly, your Honor.  I think
21   they gave us a blanket extension at some point in
22   probably 2010, 2011.
23   Q.    And then you had to go back to them, correct?
24   A.    No, they left it open.
25   Q.    Okay.  So that exam was given in 2008 and 2009 and

1   2010, 2011, 2012, 2013, 2014, and we're now in 2015, and

2   that list is actually still in effect, is that correct?

3   A.    Yes, it is.

4   Q.    Okay.  Now, isn't it true that the reason that

5   there was such a long extension on that list was because

6   by 2010, when that list was expiring, the *Lopez* case was

7   in trial but there had been no decision yet, is that

8   correct?

9   A.    Yes.

10  Q.    And there was no decision in *Lopez*, as we know,

11  for about 3 1/2 years and the Department was looking to

12  see what would happen in *Lopez* to decide what to do

13  about giving an assessment center or going back to the,

14  um, multiple choice test, isn't that right?

15  A.    Yes.

16        MS. HODGE:  Objection.

17        THE COURT:  No, overruled, that may stand.

18  Q.    And finally by 2013, or 2014, the Boston Police

19  Department didn't think it could wait any longer, did

20  it?

21  A.    That's right.

22  Q.    Okay.  And although it turned out you were

23  successful in the case, there was concern by the Boston

24  Police Department that if it gave another pen and paper

25  multiple choice test and the Court were to rule against

1    it, it could be compounding its legal problems?

2          MS. HODGE:  Objection.

3          THE COURT:  I'm going to sustain that.

4    Q.    Now, for the first three years of that 2008 list,

5    there were no minorities promoted, were there?

6          MS. HODGE:  Objection.

7          THE COURT:  Overruled.

8    A.    I don't believe there were.

9    Q.    So if that list, the 2008 list, had gone the same

10   way that these other lists had gone in other years,

11   there might have been not one promotion but zero

12   promotions of blacks, is that correct?

13         MS. HODGE:  Objection.

14   A.   It's possible, yes.

15         THE COURT:  No, I'm going to sustain it.  What's

16   possible?  It's possible another exam could be given.

17   Lots of things are possible.

18   Q.    Well, let me ask it this way.

19   If that exam only lasted three years, there would have

20   been no minority promotions, is that correct?

21   Q.    Yes.

22         MS. HODGE:  Objection.

23         THE COURT:  No, overruled.  That he may have, if

24   you know, and the answer is "Yes."

25   A.    The answer is "Yes."

1    Q.    Now, did you read the 2002 Morris and McDaniel

2    Boston police lieutenant's validity report for the 2002

3    exam for lieutenant?

4    A.    Are you talking about the job analysis report?

5    Q.    No, not the job analysis report, the validity

6    report.

7    A.    I don't believe I did.

8    Q.    Okay.  Were you aware that Morris and McDaniel

9    found no significantly -- statistically significant

10   differences in the scores received by minorities and

11   nonminorities on the 2002 assessment center?

12   A.    I'm not aware of that, no.

13   Q.    Okay.  Are you aware of what the statistics showed

14   with respect to the scores?

15   A.    No.

16   Q.    Okay.  Now, you were asked a bunch of questions

17   about the process in 2008, the SMEs looking at the

18   reading list and things like that.  Do you recall that?

19   A.    I do.

20   Q.    And then you also were asked questions about the,

21   um, SMEs looking at the KSAOs and, you know, listing

22   them in their importance, is that right?

23   A.    Yes.

24   Q.    Okay.  But just so we understand which came first,

25   as I understand it the reading list was selected back in

1    March of 2008, is that right?

2    A.    I believe it was.

3    Q.    Okay.  And that's because you have to give 6

4    months advance notice so that people can start doing

5    their studying and reading, is that right?

6    A.    That's correct.

7    Q.    Okay.  So as I understand the SMEs are convened

8    and they look at the reading list that had been used in

9    past exams, is that correct?

10   A.    They often do, yes.

11   Q.    And then they decide, um, "This is worth using

12   again" or "Maybe we should try the new update of this

13   book," is that right?

14   A.    Yes.

15   Q.    Okay.  And you're aware that all of the questions

16   are then taken from those texts and rules and

17   regulations that have been decided upon 6 months in

18   advance, is that correct?

19   A.    Yes.

20   Q.    Okay.  When the SMEs then later meet to look at

21   the knowledges, skills, and abilities, and rank their

22   importance in which to differentiate them, that's done

23   much later, much closer to the exam back in -- that is

24   it's done in the summer or the early fall, is that

25   right?

1    A.    I'm not entirely certain.

2    Q.    But isn't it true that when the SMEs are meeting

3    and deciding what the important KSAOs are, the reading

4    list, from which every question must be taken, and the

5    rules and regulations, that's already in place and has

6    been decided, isn't that right?

