1              UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                           No. 12-cv-10291-WGY

4

5   BRUCE SMITH, et al
              Plaintiffs

6

7   vs.

8

9   CITY OF BOSTON,
              Defendant

10

11                      * * * * * * * * *

12

13                   For Trial Before:
                 Judge William G. Young

14

15                      Bench Trial

16

17              United States District Court
                District of Massachusetts (Boston)
                One Courthouse Way
18              Boston, Massachusetts 02210
                Wednesday, December 17, 2014

19

20                      * * * * * * * *

21

            REPORTER: RICHARD H. ROMANOW, RPR
22                 Official Court Reporter
                United States District Court
23      One Courthouse Way, Room 5510, Boston, MA 02210
                   bulldog@richromanow.com

24

25

```
 1                    A P P E A R A N C E S

 2

 3   HAROLD L. LICHTEN, ESQ.
     BENJAMIN WEBER, ESQ.
 4       Lichten & Liss-Riordan, P.C.
         100 Cambridge Street, 20th Floor
 5       Boston, MA 02114
         Email: Hlichten@llrlaw.com
 6   and
     STEPHEN S. CHURCHILL, ESQ.
 7       Fair Work, P.C.
         192 South Street, Suite 450
 8       Boston, MA 02111
         Email: Steve@fairworklaw.com
 9       For plaintiffs

10

     GEOFFREY R. BOK, ESQ.
11   KAY H. HODGE, ESQ.
     JOHN M. SIMON, ESQ.
12       Stoneman, Chandler & Miller
         99 High Street
13       Boston, MA 02110
         Email: Gbok@scmillp.com
14       For defendant

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3   WITNESS               DIRECT  CROSS  REDIRECT  RECROSS

4

5   JOEL WIESEN (Continued.)

6        By Mr. Churchill:                  70

7        By Mr. Lichten:                    73

8        By Mr. Bok:               7                   86

9        By Mr. Simon:            16

10

11  BRUCE SMITH

12       By Mr. Lichten:    90

13       By Ms. Hodge:             121

14

15  JACINTO MANUEL SILVA

16       By Mr. Bok:      141

17       By Ms. Hodge:

18

19

20

21

22

23

24

25
```

1                        E X H I B I T S

2

3

4     EXHIBIT 77....................................... 24

5     EXHIBIT 78....................................... 37

6     EXHIBIT 79....................................... 139

7                        * * * * * * *

8

9     EXHIBIT F........................................ 19

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1           P R O C E E D I N G S

 2           (Begins, 9:30 a.m.)

 3           THE COURT:  Good morning, counsel.  No one has any

 4    objection to some members of my class sitting there in

 5    the jury box, I'm sure, and if you'd remind the witness.

 6           MR. SIMON:  Your Honor, may we address a couple of

 7    housekeeping matters beforehand?

 8           THE COURT:  You may.

 9           MR. SIMON:  Issue Number 1 is the parties have

10    agreed on some witness-ordering issues and we can tell

11    you what those are or just sort of tell you as we go

12    along, but there'll be some witnesses out of order.

13           THE COURT:  And I'm perfectly amenable to that and

14    why don't you just tell me as we go along so I can

15    follow.

16           MR. SIMON:  Thank you.  And the second issue has

17    to do with this proposed expert that the plaintiffs --

18           THE COURT:  Hough.

19           MR. SIMON:  Hough, I believe, your Honor.

20           THE COURT:  Yes.

21           MR. SIMON:  But we just want some clarity on what

22    it is you ordered.  I know you ordered on two conditions

23    which was first that her expert report be delivered by

24    December 22nd, and the second was -- and I believe it

25    was, if defendants ask Dr. Wiesen questions outside the
```

1    scope of his testimony, that she would be allowed to

2    testify, and we just want to make sure that that is the

3    correct understanding of that order.

4         THE COURT:  No, I propose to allow her to testify

5    just not to allow her to testify to anything Wiesen has

6    testified to.

7         MR. SIMON:  So from your point of view she's in?

8         THE COURT:  She's in.  She's in.  And you may --

9    and she is required to be produced, so you may depose

10   her.

11        MR. SIMON:  Okay, and that brings us to the last

12   point, which is the plaintiffs have offered her in

13   Denver and Aspen between Christmas and New Year's Eve.

14        THE COURT:  No, she has to come to Boston.

15        MR. SIMON:  Okay, that's what we're --

16        MR. LICHTEN:  For the deposition, your Honor?

17        THE COURT:  Yes.  Yes.

18        MR. LICHTEN:  Okay.

19        THE COURT:  I mean it's extraordinary that I've

20   allowed her to testify, but I do so in the exercise of

21   discretion because I think it's fair.  If she's going to

22   be an expert in this case, she'll come here and be

23   deposed.

24        MR. LICHTEN:  Thank you, your Honor.  We'll inform

25   her of that news.

 1          THE COURT:  Yes.  Thank you.

 2          All right.  Let's remind the witness.

 3          THE CLERK:  I'd like to remind you, sir, that

 4   you're still under oath.

 5          THE WITNESS:  Okay.

 6          THE COURT:  You understand that?

 7          THE WITNESS:  I do understand.

 8          THE COURT:  That's fine.

 9          And, Mr. Bok, you may continue.

10          MR. BOK:  Thank you, your Honor.

11

12   CROSS-EXAMINATION BY MR. BOK:  (Continued.)

13   Q.    Good morning, Dr. Wiesen.

14   A.    Good morning.

15   Q.    Dr. Wiesen, do you have before you Exhibit 72,

16   which is the report of Dr. Silva?

17   A.    Yes.

18   Q.    And you wrote a rebuttal or a response to that

19   which I believe is Exhibit 48, correct?

20   A.    (Looks.)  Yes.

21   Q.    Okay.  And in preparing the rebuttal and in

22   reviewing Dr. Silva's report, did you find any

23   calculation or math errors done by Dr. Silva?

24   A.    I don't believe so.

25   Q.    Okay.  If you could go to Exhibit 48, please,

1    which is your rebuttal report, Page 7.

2    A.    (Turns.)

3    Q.    Table A.

4    A.    (Turns.)  Yes.

5    Q.    And do you remember, Dr. Wiesen, talking about

6    this particular table on your direct examination,

7    correct?

8    A.    Yes.

9    Q.    Okay.  In preparing this table did you take into

10   account the candidates that have retired and thus are

11   not seeking promotion at this time?

12   A.    I don't -- I don't recall information about, um --

13   well, let me think.  I think there was one person who

14   indicated, um -- it was indicated that he retired on the

15   --

16   Q.    Well, could that be Joseph McNiff?

17   A.    It could be.

18   Q.    My understanding is he has retired.  My question

19   to you was did you take into account police officers

20   that have retired in preparing from this list of what

21   you called "additional hiring"?

22   A.    (Looks.)  Um, McNiff is there.

23         THE COURT:  Well, you're including him?

24         THE WITNESS:  So I included him in this list.

25         THE COURT:  You included him.

1   Q.    And there may be other people who have retired who

2   could be on this list as well, correct, who have

3   retired?

4   A.    If they're retired on the list, um -- then they're

5   retired and on the list.

6   Q.    Okay.  And if they're retired they would not be

7   hired or promoted up to lieutenant, correct?

8   A.    Correct.

9   Q.    Okay.  Did you -- in preparing the same Table A

10  did you take into account tie scores or are you saying

11  now that every single person on this list has their own

12  unique score or different score from the other persons

13  on the list?

14  A.    I just took the names as they appeared on the

15  list, on the civil service list.

16  Q.    Okay.  So would it surprise you to know that some

17  of these applicants in fact have high scores including

18  minorities and nonminorities having high scores?

19  A.    Um, I would not be surprised.

20  Q.    Okay.  And you understand that the person that the

21  department hires, purely in rank order, that a tie score

22  allows you to pick anyone over the same high score,

23  correct?

24  A.    Correct.

25  Q.    Okay.  But you did not take that into account in

1    this particular table, did you, sir?

2    A.    No, the ranking on the table is the ranking on the

3    civil service list.  But I didn't note if there were

4    people on it, a number of people on that list that were

5    tied.

6    Q.    Okay.  And in preparing this list did you take

7    into account the fact that the City could hire by using

8    a bypass mechanism?

9    A.    No.

10   Q.    And would you explain to the Court briefly what a

11   "bypass" is because I believe that you were at HRD, so

12   you should understand that.

13   A.    Um, no, that was not part of my responsibility at

14   HRD, um, so I don't have a definitive answer.

15   Q.    Okay.  But you understand that in general the City

16   can hire out of rank order under a bypass mechanism

17   which of course can be challenged with the Civil Service

18   Commission?

19   A.    The, um -- Chapter 31 gives them 2n-plus-1 names,

20   yes.

21   Q.    But they can also take a bypass?

22   A.    Um, I'm not familiar with the details of bypass.

23   Q.    But suffice it to say that Table A does not take

24   into account the bypass option?

25   A.    Correct.

1    Q.    Okay.  You've produced your rebuttal, which is

2    Exhibit 48, on or about January 9, 2014, correct?  That

3    is when it's dated, sir.

4    A.    (Looks.)  December 9th?

5    Q.    Yes.

6          THE COURT:  I think he said January 9th.

7          MR. BOK:  I apologize.  I misspoke.

8    Q.    December 9th, 2014, correct?

9    A.    Correct.

10   Q.    Okay.  You understand that since then the Court

11   has issued a ruling in this case that there is no

12   liability based on the 2005 examination?

13   A.    Yes.

14   Q.    Okay.  Did you take in account that ruling in the

15   conclusions that you did on direct examination?

16   A.    Um, so, um, the understanding I was operating

17   under when I wrote the report was that the adverse

18   impact for both the 2005 and 2008 examinations would be

19   the, um, subject of scrutiny.

20         THE COURT:  Well, I guess what he's getting at or

21   at least what is in my mind, as things have gone on I am

22   now satisfied and I have ruled that liability cannot be

23   predicated on the 2005 exam.  I've made that ruling.

24   And I think what he's asking you, since you looked at

25   both, and certainly I don't fault you for that, but

1    knowing that liability can't be predicated on the 2005

2    exam, does that change any of your conclusions about the

3    2008 exam which is at issue presently in this case?

4         THE WITNESS:  So I don't quite understand what

5    liability the 2005 exam means with respect to --

6         THE COURT:  It means this.  It means this.  Well,

7    it may not have any.  I'll deal with the legal, you deal

8    with the areas within your expertise.

9         But I've said that no one is going to get any

10   relief here, any injunctive relief, anything, no relief

11   is going to stem from whatever happened in the 2005

12   exam.  But the lawyers for the plaintiffs convinced me

13   that I have to look at the 2005 exam better to

14   understand the entire picture, and in my mind it is

15   relevant to do that, and I am.

16        So I think what he's asking you, but we'll let him

17   ask the questions, but I'll put this one.

18        Knowing that the 2005 exam is out in the sense

19   I've explained, does that change any of your conclusions

20   about -- because you've spoken to disparate impact,

21   you've spoken to the validity of the 2008 exam, does it

22   change any of your conclusions about the 2008 exam?

23        THE WITNESS:  No, it does not.

24        THE COURT:  All right.

25        Well, now you go ahead, Mr. Bok.

```
 1          MR. BOK:  Thank you, your Honor.
 2    Q.    Given that the 2005 exam is, you know, out, as the
 3    judge so, you know, stated, do you think it's still
 4    proper for you to aggregate data between the 2005 exam,
 5    that is not part of the liability of the defendants, and
 6    the 2008 exam on which the defendants can be held
 7    liable?
 8    A.    Yes.
 9    Q.    On what basis do you believe it's appropriate to
10    bring in an exam as a merely historical document into,
11    you know, judging whether or not 2008 occurs and causes
12    liability, sir?
13    A.    I was looking at the overall pattern of the impact
14    of the two exams, and the two exams are similar, they're
15    in the same department, for the same title, and so
16    I thought that the results of the '05 exam would help
17    inform the evaluation of the '08 exam.
18    Q.    Okay.  If you could turn to Exhibit 48, and it's
19    the first Page 7, but it's a little bit hard to explain
20    because there's sort of an attachment on it, but it's
21    the first Page 7 and there's a Part 8 which says --
22    which starts with "Silva has no reason," and it's ends
23    with "aggregation."
24    A.    (Looks.)  The page again is what?
25    Q.    Page 7, sir.
```

1  A.     And what number?

2  Q.     I'm dealing with Point 8.

3  A.     Number 8.  I see it.

4        MR. BOK:  Your Honor, in terms of -- I'm going to

5  ask the question regarding that first quote.  Is it okay

6  to ask the witness simply to read it into the record and

7  then I could ask him questions or --

8        THE COURT:  Well, I can read it and he's reading

9  it now.

10        MR. BOK:  Okay, fine.

11  Q.     Could you please read that quote that begins with

12  "widen the time frame."

13  A.     (Reads.)  "Widen the time frame of the events

14  being" --

15        THE COURT:  I said you could read it to yourself,

16  so just take a minute and do that.

17  Q.     Yes, please read it, sir.

18  A.     Oh, I will do that.  (Reads.)  I've read it.

19  Q.     Okay.  And in this litigation you are proposing to

20  aggregate several exams, two exams into a single

21  analysis of aggregated data, correct?

22  A.     Yes.

23  Q.     Okay.  Can you tell me what evidence you have of a

24  continuing violation, which appears to be a requirement?

25  A.     (Looks.)  There's been a long history of adverse

```
 1   impact in the, um, police promotional exams in
 2   Massachusetts.
 3   Q.    And is that the factual basis of it you're basing
 4   it on?
 5   A.    Um, yes.
 6   Q.    Okay.  So you believe the continuing violation is
 7   simply based on that so-called "long history"?
 8   A.    Yes.
 9   Q.    Do you have any other evidence beyond that of a
10   continuing violation to justify the use of aggregation?
11   A.    We have some statistically significant differences
12   in '05 as well as in '08.  So there is -- um, with
13   respect to those two exams.
14   Q.    Okay.
15         MR. BOK:  Your Honor, at this point, as you've
16   allowed, I'm going to turn over the remainder of the
17   cross-examination over to my colleague John Simon.
18         THE COURT:  Of course.  Mr. Simon.
19         (Pause.)
20         MR. CHURCHILL:  Your Honor, can I just raise a
21   procedural point, um, whichever makes the most sense?
22         THE COURT:  Sure.
23         MR. CHURCHILL:  I guess there's two options at
24   this point.  I can do my redirect to kind of close out
25   the adverse impact issues or we could do all the cross
```

```
 1   --

 2        THE COURT:  I think I could keep it in mind.

 3        MR. CHURCHILL:  Okay.

 4        THE COURT:  We could have argued for doing the

 5   cross immediately following Mr. Lichten, but they didn't

 6   raise it so -- but I'm taking notes as we go on.

 7        And, Mr. Simons, go ahead.

 8        MR. SIMON:  Thank you, your Honor.

 9

10   CROSS-EXAMINATION BY MR. SIMON:

11   Q.   Good morning, Dr. Wiesen.

12   A.   Good morning.

13   Q.   Now, yesterday -- well, first of all, we haven't

14   actually officially met.  My name is John Simon and I

15   represent the City of Boston, and it's nice to finally

16   meet you, um, officially?

17   A.   Thank you.  Likewise.

18   Q.   Um, now, you recall testifying yesterday about

19   various alternatives that you were saying that the City

20   of Boston should have considered and implemented with

21   respect to the 2008 exam, correct?

22   A.   Yes.

23   Q.   And you spoke about things like structured

24   interviews, simulation exercises, things of that ilk?