7    A.    You know I believe we have a separate reading list

8    committee that was involved prior to all of that.

9    That's my recollection.

10    Q.    Well, that's not my question.

11    A.    Oh, okay.

12    Q.    My question is, when the SMEs are meeting to then

13    look at the KSAs and rank them in importance, they're

14    doing that after the reading list has already been

15    established some months before, isn't that right?

16    A.    Yes.

17    Q.    So if the SMEs were to come to HRD and say,

18    "Uh-huh, you know, we found something that's really

19    important but it's not in any of these books," that

20    question could not be asked, could it?

21         MS. HODGE:  Objection.

22         THE COURT:  Yeah, it is speculative.  I'm going to

23    sustain it.

24         (Pause.)

25         MR. LICHTEN:  May I have a moment with my

```
 1    co-counsel, your Honor?

 2          THE COURT:  Of course you may.

 3          (Pause.)

 4          MR. LICHTEN:  Just a couple more questions, your

 5    Honor.

 6          THE WITNESS:  Okay.

 7    Q.    In the last couple days has there been another

 8    promotion to lieutenant?

 9    A.    (Pause.)  I believe there's been a temporary

10    promotion to lieutenant.

11    Q.    And that person is white?

12          MS. HODGE:  Objection.

13          THE COURT:  No, he may answer.

14    A.    Yeah, I believe he's white.  Yes.

15    Q.    Okay.

16          THE COURT:  I saw in the paper a celebration of a

17    promotion to lieutenant, and maybe it's earlier than the

18    last couple of days, but that fellow looked black to me.

19          Do you know what I'm talking about?

20          THE WITNESS:  I do, your Honor.  I believe that

21    was just an event, that he had been promoted previously,

22    and then the event was held.

23          THE COURT:  Like a ceremony where you swear in a

24    judge?

25          THE WITNESS:  Exactly.
```

1          THE COURT:  Okay, so he's been accounted for, but

2     now in the last couple of days there's been a temporary

3     promotion and that individual is white?

4          THE WITNESS:  Yes.

5          THE COURT:  Thank you.

6          MR. LICHTEN:  Your Honor, and that person -- I

7     know because we checked the list, that person had been

8     counted as being promoted a month before and he's in the

9     data.

10         THE COURT:  I appreciate that information and

11    thank you.

12         (Pause.)

13    Q.   Okay.  So you were asked some questions about the

14    entry-level exams and, um -- well, let me ask you about

15    that.

16    You said, um, that one part of the entry-level process

17    is a general knowledge test, is that correct?

18    A.   Yes.

19    Q.   And do you know who constructs it, does HRD do

20    that or does EB Jacobs do that or do you know who did

21    it?

22    A.   I don't know.  I believe it would have been HRD,

23    but I'm not entirely certain.

24    Q.   Okay.  So currently for the Boston -- well, not

25    currently, but in 2006 or 2008, in order to be hired for

1    the Boston Police Department you had to take this

2    written multiple choice exam, is that correct?

3    A.    Yes.

4    Q.    And -- and I've had some experience with this, but

5    perhaps you can tell us.

6          And as I understand it, it's so competitive to try

7    to get on the Boston Police Department that if you don't

8    have a 95 or a 96 you're likely never to get a -- a 95

9    or a 96 out of 100, you're likely not to get on the

10   Boston Police Department, is that right?

11         MS. HODGE:  Objection.

12         THE COURT:  Why is that relevant here in light of

13   her objection?

14         MR. LICHTEN:  It's relevant, your Honor, in light

15   of the testimony that some of the experts have talked

16   about on the question of range restriction, she brought

17   it up in her direct, and --

18         THE COURT:  In other words, the validity of the

19   initial knowledge examination, you're suggesting that

20   gets very good applicants?

21         MR. LICHTEN:  Exactly, and therefore makes

22   unnecessary the retesting procedure.

23         THE COURT:  No, I follow that.

24         On that basis doesn't it pass the relevancy test?

25         MS. HODGE:  No, because it's the general knowledge

1    versus the specific knowledge and there's no evidence

2    that general knowledge is what is being tested.  You've

3    got very specific information about what is necessary

4    for promotion --

5              THE COURT:  I do follow that.  No, it passes --

6              MS. HODGE:   -- and the other piece of it was is

7    that that was a predicate to merely ask how a person --

8    after an exam a person comes in and what this criteria

9    was including the psychological testing.