25   A.   Yes.
```

1    Q.    And you offered your opinion with respect to

2    those, correct?

3    A.    Yes.

4    Q.    And your opinion was the City should have

5    implemented some of those types of things in 2008,

6    correct?

7    A.    Actually should have considered them, and if I

8    were doing it I probably would have considered them.

9    Q.    Okay.

10         MR. SIMON:  Your Honor, may I approach?

11         THE COURT:  You may.

12         (Hands to witness.)

13   Q.    Now, Dr. Wiesen, I've handed you a document.  Have

14   you had a chance to look at it?

15   A.    Um, I sort of inspected it, yes.

16   Q.    Do you recognize what it is?

17   A.    Um, yes.

18   Q.    What is it?

19   A.    This is the Power Points that I used in 2005 when

20   I made a presentation at a professional conference.

21   Q.    Okay.  So this is a Power Point presentation and

22   these are slides that you prepared, correct?

23   A.    Correct.

24   Q.    You prepared them close in time, I take it, to the

25   June of 2005 conference?

1    A.    Yes.

2    Q.    And this was in fact a presentation that you gave

3    at the conference?

4    A.    Yes.

5    Q.    And, by the way, what is the "ITMAAC"?

6    A.    The "International Personal Management Association

7    Assessment Council."

8    Q.    Okay.  And what do they do?

9    A.    The assessment council is a group of assessment

10   professionals and their major activity is the annual

11   conference.  Occasionally they publish monographs and

12   things.

13   Q.    Okay.  And you again presented this at a

14   conference of theirs?

15   A.    Yes.

16        MR. SIMON:  Your Honor, at this time I move that

17   this be admitted as an exhibit.

18        THE COURT:  Any objection?

19        MR. LICHTEN:  I haven't read it yet, so I would

20   object, your Honor.  I think it could be used for cross-

21   examination purposes, but I don't believe it could be --

22        THE COURT:  Well, if you -- again, you do object?

23        MR. LICHTEN:  Yes, I object.

24        THE COURT:  Yeah, it seems to me I have to sustain

25   it, but if --

1          MR. SIMON:  We can certainly proceed --

2          THE COURT:  But you can use it for cross-

3     examination.

4          MR. SIMON:  Yeah, that's true.

5          THE COURT:  We probably should mark it for

6     identification though so we know what we're talking

7     about.

8          What are the next letters for identification?

9          MR. SIMON:  That's a good question, your Honor.

10          MR. CHURCHILL:  Your Honor, the next letter would

11     be "F" as in "Franklin."

12          THE COURT:  "F."  It's marked "F" for

13     identification.

14          (Exhibit F, marked.)

15     Q.    Okay.  Now, Dr. Wiesen, the title of this

16     presentation is "Statistical Support of Test Fairness

17     Reconsidered," yes?

18     A.    Yes.

19     Q.    I'm going to ask you to look at Page 3 of this

20     document.  Unfortunately the pages aren't numbered.  But

21     if you look at the third page there.

22     A.    Yes.

23     Q.    You have a statement there, "Accepted wisdom,

24     tests are fair."  Do you see that?

25     A.    Yes.

1    Q.    Now, um -- and I'm not going to read the whole

2    slide to you, but you can see, based upon what you say

3    on this slide, that what the slide is purporting to show

4    is what the accepted beliefs were at the time with

5    respect to testing and adverse impact, yes?

6    A.    Um, this is a -- perhaps a little overstated, it's

7    perhaps a bit of a straw man, but I think that's a fair

8    statement.

9    Q.    Well, this is a document you prepared, correct?

10   A.    Yes.

11   Q.    And it's accurate?

12   A.    It's basically accurate, yes.

13   Q.    And you try to be accurate when you give

14   presentations to professional groups, yes?

15   A.    Oh, yes.

16   Q.    Now --

17        THE COURT:  But just so I get the whole thing here

18   because I've jumped to your conclusions, looking at his

19   Power Point presentation that's precisely what you're

20   doing you're setting up a straw man because the gravamen

21   of your lecture there was to point out weaknesses in

22   tests, have I got that right?

23        THE WITNESS:  Yes.

24        THE COURT:  All right.  Go ahead.

25        MR. SIMON:  Okay, thank you, your Honor.

1    Q.     And in fact, as the judge indicated, that when you

2    go on to the next slide, some indications are that the

3    tests may not be completely fair, right?

4    A.     Correct.

5    Q.     And what you're doing in this slide is you're

6    showing that despite the accepted wisdom there's this

7    evidence that you're presenting that there are reasons

8    that we should all believe that sometimes these tests

9    aren't so fair, right?

10   A.     Correct, and they're not necessarily my ideas, but

11   they're also in the literature.

12   Q.     Correct.  So this is development in the literature

13   that led you to the conclusion that this testing may not

14   be fair?

15   A.     Correct.

16   Q.     Okay.  Now, let's jump to the fifth slide from the

17   back.  (On screen.)  There are three pages of references

18   at the end.  So skip over those.  There's one called "R

19   & D thoughts" and then there's an "In conclusion."

20   Do you see where I am?

21        MR. LICHTEN:  Where are you?

22        MR. SIMON:  On the fifth page from the back.

23        THE COURT:  It's titled "In conclusion."  It was

24   looking at this slide that was the basis for my last

25   question.

 1    Q.    (On screen.)  Do you see where we are, Dr. Wiesen?

 2    A.    (Looks.)  "In conclusion," yes.

 3    Q.    Okay.  Why don't you take a minute to look at

 4    that.

 5    A.    (Looks.)  All right, I've looked at it.

 6    Q.    Okay.  Do you recall preparing this slide?

 7    A.    Generally.

 8    Q.    Okay.  And again I won't read it to you, but I

 9    think the point of this slide, is it not, is that what

10    you're saying is, "In conclusion the tests might not be

11    as fair as we think they are or as effective as we would

12    like, but" -- and I'm going down to the last two bullet

13    points where you offer suggestions for this, correct?

14    A.    Yes.

15    Q.    Do you see that?

16    A.    Yes.

17    Q.    And you say, "Oh, we should continue to strive to

18    understand and reduce adverse impacts on our tests"?

19    A.    Yes.

20    Q.    And then the second point is "Innovative R & D is

21    needed," do you see that?

22    A.    Yes.

23    Q.    And that's what you thought at the time?

24    A.    Yes.

25    Q.    And if we go to the next page, R & D thoughts will

1   be expounded upon and what you think about the R & D of

2   this situation, right?

3   A.     Yes.

4   Q.     And I'll skip back down to the bottom two points.

5   You say "Tests: New tests modes/question types"?

6   A.     Yes.

7   Q.     And that's, I suppose, your suggestion that we

8   need to think about new test modes for these tests, yes?

9   A.     Yes.

10   Q.     And we need to think about new question types,

11   right?

12   A.     Yes.

13          THE COURT:   What's "I/O," what does that stand

14   for?

15          THE WITNESS:   "Industrial/Organizational," that

16   means literally "organizational psychologists."

17          THE COURT:   I see.

18   Q.     And moving on to the last bullet, "More research

19   cooperation with colleges," yes?

20   A.     Yes.

21   Q.     Okay.  So exhibits -- or what we've marked as

22   Exhibit F here describes what you believe to be the

23   state of testing at the time you gave this presentation,

24   correct?

25          MR. LICHTEN:   Your Honor, we withdraw our

1    objection.

2         THE COURT:  Do you still press it?

3         MR. SIMON:  I do.

4         THE COURT:  Then F will be admitted and the next

5    number is what?

6         MR. SIMON:  Exhibit 77, I think.

7         THE COURT:  77 in evidence.  Thank you.

8         (Exhibit 77, marked.)

9    Q.    There was a question, which I have now forgotten,

10   but I think what I was asking you was, um, Exhibit -- it

11   was Exhibit 77 is what you believe was the state of

12   testing and adverse impact at the time you gave this

13   presentation, correct?

14   A.    Yes.

15   Q.    And that's June of 2005?

16   A.    Yes.

17   Q.    And what you believe at the time was that we

18   needed to do some research?

19   A.    Yes.

20   Q.    And we needed to come up with some better tests?

21   A.    Yes.

22   Q.    And we needed to continue to strive to understand

23   what's going on in this adverse impact of these tests?

24   A.    Yes, and we still do.

25   Q.    Exactly my point.  Okay.  Thank you.

1    So it doesn't sound like in June of 2005, at any rate,

2   you had all the answers to these problems?

3   A.    We definitely did not have all the answers to

4   these problems.

5   Q.    In fact you don't have any answers to these

6   problems?

7   A.    We -- well, that's an overstatement.  I would

8   disagree with that.

9   Q.    Okay.  Let's see if we can quantify that.

10    So what level of certainty are you with regards to

11   resolutions to these adverse impact problems in testing?

12        MR. LICHTEN:  Objection to the form of the

13   question.

14        THE COURT:  Well, he may have it in that form, if

15   you can answer it.

16   A.    Well, it's a very important question.  I don't

17   really know what aspects of what we're talking about.

18   If we're talking about, um, do we know what test areas

19   and what test modes tend to minimize and maximize the

20   adverse impact, I think the answer is we have

21   considerable information about that.  If the question is

22   have we created, um, the Penicillin of personnel

23   selection in giving a perfectly valid test that has no

24   adverse impact?  We haven't done either.  We do have

25   perfectly valid tests.  Our tests are reasonably good,

1   but they're also quite limited in what they could do,

2   and we have not been able to completely eliminate

3   adverse impact.

4        THE COURT:  And just so I'm clear, during your

5   direct examination counsel were careful to use this

6   phraseology frequently before eliciting your opinion,

7   "Do you have an opinion to a reasonable degree of

8   professional certainty in your profession," or words

9   like that and you would answer "yes" and over objection

10  I, by and large, let you express your opinion.

11       Here's what those buzz words which lawyers use

12  mean to me because he's -- it's perfectly all right for

13  him to ask questions like this.  It means to me that you

14  think, more likely than not, that the opinion you

15  expressed is accurate.  Now, maybe you think it even to

16  a higher degree, but at least based upon what you

17  reviewed as the questioning was going along and prior to

18  trial you think more likely than not that your opinion

19  is accurate.

20       Now, do you understand it in the same sense when

21  counsel for the plaintiffs were asking questions?

22       THE WITNESS:  I thought that it envisioned a

23  higher standard than just a little bit in one direction.

24       THE COURT:  All right.  Fine.  Go ahead,

25  Mr. Simon.

1          MR. SIMON:  Thank you, your Honor.

2     Q.    So, Dr. Wiesen, if I understand your testimony

3     what you're saying is, um, there are these things that

4     we can do -- let me take a step back.

5     I think this is what you testified to and correct me if

6     I'm wrong, but research shows that there are various

7     alternatives that tend to lessen adverse impact, yes?

8     Is that fair?

9     A.    Yes.

10    Q.    Now, isn't there also research that shows the

11    opposite?

12    A.    (Pause.)  And what would the opposite be?

13    Q.    The opposite would be that in fact it increases

14    that risk?

15    A.    It's possible to increase adverse impact in some

16    situations if you use alternatives, yes.

17    Q.    Okay.  And this is especially true when you're

18    simply adding selection procedures onto a test, yes?

19    A.    Yes.

20    Q.    And isn't it fair to say that the state of the

21    science, if you will, at this point is that the experts

22    don't really know when a test is going to be -- is going

23    to result in less adverse impact or more adverse impact?

24    A.    Um, when people are involved it's very hard to

25    make absolute statements.  So, um, having certain

1    knowledge of what will occur is not possible.  But based

2    on long experience and much research, um, there are very

3    reasonable predictions of what would happen.

4    Q.    Okay, reasonable predilections.  I'm sorry,

5    reasonable predictions.

6    Well, isn't it fair to say though that you're never

7    going to know what the outcome is until you actually do

8    it?

9    A.    Yes.

10   Q.    And this is especially true with respect to

11   various components and their weights, how you come up

12   with the entirety of the exam process, right?

13   A.    I don't quite understand that.

14   Q.    Well, what I'm getting at is, um, you've suggested

15   that there are these various components that you can add

16   to the testing process that you say reduce adverse

17   impact or at least research shows tend to reduce adverse

18   impact, right?

19   A.    Yes.

20   Q.    And involved with making those kinds of decisions

21   about what components to add, you also have to make

22   decisions about how to weight them?

23   A.    Yes.

24   Q.    And when you factor in those kinds of things in

25   the analysis that makes the result even more -- well,

1    even less fair?

2    A.    No, maybe it makes it possible to make more

3    accurate predictions, um, you know the D, the

4    standardized difference between groups on each of the

5    components, now you know the weight that you're giving

6    to the components and how those components are going to

7    be used, and with some, um, statistical models you can

8    make an informed prediction of the level of adverse

9    impact of different ways of combining the test

10   components.

11   Q.    And the research shows that those predictions can

12   be wrong?

13   A.    Um, and the research -- that those predictions are

14   not always correct, yes.

15   Q.    Okay.

16        MR. SIMON:  May I approach again, your Honor?

17        THE COURT:  Of course.

18        (Hands to witness and judge.)

19        MR. SIMON:  Yeah, I apologize for the small print

20   everyone, but this was the best I could do.

21        THE WITNESS:  I have a version, but --

22        MR. SIMON:  Well, do you have it on you?

23        THE WITNESS:  Oh, no.

24   Q.    Well, then, Dr. Wiesen, I've shown you a document,

25   a very small typed document, and I'm going to ask you if

```
 1    you recognize that?

 2    A.    Yes.

 3    Q.    And what is it?

 4    A.    It's an article that I wrote for a professional

 5    newsletter.

 6    Q.    And in fact this is for the Society of Industrial

 7    Organization of Psychologists -- or Psychology, right?

 8    A.    Yes.

 9    Q.    "SIOP," as we've been calling it?

10    A.    Yes.

11    Q.    Okay.  And that is probably the most prestigious

12    organization in this field, yes?

13    A.    Yes.

14    Q.    Okay.  And you took great care when you wrote this

15    article, right?

16    A.    Yes.

17    Q.    Okay.  When did you write this article?

18    A.    It came out, I think, in -- let me see.

19    Q.    And I think I can maybe help you out here.

20    A.    Yes, help me with that, please.

21    Q.    In the bottom left-hand corner I believe it says

22    April of 2010.  Do you see that?

23    A.    (Looks.)  That sounds about right.

24    Q.    Okay.

25          MR. LICHTEN:  Well, your Honor, I read that as
```

1    "2003."

2          THE COURT:  Actually I do too, but the witness has

3    so testified.

4          THE WITNESS:  Well, it's not 2003.

5          THE COURT:  It's not 2003?

6          THE WITNESS:  No, I published this after I moved

7    to New York, which was five years ago.

8          THE COURT:  So do you know what the "03" means

9    there?

10         THE WITNESS:  I think it's probably the third

11   volume.

12         THE COURT:  I follow.  Right.

13   Q.    So you think it was April of 2010, yes?

14   A.    That's likely.

15   Q.    Okay.

16   A.    If not, it's within a year or so.

17   Q.    Okay.  Now, the title of this article, "A

18   hypothetical novel approach to an employee selection

19   system to reduce adverse impact and improve job

20   performance for a fire lieutenant: Musings of a

21   practitioner," correct"?

22   A.    Yes.

23   Q.    What was the purpose of this article, Doctor?

24   A.    I wanted to bring to the attention of the more

25   academic members of the profession, um, some ideas that

1    I had as a practitioner.

2    Q.    Okay.  And I'm not going to bore you with the

3    details, but in looking at the various headings of the

4    various parts of this article, the first heading,

5    "Traditional selection systems for fire lieutenant."  Do

6    you see that?

7    A.    Yes.

8    Q.    And I believe in there you're talking about the

9    fact that traditionally they would use multiple choice

10   tests for these kinds of exams?

11   A.    Yes.

12   Q.    And you're talking about the fact that -- well,

13   let me direct your attention to -- and again I know it's

14   difficult to read, but the last sentence of the first

15   paragraph.

16   A.    Yes, I can read it.

17   Q.    You say "Now many fire departments supplement the

18   multiple choice test with another component such as a

19   structured oral interview or assessment center."  Do you

20   see that?

21   A.    Yes.

22   Q.    Okay.  So "now" is of the time you wrote this

23   article in 2010, correct?

24   A.    Yes.

25   Q.    Now, moving on to the next heading, you cite to

1    "two vexing problems"?

2    A.    Yes.

3    Q.    And again if you need to read it you can tell me,

4    but in that section you're talking about the fact that

5    one of the vexing problems is adverse impact?

6    A.    Yes.

7    Q.    And the other vexing problem with respect to fire

8    lieutenants is job performance, correct?

9    A.    Could you give me a moment to read it?

10    Q.    Sure.

11    A.    Okay.  (Reads.)  Okay.

12    Q.    Okay.  And my question was, those two vexing

13    problems that you identify, at least with respect to

14    fire lieutenants, have to do with the adverse impact of

15    the traditional testing system, yes?

16    A.    Yes.

17    Q.    And then the second part is how that relates to

18    job performance, correct?

19    A.    No.

20    Q.    Okay.  Well, what is it about job performance that

21    is a vexing problem?

22    A.    The vexing problem -- so what fire lieutenants do,

23    um, is they are the, um -- they are in charge at the

24    beginning of every emergency operation, they, and some

25    firefighters, get to the fire emergency scene as soon as

1  they possibly can and the lieutenant has to decide how

2  to handle that.  So the lieutenant has to, um, figure

3  out what's going on and figure out how best to approach

4  it.  It's a problem-solving situation.  And, um, I've

5  given examinations for fire lieutenant and presented

6  them with various incident simulations and diagrams and

7  pictures and words and what have you, um, and the

8  subject matter experts that are grading those have

9  explained to me in great detail what the major hazards

10  are, the dangers, what has to be addressed first, what

11  can wait till later, how best to go about addressing the

12  situation, and the job applicants often are on the

13  clueless side, they're not very good at handling what it

14  is they're supposed to handle if they are promoted to

15  lieutenant.

16  Q.    Okay.

17  A.    So it's nothing -- that part has nothing to do

18  with adverse impact.

19  Q.    I understand.  And you're addressing an issue

20  that's specific to a fire lieutenant in a certain

21  situation?

22  A.    Um, I'm using a fire lieutenant in this example,

23  yes.

24  Q.    Okay.  In any event, let's move on.  We don't need

25  to talk about fire lieutenants.

1   But what I'm interested in talking about is the next

2   section which has to do with "Novel employee selection

3   systems."  Do you see that?

4   A.    Yes.

5   Q.    And what you propose here -- and again I'll let

6   you read it if you need to, but what you're proposing is

7   what you call a "novel testing approach to dealing with

8   these problems"?

9   A.    Yes.

10  Q.    And what you're talking about is, well, training

11  on the job for the people who are interested in

12  promotion?

13  A.    Yes.

14  Q.    You're talking about courses for people who are

15  eligible for the exam?

16  A.    Yes.

17  Q.    And then you're talking about a structured oral

18  exam for purposes of the exam itself, yes?

19  A.    Well, I say a structured oral exam, fire emergency

20  instant simulations, an assessment center, so --

21  Q.    Okay.  So what you're talking about are the kinds

22  of things that you are saying that the City of Boston

23  should have implemented with respect to the lieutenants

24  police exam in 2008, right?

25  A.    Basically, yes.

1    Q.    Okay.  Now, you wrote this article again in 2010?

2    A.    Yes.

3    Q.    Let's skip to the conclusion.

4    A.    (Turns.)

5    Q.    The second page.

6    A.    Yes.

7    Q.    Okay.  You talk about the fact that you presented

8    a "skeleton of an approach that you believe is

9    scientifically sound."  Do you see that?

10   A.    Yes.

11   Q.    And then you say "Only after a few implementations

12   will we know how difficult it will be to put these ideas

13   into practice."

14   A.    Yes.

15   Q.    And then you go on in the last sentence of that

16   conclusion to say:  "I do not offer this approach as a

17   panacea for the job of fire lieutenant nor for all job

18   titles, but can envision adaptation of this approach

19   that would be appropriate to other promotional job

20   titles."

21   Do you see that?

22   A.    Yes.

23   Q.    Okay.  And that's what you believe at the top?

24   A.    Yes.

25   Q.    Now --

1      MR. SIMON:  And, your Honor, at this time I would

2  move that this be admitted as an exhibit as well.

3      THE COURT:  Any objection?

4      MR. LICHTEN:  No objection, your Honor.

5      THE COURT:  It may be received, Exhibit 78 in

6  evidence.

7      (Exhibit 78, marked.)

8  Q.    So with respect to Exhibit 78, it's now been

9  marked as Exhibit 78, um, it doesn't sound again like

10  you had any definitive answers for this problem?

11  A.    I was suggesting a new approach.

12  Q.    Right.  In April of 2010 this was a new approach?

13  A.    Yes, and unfortunately I don't know of any

14  department that's tried it yet.

15  Q.    Okay.  And indeed you described it as a "skeleton

16  approach"?

17  A.    Well, that was just a small part of it, right.

18  Q.    I'm sorry?

19  A.    It's a short article.  I didn't go into

20  implementation details, yes.

21  Q.    Right, but I guess the point I'm getting at is

22  this was an initial thought of yours?

23  A.    Yes.

24  Q.    In fact the title of that is "Musings of a

25  practitioner"?

 1   A.     Yes.

 2   Q.     You were musing?

 3          THE COURT:  Well, let me ask this.  The military

 4   engages in extensive training up and down its command

 5   staff and because of the vagaries and dangers of combat

 6   a lower officer or a noncommissioned officer may

 7   immediately have to assume the responsibilities of

 8   higher command.  In your profession is that ever looked

 9   to as a -- I was struck by just glancing at this fire

10   lieutenant, one theoretically knows these, but, for

11   instance, a fire lieutenant, of course you have to

12   think, as you point out in your article, about where you

13   position the fire engines because once you run the hoses

14   and you get additional vehicles on site -- and

15   fortunately we have fewer fires, and therefore, um, they

16   don't have the experience of the responsibility of the

17   next higher grade.  So that -- and police procedures are

18   only paramilitary, but in hostage situations and other

19   traffic situations or protest situations, all which one

20   can imagine police departments have to deal with, um, I

21   would imagine that there are training opportunities not

22   just for the lieutenants or just for the sergeants or

23   indeed the captains, but I would imagine that they train

24   together.

25          Are you in a position to advise me at all about

1   that?  I'm talking about police departments.

2        THE WITNESS:  There are, um -- training

3   departments and police departments they offer various

4   and sundry courses at various levels and those are

5   not -- I'm not familiar with what levels receive what

6   type of training, but they are not used as part of the

7   civil service examination process.  So you don't have to

8   have taken and passed any particular course to take a

9   civil service exam.  You don't have to --

10        THE COURT:  All right.  I -- forgive me for

11   cutting you off, but I think I sort of generally know

12   that.

13        THE WITNESS:  Okay.

14        THE COURT:  And I know that they get credit for

15   courses that are germane to police work.

16        THE WITNESS:  Degrees.

17        THE COURT:  All right.  Degrees.

18        But I'm talking about, since you have some

19   familiarity with the Massachusetts system, does District

20   3 command staff, do they train together for, um -- I

21   know from presiding, for instance, in criminal cases

22   that they have increasingly sophisticated computer data

23   about hot spots in the city or -- and they look at, um,

24   indicia, for example, of gang activity and they try to

25   derive law enforcement strategies from that.  I want to

1    stay focused on what I'm supposed to decide here, but

2    one would think that the responsible officers would

3    analyze things together with lower officers being privy

4    to the analysis and perhaps participating in it because

5    they're doing community policing.

6        Do you have any knowledge of that or should I ask

7    another witness?

8        THE WITNESS:  You need to ask someone else.

9        THE COURT:  All right.  Go ahead.

10       MR. SIMON:  Thank you, your Honor.

11   Q.    Now, Dr. Wiesen, let's move on to something else.

12   You worked at the Department of Personnel Administration

13   for a number of years, correct?

14   A.    Yes.

15   Q.    That's the DPA that we've been seeing in various

16   documents?

17   A.    Yes.

18   Q.    You worked there from 1977 to 1993?

19   A.    Very early '93, yes.

20   Q.    Okay.  So 15 years or thereabouts?

21   A.    Yes.

22   Q.    And, by the way, DPA was the precursor to the

23   Human Resources Department, right?

24   A.    Yes.

25   Q.    Or the "Human Resources Division" is usually what

1   it's called and "HRD" is the acronym for that?

2   A.    Yes.

3   Q.    All right.  Now, you held various titles at DPA,

4   correct?

5   A.    A few, yes.

6   Q.    You were chief of test validation, is that

7   correct?

8   A.    Chief of testing development and validation, yes.

9   Q.    Okay.  Is that something different than chief of

10  testing and validation or is that the same?

11  A.    I think that the -- I'm not sure.

12  Q.    Okay.  You were the director of planning and

13  research?

14  A.    I was.

15  Q.    And what all this means is that during your time

16  at DPA you validated tests?

17  A.    Much of the time.

18  Q.    You developed tests?

19  A.    Much of the time, yes.

20  Q.    And you developed police promotional tests, yes?

21  A.    Yes.

22  Q.    And the testing process, if you will, under, but

23  by the HRD -- and I'll call it "HRD" because that's what

24  it's called now, if that's okay with you, is governed by

25  Chapter 31 of Massachusetts General Laws, correct?

1    A.    Yes.

2    Q.    So in your time at HRD you became familiar with

3    the requirements of Chapter 31 at least as they related

4    to testing, yes?

5    A.    Yes.

6    Q.    And in particular how it related to public safety

7    testing --

8    A.    Yes.

9    Q.    -- which has to do with police and fire testing,

10    correct?

11    A.    Yes.

12    Q.    And others perhaps?

13    A.    Yes.  I don't recall any specific requirements

14    related to the development of public safety exams other

15    than minimum qualifications, but the Chapter 31 governs

16    the testing program.

17    Q.    Okay.  Okay.  So you're familiar with the fact

18    that Chapter 31 requires competitive examinations for

19    all police promotions?

20    A.    Yes.

21    Q.    You know that?

22    A.    Yes.

23    Q.    And you're familiar with the fact that Chapter 31

24    requires rank ordering of exam-taker scores?

25    A.    Well, I left the employment of the state, um --

1    well, maybe 20 years ago, 22 years ago.  I don't recall

2    that particular provision of Chapter 31.

3    Q.    Okay.  But you're here, Doctor, as an expert?

4    A.    Yes.

5    Q.    As an expert on police promotional testing, yes?

6    A.    Yes.

7    Q.    And you're telling us you don't know whether or

8    not Chapter 31 requires strict rank ordering?

9    A.    It envisions rank ordering.  By "strict rank

10   ordering" do you mean that it doesn't allow banding?

11   Q.    Well, let's talk about that.  I do mean that.  It

12   doesn't allow banding, does it?

13   A.    Well, as I understand it HRD has used banding in

14   the past.

15   Q.    And is it also your understanding that when HRD

16   did try to use banding there was a lawsuit brought?

17   A.    No, that was a promotional exam.  For the entry

18   exam it used banding and it wasn't challenged.

19   Q.    Okay.  Let's talk about functional exams.

20   A.    Okay.

21   Q.    Are you aware that HRD tried to come up or

22   institute banding with respect to promotional exam

23   scores?

24   A.    I, um, don't have any detailed information about

25   that.

1   Q.    And you don't know whether or not the very tested

2   issue, the 2008 lieutenant's promotional exam, was that

3   test that HRD attempted to implement banding on?

4   A.    I know that banding was considered back then.   I

5   don't have recollection of the details of what happened.

6   Q.    Okay.  So you're not familiar with the case of

7   *Craft v. Deedle*?

8   A.    No.

9   Q.    You don't know whether or not that was a Superior

10  Court case that said banding is illegal under Chapter

11  31?

12  A.    No.

13  Q.    Okay.  So when you testified yesterday --

14        THE COURT:  If you could -- perhaps you have, but

15  if you'd provide the cite to that, at some time, I'd be

16  grateful.

17        MR. SIMON:  I have a copy of that, your Honor.

18        THE COURT:  I'd be happy to see it.

19        (Hands up.)

20  Q.    So in any event, Doctor, when you suggested

21  yesterday that banding was one of the alternatives the

22  City should have considered, you didn't know whether or

23  not this case had outlawed it?

24        MR. LICHTEN:  Your Honor, that's just an incorrect

25  characterization of the case.

1          THE COURT:  Well, I -- that's why I want to see

2     it.  Now, so you say, and let me take a look here.

3          (Pause.)

4          THE COURT:  Put your question again, Mr. Simon.

5          MR. SIMON:  Well, my question is, um, whether or

6     not the doctor considered this case, um, or subsequent

7     legal action, when he suggested that the City should

8     have considered banding in 2008?

9          THE COURT:  He may have that.

10         Are you familiar with this case?

11         THE WITNESS:  No.

12         THE COURT:  Okay.

13    Q.    You talked or you testified today in fact about

14    the 2N-plus-1 formula?

15    A.    Yes.

16    Q.    And correct me if I'm wrong, but what that is is

17    the way in which the Civil Service Commission or which,

18    I'm sorry, HRD sets the list that they're going to send

19    to the municipalities for filling positions, right?

20    A.    Yes.

21    Q.    Okay.  And what that means is that if N is the

22    number of open positions, and if the number of open

23    positions is 3, then 2 times 3 plus 1, the City would

24    get 7 names, correct?

25    A.    Correct.

1    Q.    Now, do you have an understanding as to whether or

2    not those seven names are ordered?

3    A.    My understanding is that there was a rank order on

4    the civil service list.

5    Q.    So the City, once it gets those seven names, can't

6    simply pick whoever it wants from the group, right?

7    A.    I'm not exactly sure how free the City is to

8    choose from those names.  Chapter 31 says that they can

9    choose from those names.  But that was not part of my

10   responsibility when I worked for the state and I don't

11   know what the practicalities are about going outside of

12   rank order.

13   Q.    Okay.  But it is your understanding that there is

14   that rank order with respect to that grouping?

15   A.    That and mostly you have the, um -- the appointing

16   authority has the ability to use the 2N-plus-1 names.

17   Q.    Okay.  But this -- and I believe in your expert

18   report you describe that 2N-plus-1 system as a type of

19   "modest banding," is that correct?

20   A.    Um, I think that was another expert that used that

21   term, but it definitely used a form of very modest

22   banding.

23   Q.    Okay.  Regardless of the --

24   A.    I think I quoted someone else, yes.

25   Q.    Okay.  And you believe that to be true?