10             THE COURT:  I think it's relevant.

11             MS. HODGE:  I believe that there was as much

12   testing -- his whole point was that they give these

13   personality tests, um, and I believe, my understanding

14   is --

15             THE COURT:  No, your argument is going beyond what

16   I requested, respectfully.  I think it's relevant.

17   Overruled.  You may answer.

18             Is that right?

19             THE WITNESS:  That's generally correct, yes.

20   Q.    Okay.  So moving on.

21   An individual, once they receive a conditional offer,

22   it's only at that point that they undergo some

23   psychological testing, is that correct?

24   A.    Yes.

25             MS. HODGE:  Objection.

1      THE COURT:  No, I'm going to let that stand.

2  Q.    And the reason for that is because you can't have

3  someone psychologically tested until you made a

4  conditional offer to them under Chapter 151(b), isn't

5  that correct?

6  A.    Yes, it is.

7  Q.    Okay.  And when you're giving that person, um, a

8  psychological test, you're not looking to see who the

9  best person to hire is, you're looking to see if they

10 have a psychological problem that would be

11 disqualifying, is that correct?

12 A.    Yes.

13 Q.    You're not looking to rank them based upon the

14 psychological test, you're looking to see if someone

15 portrays traits that might make them a danger to be a

16 police officer?

17      MS. HODGE:  Objection.

18      THE COURT:  Yeah, I hear this and that sounds

19 logical, but what does that have to do with our case

20 where we have successful police officers now vying to be

21 supervisory officers?

22      MR. LICHTEN:  Exactly, your Honor, but in

23 Ms. Hodge's questioning of this witness she was trying

24 to elicit testimony about the tests provided, the

25 psychological test, as if to claim that they're already

1    doing this personality testing and therefore it's

2    unnecessary, when in fact they're looking at a

3    completely different thing and that's what I'm trying to

4    establish.

5         THE COURT:  I see, but I didn't get that from her

6    examination, so since I missed that, we're going to

7    sustain it.

8         (Laughter.)

9         THE COURT:  I think I understand that use.  I

10   recall -- well, never mind.

11        The side colloquy after Mr. Simon's examination

12   seemed to go to a different point and, um, gives me

13   pause about so-called "psychological testing," but

14   that's not what Ms. Hodge was inquiring about, as far as

15   I could see, and so I'm sustaining it.  So move on.

16        Anything else for this witness?

17        MR. LICHTEN:  Yes, your Honor, moving on to

18   something else.

19   Q.   The Civil Service Commission did not bar the

20   Boston Police Department from conducting banding, did

21   it?

22   A.   I thought they ruled that we couldn't.  But that's

23   just my recollection.  That could be wrong.

24   Q.   In fact isn't what happened is that initially the

25   Boston Police Department proposed to do banding, it was

1    proposed -- it was approved under the delegation

2    agreement, and then there was a challenge from some

3    officers or the union and that went to a civil service

4    hearing.  Isn't that what happened initially, it was

5    approved by HRD and it was announced that there was

6    going to be banding?

7    A.    I believe you're right.

8    Q.    And then Commissioner Evans wrote a letter

9    announcing that he had decided to withdraw the banding,

10   isn't that correct?

11   A.    I think it would have been Commissioner Davis.

12   Q.    Well, I think it was Commissioner Evans.

13   A.    I'm getting my years mixed up then.

14   Q.    Sure.

15         Can you go -- well, all right.  Well, it's Exhibit

16   194 in *Lopez*.  But let me ask it this way.

17   Do you remember Commissioner Evans stating at the time

18   that he was very sad that he had to withdraw this

19   banding proposal because he thought the Boston Police

20   Department had to change the way it promoted officers,

21   do you recall that?

22         MS. HODGE:  Objection.

23         THE COURT:  Yeah, sustained on this foundation.

24   If there's evidence in *Lopez*, it may be called to my

25   attention.

1          (Pause.)

2          MR. LICHTEN:  Thank you very much.  I have nothing

3     further, your Honor.

4          THE COURT:  Nothing further, Ms. Hodge?

5          MS. HODGE:  I just -- (Pause.)

6

7     REDIRECT EXAMINATION BY MS. HODGE:

8     Q.    Mr. Callahan, is there a difference between a

9     temporary appointment and a permanent appointment of a

10    lieutenant?

11    A.    Yes, there is.

12    Q.    And could you just describe what the difference

13    is?

14    A.    Well, a permanent position, by its nature, is, you

15    know --

16    Q.    Permanent?

17    A.    Yes, permanent.  A temporary position is somebody,

18    if a lieutenant is out sick or injured for a protracted

19    period of time, well, then we would promote the next

20    available lieutenant candidate into that spot.  So it's

21    a temporary thing.  It could last a few weeks.  It could

22    last a few months.