```
 1   A.     Yes.
 2   Q.     And that's regardless of the fact that they do
 3   come in order, correct?
 4   A.     So, it has some, um, similarity to banding in that
 5   you don't have to choose from a list of one.  It has
 6   some differences from banding in that there's no
 7   psycho-metric foundation to the rule of 2N-plus-1.
 8          THE COURT:  Mr. Simon, just help me out here, as
 9   an officer of the court.  This is a decision and an
10   order on a preliminary injunction.  What happened in
11   this case?  Do you know?
12          MR. SIMON:  I believe Mr. Lichten should --
13          MR. LICHTEN:  I know what happened because I was
14   involved with it, your Honor, if you want to know.
15          THE COURT:  Yes, I'm simply -- as officers of the
16   court, so then what happened?
17          MR. LICHTEN:  The unions brought a challenge and
18   after this decision was issued the Commissioner decided
19   not to go forward with it.
20          THE COURT:  So in essence in terms of the legal
21   determination the -- because the attempt at banding was
22   abandoned, the case became moot?
23          MR. LICHTEN:  Exactly.
24          THE COURT:  And there was no memorandum of
25   decision in support of a final judgment in the case?
```

1          MR. LICHTEN:  Not that I'm aware of.

2          THE COURT:  No.  All right.  Thank you.

3          Go ahead, Mr. Simon.

4          MR. SIMON:  Thank you, your Honor.

5     Q.    Now, Dr. Wiesen, Chapter 31 also requires an

6     experience and education component be included as part

7     of the testing process, right?

8     A.    Yes.

9     Q.    So when you see references to that, and really

10    with respect to the 2008 exam, that's not something that

11    the City is pulling out of thin air, correct, it's in

12    the law?

13    A.    Correct.

14    Q.    Okay.  And finally with respect to Chapter 31

15    you're aware, are you not, that municipalities can go

16    off on their own and do their own test, correct?

17    A.    Under certain circumstance, yes.

18    Q.    And those circumstances are they would need to get

19    a delegation agreement from HRD?

20    A.    That's my understanding of how it works, yes.

21    Q.    And with HRD's permission they could develop their

22    own testing process and have something different than

23    what it is that HRD offers, correct?

24    A.    Yes, basically.

25    Q.    And this is relatively unusual, right?

```
 1    A.    It's definitely unusual.  It's not rare, but it's
 2    unusual.
 3    Q.    Okay.  And it's unusual because the statute
 4    establishes HRD as the state agency to make these tests,
 5    yes?
 6          MR. LICHTEN:  Objection to the form of the
 7    question.
 8          THE COURT:  No, overruled, it's proper in form.
 9    If you know.
10    A.    Um, that seems likely.
11    Q.    Okay.  And -- well, let's put it this way, HRD is
12    the expert in this field, correct?
13    A.    HRD is the expert in the field for the state, yes.
14    Q.    And the cities and towns have a right to rely on
15    that expertise, correct?
16    A.    That's a reasonable conclusion you could make,
17    yes.
18    Q.    Okay.  And it's a reasonable thing for them to do,
19    right?
20    A.    Yes.
21    Q.    And in addition if municipalities do want to go
22    off on their own and create their own test, they have to
23    pay for it, correct?
24    A.    Yes.
25    Q.    That's another consideration that should be
```

1    factored into that mix, correct?

2    A.    Yes.

3    Q.    And as a result of all of this the towns and

4    cities simply rely on HRD doing this?

5    A.    I believe that's true.

6    Q.    And as you just testified, that's reasonable here?

7    A.    It's understandable.

8    Q.    Okay.  Now, you yourself, you said, have developed

9    tests, you've done so when you were at HRD?

10   A.    Yes.

11   Q.    You've done so in the time since?

12   A.    Yes.

13   Q.    And you believe the multiple choice tests are a

14   good predictor of future job performance, correct?

15   A.    It depends on the job and the test.  But they can

16   be.

17   Q.    Okay.  How about police lieutenant?

18   A.    So, nobody's done a predictive validity study of

19   job knowledge tests, um, for police lieutenant, as far

20   as I've been able to find.  I've looked for that for a

21   number of years in the literature asking colleagues,

22   even making special phone calls to larger departments.

23   But I think the answer to that question is, um, that job

24   knowledge is necessary for a police lieutenant and you

25   can attempt to measure job knowledge and that would give

1  you some information about the qualifications of the

2  candidates.

3  Q.    It's a good predictor, yes?

4  A.    Whether it's a good predictor depends on the test.

5  Q.    Okay.  But doesn't it always depend on the test?

6  A.    Yes.

7  Q.    The quality of the test is always an issue?

8  A.    Yes.

9  Q.    You could have the best multiple choice tests in

10  the world and it would be a very good indicator of job

11  performance in the future, yes?

12  A.    There are things that a multiple choice test can't

13  measure which are extremely important for a police

14  lieutenant.  So that's too strong a statement.

15  Q.    Okay.  But those things that do measure those

16  other things, and by "those other things" we're talking

17  about judgment, interpersonal relations, things of that

18  nature?

19  A.    Yes.

20  Q.    Um, bad tests for those are no better than

21  anything else, right?

22  A.    Correct.

23  Q.    So it's all about how well a test is developed?

24  A.    So, um, it is about how well a test is developed,

25  but also some testing modes, paper and pencil multiple

1   choice tests, just are not good measures of the ability

2   to notice the important information or come up with

3   innovative solutions, or any solutions, because in a

4   multiple choice test all the answers are there and you

5   could read it and say, "Oh, gee that's a great answer,"

6   but you might not have been able to come up with that

7   answer.

8   Q.    Do you believe, um --

9        THE COURT:  I'm not sure what you're getting at.

10  I have been told I'm off point, but as you are a test

11  expert here, um, I've been told that the LSATs are

12  really a remarkably good predictor of performance in law

13  school.  Performance in law school bears little or no

14  relation to success at the bar measured either by

15  monetary success or by, um, public service success in

16  the hierarchical nature of -- of our legal system.

17       Do you think there's any truth to that?  Do you

18  know anything about that?

19       THE WITNESS:  Paper and pencil tests are very good

20  predictors of academic achievement measured by paper and

21  pencil tests.

22       THE COURT:  Well, that's an answer.

23       All right.  Forgive the interruption, Mr. Simon.

24  But I didn't understand -- I don't know where we're

25  going with this?

1          MR. SIMON:  Okay, your Honor, thank you.  I'll

2     move on.

3          THE COURT:  Oh, I didn't say you have to.  I'm

4     just grappling with the transition, which we must

5     address in this case, to supervisory responsibility in

6     the field in rapidly-emerging situations where the

7     public safety and good order are at issue with

8     responsible professionals.  Of course it's difficult.

9     And yet much is to be said for "neutral tests," whatever

10    that means.

11         Go ahead.

12         MR. SIMON:  Yes, your Honor.  Thank you.

13    Q.    Along those lines, Dr. Wiesen, there are many

14    things other than job knowledge that a multiple choice

15    test can test, yes?

16    A.    Yes.

17    Q.    There's supervisory abilities?

18    A.    Perhaps some supervisory, some aspects of

19    supervisory abilities.

20    Q.    Managerial abilities?

21    A.    Perhaps some aspects of managerial abilities, yes.

22    Q.    And those are things that are important for a

23    police lieutenant, yes?

24    A.    And those seem to be job-related depending on what

25    level of managerial ability you're talking about.

1   Q.     Now, let's switch gears completely here.  I want

2   to talk about this 1991 validation report.

3          MR. SIMON:  This has been admitted in this case as

4   Exhibit 71.  It also is an exhibit in the *Lopez* trial,

5   your Honor, Exhibit 40 in that case.

6          THE COURT:  All right.  I have it.

7   Q.     Now, Doctor, you see what I'm referring to?

8   A.     I see it, yes.

9   Q.     You're familiar with it?

10  A.     Yes.

11  Q.     You know what it is, right?

12  A.     Yes.

13  Q.     What is it?

14  A.     It's a validity study that was done in 1991 by

15  personnel administration for police promotional --

16  police promotional selection procedures.

17  Q.     Okay.  This document was prepared by DPA, yes?

18  A.     Yes.

19  Q.     And it covers the position of police lieutenant,

20  right?

21  A.     And others, yes.

22  Q.     And others, yes.  And this was the subject of much

23  testimony, et cetera, at the *Lopez* trial, correct?

24  A.     Yes.

25  Q.     Do you recall that?

1   A.     Not in any great detail, no.

2   Q.     You don't recall being asked about this report

3   during that testimony?

4   A.     Um, I recall being asked about my involvement in

5   the report and I recall being asked about some parts of

6   it.

7   Q.     Okay.  Did you have involvement in the report?

8   A.     Well, it's now several years later than *Lopez* and

9   what I said in *Lopez* is that when I first saw this

10  report I was very interested because it happened when I

11  was still employed at HRD and I had no recollection at

12  all of having seen the report earlier.  It's now a few

13  years after *Lopez* and I have no better recollection now

14  than I did then.

15  Q.     Okay.  And I don't want to go into what you talked

16  about in *Lopez* because we can certainly refer to that.

17  Well, let me ask you this.  Do you recall that there's

18  much more to that report than what's in Exhibit 71 in

19  this case?

20  A.     There are appendices.

21  Q.     And there are -- do you recall how many?

22  A.     20-some-odd appendices.

23  Q.     And are we talking hundreds if not thousands of

24  pages?

25  A.     Probably a good few -- a couple of hundred.

1    Q.    Okay.

2          MR. SIMON:  And just for your Honor's benefit,

3    that is actually Exhibit 71 of the *Lopez* exhibits.

4          THE COURT:  So 71 is the whole thing?

5          MR. SIMON:  I'm sorry, that is Exhibit 41 of the

6    *Lopez* exhibits.

7          THE COURT:  I'm sorry.  I have 71 in -- as marked

8    in this case, is the study.  41 in *Lopez* is the

9    appendices.

10          MR. SIMON:  Exactly.  Thank you.

11          THE COURT:  I see.

12   Q.    Now, Doctor, as part of this case you issued a

13   rebuttal report to Dr. Campion's validation report or

14   his report on validation, Correct?

15   A.    Correct.

16   Q.    And that's been marked as Exhibit 49?

17   A.    Yes.

18   Q.    And in fact that's been more than marked, it's an

19   exhibit in this case, Number 49, yes?

20   A.    I see it as Number 49 in my folder, yes.

21   Q.    Okay.  Now, in Exhibit 49 you critique

22   Dr. Campion's view of these things, yes?

23   A.    Yes.

24   Q.    And you make various criticisms about the 2008

25   exam?

1    A.    Yes.

2    Q.    The 2005 exam?

3    A.    Yes.

4    Q.    As well as the 2000 job analysis that Morris and

5    McDaniel prepared for the police lieutenant position?

6    A.    Yes.

7    Q.    Okay.

8          MR. SIMON:  And that, by the way, is Exhibit 39 in

9    this case, your Honor, for your benefit, that job

10   analysis report.

11   Q.    Okay.  Now, your rebuttal report altogether

12   ignores the 1991 validation report, doesn't it?

13   A.    No.

14   Q.    And how does it -- well, where does it discuss the

15   1991 validation report?

16   A.    (Looks.)

17         MR. SIMON:  I can withdraw that question and ask a

18   better one.

19         THE COURT:  Withdrawn.

20   A.    Well, I can tell you that --

21         THE COURT:  No, it's withdrawn.  Let him ask a

22   question.

23   Q.    What I'm getting at is that your critiques of all

24   these various things do not take into account the 1991

25   validation report, isn't that correct?

1   A.     No.

2   Q.     Okay.  For example, you say, for the 2005 and 2008

3   exam, there's no validation study, right, that's one of

4   your critiques?

5   A.     I critiqued the validation evidence in 2008, yes.

6   Q.     Right, and you do that without considering the

7   1991 validation report?

8   A.     No, I considered it.

9   Q.     And why didn't you consider that to be evidence of

10  validation with respect to the 2005 and 2008 exams?

11  A.     Well, the test outlined for the 2008 exam and all

12  of the other validation materials for the '05 and '08

13  exam, um, lists of KSAs and those lists of KSAs were

14  numbered and the numbering and the wording of those KSAs

15  that were, um, used to try to support the test outlines

16  were all a numbering and wording from the 2000 study.

17  So none of the numbering of the KSAs and the wording of

18  the KSAs from the '91 study seemed to be considered.

19  There's no indication in the documentation they were

20  considered.

21  Q.     Okay.  So there was no indication in the

22  documentation?

23  A.     Yes.

24  Q.     So you don't know whether or not they were

25  considered?

1    A.    Correct.

2    Q.    Okay.  And with respect to the 2000 job analysis,

3    that was designed for a different test the City of

4    Boston was giving itself, yes?

5    A.    Yes.

6    Q.    That had involved a test which had an assessment

7    center component?

8    A.    Yes.

9    Q.    So one of your other critiques with respect to the

10   2005 and 2008 exams is that they don't use the

11   components that are recommended by the authors of the

12   job analysis in 2000, right?

13   A.    Yes.

14   Q.    And another criticism is that they don't use the

15   weights that the authors of the 2000 job analysis have

16   suggested should be used?

17   A.    Yes.

18   Q.    But isn't it true that the tests in 2005 and 2008

19   were HRD tests?

20   A.    Yes.

21   Q.    They were different tests?

22   A.    Yes.

23   Q.    Okay.  Now, with respect to the '91 validation

24   report --

25         (Pause.)