23    Q.    Okay, and then what happens?

24    A.    Well, then the individual who's temporarily

25    promoted reports back to the civil service rank upon the

```
 1   return of the permanent lieutenant that he's replaced.

 2          MS. HODGE:  I have nothing further, your Honor.

 3          MR. LICHTEN:  Nothing further, your Honor.

 4          THE COURT:  Nothing further for this witness.  You

 5   may step down and thank you.

 6          That's the defense's case?

 7          MS. HODGE:  No, your Honor, I have one more

 8   witness.

 9          THE COURT:  All right.

10          MS. HODGE:  But in light of the hour, I would

11   suggest that we start the witness tomorrow morning.

12          THE COURT:  How long is the witness going to take?

13          MS. HODGE:  I don't believe he will be long.  It's

14   Commissioner Evans.

15          THE COURT:  Um -- well, this makes perfect sense.

16   I -- well, now let's take a minute and talk about what

17   we're going to do.

18          So you're going to call Commissioner Evans

19   tomorrow morning.  Well, here's what I propose to do.

20   We'll hear his testimony, then whatever time of the day

21   it is, unless we're pressing on up to 1:00 --

22          But you suggest we won't be?

23          MS. HODGE:  Oh, no.  No.

24          THE COURT:  Then we're going to take a half an

25   hour break and that will be the time when you get ready
```

1    for oral argument.  Oral argument is half an hour a

2    side.  I follow the Massachusetts practice, the defense

3    goes first and then the plaintiff.

4         Now let me -- and I've told you what's then going

5    to happen, so let me say now what I would have said

6    tomorrow and it is this.

7         This case has been very well tried.  I think this

8    is an extraordinarily important case, which in no way

9    foreshadows its outcome.  And I will tell you, going

10   into the final argument, assuming the current

11   Commissioner doesn't change thing markedly, that all

12   three prongs of this type of analysis are very much in

13   play, and in an effort to be transparent let me speak to

14   each one of them.

15        I'm fully satisfied with the denial of the motion

16   for summary judgment brought by the City.  Having said

17   that, on the first prong I recognize that there has to

18   be some not insignificant evidence of disparate impact

19   before a Federal court should get in the middle of this.

20   One of the really important and vital aspects of the law

21   of disparate impact is that it gives evidence of

22   society's genuine commitment to equal opportunity.  Here

23   we have no, um, need for evidence of overt or covert

24   discrimination or evidence of, um, in any way, um,

25   affirmative action and concerns that such policies

1    raise, here we have honest people doing honest work and

2    the law requires this genuine commitment to equal

3    opportunity.  So against that background there really

4    has to be a standard before -- since no one's doing

5    anything wrong, before a Federal court can engage

6    itself.  And I have thought from the beginning of this

7    case and I think now that that's very much in play.

8         Now, if we get beyond that, the second prong,

9    which the City bears the burden, um, I had said earlier

10   that I thought, "Well, they don't have to do all that

11   much and they've certainly shown a business necessity,"

12   and of course anything I say at this stage is just to

13   help you, but I will tell you, after the cross-

14   examination of Campion with these various documents,

15   that the question of whether the test that's used on all

16   this evidence was valid is likewise very much in play.

17        Then we get to the third and most interesting and

18   most difficult prong, which doesn't mean I'm in any way

19   yearning to get there, I'm not, but if I'm required to

20   get there, I conceive of the law as requiring proof that

21   in 2008 there were techniques that were at least as good

22   at identifying competent candidates and would be better

23   at reducing adverse impact.  And if the plaintiffs were

24   to prevail on that, then we'd have a most knotty issue

25   of remedy, but that's not for this phase of the trial.

1      So I'll tell the plaintiffs, until they put on

2   this witness this morning, Ms. Hough, I didn't see any

3   evidence that it would be better.  The knowledgeable

4   people were saying, "Well, that's certainly interesting

5   and it's certainly an appropriate question, but we can't

6   tell you that and it's all up for grabs."  Now she's

7   pretty confident, so there's evidence that would warrant

8   a finding in favor of the plaintiffs, if I got that far,

9   although I thought Mr. Simon cross-examined her pretty

10   well and I don't know whether I believe that evidence,

11   and, of course, these are all matters for argument.

12      So that's the best I can do to assist you with the

13   argument.  Now I want you to come to the sidebar, if you

14   would for a moment.

15      (Sidebar off the record.)

16      THE COURT:  Now we'll recess.

17      (Adjourned, 1:10 p.m.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, January 6,

8      2015, to the best of my skill and ability.

9

10

11

12    /s/ Richard H. Romanow 02-19-15
      _____
13    RICHARD H. ROMANOW Date

14

15

16

17

18

19

20

21

22

23

24

25