```
1            MR. SIMON:  May I just have one minute, your
2    Honor?
3            THE COURT:  Of course.
4            (Pause.)
5    Q.    Okay.  Dr. Wiesen, it's not typical for a
6    municipality to conduct a validation report every time
7    it tests, right?
8    A.    (Pause.)  You mean when there's a delegated exam
9    process?
10   Q.    When there's a delegated exam, sure.  Let's start
11   there.
12   A.    (Pause.)  I think you can divide the delegated
13   exam processes into, um, large municipalities,
14   particularly Boston, and some very small departments
15   that choose to implement a board.  I think the very
16   small departments that were doing an oral board for five
17   people might not have a validation study for that oral
18   board, but I think the, um, a delegation to a -- say
19   like Boston I would imagine the HRD people now would
20   expect a validation study, and I would if I was there.
21   Q.    Okay.  2002, the Boston exam, for lieutenant --
22   A.    Yes.
23   Q.    -- involved, in Boston, a delegation agreement?
24   A.    Yes.
25   Q.    There was no separate job validation -- I'm sorry,
```

1    there was no separate validation report for that,

2    correct?

3    A.    I've seen it.

4    Q.    You've seen it?

5    A.    Yes.

6    Q.    Is it part of the 2000 job analysis?

7    A.    It's separate.

8    Q.    It's separate.

9    Okay.  Now, isn't it common however, especially for the

10   HRD test, for them to build upon past reports and job

11   analyses?

12   A.    Yes.

13   Q.    In other words they don't recreate the wheel every

14   time they do a test?

15   A.    Correct.

16   Q.    And that's because they're doing tests every year,

17   right?

18   A.    Well, every year or two, yes.

19   Q.    Okay.  (Pause.)  In 2005 the City came back to the

20   HRD test, if you will?

21   A.    Yes.

22   Q.    Correct?  In other words it had gone off, in 2002,

23   on its own and came back to the HRD test in 2005, right?

24   A.    Yes.

25   Q.    And in response HRD relied upon the 1991

1   validation report, did it not?

2   A.     In '05?  No.

3   Q.     What did it rely on in '05?

4   A.     The 2000 study.

5   Q.     The 2000 study that we just established was a

6   different test, right?

7   A.     Well, that might be, but, um, for the 2005, as

8   well as 2008, all of the lists of KSAs had the numbering

9   from the 2000 job analysis and the wording from the 2000

10  job analysis.  I did not see any documents that had the

11  numbering and wording of the task for the KSA statements

12  from the 1991 study.

13  Q.     Okay.  Thank you.  Let's turn to the another

14  criticism that you're making of the 2008 exam.

15  You say that there's a lack of documentation, correct?

16  A.     Um, there was -- I received some, I don't know,

17  well over a thousand, maybe 2000 pages of documentation.

18  So it's not that there's no documentation, it's not, um,

19  clear.

20  Q.     Okay.  And you testified to this already, but in

21  your opinion they don't comply with the Uniform

22  Guidelines?

23  A.     Right.

24  Q.     That the SIOP principles --

25  A.     Right.

1   Q.     -- talked about, the procedures or standards?

2   A.     Right.

3   Q.     Now, those are standards, correct?  Principles?

4   Guidelines?

5   A.     They are.

6   Q.     Those aren't the law?

7   A.     Correct.

8   Q.     And you don't understand there to be any

9   requirement or law with regard to documentation of these

10  kinds of studies related to tests?

11  A.     Other than the Uniform Guidelines, I'm not

12  familiar with any.

13  Q.     Okay.  Well, do you believe the Uniform Guidelines

14  have the force of law?

15         MR. LICHTEN:  Your Honor, that's a legal question.

16         THE COURT:  It is.  Sustained.

17  Q.     Well, let's talk about a larger issue, Doctor.

18  Do you know -- well, you're here as an expert on

19  promotional testing, yes?

20  A.     Yes.

21  Q.     And you're here supporting a claim under Title VII

22  --

23  A.     Yes.

24  Q.     -- of discrimination, yes?

25  A.     Yes.

1    Q.    Do you know what Title VII speaks to about testing

2    in this context?

3    A.    (Pause.)  Only generally.

4    Q.    Okay.  What generally do you know?

5          MR. LICHTEN:  Objection.

6          THE COURT:  Yeah, I don't think this is

7    particularly helpful.  Sustained.

8          MR. SIMON:  Thank you, your Honor.

9    Q.    Do you have an understanding as to whether or not

10   tests need to be job-related and consistent with

11   business necessity?

12   A.    In certain circumstances.

13   Q.    Okay.  And in what circumstances are those?

14   A.    Well, under the Uniform Guidelines it uses those

15   terms, um, I believe.

16         THE COURT:  Yes, the guidelines use those terms.

17   So I've heard evidence about job relationship, but what

18   is your understanding of the guidelines' reference to

19   "consistent with business necessity"?

20         THE WITNESS:  Well, I have an idea about that.  It

21   is only an idea.  I have no contact with the authors of

22   the guidelines.  I think that perhaps they had in mind

23   utility, the financial payoff for using the tests.  So a

24   test can be valid, um, but so minimally valid that it

25   has no practical import.

1          THE COURT:  Thank you.

2          THE WITNESS:  And even a test that is -- that has

3    more validity might have no practical import in some

4    settings.

5    Q.    How about the fact that Chapter 31, at least with

6    respect to the City of Boston, requires testing?

7    A.    It certainly does.

8    Q.    Wouldn't that be considered a business necessity

9    then for the City to test?

10         MR. LICHTEN:  Objection, your Honor, a legal

11   question.

12         THE COURT:  Well, I think it is a legal question

13   and I've asked one question, so I won't ask it again,

14   but I will tell counsel that I'm not clear of the legal

15   framework that "business necessity" imports and I'm not

16   clear I'm going to get it from him, Mr. Simon.

17         MR. SIMON:  I'm asking if he understands, your

18   Honor.

19         THE COURT:  But I don't see why it's relevant

20   whether he understands or not.  He doesn't seem to have

21   much of an understanding and I don't know that that's

22   necessary.

23         But go ahead.

24         MR. SIMON:  Okay.

25   Q.    Well, let's talk about job relatedness then.

1    A.    Yes.

2    Q.    Okay.  You certainly have an understanding as to

3    that?

4    A.    Yes.

5    Q.    And your understanding, I take it, comes out of

6    the Uniform Guidelines, right?

7    A.    Yes.

8    Q.    Now --

9    A.    In part.

10   Q.    Okay.  And what part is that?

11   A.    You mean what else was there or what part of the

12   guidelines?

13   Q.    Well, if I understand your answer, you said that

14   your understanding of job-relatedness comes out of the

15   Uniform Guidelines in part?

16   A.    Right.

17   Q.    So what part is that?

18   A.    Well, what I meant by "in part" is that, you know,

19   there are also various court cases that talk about

20   job-relatedness.

21   Q.    Okay.  And indeed --

22         THE COURT:  Mr. Simon, it's about time for a

23   shorter recess, since we started later, but do you have

24   much more for this witness?

25         MR. SIMON:  Well, a few more.

1          THE COURT:  What do you say, 5 minutes?

2          MR. SIMON:  No, I think 15 to 20, half an hour

3     maybe.

4          THE COURT:  Well, I think 15 or 20 justifies a

5     recess.  We'll take a recess for 15 minutes and start

6     again at 11:15.  We'll recess.

7          (Recess, 11:00 a.m.)

8          (Resumed, 11:15 a.m.)

9          THE COURT:  Go ahead, Mr. Simon.

10          MR. SIMON:  Thank you, your Honor.  And on

11     reflection I may have less than I said before.

12          THE COURT:  Well, I wasn't trying to crowd you, I

13     was just trying to take my break.

14          MR. SIMON:  Yes, I know, your Honor.

15     Q.    Okay.  Now, you, in your expert -- we were talking

16     about documentation issues that you were having issues

17     with, correct?  Do you remember that?

18     A.    Yes.

19     Q.    Now, in your expert report --

20          MR. SIMON:  And this is Exhibit 49 now.

21     Q.    I'll just ask you to take a look at Page 49 of --

22     is it Exhibit 49 and Page 49?  Maybe I'm confusing the

23     pages.  Your expert report to Dr. Campion is --

24          THE COURT:  The rebuttal to Dr. Campion is 49.

25          MR. SIMON:  Okay.  So I am not crazy.  It's

1    Exhibit 49, Page 49.

2    A.    I'm there.

3    Q.    Okay.  And all I'm asking you to do is to look at

4    the point about documentation that you make at the end

5    there.  You state -- well, not at the end there.

6    (Pause.)   Oh, I apologize, I may have the page wrong.

7    In any event, you say at some point in this report that,

8    um -- oh, I see what I've done.  I'm sorry.  I'm looking

9    at Page 19.  I apologize.

10          THE COURT:  Do you want us to go to 19?

11          MR. SIMON:  Well, please, please, go to Page 19.

12   A.    (Turns.)

13   Q.    And I'm looking now at the -- again this is your

14   critique with regard to poor documentation, correct,

15   that's where we are in the report?

16   A.    (Looks.)  Well, it's not the heading, is it?  Oh,

17   yeah.  Yes.

18   Q.    Okay.  All I'm asking is to look at the

19   second-to-last sentence which says "poor documentation

20   may not be a fatal flaw for validity," yes?

21   A.    Yes.

22   Q.    Do you see that?

23   A.    Yes.

24   Q.    And that's true?

25   A.    Yes.

1   Q.    Okay.   It was a long way to get there.

2   Now, yesterday you also talked about some other

3   alternatives which you called "off-the-shelf

4   alternatives" in testing, yes?

5   A.    Yes.

6   Q.    Do you know of any large jurisdiction that using

7   some off-the-shelf tests in this way?

8   A.    Yes.

9   Q.    And what jurisdiction is that?

10  A.    Um, so the -- the BPAD video exercises are being

11  used by some large jurisdictions.  The name of the

12  jurisdiction I have in mind I think it's -- well, the

13  name escapes me.

14  Q.    So you have one jurisdiction in mind?

15  A.    At least one, yes.

16  Q.    Okay.

17         THE COURT:  And which is that?

18         THE WITNESS:  I said the name escapes me.  I could

19  produce it from my notes.

20         THE COURT:  Okay.

21         THE WITNESS:  It might be more than one.  A large

22  consulting firm is, um, using the BPAD.

23  Q.    Okay.  Now, Doctor, as of the year 2008, do you

24  know of any large municipality that has implemented a

25  test that regularly and consistently reduces adverse

1  impact?

2  A.    (Pause.)  I don't track, um, the exams in any

3  given municipality regularly, so I don't think I can --

4  that I do.

5  Q.    So your answer is "no" then?

6  A.    Yes.

7  Q.    And today, in fact, you don't know of any either,

8  do you?

9  A.    (Pause.)  I think the City of Columbus, Ohio has

10  had a very good track record of adverse impact over the

11  years in their various promotional exams for different

12  ranks in the police department.

13  Q.    Okay.  They haven't limited it, though, have they?

14  A.    They have not.

15       MR. SIMON:  I have no further questions.

16       THE COURT:  Any redirect?

17       MR. CHURCHILL:  Yes, your Honor.

18       THE COURT:  Then proceed.

19

20  REDIRECT EXAMINATION BY MR. CHURCHILL:

21  Q.    And, Dr. Wiesen, you were asked some questions

22  about one-tailed and two-tailed tests, do you recall

23  that?

24  A.    Yes.

25  Q.    And if I could direct you to Exhibit 47, which is

1   your initial report in this matter?

2   A.    Yes.

3   Q.    And when you find it, if you can go to Page 7.

4   A.    (Turns.)  I'm there.

5   Q.    Okay.  And this is the report that you prepared in

6   September of 2014, is that right?

7   A.    Yes.

8   Q.    Your initial report in this matter?

9   A.    Yes.

10  Q.    And if I can direct your attention to the bottom,

11  Footnote 4.  Do you see that?

12  A.    Yes.

13  Q.    And you indicate there that -- and we can all read

14  it, but you indicate, back in this initial report, that

15  a one-tailed approach is the more logically defensible

16  one statistically speaking, is that right?

17  A.    Yes.

18  Q.    And has that -- has that been your consistent

19  opinion in this case?

20  A.    Yes.

21  Q.    Now, when --

22        THE COURT:  You answered that "Yes"?

23        THE WITNESS:  I did.  The answer was "Yes."

24        THE COURT:  Okay.  Thank you.

25  Q.    Okay.  When two promotions were made in November,

1    as we've heard testimony, that changed the two-tailed

2    analysis with respect to promotion rates, is that right?

3    A.    Yes.

4    Q.    And it went from a P value that was below .5 to a

5    P valve of .5 -- I'm sorry, .052, right?

6    A.    Correct.

7    Q.    So 2/10ths of 1 percent above the .05 threshold?

8    A.    Correct.

9    Q.    Okay.  And when you were looking at these

10   statistical analyses, you were doing that to make an

11   inference, is that right?

12   A.    Yes.

13   Q.    And what was the ultimate question in this case

14   that you were seeking to make an inference about?

15   A.    Whether the test, um, was causing adverse impact.

16   Q.    Okay.  And did you consider a wide range of data

17   to answer that question?

18   A.    Yes.

19   Q.    Beyond that one statistical measure of .052 in

20   November of 2008?

21   A.    Yes.

22   Q.    Okay.

23         MR. CHURCHILL:  I have no further questions, your

24   Honor.

25         THE COURT:  And, Mr. Lichten, anything?

1           MR. LICHTEN:  Yes.

2

3    REDIRECT EXAMINATION BY MR. LICHTEN:

4    Q.    Okay.  You were asked some questions about this

5    presentation you made.  Do you recall that?

6    A.    Yes.

7    Q.    Okay.  And I wanted to ask you about, um, if you

8    could turn to -- again there are no page numbers, but

9    doing it by hand, 1, 2, 3, 4, 5, the fifth page.  It's

10   two pages after or two slides after the one that you

11   were asked about by Mr. Simon.

12   A.    Yes.

13   Q.    Okay.  Do you see that slide?

14   A.    I do.

15          THE COURT:  What's the title so I could --

16   Q.    Can you tell us what the title is of the slide?

17   A.    If I'm on the right page, it's "Test versus Job

18   Performance Differences."

19          THE COURT:  Okay, I have it.

20   Q.    Okay.  Can you tell us what this slide is

21   addressing?

22   A.    Yes.

23   Q.    Okay.  Tell us, please.

24   A.    So the, um, presentation was about test fairness

25   and this is, um, a comparison that I think speaks to an

1    aspect of test fairness.  So typically there's a large

2    one standard deviation difference in mean test scores on

3    multiple choice cognitive ability tests, a D of about

4    .1.  There are -- and that's nation-wide.  And I'm

5    looking at a very, very wide range of, um, people tested

6    and tests.

7        Also looking nation-wide at a wide group of jobs,

8    measures of job performance, on average there's a

9    one-half standard deviation difference in job

10   performance, and when they have that bullet on the

11   bottom saying, "Is this fair?" I was asking whether, um,

12   a one-standard deviation difference in test performance

13   is a reasonable way -- is reasonable where the job

14   performance only has a half a standard deviation

15   difference.

16   Q.   So let me just say --

17       THE COURT:  No, let me try and we'll see if he

18   agrees.

19       MR. LICHTEN:  Yes, your Honor.

20       THE COURT:  So again Power Points tend to

21   simplify, but here in this presentation you are

22   lecturing based upon nation-wide data, is that right?

23       THE WITNESS:  Correct.

24       THE COURT:  And so as you've explained here you've

25   got a 1 standard deviation difference in test scores,

1    um, and you say, "Well, that's a big deviation looking

2    at the test scores," but on job performance tests, again

3    nation-wide, you have a .5 standard deviation, and the

4    suggestion is that at least in terms of potential

5    adverse impact, maybe job performance tests work better,

6    is what I get from it?

7         THE WITNESS:  That's a very nice conclusion.  It

8    wasn't the one I was getting at.  The one I was getting

9    at was, um, just the more basic picture of why should we

10   consider a test that has a 1 standard deviation

11   difference to be a fair test of job performance when it

12   only has a difference half that big.

13        THE COURT:  I see.  And going along with your

14   other slides here, you are trying to shake the

15   perhaps-too-facile belief that tests are fair?

16        THE WITNESS:  Correct.

17   Q.   Okay.  And that point is also made in your report,

18   is that correct?

19   A.   That's correct.

20   Q.   Okay.  Can you just turn to your -- I think it's

21   Exhibit 49, Page 45.

22   A.   (Turns.)

23   Q.   Section 48.

24   A.   Yes.

25   Q.   And is this the same point you were making in the

1  slide only in more detail?

2  A.    Yes.

3  Q.    And is there literature to back up that -- upon

4  which you rely for the determination that there's a

5  lower deviation in job performance than for test-taking?

6  A.    Most definitely.

7  Q.    Okay.  All right.

8  Now, I wanted to ask you for a minute about Exhibit 78,

9  which I can barely read it, I just had eye surgery, but

10  I think I know what it's about, it's the lieutenant's

11  exam.

12  A.    Yes.

13  Q.    Okay.  Now, you mentioned that you were, um -- I

14  think you were asked whether this was a new approach,

15  and let me ask you.  When you were talking about the

16  "inventiveness of the approach," were you referring to

17  the training before the test-taking?

18  A.    I was referring to training as a substitute for

19  part of the test.

20  Q.    I see.  So obviously in the City of Boston you're

21  not aware of them providing training for individuals

22  going to classes or going to lieutenants' classes if

23  you're a sergeant prior to your taking the test, is that

24  correct?

25  A.    Correct.

 1    Q.    Um --

 2          THE COURT:  Well, again let me interrupt.

 3          You're talking here about training in making those

 4    tactical decisions that one would expect have to be made

 5    on an emergency response to a fire?

 6          THE WITNESS:  Correct.

 7    Q.    So I can understand, were you referring to

 8    training that would assist someone in taking a

 9    promotional exam or, as the Court has asked, training

10    just generally on what to do in such situations, or a

11    combination of both?

12    A.    I was not talking about training in taking a civil

13    service exam or any exam, I was talking about training

14    in aspects of the job that are difficult to learn from

15    the textbook.

16    Q.    Okay.  So can you tell us how that would translate

17    to this case and how it -- and what might be done to

18    lower adverse impact in a case like this involving

19    promotions to lieutenant based upon this Exhibit 78, if

20    anything?

21    A.    Well, I can think of two ways.

22    Q.    Okay.

23    A.    First, as I mentioned in this article, I think

24    it's somewhat unrealistic to expect people to learn on

25    their own, um, perhaps by reading textbooks, how to do a

1    complex supervisory job.  So providing training in the

2    next job duties of the next higher rank would make sense

3    and I think that would probably help somebody with a job

4    simulation-type examination, although that wouldn't be

5    the primary goal.

6         The other way it might work is that we want the

7    test to do two things, we want to make sure the

8    candidates are competent to do the job, and then we want

9    to select the best candidates.  Well, the test is only,

10   you know, a few hours at most.  If you have a course, it

11   might cover weeks and months, it might have many hours,

12   it might have many exercises.  If someone passes that

13   course, you might have a much higher comfort level to

14   say that the candidate is competent to the job in

15   question.  And then, um, it might be also possible to

16   use grades from that longer course as part of the civil

17   service exam or just use it on a pass/fail basis.

18   Q.   Okay.  Let me ask you the following.  Assume for a

19   moment that -- and we'll have testimony later on on

20   this, that when you're a sergeant in the Boston Police

21   Department you are regularly asked to be the acting

22   lieutenant when the lieutenant is sick or injured or on

23   vacation or at training, so that many sergeants are

24   already --

25         MR. SIMON:  Objection, your Honor.

```
 1            THE COURT:  Well, that's --
 2            MR. SIMON:  It's leading.
 3            THE COURT:  Well, it is, it's leading,
 4    Mr. Lichten.
 5            MR. LICHTEN:  No, no, I'm giving him a
 6    hypothetical, I haven't gotten to the question yet, your
 7    Honor.  I'm just asking him to assume the following
 8    facts which I represent to you the next witness is going
 9    to present.
10            THE COURT:  Go ahead and ask your question.
11            MR. LICHTEN:  Okay.
12    Q.   Assume for a moment that many sergeants have
13    significant amounts of time acting as out-of-grade
14    lieutenants.  Do you understand what that phrase means?
15    A.   Yes, they're acting at a higher level.
16    Q.   Okay.  Is there a way of incorporating that
17    experience into the testing mechanism that would allow
18    one to have confidence that the person ultimately being
19    promoted would be able to perform that job?
20    A.   The answer is "perhaps."  So you could give credit
21    for acting in the higher rank.  I would feel more
22    comfortable doing that if I had some assurance that the
23    people who were acting at the higher level were, um,
24    performing at a competent level.
25    Q.   Could you do that by reviews by superiors?
```

1    A.     Yes.

2    Q.     Now, you were asked some questions about combining

3    elements into an examination procedure and whether you

4    can create the dilemma of having more testing, um, more

5    components to the test and thereby increasing adverse

6    impact.  Do you remember that question by Mr. Simon?

7    A.     I do.

8    Q.     Okay.  So let me ask you.  If you increase

9    components, let's say you do a job knowledge test and

10   then you do simulations and then you do oral boards and

11   then you do presentations and you combine many many

12   tests that experts have utilized, um, in different types

13   of police exams, what happens to the validity -- put

14   aside the adverse impact, what happens to the validity?

15   A.     Well, you greatly increase the validity because

16   you're greatly increasing the range of what you're

17   measuring.

18   Q.     Could you explain that to the Court, please.

19   A.     Surely.  So if the multiple choice job knowledge

20   test doesn't measure the ability to handle real-life

21   tactical incidents, um, dealing with, um, citizens

22   groups, business groups, um, making presentations before

23   various groups of the type that a lieutenant might be

24   called on to do, and you now include an exercise that

25   perhaps includes a verbal presentation, um, maybe to a

1    receptive group, maybe to a hostile group, or a tactical

2    situation, maybe one that's involving something delicate

3    for the police department, maybe a police officer has

4    done something inappropriate, um, and something has to

5    be done immediately, um, you can -- you can create short

6    scenarios that cover a wide range of things you cannot

7    cover on a multiple choice test and that would make

8    the --

9         THE COURT:  Well, let me ask you something, um,

10   and picking up on that, something that Mr. Simon's

11   questions suggested.

12        He asked you about this inference, that as you add

13   different components, you may increase the disparate

14   impact, and I recall your answer is that that might

15   happen.

16        THE WITNESS:  That is correct.

17        THE COURT:  Right.  And I can see that's at least

18   a possible inference because while we cannot know -- as

19   I'm learning what you're teaching, we cannot know why it

20   is that there's a one standard deviation between blacks

21   and whites on a multiple choice test, though we perceive

22   this difference.  As you add in these things that you're

23   talking about, you potentially are adding in an

24   advantage to those -- the likelihood is white officers,

25   who already occupy these sergeant positions and get the

1    chance to work above grade or get the chance to make

2    these presentations and the like.

3          So that's a reasonable inference in some

4    circumstances, isn't it?

5          THE WITNESS:  I think that the acting assignments

6    are not given out by cronyism, they're governed by the

7    union contract, so that black sergeants would get to

8    experience the acting lieutenants work equitably.

9          THE COURT:  Equally, and I see your point, because

10   that's governed by the contract.  Um -- all right.

11   Thank you.

12         MR. LICHTEN:  Well, let me just ask two follow-up

13   questions.

14   Q.   So the question I was asking was, if you increase

15   the components in a professionally-acceptable method

16   using professionally-accepted selection techniques, so

17   instead of having one or two selection techniques, you

18   had seven or eight that tested for greater areas of

19   knowledges, skills, and ability, do you have an opinion

20   to a reasonable degree of scientific certainty whether

21   that would increase or decrease the validity of the

22   examination?

23         MR. BOK:  Objection, your Honor.

24         THE COURT:  Grounds?

25         MR. BOK:  Lack of foundation.

1          THE COURT:  Overruled.  He may answer.

2     A.    Yes, I have an opinion and the opinion is that,

3     with the addition of those other exercises, the exam

4     would be much more valid.

5     Q.    So even if it were -- and I'm not suggesting it,

6     but even if our Boston Police Department were to have an

7     increase in adverse impact, they would have a more valid

8     examination?

9     A.    Oh, yes.

10          THE COURT:  And that follows from your testimony

11    that you are capturing a greater array of the skill set

12    that you have reasonably believed constitutes the job?

13          THE WITNESS:  Yes, exactly.

14          THE COURT:  Okay.

15    Q.    Okay.  Now let me explore the Court's question.

16    I understand that you testified that there could be

17    situations whereby you could have several components and

18    that could increase adverse impact over one component.

19    But let me ask you.

20          These other components that we've talked about

21    today, structured interviews, assessment centers, oral

22    boards, is there research in the field, which you rely

23    on, that describes the adverse impact, if any, these

24    types of tests have vis-vis the multiple choice

25    knowledge test counterparts?

1  A.    Yes.

2  Q.    And what do we know from the literature?

3  A.    What we know from the literature is that

4  structured interviews and work samples, um, and

5  assessment centers, have anywhere from a half to a third

6  or less adverse impact in terms of, um, the standardized

7  difference between group averages than the multiple

8  choice knowledge tests.

9  Q.    Okay.  And do the Uniform Guidelines provide any

10  guidance upon what one should do in this scenario that

11  they have when there are several possible selection

12  techniques some of which have less adverse impact and

13  some have more?

14  A.    Yes.

15  Q.    And what are they?

16  A.    That the, um -- the less -- that the selection

17  tools that have less adverse impact and substantially

18  equal validity are favored.

19        (Pause.)

20        MR. LICHTEN:  Just almost done, your Honor.

21  Q.    Moving on.

22  There were some questions about delegated tests, is that

23  correct?

24  A.    Yes.

25  Q.    Now, when there are delegated tests, um, are those

1    published in the paper when they're looking for an

2    expert to create the test?

3    A.    Um, I imagine there are purchasing rules that have

4    to be followed or RFPs.

5    Q.    Well, let me ask you.  Have you ever developed

6    tests, delegated tests in Massachusetts for communities?

7    A.    (Pause.)  You mean as an employee of the state or

8    as a consultant?

9    Q.    No, as a consultant.

10   A.    I think I did, yes.  I did for the fire service.

11   Q.    And what town or city was that?

12   A.    I think it was North Hampton.

13   Q.    Okay.  So under the civil service law, if a city

14   wants to have its hiring on an examination procedure

15   let's say to try to increase validity, are they free to

16   do so?

17   A.    They're able to do so.

18   Q.    And they can hire someone like you to do that?

19   A.    Yes.

20     (Pause.)

21        MR. LICHTEN:  May I just have a moment, your

22   Honor?

23        THE COURT:  Of course.

24        (Pause.)

25        MR. LICHTEN:  I have nothing further.  Thank you

 1    very much.

 2            THE COURT:  Any recross?

 3            MR. BOK:  Yes, your Honor, just a couple of quick

 4    questions on things that were asked about by Attorney

 5    Lichten.

 6            THE COURT:  Okay.  Go ahead.

 7            MR. BOK:  And they deal with numbers, your Honor,

 8    so I -- (Gets calculator.)

 9

10    RECROSS-EXAMINATION BY MR. BOK:

11    Q.    Dr. Wiesen, you may remember earlier on when we

12    discussed, in my cross-examination of you, I believe

13    yesterday, the fact that you have compiled I think

14    approximately 100 reasons why black people generally do

15    worse on certain kinds of tests.  Do you remember that?

16    A.    Correct.

17    Q.    All right.  And do you know that or do you -- are

18    you aware of it in the literature, including in your own

19    report, there is a phrase that there is some evidence

20    that supervisors rate employees of their own race or

21    national origin more favorably than they do for

22    employees of other groups.  Perhaps a 1985 study by

23    Craiger and Ford?

24    A.    Yes.

25    Q.    And you're aware of that study, right?

1   A.    Um, the particular authors don't ring a bell, but

2   I'm aware of that, that line of research.

3   Q.    Okay.  And then you accept the proposition that to

4   the extent that supervisors tend to be white, that this

5   will "negatively affect job performance evaluations of

6   African Americans," do you accept that?

7   A.    It can, yes.

8   Q.    So then when you were just asked by Attorney

9   Lichten about whether or not you should use evaluations

10  of sergeants when they act out of grade, couldn't that

11  have a disproportionally adverse impact on the black

12  sergeants who act out of grade who -- who have white

13  supervisors, rather than when the white sergeants act

14  out of grade and who have disproportionally white

15  supervisors?

16  A.    It's possible, yes.

17  Q.    So that in other words how would --

18  A.    It's not inevitable, but it's possible.  And so

19  the performance evaluation would have to be a structured

20  process that had checks and balances.

21  Q.    Okay.  So you couldn't just use evaluations in the

22  normal course of it that are given by supervisors in the

23  Boston Police Department?

24  A.    Just like any test, in this case it's a measure of

25  the use of such tests, you can have a well-designed test

1   or a poorly-designed test.

2   Q.    But you haven't studied whether or not the normal

3   evaluations of supervisors in the Boston Police

4   Department fits your definition of a "well-designed

5   test"?

6   A.    That's correct.

7   Q.    And do you have any reason not to believe that

8   those evaluations are that way?

9        MR. LICHTEN:  Your Honor, there's no evidence that

10  there are such evaluations.

11       THE COURT:  Yeah, I guess I --

12       MR. BOK:  Well, Attorney Lichten raised this.

13       THE COURT:  Oh, he did raise it, but the witness

14  says he doesn't know.

15       MR. BOK:  Okay.  Fine.

16  Q.    If we could go then to Exhibit 77, which is your

17  statistical report, we'll go back to the same page that

18  Attorney Lichten had, which is Page 5, I think it's

19  called "Test versus Job Performance Differences."

20  A.    (Turns.)  I'm there.

21  Q.    Okay.  And it starts and it says "The big one

22  standard deviation difference in black, white, mean test

23  scores is" --

24  Well, did I read that right, um, taking out the

25  abbreviations?

A.     Yes.

Q.     Okay.  Did I hear you earlier testify that
normally it was only a statistical significance of a
standard deviation of a 2 or greater?

A.     No.  This is confusing because the standard
deviation refers to something different.  In the other
case we talk about "standard deviation units," we're
talking about the difference between means in terms of
the, um, something that employs standard deviation to
calculate the size, um, but -- although the words are
similar, it's a completely different concept.

       (Pause.)

       MR. BOK:  Thank you, your Honor.  I think we're
completed with this witness.

       THE COURT:  You're speaking for Mr. Simon?

       MR. SIMON:  Oh, yes, your Honor.

       THE COURT:  Nothing further, Mr. Lichten?

       MR. LICHTEN:  Nothing further, your Honor.

       THE COURT:  You may step down.  Thank you.  Call
your next witness.

       (Witness steps down.)

       MR. LICHTEN:  Your Honor, just so you understand,
what we've agreed to do because of -- to accommodate
their witnesses, their experts, is I'm going to call one
more witness today, a Bruce Smith, and then they're

1    going to be putting on their statistics experts who

2    can't be here in January.  So I just wanted to let you

3    know that.

4         THE COURT:  And I appreciate the agreement and I

5    think I'm capable of following it.

6         All right.  So let's call the next witness.

7         MR. LICHTEN:  The plaintiffs call Bruce Smith.

8         THE COURT:  He may be called.

9         (BRUCE SMITH, sworn.)

10

11        * * * * * * * * * *

12        BRUCE SMITH

13        * * * * * * * * * *

14

15   DIRECT EXAMINATION BY MR. LICHTEN:

16   Q.    Can you state your full name for the record,

17   please.

18   A.    Bruce Edward Smith.

19   Q.    Okay.  And are you one of the plaintiffs in this

20   case?

21   A.    I am.

22   Q.    Okay.  And how old are you, Mr. Smith?

23   A.    50 years old.

24   Q.    And are you currently employed?

25   A.    I am.

1    Q.    And where are you employed?

2    A.    With the Boston -- with the City of Boston, the

3    Boston Police Department.

4    Q.    And how many years have you been employed for the

5    Boston Police Department?

6    A.    Um, I just went over 25 last month.

7    Q.    What is the civil service rank that you hold?

8    A.    Um, sergeant.

9    Q.    And do you hold another rank within the Boston

10   Police Department?

11   A.    I do.

12   Q.    And what is that?

13   A.    Sergeant detective.

14   Q.    Okay.  Now, to become a detective, did you have to

15   go through an examination procedure or anything like

16   that or were you simply chosen?

17   A.    I was chosen.

18   Q.    Okay.  And where are you a sergeant detective at?

19   A.    Um, Jamaica Plain police station.

20         THE COURT:  Just so I'm clear, so that's a command

21   decision, that's an assignment like a duty assignment?

22         THE WITNESS:  They consider it a rating, your

23   Honor.

24         THE COURT:  They count it as a rating?

25         THE WITNESS:  A rating.  So it's a little higher

```
 1    than a sergeant.
 2           THE COURT:  I see.  I see.  But it's a command
 3    decision within the department?
 4           THE WITNESS:  Correct, yes.
 5           THE COURT:  Okay.
 6    Q.    And who appointed you to be a detective?
 7    A.    Um, the Commissioner Ed Davis.
 8    Q.    Okay.
 9           Now, just so we can get our bearings here.  In
10    Jamaica Plain where you're a sergeant detective, is
11    there someone who ranks higher than you on the shift you
12    work for the detectives when you work or are you in
13    charge of that shift for the detectives?
14    A.    I am the highest-ranking detective at the station
15    right now acting in the capacity of a lieutenant
16    detective.
17    Q.    Okay.  So you're --
18           THE COURT:  And among sergeant detectives rank is
19    determined by seniority?
20           THE WITNESS:  No.
21           THE COURT:  How is it determined?
22           THE WITNESS:  As far as getting there?
23           THE COURT:  No.  No.  No.  Now you're there.  You
24    answered the question.  You're the top-ranking sergeant
25    detective.
```

```
 1           THE WITNESS:  Correct.
 2           THE COURT:  So if there's more than one sergeant
 3      detective, who's the top ranking?
 4           THE WITNESS:  It's kind of decided by -- I guess
 5      the captain decides it.
 6           THE COURT:  Okay.  Fine.  I understand.  With us
 7      who gets to be Chief Judge is decided absolutely by the
 8      date of your commission.
 9           THE WITNESS:  I tried to push it off, your Honor,
10      but they wouldn't let me.
11           (Laughter.)
12           THE COURT:  Okay.  So again that's a command
13      decision and as it happens you're the ranking one?
14           THE WITNESS:  That's correct.
15           THE COURT:  Okay.
16      Q.   And how long have you been at Jamaica Plain?
17      A.   Four years.
18      Q.   Okay.  And who's your captain?
19      A.   Captain Al Andres.
20      Q.   Okay.  Now, let me -- I want to go over your
21      career very briefly.
22      So how far did you get in school?
23      A.   I have a bachelor's degree and I'm working on a
24      master's.
25      Q.   Okay.  And where is the bachelor's degree from?
```

1    A.    Curry College.

2    Q.    Okay.  And where did you go to high school?

3    A.    I went to Boston Technical High School.

4    Q.    And what area -- did you grow up in Boston?

5    A.    I did.

6    Q.    And what area of Boston did you grow up in?

7    A.    In my younger years I grew up in Roxbury and then

8    we moved to Dorchester.

9    Q.    Okay.  So you're very familiar with Boston?

10   A.    That's correct, yes.

11   Q.    Okay.  Now, after you graduated high school, what

12   did you do?

13   A.    I joined the United States Air Force.

14   Q.    And how many years did you spend in the United

15   States Air Force?

16   A.    Four years.

17   Q.    And were you honorably discharged?

18   A.    Yes.

19   Q.    And what was the rank that you achieved in the Air

20   Force?

21   A.    Um, E-5.

22   Q.    And can you tell us lay people what "E-5" means?

23   A.    That's one grade above a sergeant.

24   Non-commissioned.

25   Q.    Okay.  So what did you do -- did you have

1    supervisory responsibilities as an E-5 sergeant in the

2    Air Force?

3    A.    I did.

4    Q.    And did you perform any law enforcement tasks

5    while you were in the U.S. Air Force?

6    A.    I did.

7    Q.    And what kind of law enforcement tasks?

8    A.    It was a -- I was considered a law enforcement --

9    I was a military police officer.

10   Q.    Okay.  So after high school, what did you do?

11   A.    After high school I joined the military.

12   Q.    Oh, I'm sorry.  After the military, after you were

13   honorably discharged, what did you do next?

14   A.    After I came out I joined Putnam Investment

15   Services.

16   Q.    Okay.  What did you do after that?

17   A.    I joined Merrill Lynch.

18   Q.    Okay.  And what did you do after that?

19   A.    I joined the Boston Police Department.

20   Q.    Okay.  In what year did you join the Boston Police

21   Department?

22   A.    November of 1989.

23   Q.    Okay.  Can you quickly tell me what your duties --

24   where you were stationed and what your duties were

25   during the time you were a patrol officer for the City

1   of Boston?

2   A.    I worked in Mattapan, the Dorchester Area, B-3.  I

3   worked in Roxbury, which was B-2.  And I worked in the

4   South End, which is District 4.

5   Q.    Okay.  So you worked in areas that we would call

6   the "inner city of Boston"?

7   A.    That's correct, yes.

8   Q.    And B-2 is where again?

9   A.    Roxbury.

10  Q.    Okay.  And what's the name for the Dorchester

11  location you were working?

12  A.    That's B-3, Mattapan.

13  Q.    Okay.  Now, I'm moving ahead.

14  Have you received any awards of any type?

15  A.    I have, yes.

16  Q.    Okay.  And is there something called a Shattuck

17  Award?

18  A.    Yes.

19  Q.    Can you tell us what the Shattuck Award is,

20  please?

21  A.    The Shattuck Award is an award given to city

22  employees for outstanding work and contributions.

23  Q.    And how many city employees get that?

24  A.    Um, there's 10 per year.

25  Q.    Okay.  And were you nominated for the Shattuck

1    Award?

2    A.    I was.

3    Q.    And did you get the Shattuck Award?

4    A.    I did.

5    Q.    And what was it for?

6    A.    It was for, um -- I devised and implemented

7    strategies to help curb crime and get the community to

8    work with the police department in B-2 Roxbury where I

9    worked.

10   Q.    Okay.  Were you attending meetings to do that?

11   A.    I was, yes.

12   Q.    Okay.  Were you, um -- did you receive the

13   Shattuck Award just for that or was there anything else

14   that you received the award for?

15   A.    That was the basis of it.

16   Q.    Okay.  By the way, when you took the promotional

17   exam did you get any credit for the work you had done

18   forming that project?

19   A.    That project specifically?

20   Q.    Yes.

21   A.    No.

22   Q.    Okay.  Putting aside that particular project, have

23   you been involved in other community service for the

24   City of Boston?

25   A.    I have.

1  Q.    Can you tell us what that is, please?  Just tell

2  us briefly what that is.

3  A.    Well, community service things?

4  Q.    Yes.

5  A.    Oh.  I give -- I provide meals for the homeless,

6  the elderly, at Thanksgiving.  I belong to -- I

7  implement or was involved with the "Police and Youth

8  Dialogue," we talk to the younger people in the city,

9  got their views on what they feel about police officers,

10  gave them our views.

11  Q.    Okay.  Quickly, when you were a patrol officer,

12  can you just tell us what your duties -- it may be

13  self-evident, but so the record is clear, what were your

14  duties as a patrol officer?

15  A.    Respond to radio calls, um, assist citizens in

16  emergencies, um, direct traffic, um, citations, things

17  of that nature.

18  Q.    Okay.  At some point in time did you first apply

19  to become a sergeant in the Boston Police Department?

20  A.    I did.

21  Q.    And what year was that?

22  A.    1999.

23  Q.    And what kind of test was that, was that a written

24  test or was that an assessment -- what kind of test was

25  it that you took?

1    A.    It was a written test.

2    Q.    And how did you do on that?

3    A.    I did well.

4    Q.    Okay.  Were you promoted?

5    A.    No.

6    Q.    Okay.  Did you take -- was there a test after that

7    that you took?

8    A.    Yes.

9    Q.    And what test was that?

10   A.    In 2002.

11   Q.    Okay.  Now, with the 2002 test, was that different

12   from the 1999 test?

13   A.    It was.

14   Q.    Okay.  Can you describe for the Court the

15   difference between the tests?

16   A.    The difference was there was an oral component to

17   it where we had to, um -- we were given a scenario and

18   we had to answer the scenario, we were video-recorded,

19   and we were judged by that.

20   Q.    Okay.  And were you judged by people in the Boston

21   Police Department or people from the outside?

22   A.    People from the outside.

23   Q.    Okay.  And how did you score on the oral component

24   of that exam?

25   A.    I scored well.  Very well.

1    Q.    Can you tell us what that means, to score well?

2    A.    I scored actually 36 out of 40, which was high,

3    there were a lot of people.

4    Q.    And you were promoted off that list?

5    A.    That's correct, yes.

6    Q.    Okay.  When you were promoted to sergeant, where

7    were you assigned?

8    A.    Um, C-6, South Boston.

9    Q.    And were you assigned anywhere else other than

10   C-6?

11   A.    Yes, um, after I went back to B-2 and then I went

12   to B-13.  Oh, I'm sorry, B-2 was Roxbury and then I went

13   to Jamaica Plain.

14   Q.    Okay.  And that's where you are now?

15   A.    That's correct, yes.

16   Q.    Okay.  Now, while you've been a -- while you were

17   a sergeant -- how many years were you a sergeant before

18   you were a sergeant detective?

19   A.    About three years.

20   Q.    Okay.  And how many years have you been a sergeant

21   detective?

22   A.    Since, um -- about 4 years.

23   Q.    Okay.  Now, is there opportunity, when you're a

24   sergeant on the Boston Police Department, to be placed

25   in the position of acting lieutenant?

```
1    A.     Yes.

2    Q.     Can you explain to the Court how that works,

3    please.

4    A.     There's usually two sergeants working, and a

5    lieutenant, on a shift.

6    Q.     Okay.

7    A.     If the lieutenant is out, one of the sergeants

8    steps up and he becomes the duty supervisor, which is a

9    lieutenant, and the other one remains as the --

10   Q.     And how is that determined?

11   A.     You usually decide amongst the two sergeants.

12   Q.     So you collegiately make the decision?

13   A.     That's correct, yes.

14   Q.     Okay.  And how many -- have you yourself been

15   acting lieutenant?

16   A.     I have, yes.

17   Q.     And on how much shifts would you say you've been

18   acting lieutenant in your career, putting aside

19   lieutenant detective, we'll get to that in a second?

20   A.     Um, hundreds of times.

21   Q.     Okay.  And when you're acting lieutenant, are you

22   in charge of that shift?

23   A.     I am, yes.  You are.

24   Q.     Are you doing anything different from what the

25   lieutenant would do if he was there -- if he or she was
```

1    there?

2    A.     No, we're doing the same thing that he or she

3    would do.

4    Q.     Okay.  Now, since you've been sergeant detective,

5    have you ever been acting lieutenant detective?

6    A.     I have and I am, yes.

7    Q.     Okay.  And how often has that occurred, how many

8    times would you say you've been acting lieutenant

9    detective in Jamaica Plain?

10   A.     I've been acting lieutenant detective for

11   approximately two years.

12   Q.     So you've been an acting lieutenant for two years?

13   A.     For approximately two years, yes.

14   Q.     Okay.  Now, for those of us --

15          THE COURT:  This probably goes without saying, but

16   when you -- since being a sergeant detective is a step

17   or a grade, you get a little more money for that, is

18   that right?

19          THE WITNESS:  That's correct.

20          THE COURT:  Okay.  You're not being paid as a

21   lieutenant or are you?

22          THE WITNESS:  I'm not, but I get -- um, there are

23   extra hours that are thrown in to kind of make up for

24   that.

25          THE COURT:  Okay.  So you have available to you,

1  or the obligation, of some extra hours and they pay you

2  for those extra hours at your rate as sergeant

3  detective?

4       THE WITNESS:  That's correct.

5       THE COURT:  Okay.

6  Q.   Now, for those of us who only watch TV but don't,

7  um, see what goes on, can you describe for us what the

8  essential duties are of the sergeant position when

9  you're not a detective sergeant but when you're a

10 sergeant, when you perform the job of sergeant, what did

11 you do on a day-to-day basis, take us through that?

12 A.   I go to roll call.  You're in charge of the

13 patrolmen on the street.  If an emergency arises that

14 they need supervision, then you go out and you're in

15 charge.  A lot of times you check up on them.  Um, you

16 go to the different scenes.  If they find a body, you go

17 to the scene, you decide what needs to be done, who

18 needs to be notified.  You're the supervisor on the

19 street.  You're the supervisor to the officers on the

20 street.

21 Q.   Okay.  So as a sergeant it sounds like your

22 primary role is being on the street supervising the

23 officers working in that district under you?

24 A.   That's correct.

25 Q.   Okay.  Is that the same or different than what a

1    lieutenant does?

2    A.    It's different.

3    Q.    Okay.  Can you describe that to the Court?

4    A.    The lieutenant is in charge of the shift, the

5    area.  Um, each district has a certain area, like I

6    said, Dorchester, Mattapan, Roxbury, and you as

7    lieutenant are in charge of that area, you're in charge

8    of the supervisors who are the sergeants --

9    Q.    Let me just stop you.  Are you sitting in an

10   office in the district or are you out on the street in a

11   lieutenant's car?

12   A.    No, I was sitting in the office.

13   Q.    I see.

14   A.    You're in charge of them.  You're in charge of the

15   station, anything that comes in or out of the station.

16   You're in charge of the prisoners.  Um, should a

17   prisoner come in, you actually have to make sure that

18   there's probable cause for him to be there or they

19   should let him go.  If there's a complaint that comes

20   in, you have to handle it, field it.  If there's a drug

21   arrest, you have to go through the drugs, make sure the

22   drugs that come in are actually drugs.  Log them into

23   the safe.  You're in charge of that.

24   Q.    Okay.  And do you have resources available to you

25   at the station to use to help you perform these tasks?

1    A.    You do, yes.

2    Q.    Okay.  So, for example, if you wanted to check --

3    if you're the acting lieutenant and you wanted to check

4    whether there was probable cause under a particular

5    statute to hold a guy that has been brought in by a

6    police officer, what would you do?

7    A.    There's a -- you can use a computer and look at

8    Mass. General laws.  Um, most sergeants who want to be

9    lieutenants, they'll have their own book most of the

10   time, so there's easy reference.

11   Q.    And will you frequently consult the computer to

12   check these things?

13   A.    Yes.

14   Q.    Okay.  So what about going to -- when you're a

15   lieutenant, is there any obligation to deal with the

16   community outside of the station?

17   A.    Yeah, you're supposed to be dealing with the

18   community outside the station.

19   Q.    Have you yourself done that?

20   A.    I have, yes.

21   Q.    What does that involve?

22   A.    Um, they have this thing called "Call 19s" where

23   you go out and you meet and you walk and you talk to the

24   citizens.  And there are community meetings.  Things of

25   that nature.

1   Q.     And you've done that as acting lieutenant?

2   A.     Yes.

3   Q.     And how often do you do those things?

4   A.     How often do I do them?

5   Q.     Yes.

6   A.     As a sergeant detective?

7   Q.     No, I'm sorry, when you were acting lieutenant or

8   sergeant.

9   A.     Um, I did it often, actually.

10  Q.     Okay.  (Pause.)  Now, Let me ask you a question.

11  Has there been times when your race has been an asset to

12  you at the Boston Police Department?

13  A.     Yes.

14         MS. HODGE:  Objection.

15         THE COURT:  That seems somewhat divorced from the

16  issues in this case.

17         Why is that relevant?

18         MR. LICHTEN:  I believe he was going to talk about

19  situations where he was called to scenes because of his

20  race because it was thought that the participants in the

21  problem would, um --

22         THE COURT:  I recognize that.

23         MR. LICHTEN:  Right.

24         THE COURT:  And so, um --

25         MR. LICHTEN:  I can move on, your Honor.

1          THE COURT:  Yeah.  You see I recognize -- well,

2    you can move on, so I'll say no more.  Go ahead.

3    Q.    Okay, I'm moving on.

4    At some point in time did you take a promotional exam

5    for the position of lieutenant?

6    A.    I did.

7    Q.    And when was the first time you took that exam?

8    A.    2005.

9    Q.    Okay.  And how did you do on the exam?

10   A.    I did well.

11   Q.    What did you get?

12   A.    A 78.

13   Q.    Okay.  So you passed the exam and you got a 78?

14   A.    Correct.

15   Q.    Were you reached?

16   A.    No.

17   Q.    And then you took the --

18   A.    I'm sorry.  That was 2005.  I didn't take the

19   2005.

20   Q.    Okay.

21   A.    Sorry.

22   Q.    Did you take the 2008 exam?

23   A.    The 2008 exam, yes.

24   Q.    Okay.  And that was the 78?

25   A.    That's correct.

1  Q.    And you haven't been reached?

2  A.    Correct.

3  Q.    Okay.  Now, you studied for the exam?

4  A.    I did.

5  Q.    Tell me some of the things you did to study for

6  the exam?

7  A.    Um, I took seminars with Pat Rogers, I took them

8  with Sheff, and I took one with Tom Nolan, and I studied

9  on my own.

10 Q.    And Tom Nolan is a retired police officer?

11 A.    A PEC, correct.

12 Q.    Okay.  So you studied hard for the exam?

13 A.    That's correct, yes.

14 Q.    And you took the exam and you saw the questions on

15 the exam, is that correct?

16 A.    I did, yes.

17 Q.    And at the time you took the exam you had been

18 working as a sergeant and you had been doing work as an

19 acting lieutenant, is that correct?

20 A.    That's correct, yes.

21 Q.    How relevant were the questions to the work that

22 you did as an acting lieutenant?

23        MS. HODGE:  Objection.

24        THE COURT:  Isn't he capable of answering that?

25        MS. HODGE:  I don't think that he is.  He's

1    certainly not an expert.

2         THE COURT:  No one's saying that he's an expert.

3    He's doing his job.  It's overruled.  It goes to the

4    weight.  He can tell us how closely they meshed with his

5    job.

6    A.    It wasn't relevant at all.

7         THE COURT:  You mean generally, in other words

8    most of the exam wasn't relevant or some of it wasn't

9    relevant?

10        THE WITNESS:  It wasn't relevant to being a

11   lieutenant, your Honor, no.

12        THE COURT:  Why is that?

13        THE WITNESS:  It had nothing to do with -- it had

14   no questions as far as it would ask me what I would do

15   as a lieutenant as opposed to a sergeant.

16        THE COURT:  Well, let's see if I've got this

17   right.

18        When you take the sergeant's exam, which you took

19   and you became a sergeant, as I've looked at the sample

20   exam I've got here, it says "Answer these questions,"

21   and then they've got a bunch more questions for

22   lieutenants.

23        THE WITNESS:  Correct.

24        THE COURT:  And when you took the 2008 exam,

25   that's how it was set up?

1          THE WITNESS:  That's correct.

2          THE COURT:  So you're going for lieutenant so you

3     had to answer them all?

4          THE WITNESS:  That's correct.

5          THE COURT:  Okay.  So on the ones for lieutenant

6     it's your position that none of them had much to do with

7     what by then you actually knew a lieutenant did because

8     you'd been in command of a district for a period of

9     time?

10         THE WITNESS:  That's correct, there were just 20

11    more questions, they weren't anything that elevated or

12    were different from it.

13         THE COURT:  Like 20 more sergeant questions?

14         THE WITNESS:  That's correct.

15         THE COURT:  Thank you.

16         MR. LICHTEN:  May I continue, your Honor?

17         THE COURT:  Well, please.

18         MR. LICHTEN:  Okay.

19    Q.    Did you take the 2014 exam?

20    A.    I did.

21    Q.    And, um, can you tell us what the components were

22    of the 2014 exam?

23    A.    Um, there was a written --

24         MS. HODGE:  Objection.

25         THE COURT:  Overruled.

A.     There was a written part, there was an in-basket,

there was an oral board, and there was a training and

education part.

Q.     Okay.  And did you study for that?

A.     I did.

Q.     Okay.  And as I understand, you received your mark

for the written part of the test, is that right?

A.     That's correct.

Q.     But you haven't yet received your score for the

assessment center part of the test, is that right?

A.     That's correct.

Q.     Okay.  What was your written score?

       MS. HODGE:  Objection.

       THE COURT:  Overruled.

A.     I believe it was 49.

Q.     And was that good or not good?

A.     Not good.

Q.     Okay.  Now --

       THE COURT:  What was a passing score?

       MR. LICHTEN:  Well, that was my next question,

your Honor, if I may?

       THE COURT:  You may ask the question.

       MS. HODGE:  Objection.

       THE COURT:  No, overruled.

Q.     Was there a pass/fail cutoff score for the 2014

1    written exam?

2    A.    Not for lieutenants and captains, no.

3    Q.    So you're still in the mix regardless of what your

4    score -- your written score was?

5    A.    That's correct.

6    Q.    Okay.  And that was in the exam announcement?

7    A.    That's correct.

8    Q.    And this is a test that was created by EB Jacobs?

9    A.    That's correct.

10          THE COURT:  Well, let me ask this.

11          So you got a 49 out of a possible, what?

12          THE WITNESS:  I don't -- they weight it

13   differently so --

14          THE COURT:  So you're not able to say?

15          THE WITNESS:  That's correct.

16          THE COURT:  So, for instance, when you were giving

17   me it, you got 36 out of 40?

18          THE WITNESS:  Correct.

19          THE COURT:  But now you just know you're 49.  But

20   you gave me an evaluative answer, you didn't think that

21   was very good, which leads me to believe you had some

22   sense about how other people did?

23          THE WITNESS:  I would think it would be like a 49

24   out of a 100.

25          THE COURT:  At least that's what you think?

1           THE WITNESS:  Right.

2           THE COURT:  All right.  And I appreciate you're

3      being cautious.

4           Go ahead, Mr. Lichten.

5           MR. LICHTEN:  Okay.

6      Q.    Would you describe to the Court what some of the

7      scenarios were that you experienced in the non-written

8      part of this 2014 test?

9      A.    I received a -- there was an in-basket and the

10     in-basket dealt with an employee resolution.

11     Q.    Okay, before you get to -- can you give us the --

12     just give us the feeling, are you walking into a room

13     and there's a basket?  Just tell us so we understand it.

14     A.    You go into a room, you sit down, um, they put you

15     at a desk, and they --

16     Q.    And is there a video camera or are there people

17     there, or raters there?  What's going on?

18     A.    No, this is an in-basket section.  This is another

19     written part, an essay actually.

20     Q.    Okay.  Go ahead.

21     A.    So they give you a piece of paper and they give

22     you a scenario.  One scenario was that you had an

23     employee that was being -- I mean trying to come on to a

24     female that he came in -- you know, it was a domestic

25     violence situation.

Q.    Got you.

A.    And you had to kind of figure out what you would

do with that employee.

      And another part of it was you had a bar that had

just been purchased by someone else.  The community was

having problems with the bar.  The stupid kids from the

area, they were college kids, after midnight they were

coming around, they were breaking windows, they were

hanging out, doing drugs.  A lot of noise.  They wanted

you to figure out how to assess it and how you would

handle the situation.

Q.    And you would write down in an essay as to what

you would do?

A.    That's correct.

Q.    Okay.  And were there any other parts of this

in-basket?

A.    That was all of the in-basket.

Q.    Okay.  Um, and -- okay, what was the other part of

it?

A.    And there was an oral part.

Q.    Okay, tell us about the oral part.

A.    Um, you walked it -- actually it would begin as

you would walk in.  There were three people sitting at a

table in front of you.  They gave you a piece of paper

and they gave you two scenarios.  They gave one scenario

1    first and --

2    Q.    And just, sorry, remember we're not there.  These

3    three people, do we know who they are?

4    A.    No, they were from an outside agency.

5    Q.    They were from the outside?

6    A.    Correct.

7    Q.    So they don't know Bruce Smith at all?

8    A.    Correct.

9    Q.    So they don't know anything about you?

10   A.    Correct.

11   Q.    Okay.  Tell us.

12         (Record sealed at this point.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Record unsealed at this point.)

2   Q.    Okay.  Any other scenario or any other part of the

3   nonwritten exercises that you had to do?

4   A.    Then they gave you --

5        MS. HODGE:  Your Honor, if I might?

6        THE COURT:  Beg your pardon?

7        MS. HODGE:  If I might be heard, your Honor?

8        THE COURT:  Yes.

9        MS. HODGE:  I'm going to move to strike all of the

10  testimony in this whole area because the exam is still

11  ongoing.  He is just describing things which -- frankly

12  he signed a confidentiality agreement that he would not

13  disclose it and he is now disclosing it.

14       THE COURT:  Well, you -- this is the first time

15  you've raised it.  We are in the midst of a trial and

16  it's helpful to understand.

17       So what I will do is seal this part of the record

18  and, um -- rather than strike it, I'll seal it, because

19  I need to know it.  And, Mr. Lichten, you inquire at an

20  appropriate level of generality and if he doesn't, you

21  object, Ms. Hodge.  And my idea of an appropriate level

22  of generality is, um, we don't need to know what the

23  problems are, but when you got there there were three

24  outsiders in a room, they give you a piece of paper,

25  just that type of thing.

1        MR. LICHTEN:  Okay.

2        MS. HODGE:  Your Honor, If I could?  It was my

3   understanding that we made an objection with regard to

4   the 2014 exam.

5        THE COURT:  Oh, you did, but I thought it was as

6   to relevance, and when you asked to be heard, I heard

7   you.

8        MS. HODGE:  Okay, but do you want me to object

9   each and every time?

10       THE COURT:  Absolutely, if you think he's

11  trenching on ongoing matters.  Absolutely.  Or if

12  there's some other ground of objection.  I think you're

13  right that I've passed the relevance point, I think this

14  is relevant, but I have a duty to preserve the

15  confidentiality and he's just responding to the

16  questions put to him.

17       Go ahead.

18  Q.    Okay.  So following what I think the Court has

19  instructed me, you said there was a third part, but

20  you've mentioned two parts to the exam.

21  Without telling us the scenario, the actual scenario,

22  tell us what the third part was?

23  A.    You had -- on the oral component you had a

24  subordinate issue that you had to handle.

25  Q.    I see.

1          THE COURT:  Well, I've got you describing the

2     in-basket and oral interview.  You're just giving us a

3     second situation in that oral interview?

4          THE WITNESS:  That's correct.

5          THE COURT:  All right.  We'll stop it there.  They

6     give you a couple of situations?

7          THE WITNESS:  Correct.

8          THE COURT:  All right.

9     Q.    And just to follow up, how many situations do they

10    give you in that oral interview?

11    A.    Two different situations.

12    Q.    Okay.  Now -- again without going into any

13    specifics, did you find these exercises relevant to the

14    job that you would do and have done as an acting

15    lieutenant?

16    A.    Yes.

17      (Pause.)

18          MR. LICHTEN:  May I have a moment, your Honor?

19          THE COURT:  Yes.

20          (Pause.)

21          MR. LICHTEN:  Thank you very much, Sergeant

22    Detective Smith, I appreciate it.

23          THE COURT:  Thank you.

24          Ms. Hodge, any questions?

25          MS. HODGE:  If I could just have a moment, your

1    Honor?

2         THE COURT:   Of course.

3

4    CROSS-EXAMINATION BY MS. HODGE:

5    Q.    Good afternoon, Sergeant Smith.  My name is Kay

6    Hodge and I represent the City and I want to just ask

7    you a few questions about some of your testimony.

8    And that is that -- so you have been a sergeant -- or

9    you have been with the Boston police since 1989, is that

10   correct?

11   A.    That's correct.

12   Q.    Okay.  And then you were promoted, as I understand

13   it, in 2005?

14   A.    That's correct.

15   Q.    Now, you've mentioned during your direct

16   examination that there were other things that you did

17   including that you worked on a -- that you were awarded

18   a Shattuck award -- congratulations --

19   A.    Thank you.

20   Q.    -- for your outstanding work with regard to

21   something about fighting crime in Roxbury, is that

22   correct?

23   A.    To the community.

24   Q.    Okay.  And that was all done in work time, is that

25   correct?

1  A.    That's correct.

2  Q.    And you were paid for the time you spent, isn't

3  that correct?

4  A.    Not every time, no.

5  Q.    But you were paid for your time generally to do

6  the project, isn't that right?

7  A.    Yes.

8  Q.    And in addition, when you do some of these other

9  community activities, those are done on your own time or

10  done on your work time?

11  A.    On my own time.

12  Q.    Okay.  Now, with regard to -- I think with regard

13  to becoming, um -- well, let me say this.

14  With regard to your background in education, I believe

15  you testified that you graduated from high school?

16  A.    That's correct.

17  Q.    And you went on to college, isn't that correct,

18  after you were in the military for a period?

19  A.    And out with Putnam Investment Services and

20  Merrill Lynch, yes.

21  Q.    And what did you do at Putnam Investment Services

22  and Merrill Lynch?

23  A.    I was a Y-trade operator.

24  Q.    And what does that mean?

25  A.    I put in the stocks and whether to buy or sell.

1   Q.    Okay.  So someone would give you information and

2   you assisted them in actually doing the buying and

3   selling?

4   A.    That's correct.

5   Q.    And how long did you do that?

6   A.    Um, I got out in '86, I worked with Putnam for

7   maybe a little over a year, and I worked for Merrill

8   Lynch right after that until '89, until I came up

9   with -- well, so both about a year and a half.

10  Q.    And then you say you went to -- and you received a

11  bachelor of art's degree, correct?

12  A.    That's correct.

13  Q.    And you got that from Curry College?

14  A.    That's correct.

15  Q.    And in order to get into Curry College did you

16  have to take any kind of exam?

17  A.    And I had to go -- well, I went to Quincy College

18  first and then I went to Curry.

19  Q.    Okay.  So you went to Quincy College and you

20  graduated from Quincy College?

21  A.    That's correct, with my associate's degree.

22  Q.    And then did you go on to Curry College?

23  A.    That's correct.

24  Q.    And in getting admitted to Curry College, did you

25  have to take any kind of exam?

1    A.    I don't remember taking an exam.

2    Q.    You don't remember taking an exam?

3    A.    I don't remember taking an exam, no.

4    Q.    Now, you took the sergeant's exam in 1999, isn't

5    that right?

6    A.    I did.

7    Q.    Okay.  And you did well, didn't you?

8    A.    I did really well.

9    Q.    I got an 82 percent, didn't you?

10   A.    That's correct.

11   Q.    And so an 82 percent was much higher than you got

12   in 2002, isn't that correct?

13   A.    That's correct.

14   Q.    So in 2002, with all the different components, you

15   got a 78.5, isn't that correct?

16   A.    Approximately, yes.

17   Q.    So you got a much higher score when it was just a

18   written test than you did when it was a -- when it had

19   other components, isn't that right?

20   A.    Well, yes.

21   Q.    It just happened that they took a few more

22   sergeants during that particular year, isn't that right?

23   A.    Possibly.

24   Q.    Now, I believe that you say that you were a

25   sergeant for three years and a sergeant detective for

1    four then and that brings you to today, isn't that

2    right?

3    A.    I was a sergeant from 2005 to 2009 -- yeah, 2009,

4    so four years.

5    Q.    Okay, and then how long did you -- when did you

6    get appointed as a sergeant detective?

7    A.    Um, late September to 2009.

8    Q.    Okay.  And that is your current position, isn't

9    it?

10   A.    That's correct.  It was almost right after the

11   Shattuck award.

12   Q.    (Pause.)  I realize that I missed something.  I

13   just wanted to go back for just a moment if I could.

14   That in Jamaica Plain you report to a, um -- the area's

15   captain for that area is who?

16   A.    Captain Andres.

17   Q.    It's Captain Andres.  Okay.  And prior to Captain

18   Andres, who I believe just came in with the sort of new

19   administration, was there a captain?

20   A.    Captain Russell.

21   Q.    Okay.  And in that area are there any lieutenants

22   assigned to Jamaica Plain?

23   A.    Yes.

24   Q.    And who's that?

25   A.    You have Lieutenant Ryan, you have Lieutenant

1    Friedman, you have Lieutenant Sweeney.  We have

2    different shifts.

3    Q.    So there are lieutenants there.  And how often

4    have you -- and it's your testimony that during the

5    period of time that you were a sergeant -- just a

6    sergeant, not a sergeant detective, that you filled in a

7    lot -- all the time for the lieutenant?

8    A.    We're in two different places.

9    Q.    Okay.

10   A.    Me filling in for a lieutenant was prior to my

11   getting there, but I had filled in for a lieutenant at

12   this station.

13   Q.    When you said "prior to getting there," explain to

14   me your testimony?

15   A.    Since I've been at District 13, Jamaica Plain, I'm

16   a sergeant detective and I work upstairs.  I don't work

17   downstairs with those lieutenants.  But when they are

18   out, I sometimes am hired, all right, and then I do

19   sometimes -- well, depending on the other sergeant

20   that's working, one of us will take one of their places.

21   Q.    "One of us" being one of who?

22   A.    Myself or the other sergeant that's working.

23   Q.    Okay.  So is that a sergeant or a sergeant

24   detective?

25   A.    We're talking now a sergeant.

1    Q.    Okay.  So the way I understand it is from 2005 to

2    2009 you were a sergeant, correct?

3    A.    That's correct.

4    Q.    Okay.  You worked in Jamaica Plain?

5    A.    No.

6    Q.    No.  Okay.  From 2005 to 2009 where did you work?

7    A.    I worked in C-6, which is South Boston, from 2005

8    to late 2006.  2006 to 2009 I worked in B-2.  2010 up

9    until the present, I went to Jamaica Plain.

10   Q.    And so you've spent most of your years as a

11   sergeant detective in Jamaica Plain, is that correct?

12   A.    Yes.

13   Q.    And most of the time as a sergeant you were in two

14   different areas?

15   A.    That's correct.

16   Q.    Okay.  And it is your -- and as I understand it

17   in, um --

18   And who was your supervisor when you were in C-6?

19   A.    My supervisor?  Are you talking the captain or are

20   you talking the lieutenant?

21   Q.    Who was the lieutenant or was there a lieutenant?

22   A.    Yeah, there was a lieutenant, I was working for

23   Robert Lockhart.

24   Q.    Okay.  And was there more than one lieutenant?

25   A.    There's three in each station there's -- in each

1    shift.  One day shift, on the first half, and one on the

2    night shift.

3    Q.    And what shift did you work?

4    A.    Days.

5    Q.    So who was the day lieutenant?

6    A.    Robert Lockhart.

7    Q.    All right.  So how often did you fill in for

8    Mr. Lockhart?

9    A.    Um, often.

10   Q.    And when you say "often," I mean how often is

11   "often"?  There are a number of years here.

12   A.    I don't know exactly.  The department has the

13   statistic, they have the numbers, but I can't tell you

14   exactly.  But it was often.

15   Q.    Okay.  And then you moved to a different district,

16   is that correct?

17   A.    That's correct.

18   Q.    And who were the lieutenants on duty there?

19   A.    That was in B-2, um, and the lieutenant in B-2 was

20   Lieutenant Cruz.

21   Q.    And, um, in B-2 how often did you fill in --

22   And did you work the day shift again?

23   A.    I worked the day shift, correct.

24   Q.    Okay.  So who was the lieutenant on the day shift?

25   A.    Lieutenant Cruz.

1    Q.    And how often did you fill in for Lieutenant Cruz?

2    A.    Not as often as in C-6, but here and there.  And

3    also while I was working both of those I worked

4    different shifts if the other lieutenants were out also.

5    Q.    Okay.  And so you only worked different shifts

6    when the other lieutenants were out or when the other

7    sergeants were out?

8    A.    Either or.

9    Q.    But all of that would be subject to documentation

10   as to when you were paid, isn't that right?

11   A.    That's correct.

12   Q.    (Pause.)  Okay.  With regard to your work as a

13   sergeant detective in Jamaica Plain, um, I take it your

14   testimony is that you have filled in for the lieutenant

15   detective?

16   A.    I'm still doing it.

17   Q.    You're still doing it?

18   A.    That's correct.

19   Q.    Okay.  Well, is there a lieutenant detective in

20   Jamaica Plain?

21   A.    No.

22   Q.    So how -- if you're the only sergeant detective,

23   how can you be filling in for a lieutenant detective if

24   they don't exist?

25   A.    I didn't say I was the only sergeant detective,

1    there's three of us.

2    Q.    Okay, there are three sergeant detectives, but

3    there's no lieutenant detective, correct?

4    A.    That's correct.

5    Q.    So how can you say you've been filling in the

6    whole time?

7    A.    There was a lieutenant detective, they transferred

8    him out.

9    Q.    But are you getting paid to fill in for the

10   lieutenant detective?

11   A.    No.

12   Q.    So what you're saying is there isn't a lieutenant

13   detective in Jamaica Plain and therefore what you're

14   doing now -- you were a sergeant detective?

15   A.    Correct.

16   Q.    But that there just isn't a lieutenant detective

17   and that's what you -- and that's the basis of your

18   testimony?

19   A.    No, I'm doing his job as the lieutenant detective.

20   Q.    And -- but you're not getting paid for it?

21   A.    That's correct.

22   Q.    And you haven't filed a grievance over that?

23   A.    Um, no.

24   Q.    Now, when you say that you were chosen to be the

25   top sergeant detective, let me just ask this.

1    Aren't the other two sergeant detectives working nights?

2    A.    That's correct.

3    Q.    So you're the only one who's working days, isn't

4    that right?

5    A.    That's correct, but they could still be the acting

6    detective.

7    Q.    Excuse me.  You're the only one working days,

8    isn't that correct?

9    A.    That's correct.

10   Q.    (Pause.)  Now, with regard to the role of

11   lieutenant or to the lieutenant detective, um, isn't one

12   of the roles and responsibilities of a lieutenant

13   detective to supervise the sergeant detectives?

14   A.    That's correct.

15   Q.    But you aren't supervising?

16   A.    I do.

17   Q.    And who are you supervising?

18   A.    Sergeant Robert Tinker and Sergeant Sandy Woodley.

19   And in fact I just sent out an e-mail that I was here, I

20   was going to be on vacation the next week, and what I

21   wanted them to do next week.

22   Q.    All right.  So it's your testimony that you're

23   doing all of that without the title or the pay, is that

24   right?

25   A.    I have the title as a commander, I just don't have

1    the pay.

2    Q.    I'm getting confused.  So you're the commander of

3    what?

4    A.    District 13 detectives.

5    Q.    Now, are Tinker and Woodley the other sergeant

6    detectives?

7    A.    That's correct.

8    Q.    Okay.  So as the person on the day shift you're

9    just -- you're going to be on vacation and so you're

10   asking them to fill in and cover some things for you,

11   isn't that right?

12   A.    That's correct.

13   Q.    Okay.  And if one of them was going to be out,

14   they would also want to communicate with you if somebody

15   had to cover something for them, isn't that right?

16   A.    That's correct.

17   Q.    Okay.  So that is the kind of communication you've

18   just indicated you've given to each other, isn't that

19   right?

20   A.    Repeat that?

21   Q.    I mean you indicated that you had communicated

22   with Tinker and Woodley about the things that you wanted

23   covered next week when you were out, isn't that right?

24   A.    And I want them to cover, that they need to handle

25   the administrative duties that I do, right.

1    Q.    That you're just asking them to cover for you,

2    isn't that right?

3    A.    That's correct.

4    Q.    Because they work the night shift and you work the

5    day shift and you're asking them to cover, isn't that

6    correct?

7    A.    That's correct.

8    Q.    And if they were out, they would ask you to cover

9    for them, isn't that right?

10   A.    No, if they're out I decide who covers for them,

11   either one of the other detectives or myself.  It's not

12   always me.

13         THE COURT:  I can understand, given his direct

14   examination, why you would want to know the extent of

15   the time he serves as the commander, but at this level

16   of detail I'm losing why any of this is relevant.

17         MS. HODGE:  I will move on, your Honor.

18         THE COURT:  All right.

19   Q.    Now, I believe that you testified on direct

20   examination that you've studied hard for the exam to be

21   a lieutenant in 2008?

22   A.    Correct.

23   Q.    Okay.  And that what you did to study hard is that

24   you, um, went to some study courses, isn't that correct?

25   A.    That's correct.

1    Q.    Okay.  And those study courses were offered by the

2    City, isn't that right?

3    A.    There were some, yes.

4    Q.    And didn't the City give you a CD with materials

5    from Mr. Sheff?

6    A.    They did.

7    Q.    And wasn't that given to every candidate?

8    A.    It was.

9    Q.    And didn't it cover fairly comprehensively a lot

10   of the materials about the laws in Massachusetts and the

11   requirements?

12   A.    About the laws in Massachusetts?  Yes.

13   Q.    And so you mentioned that you went to a seminar by

14   Pat Rogers and what did that cover?

15   A.    We're talking about two different exams you're

16   talking about, ma'am.

17   Q.    Oh, okay.  So with regard to the 2008 lieutenant's

18   exam, which is the exam that we're talking about here,

19   besides getting the CD from Mr. Sheff, did you watch the

20   CD?

21   A.    Yes.  I didn't watch it, I listened to him.

22   Q.    Oh, so you listened to him.  And what else did you

23   do?

24   A.    I didn't know that they had one that you could

25   watch.

1    Q.    Okay.  I'm sorry.  So what else was there?

2    A.    I took a seminar with Tom Nolan, as I said, I had

3    a seminar with Pat Rogers, and I --

4    Q.    For the 2008 exam?

5    A.    2008, yes, that's the one.  I didn't take 2005, so

6    2008 is the one I'm talking about.

7    Q.    Okay.  So all three of these were people you went

8    to seminars with them, correct, you had a CD/video from

9    Sheff, you went to a seminar with Rogers, and you went

10   to a seminar with Nolan?

11   A.    That's correct.

12   Q.    And what else did you do?

13   A.    I studied myself.

14   Q.    And how much did you study yourself?  Give me a

15   quantification.  Can you tell me how much time you spent

16   --

17   A.    No, it was six months where I studied here and

18   there, a couple of hours a day, like maybe four or five

19   hours a week.

20   Q.    How much of the reading list did you study?

21   A.    I studied most of the reading list, but not all of

22   it.

23   Q.    And the reading list covers a broad range of

24   topics, isn't that right?

25   A.    That's correct.

1    Q.    And it covers topics which include everything like

2    supervision and management and administration, isn't

3    that correct?

4    A.    Yes.

5    Q.    And those are all relevant to the job that you do,

6    isn't that right?

7    A.    The books that I read?

8    Q.    Uh-huh.

9    A.    Not really, no.

10   Q.    Now, with regard to the 2014 exam, you did sign a

11   confidentiality order, didn't you?

12        MR. LICHTEN:  Well, objection, your Honor.  If

13   he's going to be disciplined for this, it's my fault

14   because I asked him the questions and he was under oath,

15   your Honor.

16        THE COURT:  I don't see any basis for any sort of

17   discipline.  If there was an objection, the objection

18   should be timely made, and I think the City has waived

19   it.  So I don't know where we're going with this.

20   Q.    But you did sign a confidentiality agreement?

21        MR. LICHTEN:  Objection, your Honor.

22        THE COURT:  Why is that relevant?

23        MS. HODGE:  Because I think that he testified to a

24   number of things in great detail and I'd like to know

25   whether or not he signed a confidentiality agreement.

1          THE COURT:  But why is that relevant to this case?

2     I've suggested and I will probably rule that you've

3     waived it, you've waived any objection to it.

4          MS. HODGE:  Then I apologize, your Honor, and I'll

5     move on.

6          THE COURT:  Please do.

7     Q.    Isn't it true, Sergeant Smith, that you have

8     received -- that you received a 9-month suspension for a

9     violation of the City's rules?

10    A.    Yes.

11    Q.    Okay.  Isn't it also true that you also received a

12    3-month suspension for the violation of the City's

13    rules?

14    A.    I don't know about that one, no.

15    Q.    I'm sorry, a 3-week suspension?

16    A.    I don't know about that one either, no.

17    Q.    I'm sorry, a 3-day suspension?

18    A.    No.

19    Q.    You did not receive a 3-day suspension?

20    A.    No, I did not.

21    Q.    You did not receive a 3-day suspension in 1998 for

22    neglect of duty and disrespectful treatment?

23    A.    No, I did not.

24    Q.    And do you know -- can you describe for me the

25    reason why you received a suspension for 9 months?

A.     Yes.

Q.     Why did you get a suspension for 9 months?

A.     Um, I had a friend living with me and I went on a cruise with my father and while I was on that cruise supposedly he got into a shootout with someone and, um, the person died.  And, um, after that the guy was living at my house.  I put him out.  I had him come to my station -- I was working in Mattapan.  He owed me money to pay me rent.  I had no knowledge of it.

       He got arrested one night and they arrested him in his girlfriend's house, not in my house, and the night they arrested him they put me on administrative leave to see if I had any knowledge of it.  I was on administrative leave for maybe a year, a year and a half.  My finances, including me working, making details to pay my mortgage, to pay everything else, everything lapsed.  Someone ran into the back of my motor vehicle, my insurance and information --

Q.     It's gone beyond for that.  I don't need to know what your insurance situation is.

A.     Well, that's the answer to that.  When he ran into my car my insurance had lapsed and they cited me for operating a motor vehicle that was unregistered and uninsured.

Q.     Well, aren't suspensions documented by the police?

1   A.   I don't work in that department, but I would think

2   they would be.

3   Q.   I'm going to show you now a document.

4        MS. HODGE:  And if I may approach?

5        THE COURT:  You may.

6        (Hands up.)

7   Q.   Now, personnel orders are posted within the

8   department, isn't that right?

9   A.   That's correct.

10  Q.   So have you ever seen this personnel order before?

11  A.   I have, yes.

12  Q.   Okay.  And this is a personnel order regarding

13  your suspension, isn't that right?

14  A.   That's correct.

15       MS. HODGE:  I'm going to move this into evidence.

16       MR. LICHTEN:  No objection.

17       THE COURT:  It may be received as Exhibit 79 in

18  evidence.

19       (Exhibit 79, marked.)

20       MS. HODGE:  If I may approach, please?

21       (Hands to witness.)

22  Q.   Sergeant Smith, I just showed you another document

23  which is a personnel order.

24       Again, this would have been a matter that was

25  posted, isn't that correct?

```
1    A.    It should have been, correct.

2    Q.    And it does reflect a 3-day suspension, isn't that

3    right?

4    A.    Okay, I have never received a 3-day suspension.

5    Also, this is not my ID number.  I never received a

6    3-day suspension on that.

7    Q.    Okay.

8    A.    This is the first time I've ever seen this.

9    Q.    So is there another police officer that you know

10   of with the name Bruce Smith?

11   A.    Yes, as a matter of fact there's an officer,

12   someone who works at City Hall by the same name, now

13   that you bring it up, and I would believe that would be

14   him.  He's not an officer, but his name and everything,

15   his ID -- I mentioned something to my captain, that one

16   time I was supposed to be receiving information, but it

17   was going to him.

18         (Pause.)

19         MS. HODGE:  I have nothing further.

20         THE COURT:  Anything further, Mr. Lichten?

21         MR. LICHTEN:  Nothing further, your Honor.

22         THE COURT:  Okay, you may step down.  Thank you.

23         (Steps down.)

24         THE COURT:  All right.  Now the defense is going

25   to call a witness.
```

1          MR. BOK:  Yes, we are.

2          THE COURT:  He may be called.

3          MR. BOK:  We call Dr. Jacinto Silva, please.

4          THE COURT:  He may be called.

5          (JACINTO SILVA, sworn.)

6          THE COURT:  And I take it you have a routine

7     procedure, so he has a report?

8          MR. BOK:  He does have a report and that's Exhibit

9     72.

10          THE COURT:  Thank you.

11          MR. BOK:  And it's been admitted.

12          THE COURT:  I understand.

13

14          * * * * * * * * * * * * *

15          JACINTO SILVA

16          * * * * * * * * * * * * *

17

18     DIRECT EXAMINATION BY MR. BOK:

19     Q.    Doctor, would you please state your full legal

20     name for the record.

21     A.    Jacinto Manuel Silva.

22     Q.    And do you commonly go by the name "Jayco"?

23     A.    I do.

24     Q.    And you also use "Jayco" professionally as well,

25     correct?

A.    Correct.

Q.    Okay.  Can you please tell me the city of your current residence?

A.    Gainsville, Florida.

Q.    Okay.  And what is your education after you graduated from high school?

A.    I attended Rutgers University where I obtained my bachelor's in psychology.  I then attended Penn State where I obtained a master's in industrial organizational psychology.  And at Penn State I also obtained a PhD in industrial organizational psychology.

Q.    Okay.  And as part of your -- well, first of all, what did you write your PhD thesis on?

A.    I wrote it on the utility of increasing minority hiring.

Q.    Okay.  And did you -- and as part of your doctoral studies, do you study statistics?

A.    I do.

Q.    What studies of statistics did you have as part of your doctoral studies?

A.    Um, my minor was in statistics while completing my doctorate.  I was also at the Army Research Institute periodically to develop some statistics to convey information to decision-makers.

Q.    Okay.  And if you could go to Exhibit 72 in this

1    case, which is your report, um, at Appendix A.  Is there

2    your current CV?

3    A.     Yes.

4    Q.     And does this list all, as far as you know, your

5    professional publications and your professional

6    presentations?

7    A.     It does.

8    Q.     And you have testified in the past in court,

9    correct?

10   A.     Yes, once.

11   Q.     And that was in the *Lopez* case?

12   A.     That's correct.

13   Q.     Okay.  Now, after you got your PhD, can you

14   briefly tell us what your work was, um, prior to you

15   joining EB Jacobs or its predecessors?

16   A.     Certainly.  I first went to work as a researcher

17   at the Army Research Institute in Virginia where I did

18   research on army-related selection processes.  I've

19   worked in some projects involving, for example,

20   selecting Morse code interceptors and tail-gunners,

21   things of that sort.  Also I did work with selection in

22   language training.  So I was selecting those individuals

23   that would go on to language training.

24   Q.     Uh-huh.

25   A.     So basically the selection area.  I was there for

1    about, I think, seven or eight years, and then I joined

2    a consulting firm in the D.C. area for about a year and

3    then moved to Pennsylvania where I've worked at EB

4    Jacobs under various names, the companies had various

5    names.  It was originally called "Landy Jacobs," um, and

6    we were bought out by a larger company, "SHL," and then

7    when we split off with it again in 2004 we became

8    essentially "Landy Jacobs" again, but because of an

9    issue related to taking the old name back we renamed

10   ourself "EB Jacobs."  But from 1998 until today I've

11   essentially worked at the same firm.

12   Q.    Okay.  And would you describe yourself as an

13   "industrial psychologist"?

14   A.    I would.

15   Q.    And, um, do you have any particular specialty as

16   an industrial psychologist?

17   A.    Mainly in the selection area, um, statistics, um,

18   sometimes modeling situations.  For example, in this

19   case I modeled the error rate for the adverse impact

20   ratio.

21   Q.    Okay.  And you said that you testified in the

22   *Lopez* case, correct?

23   A.    I did.

24   Q.    And you're obviously testifying here, correct?

25   A.    Correct.

Q.    But before that you have not testified in court on
any matter, correct?

A.    No.

Q.    Okay.  So what do you normally do as an industrial
psychologist if you're not basically a forensic one or a
court-testifying one?

A.    Um, I do a lot of different jobs.  EB Jacobs is a
relatively small firm so we all take on different
things, but I'd say about 50 percent of my time is on
project work, um, mostly promotionals and mostly in
Miami.  This past couple of years we've done all of
their fire and police promotionals except for the police
lieutenant, that's handled by another firm.  We've
actually done the fire one twice, and within the same
year, so it's been quite a busy year.  And that's most
of my work in terms of about 50 percent.

        And then I split up my tasks managing the
statistics staff, um, assisting with, um, the
development of websites, we have various websites for
collecting job-analysis data, for collecting performance
evaluations for performing candidates, for example, of
the things that are important for the test, accessing
preparation guides and the like, and so I manage all of
that as well.  As well as internal programming for the
kinds of tools that we use to automate much of our

1     processes.

2     Q.    Okay.  And in fact when you were deposed in this

3     case in Miami you were actually working on a project for

4     Miami, correct?

5     A.    I was, we were completing the second round of the

6     Chief Fire Officer testing for the City of Miami as well

7     as administering the first part of the police sergeant's

8     exam.

9     Q.    Okay.  And have you ever worked in the past on a

10    police lieutenant's exam?

11    A.    I have.

12    Q.    Okay.  And in what jurisdiction?

13    A.    In Miami, the City of Miami Police Department.

14    Q.    And in what years, just for the record?

15    A.    Um, 2000, 2003, and the last one, I believe, was

16    in 2006.  There hasn't been a test since 2006 for the

17    police lieutenant in Miami.  So, um -- it's actually

18    this January that a different firm, IO Solutions, is

19    doing that test, and I think it's going to be

20    administered in January, at least that's when it's

21    scheduled.

22    Q.    Okay.  Great.

23    Now, Exhibit 72 that's in front of you, this is the

24    report that you wrote, correct?

25    A.    That's correct.

1  Q.     Okay.  And Appendix B, um, lists off some

2  documents that you reviewed in order to prepare this

3  report, correct?

4  A.     That's correct.

5  Q.     Okay.  And have you also prepared -- have you also

6  reviewed Dr. Wiesen's two reports with respect to

7  adverse impact, which are Exhibit 47 and 48?

8  A.     Yes, I have.  As well as Rick Jacobs's affidavit

9  earlier.

10  Q.     Okay.  Now, what in general terms is your

11  understanding of what the 2005 seems to be -- it still

12  has some relevance here, and the 2008 promotional exams

13  for lieutenant, what was sort of given as an examination

14  at that time on those exams?

15  A.     You're asking about my conclusions?

16  Q.     No.  No.  Was it a purely multiple choice test?

17  A.     Well, yes, it had two components, it had a

18  multiple choice job knowledge, a technical knowledge

19  test, and it had an education and experience score, and

20  most of the components were rated at an 80-20

21  respectively.

22  Q.     Okay.  Now go to Page 2 of your report, please,

23  sir.

24  A.     (Turns.)

25  Q.     By "2" I mean the number at the bottom.

1  A.    Okay.

2  Q.    And you list on Page 2 of the data, as it was

3  given to you, for the 2005 exam, correct?

4  A.    That's correct.

5  Q.    All right.  And on Page 7 you have the data that

6  was given to you for the 2008 exam, correct?

7  A.    (Looks.)  That's correct.

8  Q.    Okay.  Now, in making your calculations, um, you

9  and Dr. Wiesen each used a Fisher Exact Test, and we'll

10  look at the details in a second.  But you each used a

11  Fisher Exact Test, correct?

12  A.    Yes.

13  Q.    And in general terms what does the Fisher Exact

14  Test test?

15  A.    It looks at the promotion rates of two different

16  groups and in this case we were looking at, I believe,

17  at whites versus blacks or whites versus minorities, I

18  think it was that we actually ended up doing.  So we're

19  looking at these promotion rates and we're trying to

20  determine if those two promotion rates are different.

21  The tests assume two underlying populations, the

22  population of blacks and the populations of whites, and

23  it basically tries to determine if these scores, these

24  promotion rates could have come from those underlying

25  populations and it ascribes a probability value to the

1    extent that they could come from those underlying

2    populations and if they're equal or not.

3    Q.    Okay.  Is the reason of it that you're looking at

4    the probability value because there is inevitably a

5    variation in the results of a population?

6    A.    That's correct.  In every sample, um, in this case

7    the 127 individuals and the 91 individuals are sampled

8    from their perspective populations.  So any time you

9    sample from your population there's always a chance

10   you're going to get somewhat less representative or more

11   representative individuals from those populations.

12   Q.    Okay.  So to use an example that we can all

13   understand, if you flip a coin and it's head or tails,

14   and it's a "fair coin," as I now understand appears to

15   be a term of art here, um, you will end up with a series

16   of results in terms of how many -- how many heads.  If

17   you flipped it 100 times, you could theoretically have

18   100 heads, correct?

19   A.    That's correct, and the population is essentially

20   50/50.  But you're always going to have some deviation

21   if you throw it up a hundred times, the same coin, you

22   might get 48/52, you might even get 40/60.  But the

23   underlying population was 50/50.

24   Q.    Okay.  So if you did that 100-flip test and you

25   did it enough times, well, you'd eventually end up with

1    the phrase that the judge certainly understands, the

2    "bell curve," in terms of your results?

3    A.    Yes, we call it the "normal distribution," but

4    it's also known as a "bell curve."

5    Q.    Okay.  And the tails that we're talking about are

6    the extreme ends of the bell curve, correct?

7    A.    Yes.

8    Q.    The little parts at the end?

9    A.    The lowest probability events, the lower ones.

10   Q.    Okay.  Now, can you explain to the judge, in

11   general terms, what is the difference between a

12   one-tailed Fisher Exact Test and a two-tailed Fisher

13   Exact Test?

14   A.    Certainly.  With a two-tailed test essentially

15   you're looking at all possibilities, you're looking at

16   the possibility, first of all, that there's no

17   difference and then you're looking at the possibility

18   that minorities perform lower, or you're looking at the

19   possibility that whites perform lower.  So all three are

20   in play.  When you're looking at a one-tailed test,

21   essentially only two possibilities apply or there's two

22   possible outcomes, the outcome that the promotion rates

23   are equal and the possibility or probability that the,

24   um, the minority group is performing lower.  The

25   possibility that the white group is performing lower is

1    not considered in any manner in that test.

2    Q.    Okay.  And do you have an understanding, um, based

3    on your review of your documents, as to what the U.S.

4    Office of the Federal Contract Compliance does in terms

5    of a one-tailed or a two-tailed test when they're

6    looking at these results?

7    A.    My understanding is that they use a two-tailed

8    test.

9    Q.    And you used a two-tailed test in your

10   calculations, correct?

11   A.    I did.

12   Q.    Okay.  Before we get to why, let's just talk

13   briefly about the phrase a "statistical significance."

14   As an industrial psychologist, can you please explain to

15   the judge what you understand to mean by "statistical

16   significance"?

17   A.    So the normal distribution covers all

18   possibilities, but it's possible that it could have a

19   very extreme result and still the underlying populations

20   are the same, or equivalent.  But when it gets down to a

21   very low probability, and since that position is usually

22   a 5 percent cutoff, so we can put 2 1/2 percent on each

23   tail.  And we would say that if it occurs in that area,

24   in this observed sample, that we would conclude that the

25   two underlying populations are not the same with respect

1   to the particular statistic that we're measuring.

2   Q.     And do you understand the 5 percent, or the .05 P

3   value or level, to be generally accepted within your

4   profession?

5   A.     It is.

6   Q.     And you hear Dr. Wiesen testify under that number

7   as well?

8   A.     Yes.

9   Q.     Okay.  Now, why did you use a two-tailed test in

10   your calculations rather than a one-tailed?

11   A.     Well, there's always a possibility that the

12   direction -- that the promotion rate differs in one way

13   or the other, so you need to look for both, and if you

14   look just on one side you basically are negating or

15   eliminating any possibility that it could happen in the

16   other direction.

17   Q.     Okay.  And have you ever observed or seen evidence

18   of times of where there's an adverse impact on a test

19   that, you know, disfavors a white group?

20          MR. CHURCHILL:  Objection, your Honor.

21          MR. BOK:  Well, your Honor, they're saying that --

22          THE COURT:  Wait.  Wait.  I didn't hear the

23   grounds.

24          MR. CHURCHILL:  It's not in the report.

25          THE COURT:  Well, that's sufficient, isn't it,

 1   unless you can point out where is it.

 2         (Pause.)

 3         THE COURT:  Then move on.

 4         MR. BOK:  Well, he explains it.  Just give me a

 5   second, your Honor?

 6         THE COURT:  All right.

 7         (Pause.)

 8         MR. BOK:  Yes, your Honor, at the top of Page 3,

 9   the first full sentence.

10         THE COURT:  Thank you.  Just a moment.

11         MR. BOK:  At least what I've observed.

12         THE COURT:  The top of Page 3.  (Looks.)

13         MR. BOK:  And you could read the sentence before,

14   if you want to put it in context.

15         THE COURT:  No.  No.  He may so testify.  But I

16   don't believe that it's necessary because I have the

17   evidence in the report.  He says he's observed it.  I

18   note that that's his position.

19         MR. BOK:  Okay, then we won't go further.

20         THE COURT:  Right.

21         MR. BOK:  But are you still sustaining the

22   objection as being beyond the scope?

23         THE COURT:  Oh, no.  No, I'm not.

24         MR. BOK:  Okay.

25         THE COURT:  Since there's no detail to be added, I

1   have his simple observation and it's evidence in the

2   case.

3           MR. BOK:  Okay.  Can you give us a little bit of

4   detail just so that we --

5           THE COURT:  No.  That's the objection.  That's why

6   we have the rule.

7           MR. BOK:  Oh, okay.  All right.  Fine, your Honor.

8   Okay.

9   Q.     Go to Page 4, please.

10  A.     (Turns.)

11          THE COURT:  Actually you're moving to a different

12  topic and it is 1:00.  So let's stop at this point.

13          MR. BOK:  That will be fine, your Honor.

14          THE COURT:  All right.  We'll stop at this point

15  and we'll resume promptly at 9:00 a.m. tomorrow morning.

16          MR. LICHTEN:  Your Honor, may I address one small

17  point?

18          THE COURT:  Yes.

19          MR. LICHTEN:  Part of this master agreement that

20  we made to take witnesses out of order was their

21  agreement that tomorrow afternoon after trial I will

22  take the deposition of Dr. Campion, but in return,

23  because we can't get the transcript back and everything,

24  that they won't produce him as a witness until Monday

25  and we're going to devote all of Monday to him.  But

1    they can put him on as a direct witness tomorrow or --

2    I'm sorry, Friday.

3        So there could be a small gap in time on Friday.

4    I know you'll be terribly disappointed --

5        THE COURT:  Now, look, I very much favor your

6    agreements and I want to, um -- I want to further them,

7    but at the same time because necessarily and for good

8    and sufficient reason we have to take a break, I don't

9    want tactical choices to build in another week, and I

10   have other jury-waived matters crowding right up behind

11   you.

12       MR. LICHTEN:  We are ahead of schedule, your

13   Honor.

14       THE COURT:  I'm only saying -- well, you answered

15   it.

16       MR. LICHTEN:  Yes, we are ahead of schedule.

17       THE COURT:  So I will assess you the time and

18   however else it works out, it works out.

19       But I very much favor your agreements.  I thank

20   you.  I am able to follow.  And so we'll recess then in

21   this case until 9:00 tomorrow morning.  We'll recess.

22       (Adjourned, 1:00 p.m.)

23

24

25

1          C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Wednesday, December

8     17, 2014, to the best of my skill and ability.

9

10

11
    /s/ Richard H. Romanow 02-19-15
12  _____
    RICHARD H. ROMANOW Date
13

14

15

16

17

18

19

20

21

22

23

24

25