```
1              UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                          No. 12-cv-10291-WGY

4

5  BRUCE SMITH, et al
        Plaintiffs
6

7  vs.

8

9  CITY OF BOSTON,
        Defendant
10

11                     * * * * * * * * *

12

13

14              For Trial Before:
               Judge William G. Young
15

16                     Bench Trial

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Friday, December 19, 2014

20

21                     * * * * * * * *

22

23         REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
                 United States District Court
24      One Courthouse Way, Room 5510, Boston, MA 02210
                   bulldog@richromanow.com
25
```

```
1                    A P P E A R A N C E S

2

3    HAROLD L. LICHTEN, ESQ.
     BENJAMIN WEBER, ESQ.
4        Lichten & Liss-Riordan, P.C.
         100 Cambridge Street, 20th Floor
5        Boston, MA 02114
         Email: Hlichten@llrlaw.com
6    and
     STEPHEN S. CHURCHILL, ESQ.
7        Fair Work, P.C.
         192 South Street, Suite 450
8        Boston, MA 02111
         Email: Steve@fairworklaw.com
9        For plaintiffs

10
     GEOFFREY R. BOK, ESQ.
11   KAY H. HODGE, ESQ.
     JOHN M. SIMON, ESQ.
12       Stoneman, Chandler & Miller
         99 High Street
13       Boston, MA 02110
         Email: Gbok@scmillp.com
14       For defendant

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5   MICHAEL A. CAMPION

6       By Mr. Simon:            4

7       By Mr. Lichten:

8

9

10

11                       E X H I B I T S

12

13                      (None marked.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning.  I see the next witness
 4     is present and he may be sworn.
 5          (MICHAEL A. CAMPION, sworn.)
 6          THE COURT:  Is this a witness for whom there is a
 7     report?
 8          MR. SIMON:  This is a witness for the City of
 9     Boston, your Honor, Dr. Michael Campion.
10          THE COURT:  Say your name again, sir?
11          THE WITNESS:  It's Campion.
12          THE COURT:  Oh, this is Mr. Campion.
13          MR. SIMON:  Yes.
14          THE COURT:  And where will I find his report?
15          MR. SIMON:  Exhibit 73.
16          THE COURT:  Thank you.  You may proceed.
17          MR. SIMON:  Thank you, your Honor.
18
19          * * * * * * * * * * * * * * * * * *
20          MICHAEL A. CAMPION
21          * * * * * * * * * * * * * * * * * *
22
23     DIRECT EXAMINATION BY MR. SIMON:
24     Q.   Dr. Campion, can you please state your full name
25     for the record.
```

1    A.      Michael A. Campion.

2    Q.      And where do you live, sir, just the city or town

3    and state?

4    A.      I live in West Lafayette, Indiana.

5    Q.      Sir, what's your occupation?

6    A.      I'm an industrial and organizational psychologist.

7    Q.      And what does that mean?

8    A.      Well, it's the, um -- well, I say it's the science

9    behind human resources.  So it's basically a research

10   area where we collect, analyze and write reports

11   relating to employment such as hiring, training,

12   compensation, employee attitudes, and all those topics.

13   Q.      And are you currently employed?

14   A.      Yes.

15   Q.      And where are you employed?

16   A.      I'm a professor at Purdue University.

17   Q.      Do you have a business otherwise?

18   A.      Yes, I consult with industry.

19   Q.      Okay.  Now, Doctor, I'd liked you to briefly run

20   through your education after high school, please.

21   A.      Well, after graduating from high school I went to

22   the University of Minnesota, getting a degree in

23   psychology and a minor in business.  Then I went on to

24   the University the Akron, Ohio where I got my master's

25   in industrial psychology and a minor in statistics.  And

1    then I went to work for four years at Weyerhaeuser

2    Company.  I returned for my PhD at North Carolina State

3    University where I got a PhD in '82 in industrial and

4    organizational psychology and a minor in human factors.

5    Q.    Do you have any other work experience?

6    A.    Well, I spent four years at Weyerhaeuser and after

7    I got my PhD I went to IBM and worked for four years.

8    And then in 1986, I went to Purdue University where I've

9    been ever since.

10   Q.    Now, Doctor, do you have any areas of particular

11   expertise in your field?

12   A.    Well, I research and consult broadly on a wide

13   range of topics, um, those noted before, recruiting,

14   training, performance appraisal, compensation, employee

15   morale, teamwork, group behavior, conflict, but probably

16   half of all my work is in selection and assessment and

17   testing.

18   Q.    Okay.  And I believe you answered my question, but

19   I was going to say, "What do you mean by 'selection' in

20   this context"?

21   A.    Well, it's probably a related set of topics, but

22   such things as job analysis, such things as test

23   development, the statistics associated with that, and

24   validation procedures.

25   Q.    Now, Dr. Campion, do you have any professional

```
 1    affiliations?
 2    A.    Yes, we have a professional association -- um, we
 3    have several and the dominant one would be the Society
 4    for Industrial and Organizational Psychology.
 5    Q.    And we've heard a little bit about that, is that
 6    "SIOP," is that how you say that in short?
 7    A.    Yes.  Yes, it's not like my former Dean said,
 8    "SLOP," --
 9          (Laughter.)
10    A.    But it's close enough.
11    Q.    And what role, if any, do you have in SIOP?
12    A.    Well, actually I've been real involved in SIOP as
13    my professional association, I've had many elected roles
14    including serving as President of the society in
15    '95-'96.
16    Q.    And any other professional associations that you
17    would have?
18    A.    Yes, I belong to the American Psychological
19    Association and the Academy of Management.
20    Q.    And in what function, if any, do you play in those
21    places?
22    A.    I'm a member and I'm a fellow of APA and I'm a
23    fellow of SIOP.
24    Q.    And what does that mean, to be a fellow of SIOP?
25    A.    It's an honorary title given to those who
```

```
 1    have contributed -- I'm trying to think of the words
 2    they use, "an unusual and outstanding contribution,"
 3    which can be and usually is science, but it may be
 4    practice.  I think, I don't know, 5 percent, maybe are
 5    fellows.
 6    Q.    5 percent of the membership of SIOP?
 7    A.    Yeah, I think it's something similar to that.
 8    Q.    Have you received any awards or honors with
 9    respect to your career?
10    A.    Yes.  Aside being the President of SIOP, I am also
11    the chaired professor at Purdue.  A chaired professor is
12    a promotion beyond full that is often given for
13    contributions and research.  And so I'm the Krannert --
14    usually they're named after donors.  I'm the Krannert
15    professor of management at Purdue.  In addition, I've
16    won the lifetime achievement award for science within
17    SIOP.
18    Q.    Who at Purdue are you teaching?
19    A.    I teach at all levels, undergraduates, MBA, and
20    then at the PhD level.
21    Q.    What kind of courses are you offering?
22    A.    Let me just think for a moment.  My MBA courses
23    are primarily staffing courses, although I teach some in
24    organizational development.  And then for the
25    undergraduate I teach a general human resources course.
```

1    And then at the PhD level I teach a research in human

2    resources seminar.

3    Q.    Have you published research papers?

4    A.    Yes, that's half my job.

5    Q.    And can you tell us the breadth of that, you know,

6    examples perhaps?

7    A.    Sure.  Sure.  I have about 130 refereed

8    publications that then -- in polls that they do of kind

9    of most published, I'm among the top most-published

10   authors in my field in the top journals.  The last

11   survey I was among the top 10 in the field in the top

12   journals.  In addition, I've given 250 papers and

13   conference presentations on a wide range of topics.

14   Q.    And you do consulting work as well?

15   A.    Yes.

16   Q.    And for whom do you do consulting work?

17   A.    Um, probably -- I'm trying to think, maybe 70

18   percent, private sector, 30 percent government.  120

19   different organizations over the last 30 years.

20   Q.    And what kind of government organizations have you

21   consulted for?

22   A.    Well, I do a lot of work particularly with the

23   federal government.  I've worked for 20 years for the

24   State Department.  Also I've done a lot of work for

25   Labor, the Department of Commerce.  I do a lot of work

1  for the EEOC.  I work for the FBI and Patent and

2  Trademark Office.  And the EPA.  Maybe those are all the

3  federal.  And then at the state level I've done a fair

4  amount of work for North Carolina and Michigan, the U.S.

5  employment Service, and then I'ved worked for the City

6  of Chicago.

7  Q.    Sir, have you ever served as an expert witness in

8  a case before?

9  A.    Yes.

10  Q.    About how many times?

11  A.    Um, I don't do a lot of expert witness work.  It's

12  probably about 5 percent of all the projects I've done.

13  In fact it would be far less than 5 percent.  But I've

14  probably been involved in maybe 20 cases, maybe a little

15  more than that.

16  Q.    What kind of courts are these in, federal courts,

17  state courts, both?

18  A.    I don't know that I know the answer to that.

19  Q.    Okay.  Fair enough.

20        For whom are you typically an expert witness,

21  which side, the plaintiff's side or the defendant's

22  side?

23  A.    About half each.

24  Q.    Have you ever not been qualified as an expert

25  witness in any case?

1    A.    Not that I know of.

2    Q.    Now, Dr. Campion, did you prepare an expert report

3    in this matter?

4    A.    Yes.

5    Q.    And I've set something in front of you which we've

6    already marked and has already been admitted as Exhibit

7    73.

8          Do you see that?

9    A.    Yes.

10   Q.    Is that your expert report in this matter?

11   A.    It appears to be.

12   Q.    Now, attached to that expert report is Exhibit A.

13   It's a copy of your academic resume, is that correct?

14   A.    Yes, it is.

15   Q.    And attached thereto as Exhibit B is a copy of

16   your consulting resume, correct?

17   A.    Yes, it appears to be.

18   Q.    Now, Doctor, in this expert report did you offer

19   opinions on various topics?

20   A.    Yes.

21   Q.    And are those opinions based on a reasonable

22   degree of scientific certainty?

23   A.    To the best of my ability.

24   Q.    Okay.  Dr. Campion, how is it that you became

25   involved in this case?

1   A.      Well, I believe I got a call from you.

2   Q.      And do you know when that was, do you recall?

3   A.      I think it was the middle of November.

4   Q.      Okay.  And let me ask you, do you -- had you heard

5   of the *Lopez* case at the time you were contacted by me?

6   A.      No.

7   Q.      You had never heard of the case before?

8   A.      No.

9   Q.      You had no involvement in *Lopez*, correct?

10  A.      No.

11  Q.      Okay.  And what is it that you were asked to do

12  with respect to this case?

13  A.      Well, I was asked to do three things.  One, is

14  review the relevant reports and documents related to the

15  validity of the promotional exam.  And I know we'll talk

16  more about validity later.  Second, I was asked to

17  review differences between the sergeant job and the

18  lieutenant job and any implications that might have for

19  validity.  And then I was thirdly asked to consider

20  alternative selection procedures that may have

21  comparable validity but lesser adverse impact.

22  Q.      Now, I take it you did those things, yes?

23  A.      Yes.

24  Q.      And the results of those reviews are in your

25  expert report?

1    A.    Yes.

2    Q.    Now, by the way, Doctor, when you were -- you said

3    you were contacted before Thanksgiving?

4    A.    I don't remember the exact date, but I believe it

5    was about then.

6    Q.    Sometime around there.  And I see that the date of

7    your expert report is what, sir?

8    A.    December 1st.

9    Q.    Is that unusual?

10   A.    Yeah, I'll say.

11   Q.    And why is that?

12   A.    Well, it was not very much time to review them,

13   the materials, and think about the issues.

14   Q.    And what's typical in a case like this, in your

15   experience?

16         MR. LICHTEN:  Objection.

17         THE COURT:  I don't know where you're going on

18   this.  This is all your fault, you know?  You have known

19   since I took over the case when we were going to go to

20   trial in this case.  That's why while I have been very

21   indulgent in hearing the testimony of the witnesses, it

22   should be on the record that I am absolutely

23   unsympathetic to any defects in case preparation.

24         I have been indulgent in the application of the

25   rules so that the case can be presented on the merits.

```
 1    I rather imagine that he was strapped for time.  So I
 2    don't know where we're going with this.
 3            Sustained.
 4            MR. SIMON:  I'm sorry, your Honor.  I'll move on.
 5    Q.    Now, Dr. Campion, what do you base your knowledge
 6    of the 2008 examination here on?
 7    A.    Well, I asked for all the materials that might
 8    bear on the technical aspects of the development of the
 9    test and validation of the test and, um, the key
10    documents include a 1991 validation report written by
11    the HRD organization, a 2000 job analysis conducted by a
12    consulting firm named Morris & McDaniel, and then
13    related documents describing the development of the 2008
14    examination primarily.  And I believe I've listed those
15    in my appendix to my report.
16    Q.    Okay.  So the documents you reviewed in
17    preparation for this case are contained in your expert
18    report?
19    A.    Yes.
20    Q.    Is that Exhibit D to your report?
21    A.    Yes.
22    Q.    Okay.  Now, you mentioned a 1991 validation
23    report.  Can you please turn to Exhibit 71 in the
24    exhibits.
25    A.    (Turns.)  Yes.
```

1    Q.    Is that the report you speak of?

2    A.    Yes, it appears to be.

3    Q.    1991 is a fairly long time ago.  Is that a problem

4    from your perspective?

5    A.    No.

6    Q.    Why not?

7    A.    Very often organizations will have a traditional

8    approach to hiring and promotion and so I actually look

9    at the fact that there's been a process in place for

10   many years as a good thing because it would, I think, be

11   less good to have an organization that changes how it

12   does promotions and hiring radically over time.  And

13   many of the large organizations that I work with have

14   approaches that they use that they continue to improve

15   over time.

16         So, for example, I have a client that has been

17   using a very similar approach for about 60, 80 years,

18   um, and it continues to get improved each time and

19   that's the way I look at this, that the basic approach

20   has been similar for many years and there's evidence

21   that it's improved over time and, um, and so forth.

22   To answer your question, I've explained way too much,

23   but I don't view that as a negative thing, no.

24   Q.    You also mentioned a 2000 job analysis?

25   A.    Yes.

1    Q.    Can you turn to Exhibit 39, please, in the

2    exhibits.

3    A.    (Turns.)  Yes.

4    Q.    Is that the exhibit that you're speaking of, the

5    document that you're speaking of?

6    A.    It appears to be.

7    Q.    And what is it about that document, if anything,

8    that you found important?

9    A.    Well, it appears to be an update to the job

10   analysis, which is something you would like to see, and

11   is keeping up on the -- any potential changes in the

12   work, and since it had been 9 years it seems appropriate

13   that it would be updated.

14   Q.    Okay.  Now, Dr. Campion, I'd like to turn our

15   attention to the test development processes generally so

16   that we have a baseline for how this all works.  Can you

17   just run us through the process of what's typically done

18   in your field?

19   A.    Sure.  Sure.  In the employment context usually

20   what you start out with is an analysis of the work.  I'm

21   sure you folks have talked about "job analyses."  And

22   from that is a determination of what skills, knowledge

23   areas, and abilities are required to do the work.  And

24   from that usually there's an evaluation of how best to

25   evaluate those attributes within the context of the

1   organization's situation.  And that might include

2   constraints such as, you know, the amount of time and

3   money and the procedures they experienced, adverse

4   impacts and other considerations.

5       Then once that determination is made usually there

6   is a process of converting the knowledges and skills and

7   other attributes into whatever the assessment would be.

8   In the case of a test, usually it's designing a "test

9   blueprint," we might call it, or a test specification

10  that describes a number of questions in each topic area.

11  After that the assessment would be developed by people

12  who hopefully know how to do that kind of work.  In this

13  case it would be people writing test questions who

14  hopefully know how to do that.

15      Then there would be some sort of evaluation of the

16  validity of the assessment prior or concurrent with its

17  development that would look, um, depending on the

18  approach to the validation, you might look at the

19  content of the assessments, reviews by subject matter

20  experts, or other analyses to evaluate the extent to

21  which that test is valid.  And we'll talk later about

22  other kinds of approaches to validity.  But presuming

23  that the validity is content-based, then it would have

24  some kind of a review like that.

25      Then the assessment might be pilot-tested if it's

1    possible.  In some cases it is, some cases it isn't.  In

2    the civil service context there's usually great concerns

3    about security, so the actual analysis may take place

4    after it's administered.  But as a part of that would be

5    an analysis of the characteristics of the assessment

6    from a statistical point of view and that might involve

7    modifying questions, keeping some questions, not keeping

8    others, looking at the -- what we call the "statistical

9    reliability" of the assessment, and that's how well or

10   how stable or consistent the assessment is in providing

11   the scores that describe differences in people.

12        Then the assessment would be used and then usually

13   there would be, as part of the process, is a set of

14   recommendations about the administration of the

15   assessment and how the scores would be used for making

16   decisions such as cutting scores or rank ordering or

17   ranking of subcomponents of the assessments that you're

18   using.  And so that, in a nutshell, is kind of the

19   overall process.

20   Q.    Thank you, Doctor.  Let's talk about what you were

21   asked to look at in this case.  Well, why don't you tell

22   me, what was your primary task in getting involved in

23   this case?

24   A.    Well, my initial task was to evaluate the

25   validity.

1    Q.    The validity of the 2005 Boston Police Department

2    lieutenant's promotional exam?

3    A.    Yes, primarily the job-knowledge test.

4    Q.    Okay.  And, first of all, what is "validity"?

5    A.    Well, the technical definition, which isn't really

6    too hard to understand, is it's the inferences you can

7    make from test scores.  So it's the extent to which the

8    numbers themselves have meaningfulness in terms of what

9    you're trying to use them to infer, and most often that

10   is future job performance.  So it's the extent to which

11   the numbers can make meaningful inferences about future

12   job performance.

13   Q.    Now, how, if at all, does the concept of validity

14   relate to job-relatedness?

15   A.    Well, my understanding, and I'm not an attorney,

16   but the Civil Rights Act stated that such hiring

17   procedures needed to be -- if they had adverse impact,

18   then you needed to prove that there was a business

19   necessity and the way business necessity has been

20   interpreted by industrial psychologists is

21   job-relatedness and job-relatedness is determined

22   through the process of validation.  So all of those are

23   somewhat synonymous terms for how we evaluate validity

24   in a practical sense.

25   Q.    Now, how does one determine that an exam is valid?

A.    Well, there are a number of different approaches,
but probably two are the most common.  The first is a
statistical approach where you would look at the actual
statistical relationship between scores on a test -- and
I'm using the term "test" broadly, it could be any way
you hire people, it could be an interview, it could be
an actual written test, it could be a review of resumes,
but let's call them all "tests" right now.  So it would
be the scores of your hiring procedures or your
promotion procedures statistically correlated with some
important criteria, and we call that "criterion-related
validation."

        So in the traditional design you might take
current employees on the job, test several hundred of
them, measure their job performance by having, for
example, their supervisors rate their job performance,
and then statistically correlating the two, and that
would be criterion-related validation.  And I just would
add parenthetically that industrial psychologists love
doing that and have done tens of thousands of those
studies in the last 110 years.

Q.    And why is that?

A.    I think we do like it.  No, I think it's viewed as
an important way of understanding the relationship and
looking at it in a statistical sense, and a lot of that

1    information has been published and summarized to

2    constitute the body of knowledge in my field.

3    Q.    Are there other ways to determine validity?

4    A.    Yes, the other most common way we call "content

5    validity" and that is where there is an attempt to

6    develop an assessment that either is a piece of the job

7    or it is linked to the important knowledge and skills of

8    the job, and the big difference is content validity is

9    more of a set of procedures and arguments and logic,

10   it's not a statistical matter.  And I would just again

11   note that it is something that is -- that it is feasible

12   to do a content validation study in most every

13   situation, whereas it's usually very difficult to do a

14   criterion-related study because of the expense of

15   testing a bunch of people, the availability of the

16   sample size, and then there are statistical complexities

17   that are -- that can make it very hard to do a

18   criterion-related validation.  And I'd be glad to speak

19   about those if it's relevant.

20   Q.    Right, and I don't think we need to get into that

21   right now.

22         But my next question would be is there -- in your

23   field is there a preference for criterion versus

24   content, is one better than the other?

25         MR. LICHTEN:  Objection to the form of the

 1    question.

 2        THE COURT:  No, is there a criterion?  I'm going

 3    to allow that.  You may answer.

 4    A.    As much as we like statistics, I don't believe so.

 5    Our Uniform Guidelines, which we'll be speaking about in

 6    a bit, as well as our testing principles from our

 7    professional association, both of those recognize these

 8    different alternatives and neither makes a statement

 9    that one is necessarily better than the other.

10    Q.    And do you believe one is better than the other?

11    A.    No, as a scientist I look at each one as offering

12    important information, um, and the information is a

13    little different, but the fundamental goal is the same,

14    I'm trying to gather evidence about the inferences that

15    can be made from test scores about future job

16    performance.

17    Q.    And you may have just answered this question, but

18    there are professional standards by which you determine

19    content validity, correct?

20    A.    Yes, it's, um -- yes, there are two or more sets

21    of documents that provide some guidance.

22    Q.    And what are those documents?

23    A.    Well, the only reason I'm hesitating is that the

24    guidance is reflecting both the fact that there is some

25    consensus in the field, but the guidance is also general

1    enough that it allows interpretation, and researchers

2    may not follow the exact same path.  In other words,

3    it's not a recipe of exact things to follow, it's more

4    guidelines and parameters, if you will.  So just a point

5    of clarification.

6    Q.    Okay.  Thank you very much.  But back to my

7    question which was what are those documents or those

8    guidelines that you're speaking of?

9    A.    Well, the first one and the one that gets the most

10   attention publicly and especially in legal contexts is

11   the document called the "Uniform Guidelines for Employee

12   Selection Procedures" and that document was published in

13   1978 by several government agencies in an attempt to

14   interpret how selection and testing and assessment

15   should be conducted, um, consistent with the Civil

16   Rights Act of 1964.  So it was a set of documents

17   designed to help interpret or define minimum

18   expectations.  And the government agencies were the --

19        MR. LICHTEN:  Your Honor, this is way beyond the

20   question.

21        THE COURT:  I think it is.  So I'll stop him

22   there.

23        MR. LICHTEN:  Yes, your Honor.

24   Q.    Now, Dr. Campion, there's other guidelines for

25   determining validity, content validity, other

1   professional guidelines?

2   A.    Yes, this Society for Industrial or Organizational

3   Psychology that I mentioned a while back has

4   "principles," they call them, principles for -- well,

5   hold on -- "for the validation and use of personnel

6   selection procedures."

7   Q.    And, I'm sorry, what are those "principles,"

8   describe them?

9   A.    Similarly they're a set of general guidelines

10   that, um, are an attempt to define parameters around

11   expectations for test development and validation.

12   Q.    And did you evaluate the issue of content validity

13   of the 2008 exam using any of these guidelines?

14   A.    Yes, I did, I used both sets of guidelines to

15   evaluate the exam.  Yes.

16   Q.    And what are the APA standards?

17   A.    Well, there is another organization called the

18   "American Psychological Association" and several others,

19   the names of which I cannot remember, that have what

20   they call "standards for psychological testing."  These

21   standards are broader, they apply to all uses of tests,

22   and tests for employment, it's just one of many uses of

23   tests.  Tests are also used, you know, for education,

24   for counseling patients, and in clinical contexts.  And

25   So they have a set of guidelines that are on testing as

1  well, they are broader, they are more general.  I would

2  note that the SIOP principles are intended to be

3  consistent with those standards, but usually the

4  principles and --

5  　　　　MR. LICHTEN:  Your Honor, again way beyond the

6  question asked.

7  　　　　THE COURT:  No, we'll let him finish.

8  　　　　What is it you were going to say?

9  　　　　THE WITNESS:  Thank you, your Honor.

10  A.　　The SIOP principles were intended to interpret the

11  APA guidelines for employment contexts, so they're more

12  specific to employment.  So that's why I focused on

13  them.

14  Q.　　Okay.  Thank you.

15  　　　　Now, was there a particular type of validity

16  evidence that was used for purposes of the 2008

17  lieutenant's exam?

18  A.　　It appears to me that the City attempted to use

19  content-validation here.

20  Q.　　Thank you.  So what did you do in order to

21  evaluate the content validation of that exam?

22  A.　　Well, I took both, in turn, the Uniform Guidelines

23  and the SIOP principles, and broke them down into their

24  individual recommendations.  Both of them make what I

25  think are maybe a dozen or so recommendations and I laid

1   each of those recommendations out and then evaluated the

2   2008 exam and the cumulative evidence against those, um,

3   recommendations.

4   Q.    Okay.  So why don't we turn to Page 9 of Exhibit

5   73, which is your expert report.

6   A.    (Turns.)  Okay.

7   Q.    Do you see where I am?

8   A.    Yes.

9   Q.    And this is where you, in fact, evaluated the 2008

10   exam in relation to the Uniform Guidelines?

11   A.    Yes, it is.

12   Q.    Now, looking at Subsection A from Paragraph 23 on

13   Page 9.

14   A.    Yes.

15   Q.    You speak of the "Content-validity strategy should

16   be appropriate to the employment context."  That comes

17   out of the Uniform Guidelines?

18   A.    Yes.

19   Q.    And what does that mean?

20   A.    Well, it's like so many things, peeling an onion,

21   and it gets a little more complex or deeper with each

22   level.  But the guidelines break down content validation

23   into two possible alternative strategies for content

24   validation and one of them is that you can -- you can

25   simulate or sample part of the job.  So one way to

1    establish content validity is if it's a situation where

2    you can actually have the candidate perform a piece of

3    the job, and that's possible in some cities but not in

4    others.  And the second approach is where -- is where

5    you're measuring some attribute like knowledge, skill,

6    ability, and that knowledge, skill, ability meets

7    several conditions.

8    Q.    Okay.  And what are those conditions?

9    A.    Well, there's three or four depending on how you

10   want to count.  Number 1 is that you've got to be very

11   clear about the definition of what the skill or

12   knowledge is, so you've got to be real clear exactly

13   what it is, and it's best if things can be behavioral,

14   in other words that you can see it or define it in some

15   way that's very obvious and clear.  Second is it has to

16   be important or shown to be important to the job.  And

17   then as either part of that one or a separate one, it's

18   got to be something that's a prerequisite, in other

19   words, a person needs to have it before they are

20   promoted or hired.  And then lastly it's got to be --

21   and what the term is, is a "representative measure" of

22   that attribute.

23   Q.    And what does that mean?

24   A.    I was going to say that's a little trickier, but

25   it's how good your measure is of that knowledge.  So a

1    silly example might be if you asked two math questions,

2    would that be a representative measure?  No, you've got

3    to ask more than that.  If you instead ask 30 math

4    questions and those 30 math questions were shown to

5    represent all the different kinds of math knowledge

6    needed on the job, that would be a lot more persuasive.

7    So the issue is how representative and much of the

8    research that goes into content validation is around

9    demonstrating those things.

10   Q.    Now, did you evaluate the 2008 exam in the context

11   of this appropriateness for the context?

12   A.    Yes.  Yes.  It appeared to me that the 2008 exam

13   would be -- the approach to validation was that second

14   approach where there's a -- a trying to measure a

15   knowledge as opposed to a sample of behavior.

16   Q.    Okay.  And how do you know that?

17   A.    Well, a bunch of things.  We, um -- there's a

18   bunch of aspects that go into it but one of the first

19   things you do is you say, "Well, is it possible that the

20   situation here could lend itself to that type of content

21   validation?" and my review indicated that those four

22   conditions, at least preliminarily, were applicable.  So

23   we were trying get at a knowledge and there was this job

24   analysis which we will talk about, that attempted to

25   prove that the knowledge was important, and it was a

1    prerequisite, and there were efforts to try to develop a

2    representative exam.

3         Now, later on I go and evaluate each of those in

4    more detail, but it appeared as though it was at least

5    possible to validate the selection procedure based on

6    that second approach.

7    Q.    Okay.  And what basis of -- I guess my question

8    was how do you know that, are there particular documents

9    that you're referring to in order to learn those things?

10   A.    Yes.

11   Q.    And what are they?

12   A.    Yes, there were two separate job analyses, one was

13   in 1991 and then there was one in 2000, and then there

14   were sort of -- kind of mini-job analyses or checks on

15   the continuing relevance of the skills and abilities for

16   the 2008 exam.  So they did kind of a confirmatory step

17   where they had a group of subject matter experts review

18   the tasks and skills to make sure they were still

19   current.  And so all three of those documents were

20   relevant as a starting point.  But then I tried to

21   evaluate all the components, the remaining components as

22   well.

23   Q.    Okay.  Let's move on to -- you spoke about job

24   analysis.  What does the Uniform Guidelines say or what

25   do the Uniform Guidelines say, if anything, about job

1    analysis?

2    A.    Um, job analysis appears to be about as

3    interesting to industrial psychologists as doing

4    validation studies.  We love job analysis.  And it's

5    always -- as I tell my students, it's always the right

6    answer for an exam question.  So no matter what the

7    question on my exam, start with the phrase, you know --

8    start with the job analysis.  And it's not meant to be

9    funny, it's the issue of this whole business of

10   job-relatedness being that a touchstone to business

11   necessity.  So everything you do should be job related,

12   at least that's the way we teach you in human resources.

13   So starting out with an understanding of what the work

14   is about is sort of the first and foremost thing that I

15   always want people to think about.  That's both in

16   practice and in teaching.  So --

17   Q.    And -- I'm sorry.

18   A.    So I was just going to say, job analysis is a big

19   deal and they give a lot of advice on job analysis.

20   Q.    Okay.  And that was my next question.

21         Do the Uniform Guidelines speak to job analysis

22   and what should be in there?

23   A.    Yes, they do.

24   Q.    And what do they say?

25   A.    Well, again I've kind of broken it down into some

1  interesting substeps.

2       If it would be okay to look at my report?

3  Q.    Sure.

4  A.    Well, one of the things -- the first thing they

5  say is it should be a good description of the job

6  analysis method provided.  So there should be a good

7  description.

8  Q.    And you've analyzed that in reference to the 2008

9  exam?

10 A.    Yes, I did.

11 Q.    And what did you conclude?

12 A.    Well, there are several things, there's the 1991

13 validation report that had a thorough job analysis.

14 Q.    And that's Exhibit 71?

15 A.    Yes, it is.

16 Q.    Can you show us in there what you're talking about

17 exactly?

18 A.    (Looks.)  Just for illustration there were so many

19 examples, so I'm struggling.  So, for example, on Pages

20 105 and 106, where it is a listing of the skills -- in

21 fact really much of the document is a listing of skills

22 and abilities, um, perhaps most of it describing in

23 great detail.  I think the document itself, the 1991 is,

24 um, 134 single-spaced pages and I don't know how many

25 pages in the appendices, and they had a very large

1  number of tasks and skills and abilities.  I guess we'll

2  talk about that in a minute.

3  Q.    Now, um --

4  A.    Can I add that we also have the 2000 report, which

5  itself was also, you know, another 65 double-spaced

6  pages plus appendices, and that also again had many

7  hundreds of tasks and KSAs.

8  Q.    Okay.  And what else do the Uniform Guidelines say

9  about job analysis?

10 A.    Well, the second thing is they say the work

11 behaviors of the tasks should be described as part of

12 that job analysis.

13 Q.    And were they for the purposes of the 2008 exam?

14 A.    Yes, in great detail.  The '91 job analysis had

15 136 tasks and the 2000 job analysis had 302 tasks.  So a

16 great amount of detail.

17 Q.    Okay.  What else, if anything, did the Uniform

18 Guidelines say about job analysis?

19 A.    Yes, if you can recall that part of the

20 definition -- in order to prove content validity, you

21 need to show that the knowledge or whatever it is that

22 you're measuring is important, and so that the

23 guidelines say that there should be some measure of

24 importance.

25 Q.    And did you find that?

A.    Yes, it's customary for job analysis.  And when I
say "customary," I don't mean it always has to be done,
but it's very common that there will be a survey that
they will conduct with employees that confirms that the
tasks are important and which ones are most important so
they can develop the assessment based on the important
tasks.  And the reason you do that is the identification
of the original knowledge areas -- and I guess we're
speaking about tasks now, it often is sort of a
brainstormed effort, you get as many things as you can.

So in the case of the '91, the beginning study,
the researchers did a survey of other jurisdictions,
they did a review of the research literature, and they
got together, you know, everything they could on the
tasks and, you know, observed the job, did other things,
focus groups are common as well, and so you did a big
number of tasks but you don't know how important each is
and you don't know if it applies to all jobs, so you do
a survey because it's the easiest way to gather that
information.  And part of that survey is you show the
people -- the job incumbents very often, these tasks and
you say "Rate them on importance, high, medium and low."
Q.    And you don't need to go through every single one,
but there are other particularly important parts of the
Uniform Guidelines that speak to the issue of job

1    analysis?

2    A.    Yes, a few more things.  If you recall, again the

3    definition of the appropriateness of content validation

4    and the approach to content validation required that

5    there be a very clear definition of what the skills and

6    knowledges, in this case knowledges are.  So the

7    guidelines say that the operational definitions of the

8    knowledge or skills or abilities should be very clear.

9    And, um, so that's another one of their guidelines.

10   Q.    And did you examine that issue with respect to the

11   2008 exam?

12   A.    Yes.

13   Q.    And what did you find?

14   A.    There are several analyses that bear on this.  For

15   example, the first thing is the statements that the job

16   analysis contains that describe the knowledge areas are

17   very detailed, so we have detailed definitions of the

18   statements of the skills.  They're usually described in

19   terms of either declarative or procedural knowledge.

20   There are also --

21   Q.    Can I stop you there.  What does that mean

22   exactly?

23   A.    Well, a knowledge distinguished from an ability is

24   something usually that is acquired through study or

25   other life's experiences, it's not something that

1    you sort of inherently have for a long period of time.

2    Like basic intelligence might be something that's an

3    ability, but knowledge is usually something that -- it's

4    an acquired body of information and it can be both

5    declarative, you know, "What's the capital of South

6    Dakota?  Anybody know?"  "No."  And then the other is --

7            THE COURT:  It's Pierre.

8            THE WITNESS:  Thank you, your Honor.

9    A.    Then the other is procedural or how you do things.

10   And both of those are appropriate.

11   Q.    Before I interrupted you you were continuing.  I'm

12   sorry.

13   A.    Well, I was saying that the operational definition

14   of the knowledge areas was supported partly by the

15   detailed definitions that are provided of the knowledge

16   areas, but then there was an effort to show linkages

17   between the knowledge areas and the tasks to show sort

18   of really in reverse which tasks -- excuse me, which

19   knowledge areas are required by which task?  But also it

20   goes to the issue of to what extent are these knowledge

21   areas important for a wide range of tasks, if they are

22   linked to them, and are needed to perform those tasks?

23   And that gives another indication of how important the

24   knowledge areas are.  And then it also helps us

25   interpret the meaningfulness of the knowledge because

1  you can understand how it is used on the job.

2         So, for example, to use an analogy, if I'm

3  developing a math test and I have a -- if I'm trying to

4  measure math it's clearer if you can say, "Well, how is

5  that math used?"  So if it's a store manager who needs

6  to calculate discounts and markups of products, then

7  you've got an idea of what type of math you need, it's

8  likely to be adding, subtracting, multiplying, dividing,

9  but probably there's no equations -- well, maybe an

10  equation, but probably not.  It's most likely whole

11  numbers and decimals, but probably not fractions.  So,

12  you see, by linking it to the task, you get a good idea

13  of the nature of the knowledge and see then that that

14  helps you develop test questions that are then

15  appropriate.

16  Q.     Okay.  Now, Dr. Campion, moving on, and I can

17  direct you to Page 13 of your report, to the next point,

18  something that the Uniform Guidelines call "operational

19  use."  What's that all about?

20  A.     Could I mention a couple more things about the job

21  analysis?

22         THE COURT:  Well, let him ask the questions.

23         THE WITNESS:  I'm sorry.

24  Q.     Were there more issues with respect to job

25  analysis that are important, Doctor?

A.    Well, I was just going to say that usually the

other part of it is the job analysis should include

information on the knowledges and skills and abilities

and in this case it appeared to me that it was because

we have a great number of knowledge areas where it

describes in great detail and, um --

Q.    Thank you.  And moving on to "operational use."

Do you know what I'm referring to there?  I may have the

term wrong now that I think about it.

A.    I'm sorry, I don't --

Q.    I'm on Subparagraph D of Page 13, and I may be

misquoting the Uniform Guidelines.  You tell me.

A.    Well, this guideline was likewise focusing on the

importance of the work behaviors that are measured and

that they should be work behaviors that constitute a

large portion of the job.  So as I described above, both

the job analysis studies describe how the important

tasks and KSAs were selected based on these importance

ratings and how the importance of each skill or

knowledge area was determined, um, was used to determine

then the number of test questions that would be asked on

each knowledge area.  And, um -- and then in the '91

exam, and this is I think customary in the civil service

context, there was an evaluation of the test questions

after the exam to see if there were any problems with

1    the test questions and then adjustments could be made to

2    candidate scores and that's because the test security

3    issues do not allow pilot testing in advance.  And this

4    is really somewhat, I think, more unique to --

5         MR. LICHTEN:  Your Honor, with respect, this is

6    not even close to the question that was asked.

7         THE COURT:  That's true.  So let's stop it there.

8    Go ahead.

9    Q.   Okay.  Dr. Campion, with respect to the 2008 exam

10   what evidence did you see, if any, of this notion of

11   work behavior selected should be important work behavior

12   as constituting most of the job?

13   A.   Well, we have the 1991 job analysis, we have the

14   2000 job analysis, and then in addition, right before

15   the 2008 exam, there was an exercise where a sample of

16   subject matter experts were asked to review the task and

17   knowledge statements from the 2000 job analysis to

18   ensure that they were still applicable, which is a

19   confirmatory step that was conducted.

20   Q.   Now, Doctor, do you happen to recall was there a

21   particular document or documents that showed those

22   things?

23   A.   Yes, there was.

24   Q.   And they were called what, sir, do you recall?

25   A.   Not right at this moment, but maybe I can find

1    them here.  (Looks.)  I believe they have that term

2    "task" or "TSA linkage" in them.  (Looks.)

3         MR. SIMON:  Just a moment, your Honor.  Sorry.

4         (Pause.)

5    Q.    Let's look at Exhibit 57, please.

6    A.    (Looks.)

7    Q.    Do you see where I am, Doctor?

8    A.    Well, actually, I was looking at --

9         THE COURT:  I beg your pardon?

10        MR. SIMON:  57.

11   A.    I'm sorry.  The document I was referring to just a

12   moment ago was Exhibits 55 and 56, that's the ones I was

13   referring to, and that was the "confirmatory step" that

14   I mentioned.

15   Q.    Okay, and then let's look at Exhibit 55, please.

16   A.    (Looks.)

17   Q.    And what does this document mean to you?

18   A.    Well, it appeared to be a table showing the

19   results of what is entitled a "Lieutenant Task Ratings,"

20   but it was a judgment by subject matter experts as to

21   the continuing importance of the, um, of the tasks.  And

22   then 57 was a judgment about the continuing importance

23   of the knowledge areas that were part of the exam.  And

24   so I interpreted this as a -- as just a confirmatory

25   step to ensure that the job had not changed radically

1    and that the test content or the previous blueprint was

2    still correct.

3    Q.    And how about Exhibit 56?

4    A.    So 56 appeared to be for the knowledge areas.  So

5    you can see in the left-hand column it says "KSA

6    number," but really what those are is the knowledge

7    areas from the examination.  So law, supervisory, police

8    functions, administration, and down the list.

9    Q.    And what is the document showing?

10   A.    Well, they appear as though these were the

11   judgments of subject matter experts.  You can see

12   they're referred to as "SMEs."  And I'm presuming that

13   they mean referring to specific individuals who were

14   involved and the ratings that they provided.

15   Q.    Okay.  And what is a "subject matter expert"?

16   A.    It can be anyone who has specialized knowledge of

17   the work.  So it's commonly either a job incumbent or a

18   supervisor over that job.

19   Q.    Now, Doctor, I want to direct your attention to

20   Exhibit 60, please.

21   A.    (Looks.)

22   Q.    Do you see that?

23   A.    Yes.

24   Q.    What is this document?

25   A.    Well, this was a -- this was another planning

1    document -- I should say a more detailed planning

2    document, that evaluated -- or I should say described

3    the plan for test development where it showed for each

4    of those knowledge areas that were momentarily ago shown

5    to be still relevant to the job.  It shows the detailed

6    knowledge, um, the statement itself, how it is relevant

7    to the sergeant, lieutenant, and captain examinations in

8    terms of the number of items that would be budgeted to

9    that knowledge area.  So it's called an "outline" here,

10   but elsewhere it could be called a "blueprint" or "test

11   specifications."  Oh, I'm sorry, and it also shows the

12   test questions in the actual examination itself, um,

13   reflecting that knowledge.

14   Q.    Okay.  I am now looking at Page 14 of Exhibit 73,

15   your report.

16   A.    (Looks.)  Yes.

17   Q.    And this refers, does it not, to a Uniform

18   Guideline reflecting or discussing "operationally-

19   defined and necessary prerequisites to the performance

20   of important work behavior."  Do you see that?

21   A.    Which one are we on?

22   Q.    Sub G?

23   A.    G, okay.

24   Q.    And is that indeed part of the guidelines?

25   A.    That would be right, and that's an issue that we

1   have discussed already, the fact that it was --

2   Q.    Okay.

3   A.    -- the fact that those statements were clearly

4   defined, that they were shown to be related to the work,

5   they were shown to be important and prerequisite, and

6   then, as we were discussing, we believe the test is

7   representative because it measures a wide range of

8   knowledge areas that are linked to most of the job tasks

9   and the knowledge areas cover a number of topics and

10  there are a large number, 100.

11  Q.    Okay, Doctor.  Thank you.

12        Now, the guidelines speak to something called

13  "reliability of selection procedure," correct?

14  A.    Yes.

15  Q.    Explain that to us, what does that mean?

16  A.    Well, "reliability" is, in plain language, it

17  refers to the consistency, the repeatability or the

18  dependability of a measure and it's really how good a

19  measure is as a measure of itself.

20  Q.    And is that something you examined with respect to

21  the 2008 exam?

22  A.    Yes.

23  Q.    And what did you find?

24  A.    Well, there's also a way to look at it

25  statistically and there are a number of different

1    statistics that can bear on this topic and one that's

2    commonly done in a written examination is something

3    called "internal consistency reliability," it is a

4    statistical indicator of the extent to which the

5    different test questions are measuring homogenous

6    content, so they're all measuring the same thing.  But

7    it also has a value in that it shows the extent to which

8    another exam with a similar number of items would give

9    the same scores.

10        So an issue is whether, you know, there's

11   something unique about this 100 questions?  And what

12   this index shows is that if you had another 100

13   questions that were drawn from the same domain as this

14   100 questions, you would get very similar scores.  And

15   that's a useful thing when it comes to testifying, to

16   know that your scores are not unique to just these

17   items.

18   Q.    And how does that concept or those concepts relate

19   to the 2008 exam?

20   A.    Well, they analyzed it in the '91 report and I

21   don't see -- and the value they obtained was a 79, which

22   is in the acceptable range.  You're usually looking for

23   something above .6 or .7.  A 1.0 would be the upper

24   limit, but never achieved.  But they looked at it in

25   '91, they had -- they did not look at it since in

1    anything I observed, but I'm not concerned because the

2    exams are all the same, they're all 100 questions, and

3    this index is tremendously influenced by the number of

4    questions.  There are similar questions on the same

5    topic.  So I'm confident the reliability would be

6    similar.

7    Q.    Do the Uniform Guidelines allow for that kind of

8    predictive -- the prediction you just made about the

9    2008 exam, if you understand my question?

10   A.    Yeah, I don't think the Uniform Guidelines

11   really -- they just say you should look at reliability,

12   um, and so do the principles.  And so I believe they

13   have looked at it here, I believe it is adequate, and,

14   you know, with 100 questions, with 100 knowledge

15   questions, it would be an unusual exam that would not be

16   reliable because that's a good number of questions and

17   the topic is fairly homogenous, so.

18   Q.    Okay.  Now, one of the guideline -- one of the

19   guidelines speaks to the topic of "ranking."  Do you

20   know what I'm referring to?

21   A.    Yes.

22   Q.    Can you explain to us what the guidelines say

23   about that?

24   A.    The guidelines, um -- let me just think for a

25   moment.

1          The guidelines would like to see ranking used less

2     often because even they knew in 1978 that ranking

3     sometimes can increase adverse impact.

4     Q.     Okay.

5     A.     There are differences in test scores between

6     subgroups and ranking is more likely to --

7     Q.     I'm sorry.  I don't mean to interrupt.

8          THE COURT:  I'm not sure I follow that.  Have you

9     just testified that a goal here is to see ranking less

10    often?

11         THE WITNESS:  I believe the Uniform Guidelines

12    wanted to make it more difficult to use ranking because

13    they worried it would create adverse impact.

14         THE COURT:  All right.  And explain that, what do

15    you mean by that?

16         THE WITNESS:  Well, if you have any differences

17    between subgroups, if you use the test scores to select

18    the very highest of the candidates, then the adverse

19    impact is likely to be greater compared to if you use

20    the scores to set a minimum cut on the bottom, there

21    only had to be a minimum level of knowledge, and then

22    you would see less adverse impact.

23         THE COURT:  Well, let me say it back to you, and I

24    know as the factfinder I must be very wary of using my

25    own life experience and applying it here.  I'm sensitive

1    to that.  But I teach and so I grade.  And when I grade

2    in accordance with the instructions from the institution

3    I actually -- for years I can't recall being in the

4    process of giving number grades, but that would be

5    ranking, correct?

6         THE WITNESS:  Yes, that's right.

7         THE COURT:  So many institutions today go to a

8    pass/fail or to an honors, that would be setting -- the

9    pass/fail would be setting the minimum?

10         THE WITNESS:  Right.

11         THE COURT:  And when I -- because we're now in the

12    fifth day of trial here, when I grade on a -- with

13    requirements that I give As, Bs, Cs, Ds, et cetera,

14    or sometimes pluses and minuses, that's what's known as

15    "banding," that all the people who get a B, though there

16    may be subtle differences in my review of their essay

17    questions, they get a B in that band.

18         Have I got the understanding correct?

19         THE WITNESS:  Yes.

20         THE COURT:  And in your work the language is being

21    used the way I understand it in my grading?

22         THE WITNESS:  Right, grading and banding would be

23    very similar.

24         THE COURT:  Okay.  Go ahead, Mr. Simon.

25         MR. SIMON:  Thank you, your Honor.

1  Q.    Now, what do the Uniform Guidelines say about

2  ranking?

3  A.    Well, they say that there should be additional

4  evidence that more of the knowledge leads to, you know,

5  more of the things you're predicting and so a higher

6  level of job performance.  So they would like to see

7  some additional evidence before you use ranking.

8  Q.    And did you look for such evidence with respect to

9  the 2008 exam?

10  A.    Well, I really think there's a couple of kinds of

11  evidence and one is the 2000 job analysis which asked

12  subject matter experts that question directly, "Does

13  more of this knowledge area differentiate job

14  performance?"

15  Q.    And what did they say?

16  A.    So that evidence generally people felt that the

17  more knowledge you have the better the lieutenant you

18  could be, but there's broader evidence and that is all

19  of these -- remember I told you 110 years, tens of

20  thousands of studies?  Well, there's been a bunch of

21  summaries of these studies called metaanalyses, which

22  are literally analyses of analyses, and those studies

23  summarize the literature and there is literally

24  overwhelming evidence about the validity of knowledge

25  tests and that validity is based on the statistical

1    relationship which looks directly at this topic, that

2    higher scores lead to higher job performance.  That's

3    what the statistical correlation actually shows.  So all

4    of these metaanalyses are very extensive proof of --

5    that more is better.

6        THE COURT:  Again let me engage you here.  I'm

7    following your testimony to say that, um, a way to

8    support ranking or at a lesser level of being discrete,

9    banding and the like, is that if greater knowledge on

10   the test is an accurate predictor of better job

11   performance, then of course you'd want to do it.  Is

12   that your testimony?

13       THE WITNESS:  Yes.

14       THE COURT:  And you're telling me these

15   metaanalyses confirm, at least among valid exams, that

16   the better you do on the exam the better you're going to

17   do in practice?

18       THE WITNESS:  That's right.

19       THE COURT:  I -- well, earlier witnesses in this

20   case posed things that I've heard, for instance, about

21   the LSATs, the law school admission tests, where, um, I

22   have some familiarity, and it is common wisdom -- which

23   may mean that it is not very valid at all, but it is

24   common wisdom that the LSATs predict very well law

25   school performance, but law school performance is no

1    predictor at all of success in the profession as

2    measured by monetary remuneration or contributions in

3    the profession as measured by academic appointments or

4    public service jobs.

5           THE WITNESS:  Sure.

6           THE COURT:  Now that's the common wisdom that I

7    think I know.  I'm not asking you about that.  We're

8    talking about police lieutenants.

9           So one of the other witnesses here, when I posed

10   that question, said, "Well, that shows you that written

11   examinations are pretty good predictors of the ability

12   to take written examinations," i.e. what goes on in law

13   school.

14          THE WITNESS:  Uh-huh.

15          THE COURT:  But when you get out in the field, and

16   that's where lieutenants are -- though I've heard

17   testimony that it's desk jobs, but it's a command

18   position, so do you think this is valid for that type of

19   in-the-field command position with the myriad of

20   responsibilities and judgments that have to be made,

21   interpersonal, the community, suspected offenders?

22          THE WITNESS:  Uh-huh.  Uh-huh.

23          THE COURT:  Do you understand that as a question?

24          THE WITNESS:  I do.  I understand it perfectly.

25   And it comes up very often.

1          THE COURT:  All right.

2          THE WITNESS:  Could I give you a couple of

3     different answers?

4          THE COURT:  I'm interested.

5          THE WITNESS:  First of all, LSAT scores are

6     intended and designed to predict law school success, so

7     that's their main focus, and they do it pretty well, and

8     the same with our General Management Admissions Test to

9     be used for management schools and a wide range of

10    others.  Whether it predicts beyond law school, I don't

11    know, or whether law school grades predict, as you say,

12    is really a separate question, um, and it might not, it

13    might not predict very well.  Usually we find selection

14    information predicts best in the short term and then

15    fades over time.  And so if you could follow employees

16    for ten years and find more validity earlier than later,

17    we've even got a term for it, it's called a "simplex

18    pattern," which means it's continuing to go in the same

19    direction, of smaller.

20         Most of the validation research in personnel

21    selection though looks at job performance and job

22    performance, you know, takes into account all these

23    things, you know, that jobs involve, you know, more than

24    just using your knowledge they involve lots of other

25    things, and so most of the validity data that we have is

 1   in a job performance context.  And so that would be in a

 2   law school, if you could say how smart is an attorney or

 3   how successful is an attorney, that would be -- or how

 4   knowledgable is an attorney or how successful they are

 5   would be what these validation studies usually looked

 6   at.  But there's so much evidence.  It's overwhelming.

 7   As I say it's 110 years, tens of thousands of studies.

 8   We're positive this stuff works.  And now we can debate

 9   about the --

10         THE COURT:  And "this stuff," we're talking about

11   are written examinations?

12         THE WITNESS:  In particular, but also we have good

13   data on a wide range of other selection procedures too.

14         THE COURT:  Well, I, of course am dealing with

15   this particular case, so I've got this 2008 examination

16   and the written examination counted 80 percent and then

17   there was an experience and education part that counted

18   20 percent and that's it, and then over the five days

19   I've heard about other ways to test with boards and with

20   simulations and with so-called "in-boxes."  So what I

21   understand you to be saying is that properly-designed

22   written tests -- and I'm going to go step by step, that

23   written tests are pretty good?

24         THE WITNESS:  Yes, that's kind of where it all

25   started.

1      THE COURT:  And now today properly-designed

2  in-boxes, independent boards, they're pretty good too?

3      THE WITNESS:  It kind of depends.  It's hard to do

4  those well.  They've got to be really well-designed and

5  many are not.  But if they are really well-designed,

6  they can do a good job.

7      THE COURT:  I'm just trying to capture what you're

8  testifying to.

9      So I've made mention now -- and maybe counsel are

10  going to go into it as we go along, but there's an array

11  of things that could be done.  Originally it was written

12  examinations.  We thought those were as neutral as they

13  could be and people in your profession have spent a lot

14  of time trying to work out valid written examinations.

15      THE WITNESS:  Right.

16      THE COURT:  So your testimony is that

17  properly-designed, and there's a lot of ways to analyze

18  that, and that's our oldest tool after all, so you stick

19  with your testimony that those are a pretty good

20  evaluator of job performance when properly-designed?

21      THE WITNESS:  Yes, a good predictor of job

22  performance.

23      THE COURT:  A predictor.  Thank you.

24      THE WITNESS:  Uh-huh.

25      THE COURT:  Now, these others, you're familiar

1  with them and you're testifying to me that maybe, but

2  it's a lot harder to design in part perhaps because we

3  have less experience?

4         THE WITNESS:  Exactly right.  Exactly right.

5  They're a little trickier to use.  But we have a number

6  of selection procedures that do a pretty good job beyond

7  just job knowledge exams.

8         THE COURT:  Okay.  I've interrupted over-long,

9  Mr. Simon, so go ahead.

10         MR. SIMON:  Thank you, your Honor.

11  Q.    Now, Doctor, we had been talking about obviously

12  this concept of the ranking and what the Uniform

13  Guidelines require and you looked into that with respect

14  to the 2008 exam, yes?

15  A.    Yes, I did.

16  Q.    And what did you find in that regard?

17  A.    Well, there was really a couple things, aside from

18  what I've mentioned before, that we have evidence from

19  the science in general about there being a linear

20  relationship between test scores and job performance and

21  aside from the 2007 job analysis we also have the

22  unusual context here of being a civil service merit

23  system where ranking is required and, you know, it's

24  something that was put into those merit principles to

25  avoid favoritism, so it isn't the most capable that gets

1    the job.  So that's a constraint of the situation that

2    may not be true elsewhere.

3    Q.    Okay.  Now, Dr. Campion, you've reviewed documents

4    relating to the 2008 exam, right?

5    A.    Yes.

6    Q.    As well as the 2005 exam, correct?

7    A.    Right, yes.

8    Q.    And you've evaluated those documents in light of

9    the Uniform Guidelines validity recommendations?

10   A.    Yes.

11   Q.    And you formed an opinion to a reasonable degree

12   of scientific certainty about whether the 2008 exam is

13   valid under the Uniform Guidelines?

14   A.    Yes, but we've not gotten into all of it.  But,

15   yes, I have.

16   Q.    Is there anything in particular that we haven't

17   gotten into that you would like to speak to?

18   A.    We skipped some details, but they're in my report.

19   I don't want to belabor it.

20   Q.    If they're details, then we'll skip them.

21   A.    Okay.

22   Q.    But in any event what is your opinion in that

23   regard?

24   A.    It's my opinion that you take the Uniform

25   Guidelines requirements and you evaluate the

1  documentation for the 2008 exam.  It's clear to me that

2  they appear to be met well enough.

3  Q.    Now, Dr. Campion, you also evaluated the 2008 exam

4  in light of the SIOP principles, correct?

5  A.    Yes, I did.

6  Q.    And if we look at Exhibit 76 -- are you with me?

7  A.    The exhibit?

8  Q.    Is 76.  Your report is 73.  I'm looking at 76 now.

9  A.    Okay.  (Looks.)  Yes.

10  Q.    Are those the principles about which we're

11  speaking of?

12  A.    Yes.

13  Q.    Do you know when these principles were made?

14  A.    There have been, I believe, four -- this is the

15  fourth edition and the fourth edition is dated 2003.

16  Q.    But in any event the SIOP principles offer

17  additional guidance than the Uniform Guidelines,

18  correct?

19  A.    Yes, there's a fair amount of overlap, but some

20  things in addition, yes.

21  Q.    Well, let's skip the overlap for now, let's talk

22  about some of the additional things or different things

23  that are in the SIOP principles.

24  A.    Okay.

25  Q.    With respect to content validity.

1    A.    Yes.

2              MR. SIMON:   And just to direct your Honor --

3    and I'm sorry if I'm leaving you adrift --

4    Q.    But if you look at Page 16 of your report, Paragraph

5    25, Subparagraph A.

6    A.    Yes.

7    Q.    And the first principle talks about "Jobs content

8    in a sample should be defined."  Do you see that?

9    A.    Yes, I do.

10   Q.    And what does that mean?

11   A.    Well, that's much the same as the Uniform

12   Guidelines recommendation, that you should conduct a job

13   analysis.  The only thing that's different is the SIOP

14   principles recognize that -- they ask for clarity with

15   regard to what should be included in the exam and what

16   you did not include and why.  That usually is based on

17   importance, but they recognize more that there might be

18   aspects you might not include because of other things,

19   you know, constraints of the situation, for example.

20   Q.    Okay.  And I'm now on Page 17 and you cited some

21   sources for -- well, let me take a step back and ask a

22   better question.

23          So you evaluated the 2008 exam in light of this

24   principle?

25   A.    Yes.

1    Q.    And what did you find?

2    A.    Well, I found that -- I thought it was fairly

3    clear, taking the totality of the evidence of, um, that

4    they conducted their job analysis, they identified the

5    important knowledge areas, they linked them with the

6    exam, they only used the important knowledge areas, they

7    converted the knowledge areas into, you know, detailed

8    statements, they created test specifications, and so I

9    thought there was a fairly clear line of sight between

10   the job analysis and the test in terms of what was

11   included and excluded, so I thought that it met that

12   principle pretty well.

13   Q.    And one of the things that you cite in that regard

14   is something called "BPD Source Compilation by KSA," do

15   you see that?

16   A.    Yes, I do.

17   Q.    Can you turn to Exhibit 57 where I think I was

18   wrong in directing you before.

19   A.    (Turns.)  Yes.

20   Q.    Can you tell us what this document is?

21   A.    This appears, um, to be -- I want to just make

22   sure I'm looking at the whole thing.  This appears to be

23   a description of the linkages between the knowledge

24   areas that are on the exam and the source documents of

25   the knowledge from which the exam questions on that

1    topic were written.  So knowledge of, you know,

2    pertinent federal, state and municipal laws and

3    ordinances goes on for a sentence and then linked to

4    that would be motor vehicle law, cruiser guide, juvenile

5    field manual, something called the "PDR CIP," and those

6    are the documents from which they wrote the test

7    questions on that knowledge area.  And that is the same

8    for all the knowledge areas.

9    Q.    Okay.  Now, let's -- and something you cite to is

10   "Reading List Announcements" next, do you see that?

11   A.    Yes, I do.

12   Q.    Now let's look at Exhibit 1, please.

13   A.    (Looks.)

14         THE COURT:  Where are you now?

15         MR. SIMON:  I'm on Exhibit 1.

16         THE COURT:  Exhibit 1 in this case?

17         MR. SIMON:  In this case, that's right.

18         THE COURT:  All right.

19   A.    (Turns.)

20   Q.    Do you see where I am, Dr. Campion?

21   A.    Yes, I do.

22   Q.    Well, you cited to this document.  Why did you do

23   that?

24   A.    I thought it illustrated the point that I was

25   citing it for which was that, um, "The knowledge

1    requirement was converted into test outlines to guide

2    the development of the exams and communicate the content

3    to the candidates," which is somewhat unique to, I

4    think, the civil service context in employment, common

5    in education but not common in employment in general to

6    give this information in detail to candidates.  But it

7    is common in civil service and is consistent with the

8    principles or recommendations, something I mentioned

9    later that is intended to enhance fairness to

10   communicate clearly what an exam is going to be about in

11   advance so that some people can prepare.

12   Q.     Okay.  I would direct your attention to Exhibit

13   11, quickly.

14   A.     (Turns.)

15   Q.     Do you see that?

16   A.     Yes, I do.

17   Q.     And -- well, you tell me what that is.

18   A.     It appears to be kind of more of the same, it is a

19   description of the required readings for the police

20   exam.  So it shows the, um -- for example, the Boston

21   Police rules and procedures, it lists them out by

22   numbers, and then it shows readings on police science

23   and it has a number of textbooks as well as other

24   documents.  And so it gives, in my view, a plan to

25   candidates as to what they should study to be

 1   competitive on the exam.

 2   Q.    Thank you, Doctor.  And the final one I want to

 3   look at is something called "Test outlines."  So if you

 4   would look at Exhibit 60.  And we've looked at it once

 5   before.  And I apologize for the cumbersome binders.

 6   A.    (Looks.)

 7   Q.    Do you see where I am?

 8   A.    Yes, Exhibit 60.

 9   Q.    Why did you cite this document in this regard?

10   A.    Well, this document, as we noted before, shows the

11   knowledge area, how it's linked to which jobs and how

12   many items there would be, and how the items on that

13   knowledge area show up in the test booklets, and this

14   document also includes some other material I thought was

15   relevant in general to the topic of the quality of the

16   test development.  In about five pages there is

17   something that's called the "item selection diary," and

18   it shows the process that the test developers went

19   through.  So it showed that the first day it was a

20   preliminary review of the items for culture bias, they

21   used an external consultant firm for that, and then

22   there was a review of the items for edits and other

23   reviews by subject matter experts and then they had the

24   subject matter experts evaluate the items on a number of

25   dimensions, you know, the suitability of the questioning

1    for different ranks, the difficulty or the readability

2    of the item, etc.  And so this document explains how

3    they did all of that review and how they selected the

4    items that they selected, and those not being, you know,

5    too difficult, those seeming to be well written.

6         So, you know, may I go on?  There's one more thing

7    in this document.

8    Q.    I'm sorry?

9    A.    I said there's one more aspect of this document.

10   Q.    Certainly.

11   A.    Then the last several pages show the actual

12   question numbers and what ratings they were given by the

13   subject matter experts.  So it shows, you know, for each

14   question what job it would be used for, sergeant,

15   lieutenant, captain, what skill it was intended to

16   measure, what the question number is on the exam, what

17   its evaluation was in terms of difficulty, readability,

18   and whether it should be recommended for use.

19   Q.    (Pause.)   Now, Doctor, if you look at the back of

20   Exhibit 60, there is sort of a chart called "Prospects"?

21   A.    Yes.

22   Q.    Is that what you're referring to?

23   A.    Yes.  I'm sorry.  I should have read that at the

24   top.

25   Q.    The item rating summary, is that -- that's where

1   you're talking about right now?

2   A.    That's right.  It appears to be the results of the

3   SMA review and the test development effort.

4   Q.    Yes.  That's Exhibit 60 we're talking about,

5   correct?

6   A.    Yes.  60 has three separate documents in it,

7   that's why.

8   Q.    Okay.  Let's go back for a minute to Exhibits 1

9   and 11, please.  I just want to be clear what those

10  were.  I'm not sure whether I was clear or not with my

11  questions.

12          THE COURT:  Let's go back to?

13          MR. SIMON:  1 and 11, your Honor.

14          THE COURT:  Thank you.

15  Q.    We'll start with 1, please, and I can help move

16  this along.

17          You described Exhibit 1 as a reading list and we

18  talked about that.  Can you compare Exhibit 1 to Exhibit

19  11?

20  A.    (Looks.)  Are you saying I should compare them?

21          THE COURT:  Could you compare Exhibit 1 to Exhibit

22  11 was his question.

23          THE WITNESS:  Okay.

24  A.    Yes.

25  Q.    And Exhibit 11 is merely an amendment to Exhibit

1    1, correct?

2    A.    Yes.

3    Q.    And how, if at all, do those documents relate to

4    Exhibit 57, which we looked at before?

5    A.    (Looks.)  Well, it appears to show the same

6    information, I have not checked it line for line, but 57

7    also shows the sources, meaning the documents used to

8    develop the test questions, and, um, that information

9    appears to be revised to make it appropriate to tell

10   candidates, "Please read these documents."  So one

11   document is, I think, a planning document for test

12   developers showing the information that they use to

13   develop the tests and the other document is a document

14   used to communicate to test-takers what they should

15   study.

16   Q.    And those documents are consistent, yes?

17   A.    They appear to be, but I have not checked them

18   line for line.  I see no reason why they would radically

19   differ.

20   Q.    Okay.  Thank you.  Now, let's see.

21         (Pause.)

22   Q.    Now, Dr. Campion, I want to direct your attention

23   to another principle.  Page 17.  And looking at

24   Subparagraph C.

25   A.    Yes.

1    Q.    Talking about "Job Content Domains."  Do you see

2    that?

3    A.    Right.

4    Q.    What's that?

5    A.    That is essentially the principle's description

6    that there should be thorough information about the job

7    and that it should be based on credible information.

8    And, um, probably one difference between the principles

9    and the guidelines is there's a little more interest in

10   the principles about ensuring that the information we

11   use is accurate and credible and addressing any problems

12   or errors and making sure your subject matter experts

13   are qualified.  So there's a little more attention

14   around that topic in the principles.  But otherwise both

15   of them essentially recommend that a job analysis be

16   conducted that identifies tasks, KSAs, et cetera, things

17   we have talked about.

18   Q.    And we talked about this already, but you reviewed

19   that with respect to the 2008 exam, yes?

20   A.    Right.

21   Q.    And what did you conclude?

22   A.    Well, as we discussed there's many documents that

23   bear on a job analysis and I think cumulatively they --

24   that it meets the mark.

25   Q.    Okay.  The principles -- moving on to Sub D now on

1    Page 17.  And this, just to be clear, is Exhibit 73,

2    your expert report?

3    A.    Yes.

4    Q.    And talking again about job analysis.  And we

5    talked a lot about this and I don't want you to repeat

6    yourself, but are there anything in the principles that

7    are different or additional than what we find in the

8    Uniform Guidelines on this subject?

9    A.    Yeah, I'm afraid I preempted you a little bit when

10   I said that the principles mention about the credibility

11   of the source because really it's in this D, starting on

12   17, where they do that, they essentially say to do a job

13   analysis, make sure your sources are credible, and make

14   sure that you evaluate, um, you know, the subject matter

15   experts, et cetera.  But I would note one little

16   additional detail.

17   Q.    Sure.

18   A.    Sub-bullet 3 on Page 18 they get a little more

19   explicit than the guidelines around something we call

20   "psychometrics."

21   Q.    I'm sorry.  Can you please explain to us what

22   psychometric properties are?

23   A.    Yes.  "Psychometrics" is essentially statistical

24   quality indicators for psychological measures,

25   "psychological measures" being defined as "measures of

1     things you can't see," so mental ability, attitudes,

2     interview answers, whatnot, psychological things that we

3     try to measure.  There is a set of statistics, a highly

4     developed set of statistics about how to analyze the

5     quality of those and one big, big one is reliability.

6     That's a part of psychometrics.

7     Q.    And we talked about that?

8     A.    We talked about that, and then there's a bunch of

9     other things they recommend.  And I would only note that

10    in -- that that is something that they did a lot of in

11    the '91 analysis, looking at those item analyses.  And

12    it's common to do so at some point, and so the SIOP

13    principles address that.

14    Q.    Okay.  And you looked at whether the 2008 exam

15    meets this principle, correct?

16    A.    Well, as I say it was addressed in the 1991 study.

17    I didn't see subsequent item analyses, but that doesn't

18    mean it didn't occur, I know that they do this after.

19    The civil service process requires an after-the-exam

20    review of complaints around test questions.  So even

21    though I didn't have any documents, I know that that

22    occurs.

23         MR. LICHTEN:  Your Honor, I object and move to

24    strike.  He said even though he's never seen any

25    documents --

1          THE COURT:  Believe me, I'm listening, and so much

2    of the answer that says "I know that occurs" shall be

3    stricken.  It's clear from his report that's his

4    inference, but I'll strike that out.  Go ahead.

5          MR. SIMON:  Thank you, your Honor.

6    Q.    Let's move on to Page 19.  I believe we're still

7    talking about job analyses here, but you see Principle

8    Sub 7, the choice of job analysis methods?

9    A.    Yes.

10   Q.    And it says it "should be based on objectives and

11   the constraints of the situation."  Do you see that?

12   A.    Yes.

13   Q.    And what does that mean?

14   A.    Well, that means that it's possible you may use

15   different approaches for job analysis depending on the

16   situation you're confronting.  So, for example, in '91,

17   there was a very detailed job analysis with lots of

18   incumbents, you know, 800 incumbents, but no need to

19   repeat that every time.  So the 2000 job analysis was an

20   update and then what happened right before the '08 exam

21   was a review by subject matter experts.  So those latter

22   two were not as thorough as the first one, but I would

23   find that to be appropriate because unless the job has

24   changed in some radical way, you don't have to start

25   from scratch and spend another $100,000 on a job

1    analysis.

2    Q.    Thank you, Doctor.  Let's move on to Page 20.

3    Looking at Sub E.  Do you see where I am?

4    A.    Yes.  Yes.

5    Q.    "Job content domain should be defined in terms of

6    what the employee needs to do or know without training

7    or experience on the job."

8          What does that mean?

9    A.    That's the meat of that entry issue that we

10   described before about, within the guidelines, they

11   refer to it as a "prerequisite."  But the point is that

12   you need to make sure that this is something that you

13   need to know before you get promoted as opposed to

14   something you are trained on as soon as you get

15   promoted.

16   Q.    Okay.  Does the 2008 exam meet this principle?

17   A.    Yes, because that was something they evaluated in

18   each of the job analyses and only based the test on

19   knowledge areas that were judged to have met that

20   criterion.

21   Q.    We go on to the next one.  Could you explain for

22   us -- and this is Sub F now?

23   A.    Uh-huh.

24   Q.    Please explain for us what this means?

25   A.    That's SIOP's terms for it's okay to focus on the

1    knowledge areas that are the most important, and also it

2    encourages a consideration of irrelevant sources of

3    variance, which in psychological terms that means that

4    we don't want the exam measuring things that we didn't

5    intend for it to measure.

6    Q.    And how do you deal with that question?

7    A.    Well, it depends on the context.  One thing you do

8    is you make sure that your exam only measures what's

9    important and prerequisite, thereby it doesn't measure

10   the things that are not.  But sometimes we also look at

11   things such as -- the best example would be reading

12   ability.  If the exam requires a high level of reading

13   ability but the job does not, and a classic example

14   would be hiring for a factory job, and I would give, you

15   know, math questions that are word problems or I'd give

16   a mechanical aptitude test that is in, you know,

17   requires a high reading level, but the job doesn't

18   require that.  Here the job of lieutenant clearly

19   requires a lot of reading and writing and the test

20   developers, while developing the test, thought about

21   that and discussed that in their report.

22        MR. LICHTEN:  Your Honor, I move to strike the

23   part that says the job of lieutenant requires high

24   levels of reading and writing.  That's not in his

25   report.

1        THE COURT:  It -- that may be, um, but it's a

2   reasonable inference.  I'm going to let it stand.

3        MR. LICHTEN:  Thank you, your Honor.

4        THE COURT:  Put another question.

5        MR. SIMON:  Okay, thank you, your Honor.

6   Q.    Now, moving on to the next principle, Dr. Campion,

7   relating to reliability, and we spoke about this before,

8   but do the principles add anything to the Uniform

9   Guidelines in that regard?

10  A.    No, just more details.

11  Q.    Okay.  Now, Page 21, Sub Paragrah H, the principle

12  describing or speaking to the issue of ranking or cut

13  scores may be appropriate.  And we spoke about this

14  somewhat, but what does that mean in the principles?

15  A.    Well, the principles are very clear in their

16  different opinion than the Uniform Guidelines.

17  Q.    Okay.

18  A.    The principles say that ranking or cut scores are

19  both fine.

20  Q.    Okay.

21  A.    Because the principles were not a document

22  intended to make validation more difficult.

23  Q.    Okay.  And do you know why it is that the

24  principles treat ranking differently than the Uniform

25  Guidelines?

A.    There's this overwhelming -- you know these tens

of thousands of studies I've talked about, there's this

overwhelming evidence that mental abilities and many

other attributes are linearly related to job

performance, which means the more the better.  In fact,

I would assert that there's virtually no evidence

outside of a rare situation where we find anything but a

linear relationship.  In other words, you never see a

tip down at the end.  You know, we all know of somebody

who is too smart and wouldn't be successful on the job,

but when we look at data, large amounts of data, you

never see that once you get so smart your job

performance drops off.  You just never see it.  Period.

Even though we all know individual people who appear to

be overqualified for a job, it's never shown in large

studies to be the case.

Q.    Thank you.  Moving on Sub I dealing with subject

matter experts.  What do the principles say about that?

A.    Well, I mentioned it already, they just say to

make sure your subject matter experts are qualified.

Q.    Okay.  And do you have an understanding as to the

2008 exam, whether that was true or not?

A.    Not as much with the 2008, to my memory, but this

was mentioned in both the validation and the job

analysis reports, they had described this in their

1  reports, so.

2  Q.    Okay.  Thank you.  I think we can go on to the

3  last one there, Principle J -- well, it's not Principle

4  J, it's Sub J, and there's another principle that's

5  talked about there.  What's this all about?

6  A.    Well, this is -- it's not really technically

7  content validation, it's just a recommendation to

8  communicate clearly to candidates about what's to be

9  expected.  And as I mentioned, the Guidelines don't

10  refer to that, but you see that extensively in public

11  sector employment, like the documents we reviewed just

12  10 minutes ago, on communicating to candidates what's

13  expected of them.  That is something the guidelines do

14  recommend.  But it doesn't necessarily bear on validity,

15  it's more just a nice thing to do.  It bears on

16  something we call "procedural justice," or fairness.

17  Q.    And is that something that's -- is that a

18  recommendation the 2008 exam meets?

19  A.    Yes, that's one of the real strengths of civil

20  service employment, is they're very clear about that.

21  Q.    Now, Dr. Campion, so you've reviewed documents

22  related to the 2008 Boston Police Department

23  lieutenant's promotional exams, correct?

24  A.    Yes.

25  Q.    And you evaluated these documents in light of the

1  SIOP's principles with regard to validity?

2  A.    Content validity, yes, sir.

3  Q.    Okay.  And have you formed an opinion to a

4  reasonable degree of scientific certainty about whether

5  the exam is content valid?

6  A.    Yes.

7  Q.    And what is that opinion?

8  A.    The exam appears to me, all of the requirements of

9  the principles, when you break it down and identify each

10  of those requirements and compare it to the

11  documentation, it appears as though the principles are

12  met.

13        MR. SIMON:  Your Honor, I'm at a good breaking

14  point.

15        THE COURT:  And this is a good breaking point.

16  We'll recess now for one-half hour.

17        That means you're done with this witness?

18        MR. SIMON:  No.  I'm sorry.

19        THE COURT:  Oh, it's just a good breaking point?

20        MR. SIMON:  Yes.  But I could continue?

21        THE COURT:  No, no, it's good enough.  So we'll

22  recess for one-half hour at this time.  We'll recess.

23        (Recess, 10:45 a.m.)

24        (Resumed 11:15 a.m.)

25        THE COURT:  Proceed.

1          MR. SIMON:   Thank you, your Honor.

2     Q.    Dr. Campion, this morning you testified with

3     respect to opinions that you had reached with respect to

4     the 2008 exam?

5     A.    Yes.

6     Q.    Opinions based on content validity of those exams?

7     A.    Yes.

8     Q.    Did you also draw conclusions with respect to the

9     2005 exam?

10    A.    Yes, I looked at the '05 and '08 exams at the same

11    time, actually.

12    Q.    And using a similar procedure in which you

13    examined the 2008 exam, did you examine the 2005 exam?

14    A.    Yes.

15    Q.    And have you formed an opinion to a reasonable

16    degree of scientific certainty with respect to the 2005

17    exam and whether or not it is content valid?

18    A.    Yes.

19    Q.    And what is your opinion in that regard?

20    A.    Well, I felt that both exams were developed and

21    supported in the same manner.

22    Q.    And that's both under the Uniform Guidelines and

23    the SIOP principles?

24    A.    Yes, I looked at both the exams together as highly

25    similar.

1    Q.    Thank you.

2         Now, Dr. Campion, I'd like to turn your attention

3    to -- okay.  Dr. Campion, let me ask you directly.

4         Are the 2005, 2008, the promotional exams for the

5    job of lieutenant, content valid?

6         MR. LICHTEN:  Objection to the form, your Honor.

7    That's not the way an expert should be asked a question.

8         THE COURT:  Well, I'm going to sustain it in that

9    form.

10   Q.    Dr. Campion, you've reviewed documents with

11   respect to the 2008 and 2005 Boston Police Lieutenant's

12   promotional exams, yes?

13   A.    Yes.

14   Q.    And based upon your review of that written exam --

15   of those exams, excuse me, have you formed an opinion as

16   to the reasonable degree of scientific certainty -- to a

17   reasonable degree of scientific certainty whether those

18   exams are content valid?

19   A.    To the best of my ability.

20   Q.    And what is that opinion?

21   A.    Well, I believe both of the exams, the process

22   used to develop them, followed the guidelines and the

23   SIOP principles.

24   Q.    Does that mean, in your mind, that they are

25   content valid?

1   A.    That's what it does, yes.

2   Q.    Dr. Campion, let's turn our attention to "Best

3   Testing Practices," and I'm looking now particularly at

4   Page 23 of your report.

5   A.    Okay.

6   Q.    And what did you do with respect to "Best Testing

7   Practices"?

8   A.    Well, that's a term that I used to describe the,

9   um, degree to which an exam follows customary practices

10   in test development that are not explicitly described in

11   the Uniform Guidelines, in the principles.

12   Q.    Do these practices have implications for validity?

13   A.    I believe they do because they bear on the quality

14   of -- on the development of the exams and whether they

15   were developed following normal and customary procedures

16   in the profession.

17   Q.    Now, I don't mean to belabor this, I don't mean to

18   do that, but let's start with Step 1, which you

19   described as the first step, I believe, of test

20   development?

21   A.    Yes, and we've covered this quite a bit, but

22   usually you start with the job analysis, and that was

23   certainly done here.

24   Q.    And that was done with respect to both the 2005

25   and 2008 exams?

1   A.      Yes, beginning really in '91 and then updated in

2   2000, and then as I mentioned, confirmatory steps for

3   the 2005 and '8 exams.

4   Q.      Okay.  Let's move onto Step 2, "Evaluate

5   alternative methods."  Do you see that?

6   A.      Yes.

7   Q.      Does that have importance for both of them?

8   A.      Sure.

9   Q.      And why is that?

10   A.      Because the appropriateness of the selection

11   method likely determines the degree to which you can

12   validate an assessment.  So sure.

13   Q.      And did you examine both the 2005 and '8 exams in

14   this regard?

15   A.      Yes.

16   Q.      And what did you conclude?

17   A.      Well, there were a number of arguments that I

18   thought supported the use of a written exam in this

19   context and as I alluded to earlier many factors will be

20   considered here including the constraints of the

21   situation, the past history of the organization, you

22   might consider adverse impact as critical or you might

23   not consider it at all, but you'd consider whatever is

24   relevant in your situation as well as the nature of the

25   exam -- excuse me, the KSAs.  And in here they quote in

1    the '91 validation report that they selected a written

2    exam for several reasons of which I thought bear on this

3    issue.

4    Q.    Okay.  Let's discuss some of those, please.

5    A.    Well, one of them is that a job knowledge test had

6    been shown by the research to be generally valid for a

7    wide variety of jobs, that was very well-known in '91

8    and is still true today, one of the most supported.

9    Q.    Okay.  And then we're moving on to "Reading and

10   writing are required on the job."

11   A.    Yes, "Reading and writing are required on the

12   job," and so writing a test that was a reasonable format

13   in the view of the initial test developers, I thought

14   that was a correct statement.

15   Q.    There's a next statement about a multiple choice

16   format?

17   A.    And a multiple choice format is feasible with a

18   large number of applicants and that's why it's so

19   popular historically.

20   Q.    Now, you speak to the fact of evidence that the

21   test developer considered the extent to which the

22   knowledge areas could be measured on a knowledge exam.

23   Do you see that?

24   A.    Yes.

25   Q.    And why do you say that?

A.     Because that was one of the appendices, they

devoted an appendix to talking about that topic, which

was Appendix EE in the '91 validation study.  I note

that another reason might very well be the civil service

context, they didn't mention it in the report, but then

they wouldn't because we're within the civil service

context and so mentioning it wouldn't be something I

would necessarily expect them to say.

MR. SIMON:  And just for the Court's benefit,

Appendix EE to the 1991 validation report can be found

in *Lopez* Exhibit 41.

THE COURT:  Thank you.

Q.     Now, let's move on to the next step, Doctor, "A

test plan."  What's going on with respect to best test

practices there?  Step 3 on Page 24.

A.     Yeah, I'm just trying to find my place here.

Q.     Sure.

A.     So once they decide to use a given kind of

assessment, then you need to convert the job analysis

task -- excuse me, the KSAs or whatever it is that you

decided to measure, you need to convert that into the

assessment itself and usually the first step is to have

a plan.  In the case of a knowledge test, it's usually a

blueprint of your specification that we've talked about

a few different times and there's very good evidence for

1   each of the exams, not only in the '91 report, but also

2   for each of the 2005 and 2008 exams, that there was that

3   sort of a specification developed.

4   Q.    Okay.  Step 4, "Item writing procedures."  Do you

5   see that?

6   A.    Yes.

7   Q.    Um, and what does that mean?

8   A.    Well, there is not really much of an art, but

9   there's a little bit of skill required in writing test

10  questions and depending on your viewpoint it may be lot

11  of skill, and so --

12  Q.    Can you describe for us what are some of those

13  things?

14  A.   Well, you want to write a test question that has a

15  single right answer, not ambiguous alternatives.

16  Generally speaking you don't want to use formats such as

17  "all of the above" or "none of the above," you want it

18  to be clearly written.  And so there are a number of

19  those sorts of rules.  So they had a set of guidelines

20  that they put in their Appendix JJ, in the '91 report,

21  that I thought were sort of typical of the kinds of

22  guidelines that you would see.  So writing multiple

23  choice or developing the assessment in some appropriate

24  way is the step, I think, that is what was described in

25  here.

1    Q.    Okay.  And do you believe that the 2005 and '8

2    exams comport with these best test practices?

3          MR. LICHTEN:  Objection to the form, your Honor.

4          THE COURT:  No, he can use that shorthand form.

5    A.    It appeared to me to be, yes, that the test

6    questions appeared to be written in a manner that --

7          MR. LICHTEN:  Your Honor, there's no evidence in

8    the record that he looked at test questions.  His report

9    says that he didn't look at the test questions.

10         THE COURT:  Yes.

11         What do you say to that?  It's going beyond the

12   report.

13         MR. SIMON:  Your Honor, I do point out the fact

14   that he didn't address the questions specifically in the

15   writing of the report, but he did point out that he

16   reviewed them in his appendix.

17         THE COURT:  And so the objection is sustained.

18   Move on.

19         MR. SIMON:  Thank you, your Honor.

20   Q.    Step 5.  Looking now at the -- something with

21   regard to the validation analysis?

22   A.    Yes, usually there's some kind of a validation of

23   the, um -- of the test, and depending on the type of

24   validation that one selects there will be different

25   activities.

1    Q.    Okay.  And what is it about the 2005 and 2008

2    exams that relate to this?

3    A.    Well, they use many of the traditional activities

4    that we've talked about, they linked the test content to

5    the job, they had evaluations by subject matter experts

6    that they used to not only evaluate the questions but to

7    pick the questions to use, and we've covered many of

8    those already in our testimony here today.

9    Q.    Okay.  How about the Step 7 on Page 25 now?

10   A.    Yes.

11   Q.    "Proper Administration of Tests."

12   A.    Oh, I'm sorry, I think I -- I thought we were

13   going to do Step 6 first.

14   Q.    Did we skip Step 6?  Were you -- I thought we

15   talked about it.  Maybe we didn't.  "Statistical

16   analyses"?

17   A.    Actually we did allude to it before and there may

18   be analyses that one conducts like reliability and item

19   analysis, and we did discuss those before and there's

20   plenty of evidence that that occurred here in many of

21   the documents.

22   Q.    Okay.  And let's move on then to Step 7, the

23   "Administration of the Test"?

24   A.    Yes.

25   Q.    And how does that relate to validity, if at all?

1    A.    Well, it relates to how the test is put into

2    operational use and if you remember, um, the definition

3    of "validity" is the inferences you can make from test

4    scores.  So how the test is used in practice can bear

5    very well on whether the inferences are likely to be,

6    you know, appropriate.  And so that includes both how

7    the test should be administered, what format -- in this

8    case it was a sit-down exam or a written format, what

9    the time limits should be are also often recommended,

10   and then there's recommendations having to do with the

11   interpretation of the scores, how the total score is

12   calculated and then how the scores are used to make

13   promotion decisions or whatever the decision is.

14   Q.    Okay.  So, Dr. Campion, you've evaluated the

15   relevant documents for the 2005 and 2008 exams in light

16   of the professional standards regarding best test

17   development, correct?

18   A.    Yes.

19   Q.    And have you formed an opinion to a reasonable

20   degree of scientific certainty about whether the 2005

21   and 2008 exams were created in accordance with these

22   best test practices?

23   A.    Yes.

24   Q.    And what is that opinion?

25   A.    Yes, they appear to be developed in accordance

1   with those best practices or traditional practices in

2   the development of examinations.

3   Q.    Okay.  Now, Dr. Campion, another topic that you

4   examined were the differences between BPD sergeant and

5   lieutenant, is that correct?

6   A.    That's correct.

7   Q.    And why did you examine that topic?

8   A.    Well, I understood that the sergeant exam was part

9   of a previous case and, um, in that previous case the

10  sergeant exam was viewed as valid, and so to the extent

11  that the lieutenant exam and the lieutenant job are

12  greatly different, or differ, I thought that would have

13  a bearing on our understanding of the validity.

14  Q.    Okay.  And how did you compare those two jobs?

15  A.    Well, I did three things, I did, as I list here, I

16  looked at the differences in the job, the jobs

17  themselves, and, um, whether the knowledge requirements

18  were different.

19  Q.    Okay.

20  A.    And the second thing is I looked at the exams

21  themselves and reviewed the actual exam items.  And then

22  thirdly I did an evaluation of the implications for

23  validity.

24  Q.  Okay.  Let's start with the first thing that you

25  did, the differences in job knowledges.

1    A.    Yes.

2    Q.    Okay.  What did you find in that regard?

3    A.    Well, the first thing that I did was I looked at

4    the '91 job analysis and I looked at the 2000 job

5    analysis, because both of those had been conducted and

6    both of them produced a set of knowledge statements that

7    were used to develop the exam, and I found that in the

8    '91 job analysis there were 62 knowledge areas that were

9    important and needed a time of hire or promotion that

10   were common between sergeants and lieutenants and 10

11   that were additional for lieutenants, and examples of

12   those would be the staffing procedures, training

13   management, um, administrative policies.  And those

14   seemed logical to me that those would be required to a

15   greater degree by lieutenants than sergeants.

16   Q.    Okay.  Now, Dr. Campion, the second thing you said

17   you did was examining the exams themselves, correct?

18   A.    I'm sorry.  I stopped prematurely.  I also looked

19   at the 2000 job analysis.

20   Q.    Okay.  Thank you.

21   A.    Should I mention that?

22   Q.    If you looked at it, you should tell us that, yes.

23   A.    Well, there the two studies were separate, there

24   was a job analysis report for lieutenants and there was

25   one for sergeants, and so they didn't actually -- there

1    was not a one-to-one comparison.  But what I did was I

2    took the knowledge statements from each of those

3    reports, which was in Table 8 of each of the reports,

4    and counted the number that were similar and it turned

5    out 42 knowledge areas were highly similar and 12

6    additional for lieutenants.  So it essentially showed

7    the same result as the '91 job analysis.

8    Q.    Okay.  And did you do anything else with respect

9    to looking at the differences in the job knowledge of

10   these positions?

11   A.    Well, I wondered whether the jobs would be viewed

12   as different by others.  I know here, since we're

13   spending so much time thinking about these jobs, they

14   appear to us to be more nuanced and a greater number of

15   differences than they probably appear to others.  So I

16   went to a data source that is provided by the Federal

17   government based upon about 60 years of research -- they

18   have big archives of job analysis data, it's called the

19   "Occupational Information Network," it's a massive job

20   analysis system that the government developed starting

21   in the early '90s, and actually I was an advisor on this

22   project so I know it real well, and they contain job

23   descriptions for all the occupations in the U.S., they

24   count 1,000 occupations.  And when I --

25   Q.    I'm sorry.  Please continue.

1   A.     -- and when I looked up these jobs what I found is

2   that they considered both the sergeant and the

3   lieutenant as the same occupation.  So they don't even

4   distinguish between them.  Suggesting to me that from a

5   job analysis point of view, if you're looking at all the

6   jobs in the economy, you don't look at these two as

7   really separate jobs, they're pretty much similar.

8   Q.     Okay.

9          THE COURT:  And you think that's authoritative?

10         THE WITNESS:  Yes, I do, I do think "ONET," is

11  what it's called, is a very authoritative source.  I

12  could go on the rest of day about how that is.  It's

13  very comprehensive and I've had a lot of opportunity to

14  work with that -- with the Federal government on that.

15  Q.     Okay.  Now, Dr. Campion, I'm going to direct your

16  attention to Paragraph 47 of your report on Page 27.

17  A.     Yes.

18  Q.     And there you talk about the terms -- "in terms of

19  the differences in the exams."  Do you see that?

20  A.     Yes.

21  Q.     So you compare the exams of sergeant versus the

22  exams of lieutenant for these years?

23  A.     Yes.

24  Q.     And what did you conclude based upon that?

25  A.     Well, the first thing that I did was I looked at

1    the test outlines to see the content that was different

2    between them -- and I know either there's a typo in

3    here, that it should be that there are 10 items on the

4    category of police administration and 10 more on --

5         THE COURT:  Help me out as to exactly where you're

6    reading now?

7         THE WITNESS:  On Page 28, the second line from the

8    top, that shouldn't be "20," it should be "10" more.

9         THE COURT:  Thank you.

10   A.   Similarly for the 2008 exam there were 20 more

11   items, 11 on administration and management and 9 more on

12   police supervision, and I'd like to note that upon

13   closer examination it turns out that there are those

14   differences but there are also some of the questions

15   that are on common topics were actually different.  So

16   in the 2008 exam there were really only 68 that were the

17   same and 32 that were different because some on the same

18   topic were actually different questions in the sergeant

19   and lieutenant exam, and I did not know that at the

20   time, but I subsequently have learned that.

21        MR. LICHTEN:  Objection.  I move that that be

22   stricken.  It's not in the report.

23        THE COURT:  Well, it's not in the report but,

24   anticipating cross-examination, um, I hold the witness

25   is always entitled to correct any erroneous data that

1    may be before the Court and I'm treating this as a

2    correction and nothing more.

3         MR. LICHTEN:  Thank you, your Honor.

4    Q.   Dr. Campion, with respect to my earlier question

5    about item preparation or item -- well, first of all,

6    what are "items" in this context?

7    A.   They are the test questions.  We refer to "items"

8    as test questions.

9    Q.   Okay.  Now, you, in fact, reviewed the examination

10   at issue and the test questions, yes?

11   A.   Yes.

12   Q.   Well, what did you think?

13        MR. LICHTEN:  Can I have the question again?

14        THE COURT:  The question was "What did you think?"

15        MR. LICHTEN:  Of what?

16        THE COURT:  I'll sustain it.  Put a more precise

17   question.

18   Q.   -- of all the lieutenant exam questions for the

19   2005 and 2008 lieutenant's exam?

20        THE COURT:  Relative to what though?  I still am

21   not going to be aided by it.

22        MR. SIMON:  Okay, your Honor.  We're talking about

23   best test practices here and the doctor is opining about

24   --

25        THE COURT:  Well, no, I'm following it.  If you're

1  asking him to make a comparison, then set out the

2  comparison you want him to make.

3       MR. SIMON:  Okay.  Thank you, your Honor.  I'll do

4  that.

5       THE COURT:  To what standard or whatever you're

6  asking about.

7       MR. SIMON:  Yes.

8  Q.   Okay.  Now, we were previously stating, Doctor, if

9  you can recall, about best test practices with respect

10  to item writing, question writing, yes?

11  A.   Yes.

12  Q.   And you tell me, what is it about item writing

13  that's important and what are the best test practices in

14  that regard?

15  A.   Well, as we were noting before one hopes to see,

16  when it comes to test questions that are knowledge test

17  questions, that there's only one right answer that is

18  the right answer, that it is in the source document from

19  which it was drawn, that the other answers are

20  incorrect, that the test is written in good, grammatical

21  language, and that it avoids some of the problems of

22  test questions we often use in universities, like "all

23  of the above," "none of the above," "which is not true,"

24  and other things.  So my evaluation of the questions

25  suggested to me that they were written fine.  Now, I

1   didn't say that in the report apparently, but I did

2   mention the --

3         MR. LICHTEN:  Objection, your Honor.  The question

4   was a general question about question development.  Now

5   the witness has gone on to address something that's not

6   part of the question, that's not in his report.

7         THE COURT:  Well, I'll stop him at this point.  Go

8   ahead, Mr. Simon.

9         MR. SIMON:  Sure.

10  Q.    Dr. Campion, you examined the test questions

11  themselves in light of the best test practices with

12  respect to the preparation of test items, correct?

13        MR. LICHTEN:  Objection, that's not in his report.

14        THE COURT:  Is it?  Let's see it and then I'll

15  have some guidance.  You're following his report and

16  that's helpful.  I'm following.  So where's this?

17        MR. SIMON:  Well, this is on Paragraph 47 on Page

18  27.

19        THE COURT:  All right.  I see it.

20        MR. SIMON:  In terms of the differences in exams,

21  the lieutenant exams, it has the same first 50 items as

22  the sergeant exams that we talked about.

23        THE COURT:  Well, just -- I follow that.  I see it

24  and I think he's beyond it.  So I have his conclusions

25  there in Paragraph 27.  Now let's move on.  I have that.

1          MR. SIMON:  Okay.  Thank you, your Honor.

2     Q.    Now, Dr. Campion, with respect to the best test

3     practices, I believe the last thing you looked at was --

4          THE COURT:  Let me actually, since we're talking

5     about this, I want you to direct your attention to

6     Paragraph 48 of your report and I see the conclusions

7     you've drawn there because the second sentence there you

8     say, "The lieutenant job has several additional

9     knowledge requirements based on the job analysis," and

10    you conclude "These are represented in the exams."

11         And I'll just put it to you, that sounds a little

12    bit inconsistent with what you said about the ONET.

13    Would you explain?

14         THE WITNESS:  Well, the ONET is at the

15    occupational level, so this is the same occupation, but

16    there still can be differences between individual jobs

17    in a promotion hierarchy.  So between a sergeant and a

18    lieutenant, both are considered first-line managers of

19    policemen, that's how the occupation is described,

20    they're "first-line managers," but one is slightly

21    higher level than the other and has additional

22    requirements for administration and --

23         THE COURT:  And can be tested for?

24         THE WITNESS:  And that's right.  And so 20 extra

25    questions on those topics seem fine.

1          THE COURT:  All right.  I understand that's your

2    opinion and you say there's no inconsistency because

3    this ONET business is nationwide and it's at a level of

4    generality?

5          THE WITNESS:  Uh-huh.

6          THE COURT:  But when we come to test for the

7    promotion from sergeant to lieutenant, the analysis is

8    more granular and you focus on it in specific questions?

9          THE WITNESS:  That's right.  That's right.  And

10   different positions can also differ.  You know, two

11   different lieutenant jobs might have slight differences,

12   but we aggregate them to the job level for some HR

13   purposes like promotion.

14         THE COURT:  Because some of them are going to

15   supervise detectives, some may supervise traffic, some

16   may supervise laboratories and the like?

17         THE WITNESS:  That's right.  So this stuff is how

18   to aggregate things at the right level so that it's

19   useful and workable.

20         THE COURT:  Okay.

21   Q.    Now, Doctor, with respect to differences between

22   lieutenants and sergeants another topic that you

23   explored was job analysis, correct?

24   A.    Yes, I think we've -- haven't we talked about

25   that?

1   Q.    You tell me.  I can't remember.

2   A.    Yeah, I think we're about on Paragraph 49.

3   Q.    Okay.  And do you believe you've spoken to that

4   point specifically to get your point across?

5   A.    The point in 49 is that even if there are slight

6   differences between the jobs, both of the exams for the

7   sergeant and lieutenant were developed following the

8   same exact procedures, and so if the procedures for the

9   sergeant exam are valid, I would say there isn't reason

10  why they wouldn't be for the lieutenant, because it was

11  the same procedures.

12  Q.    So, Doctor, you've looked at the relevant

13  documents regarding the differences between Boston

14  police sergeant and lieutenant, yes?

15  A.    Yes.

16  Q.    And in light of those documents have you formed an

17  opinion to a reasonable degree of scientific certainty

18  about those differences?

19  A.    Yes, well --

20  Q.    And -- I'm sorry?

21  A.    I was going to say that I didn't stop there, there

22  are other things that I did.

23  Q.    Okay, and what other things did you do with

24  respect to those differences?

25  A.    Well, I thought maybe there were other

1    requirements in addition to knowledge requirements that

2    should be part of the evaluation process.

3    Q.    Like what?

4    A.    So as you can see in my Paragraph 50, I looked at

5    the skills and abilities to see if there might be

6    potential differences that would necessitate an

7    additional selection procedure in addition to knowledge

8    or -- in addition to knowledge whether there's something

9    more that ought to be needed for lieutenants.

10   Q.    Okay.  And did you -- what did you find with

11   respect to that?

12   A.    I again went back to the job analysis and I took

13   the '91 job analysis, which only reported one additional

14   skill for lieutenants than sergeants that were important

15   and needed at entry and that was dealing with the media,

16   and for the 2000 job analysis they didn't actually

17   address this issue specifically but again I compared the

18   data and found only two additional skills, um, a skill

19   in analyzing case reports and a skill in program

20   development and four additional abilities, one of which

21   looked like a real difference like evaluating budgetary

22   needs, while the other abilities that were different

23   between the two jobs looked like they could apply to

24   sergeants just as well and they were the ability to give

25   constructive criticism, the ability to identify

1   problems, and one more I didn't list.  So I concluded

2   that those differences in skills and abilities were not

3   enough to require a whole additional selection

4   procedure.

5   Q.    Okay.  Thank you.  Now I'm where I was before.

6         So having looked at relevant documents regarding

7   the differences between sergeant and lieutenant, have

8   you formed an opinion with a reasonable degree of

9   scientific certainty about those differences?

10  A.    Yes.

11  Q.    And what is that opinion?

12        MR. LICHTEN:  I'm sorry, he said "about those

13  differences," and I'm not sure what that means.

14        THE COURT:  No, that's sufficiently precise for

15  me.  You may answer.

16  Q.    What does that mean?

17  A.    My opinion is that the additional knowledge

18  requirements of the lieutenant job were captured and

19  they were properly reflected in the differences in the

20  exams and the differences in the jobs were not so great

21  that additional hiring procedures would be needed for a

22  lieutenant.  And since both exams were developed using

23  the same processes, the validity evidence is equally

24  strong for both.

25  Q.    Thank you, Doctor.

1        Now I'd like to turn our attention to

2   alternatives.  And you examined the issue of testing

3   alternatives?

4   A.    Yes, I did.

5   Q.    Why did you do that?

6   A.    Well, the Uniform Guidelines as well has the

7   requirement that there be a consideration of whether

8   other staffing approaches might have equal validity but

9   lesser adverse impact.

10  Q.    Okay.  And did you make those considerations?

11  A.    Yes, I looked at the documents and other

12  information in the case to see whether, um, there were

13  other alternatives there likely to be available that

14  could have and should have been used.

15  Q.    Okay.  Why don't we talk about some of those

16  alternatives that you examined.

17  A.    Okay.  Well, I book them into two categories,

18  alternative selection procedures, as in hiring -- excuse

19  me, as in different kinds of assessments, but the

20  guidelines also say that you should look at different

21  uses.  And so an alternative is not only -- is not only

22  a different procedure, but a different way to use your

23  current procedure.  So I tried to look at both of those

24  separately.

25  Q.    Okay.  So let's start with different procedures.

1   What different procedures did you look into?

2   A.    Okay.  Well, I first made a couple of overall

3   observations that, um, we're not talking one procedure

4   here, we're talking two already, we have the job

5   knowledge exam, but we also have the experience and

6   education rating, which is nominally considered as 20

7   percent of the decision, and that is clearly an

8   alternative, and I personally think it's an excellent

9   alternative because these people have work experience

10  and education.  And if you looked at what's the most

11  common selection procedures in the world, it turns out

12  to be experience and education in the form of a resume

13  or application is the first procedure considered and

14  virtually considered, you know, in most situations.

15  Q.    Okay.

16  A.    So we have that.

17  Q.    Yes.

18  A.    And then I observe that the merit system

19  necessitates that there be some sort of a competitive

20  process and also the job knowledge exam is the most

21  common -- is the most common process used for police

22  promotions.  So those two factors I considered.

23  Q.    Okay.  Now, with those two factors in mind let's

24  go on to discuss some of the procedural test changes

25  that you considered.

1   A.    Sure.  I considered what turned out to be four

2   alternative procedures which I thought were the most

3   likely alternatives in this context.

4   Q.    Okay.  And just to direct everyone's attention,

5   we're on Page 30 now of your report?

6   A.    Yes.

7   Q.    And we're on Paragraph 54, Subsection A?

8   A.    Yes.

9   Q.    And the first one we're talking about is "Past Job

10  Performance," yes?

11  A.    Yes.

12  Q.    And this may be obvious, but what is that?

13  A.    Well, in the promotion context, in most

14  organizations past job performance is considered and

15  usually it's the Number 1 in most organizations.  But

16  here I looked for that, you know, why didn't they do

17  that, and I understood from the *Lopez* decision that

18  there was some kind of a disagreement with the union

19  about that.  I do know that unions often -- well, prefer

20  not to use evaluations of job performance based on

21  management judgment because they think it's not always

22  fair, and so in an ideal world we might use job

23  performance but here we have that constraint.  And in

24  addition, if job performance were going to be used,

25  usually you want to make sure that the performance

1   evaluation has been developed to do a good job of

2   evaluating past performance and maybe even considering

3   promotability to the next job.  So you want to have a

4   good performance appraisal measure if you're going to

5   use it.

6   Q.    Okay.

7   A.    So we have those two problems here, one is this

8   union issue, which I don't know that I understand fully,

9   and then the second is the quality of the appraisal is

10  not clear to me.

11  Q.    Okay.

12        MR. LICHTEN:  Your Honor, I move that that be

13  stricken, "the quality of the appraisal is not clear to

14  me," I don't know what appraisal he's talking about.

15        THE COURT:  I know, and in the context of what he

16  says he's carefully cabining in or cautioning the

17  acceptance of his opinions with respect to that

18  criterion, I appreciate it.  It may stand.

19  Q.    Now, Dr. Campion, you also examined something

20  called "Panel Interviews"?

21  A.    Yes.

22  Q.    Please describe that for us, what are those?

23  A.    Well, in many civil service contexts panel

24  interviews were used, in fact they were really invented

25  there because they are good at providing the appearance

1    of fairness of having multiple decision-makers make

2    judgments about hiring or promotion, and very often, for

3    example, they will include a representative from

4    outside, from outside the organization to ensure that

5    there's an outside view.  So you will have management

6    within the organization and an outsider.  And that was

7    really invented in the civil service context because of

8    the fairness.

9         THE COURT:  You keep saying "apparently."

10   Apparently you have some concerns about them?

11        THE WITNESS:  That's not meant to hedge, it's just

12   meant that I don't know what's in the minds of every

13   person who ever used it.

14        THE COURT:  I see.  But that's an accepted

15   methodology?

16        THE WITNESS:  And it's commonly used.  And I use

17   it a lot in the industry for hiring and promotion.  And

18   the -- so that's an alternative that might have been

19   possible here.

20   Q.   Okay.  And did you consider whether or not that

21   was something that would have been possible in 2005 and

22   2008?

23   A.   Sure.

24   Q.   And what did you conclude?

25   A.   Well, it might have certainly been possible but

1   there's two caveats and one is it would have added

2   expense.  I can estimate for you what I think it might

3   cost, but that's something others can decide.  But there

4   were a lot of candidates and it would take weeks worth

5   of work combining many people to pull it off.  And then

6   there's an issue I think we'll get to later about would

7   it have been likely to have changed the hiring

8   decisions, would adverse impact have been different, is

9   a whole separate issue.

10  Q.    Well, let's talk about that while we're here.  So

11  what is it about panel interviews and reducing adverse

12  impact that you're alluding to?

13  A.    Well, panel interviews would likely have less

14  adverse impact on a job knowledge exam.

15        MR. LICHTEN:  Your Honor, I don't think that's in

16  his report.

17        THE COURT:  Have in mind what he just said, if

18  you're pressing that objection, he said "panel

19  interviews would likely have less adverse impact."

20  That's what he said.

21        MR. LICHTEN:  I understand that, your Honor, but

22  --

23        THE COURT:  But you're pressing it.  Very well.

24        Is it there, Mr. Simon?  I don't see it.

25        MR. SIMON:  I don't believe that specific point is

1   there, your Honor.

2        THE COURT:  Then we'll skip over it.

3        THE WITNESS:  Well, I could clarify it?

4        THE COURT:  Actually I'm rigorous on holding you

5   to what's in your report because -- out of a feeling

6   that that is fair in an adversary determination where

7   both sides have to have an equal chance to ask probative

8   questions.

9        Go ahead, Mr. Simon.

10       MR. SIMON:  Thank you.

11  Q.   Now, Dr. Campion -- well, first of all, let me ask

12  you -- no, let's move on, let's move on to the next

13  category, "Assessment Center Exercises."

14       Can you explain those to us, first of all, what is

15  that?

16  A.   Assessment centers are a category of selection

17  procedures, they might be different procedures with the

18  notion that they are, um, exercises that allow the

19  candidates to demonstrate that they have these skills,

20  so they're like what we discussed before as "work

21  samples."  So what you try to do is you try to have the

22  candidates perform part of the job and examples would be

23  maybe to give a presentation, to maybe participate in a

24  group discussion, be involved in a role play or analyze

25  a case exercise, or -- and I think you mentioned

1  in-basket.  There's many different exercises.  But the

2  key characteristic is that they require the candidate to

3  sort of perform a little piece of the job and

4  demonstrate observable skills.  And then outside

5  assessors, multiple other people, usually management in

6  the company, then evaluate the candidate's quality of

7  their ability to behave in a way that is consistent with

8  the job requirements.

9  Q.    Did you evaluate assessment center exercises as

10 something that Boston could have used as an alternative

11 in 2005 and 2008?

12 A.    Sure.  All the alternatives I listed here I

13 thought met the requirement of equal validity of

14 potentially less adverse impact, and that's the only

15 reason why I listed them here.

16 Q.    Okay.  And what was your conclusion in that

17 regard?

18 A.    That they are -- they're certainly something that

19 would likely have equal validity but lesser adverse

20 impact, but again there are the constraints of cost and

21 then there's the mathematical issue of whether they

22 would actually reduce adverse impact.

23 Q.    And what do you mean by that?

24 A.    That just because you add a selection procedure in

25 that has less adverse impact does not mean it's going to

1    reduce adverse impact.  It's an unfair bit of math.  But

2    when you have a selection procedure that has adverse

3    impact and you add another that has less adverse impact,

4    you put them together, but you don't usually get the

5    average, they kind add on to each other.

6         THE COURT:  Well, they "add on," that is there's

7    more likelihood of adverse impact?

8         THE WITNESS:  Yeah, in greater amount.  The only

9    time -- the only time -- a real important point, your

10   Honor, so might I explain?

11        THE COURT:  Go ahead.

12        THE WITNESS:  Well, adding together selection

13   procedures in the hopes of reducing adverse impact is a

14   very complex bit of math, but I think I can explain it

15   simply.

16        If you have a selection procedure that has a lot

17   of adverse impact and one that has less, when you add

18   them together the question is what do you get?  We

19   always think maybe it will be something to the middle,

20   very possibly it will add on top, but the key difference

21   is how highly correlated the two are.  So if they are

22   highly correlated, you'll get an averaging effect.  If

23   they're not, they add on top.

24        So a clear example.  If I have two job knowledge

25   tests, one has big adverse impact, but the other one,

1    which is correlated with job knowledge because it's

2    another knowledge test, has small adverse impact, then

3    it will pull some of the adverse impact down.  But if

4    it's independent, it will add it on top.

5            So let's suppose we use a panel interview, it

6    probably wouldn't correlate with job knowledge, so when

7    you combine it with the job knowledge test, there's a

8    very good likelihood it will add on top.

9            THE COURT:  I'm following what you say, but I'm

10   not clear on the concept of correlation.  I can

11   understand and there's been quite a bit of testimony

12   here about how the written exam tests job knowledge and

13   you and other witnesses have said how valid that is, but

14   I've also received evidence that a written test, for

15   reasons that science can't really explain, um, tends to

16   have an adverse impact on minorities, African American

17   minorities for the purposes of our case, and that seems

18   to be fairly widely accepted, correct?

19           THE WITNESS:  It's commonly observed.

20           THE COURT:  All right.  So, um, let's say, as you

21   said, panel interviews, um, have, standing alone to the

22   extent it's been tested, um, less adverse impact, is

23   that right?

24           THE WITNESS:  We think so.  We look on averages

25   across studies.  Now there's a number of studies

1    published that will show adverse impact, but it's a

2    reasonable bet it would be less.

3              THE COURT:  And we're doing the best we can here,

4    so -- and I'm very interested in what you're saying.

5              So the problem here seems to be with the

6    correlation.  If you accurately develop a test to test

7    job knowledge and you, um, develop a panel interview

8    where all the applicants that you're going to interview

9    get the same questions and various other safeguards

10   about job knowledge, doesn't it -- won't they be

11   correlated?

12             THE WITNESS:  It depends, it depends on what you

13   ask.  If you ask about job knowledge, they would likely

14   be correlated.

15             THE COURT:  All right.  But you say if you -- they

16   all have to ask the same -- what about this situational

17   problem, this in-box problem, which is not like -- well,

18   an in-box test, a situation that you expect a lieutenant

19   would face --

20             THE WITNESS:  Sure.

21             THE COURT:  -- interpersonal within the

22   department, and of course what you're trying to get at

23   is, how sensitive you're trying to get at, judgment

24   you're trying to get at, over reaction, one would

25   imagine?

1          THE WITNESS:  Right.

2          THE COURT:  Now, none of those things are in your

3     job knowledge which is, "Tell us what probable cause

4     means when you're doing a car search"?

5          THE WITNESS:  Right.

6          THE COURT:  All right.  So you're saying that

7     combining the two, which sounds attractive, very

8     possibly will increase the actual adverse impact?

9          THE WITNESS:  Yes, that is what I'm saying, and it

10    depends on how correlated those two assessments are.

11         THE COURT:  Uh-huh.

12         THE WITNESS:  So if they're independent like they

13    might be in the case you describe, so my job knowledge

14    isn't highly related to my judgment or my interpersonal

15    skills, then there would be a low correlation.  Now

16    here's the rub.  If the panel interview has any adverse

17    impact, even if it's much less, it will add on top.

18    That's the problem.

19         THE COURT:  I see the problem.  But you'd agree

20    that it's adverse impact that gets the courts involved

21    in your business.  But other than that, as I understand

22    the legal framework, we -- well, absent evidence of

23    bias, and in this particular area of the law it works

24    absent evidence of bias --

25         THE WITNESS:  That's right.

1         THE COURT:  -- it's triggered by adverse impact.

2         I have to tell you that apart from adverse impact,

3    it sounds desirable, when deciding to promote to a

4    supervisory position of the level of police lieutenant,

5    that you do more than job knowledge because job

6    knowledge alone may not give you the array of skills you

7    need adequately to supervise say a precinct or division.

8    Do you agree with that?

9         THE WITNESS:  More is always better.  I mean you

10   can always say, "Well, let's add more assessments."  But

11   if the issue is, "Is job knowledge valid?"  Yes.  "Would

12   adding more assessments reduce adverse impact?"

13   Unlikely.

14        THE COURT:  You're making the point that it is

15   problematic?

16        THE WITNESS:  You can always add more and when you

17   have --

18        THE COURT:  Well, we've got -- I'll let them ask

19   the questions, but bottom line you're saying we've got

20   two different variables.  I'm supposed to be concerned

21   about adverse impact and, yes, I will.  If I get past

22   that and we're talking about exams, you are willing to

23   say that more is better, more valid tests of job

24   performance are better?

25        THE WITNESS:  Why not?

1        THE COURT:  But I should not take comfort that I

2   think I'm, by adding more, somehow reducing adverse

3   impact?

4        THE WITNESS:  That's right.  That's exactly right.

5        THE COURT:  All right.  I understand the point.

6   Go ahead, Mr. Simon.

7   Q.    Now, Dr. Campion, I believe the next category of

8   alternatives you speak to are "Personality Tests."  What

9   are these?

10  A.    Well, personality tests are, we call them a

11  category called "noncognitive," and, um, usually you

12  find any assessment that has a mental ability component

13  will show adverse impact and, um -- and even if they

14  don't look the same.  So they may be interpersonal

15  skills.  But if there's any mental ability required to

16  be good interpersonally, there will be adverse impact.

17       Well, personally tests are a whole different

18  class, they ask you about dispositions.  So classic

19  examples would be dependability, agreeableness,

20  extroversion.  Are you outgoing?  Are you cooperative?

21  So these are tests that ask people to self-report on

22  themselves, "Yes, I am dependable."  "Yes, I like to be

23  with other people."  So that's what a personality test

24  is.

25  Q.    Okay.  And how do those tests relate to adverse

1    impact, if at all?

2    A.    Well, they have no adverse impact because they

3    don't really measure anything.

4    Q.    And what are the implications for validity then?

5    A.    See adverse impact is a function of differences in

6    abilities or differences in personalities and we don't

7    see average personality differences between races, but

8    personality tests are problematic because people

9    evaluate themselves.  So it's like my students saying,

10   "Give me an A."  If I were to ask them to evaluate their

11   own performance, they would all say, "Give me an A."

12   That's what happens with personality tests, is people

13   answer in a way they think will promote their

14   self-interest.  So if your organization uses teamwork,

15   they would know anyway to always respond positively to

16   teamwork.  So these tests have very low empirical

17   validity and so they're not really a reasonable

18   alternative if you're trying to maintain validity.

19   Q.    Okay.  Let's turn to some of the other

20   alternatives you consider and I understand the other

21   alternatives you consider have to do with different uses

22   of the same procedure, correct?

23   A.    Yes.

24   Q.    So let's talk about some of those.

25         MR. SIMON:  And just to direct everyone's

1    attention, I'm now on Page 31, Paragraph 55,

2    Subparagraph A.

3    A.    Yes.

4    Q.    "Alternative Weighting"?

5    A.    Okay.  One thing one could have possibly done is

6    weight the job knowledge less and weight the experience

7    and education more.

8    Q.    Okay.  And what if anything is wrong with that?

9    A.    That sort of thing has been the subject of a lot

10   of research and what you find is that in order for that

11   to have much of an effect, actually reduce adverse

12   impact much, usually you have to change the weights

13   quite radically and giving a whole lot of weight to

14   experience and education and very little weight to job

15   knowledge wouldn't be consistent with the job analysis,

16   wouldn't be consistent with the empirical research on

17   validity.  But that's what you'd have to do if you

18   wanted to reduce adverse impact by changing the weights.

19   Q.    Okay.  So did you consider that in light of the

20   alternatives that were available to Boston in 2005 and

21   2008?

22   A.    Usually most organizations find that an

23   unacceptable alternative to give a huge weight to

24   procedures that are less important as a way to reduce

25   adverse impact.

1      THE COURT:  Let me give you a hypothetical example

2  that pops into my head and see if I've captured the

3  idea.

4      You've testified that content-validated written

5  exams are good predictors of job performance.  I've got

6  that point from your testimony, correct?

7      THE WITNESS:  Yes.

8      THE COURT:  So here's what swims into my head.

9  Because we have an all-volunteer military force and

10  because we try to make military service (1) open to all

11  and beneficial in various ways, if you looked at the

12  demographics of our all-voluntary force, I'm positing,

13  because it was my experience years ago, that African

14  Americans have a disproportionate share in bearing the

15  country's volunteer military burden.  Among the job

16  skills necessary are military policing and there is

17  complex and extensive military police skills in all

18  three branches.  And so I have an applicant -- if I'm

19  doing the hiring and I've got an applicant who has been

20  an exemplary military policeman, and so if we've

21  weighted 60/40 -- well, how far do you have to go to

22  change it?  If we drop the -- let's say we drop the test

23  score down to 40 and we weight the experience and

24  education 60 and the person has a pretty good education,

25  but boy he's been a military policeman, so I hire him.

1          Are you saying to me that the result will be that

2     that is less good a predictor of job performance -- I

3     say I hire him, but I promote him -- of job performance

4     as a lieutenant than the same person with the 80/20

5     split that Boston follows?  Is that what you're saying?

6          THE WITNESS:  Yes, and the research that's been

7     conducted on using work experience and education to

8     predict future job performance will show that the

9     validities are not as high as job knowledge tests.  And

10    the thing is we don't know how good a job he or she did

11    as a military policeman.  And we don't know if, "I've

12    had three years experience, you've had five, does that

13    mean you know more than me?"  So we find we're going to

14    have problems in using work experience and education

15    more precisely.  It predicts a bit, it's helpful, but

16    it's not as good as measuring knowledge that is needed

17    by that next job.

18         THE COURT:  Okay.

19    Q.    Okay, Dr. Campion, let's turn our attention to the

20    next use, if you will of the same procedure.  Now I'm on

21    B on Page 32.  We're talking about alternatives to rank

22    order?

23    A.    Yes.

24    Q.    And what alternatives did you consider in that

25    regard?

A.    Well, I considered a couple of things, but one

obvious alternative would be to lower -- would be to use

a low cut score on the job knowledge examination.

Q.    And what effect does that have?

A.    Well, it would hurt the "utility," we call it, of

your selection procedure because you wouldn't hire, you

wouldn't promote the people with the most skills, you

would only use it as a basic foundation.  And so

remember that validity is the inference of test scores,

so the same inference remains, it's just that you use

the test in a manner that has less value to you.  It's

like having a valid test, but not using the scores.  So

here we have a valid test but we only use it to weed out

just the bottom.  But that's an alternative that would

reduce adverse impact, but it would have these other

consequences.

Q.    Another alternative to rank order would be

banding?

A.    Surely.

Q.    Would you explain that to us?

A.    That's an area I'm quite familiar with.  I've

written some articles on the topic.  And "banding" is,

like we discussed with grading, it essentially puts

candidates, like students, into categories of similar

performance and the idea is that it's supposed to take

1    into account the fact that there is a little margin of

2    error around test scores, we call it the "standard

3    error," it's like a standard deviation except it's of

4    the error distribution.  So it's -- you've got a little

5    slop in test scores.

6         THE COURT:  And you agree with that, I mean, there

7    is?

8         THE WITNESS:  That's the way it is, yeah.

9    A.    So we have that slop in there.  So one possibility

10   is to say, "Well, people who are close enough that they

11   could be within this error, or "error band," we called

12   all those folks the same.  So if it's among our

13   students, we say, "Well, a high A or a low A, it doesn't

14   matter, they're both A student performance."  Well, you

15   can do the same with test scores and there are some

16   sophisticated mathematical ways of estimating the size

17   of those bands that would approximate the error.

18   Q.    Okay.  And did you consider these alternatives to

19   rank ordering with respect to the 2005 and 2008

20   lieutenant's exam?

21   A.    Yes, and there are a couple of difficulties with

22   using banding.

23   Q.    Okay.

24   A.    Usually the way it works is people are put into

25   bands and as you hire you would take everybody within a

 1    -- if you need more people than what's in the first

 2    band, then you take everybody in the first band and then

 3    you look at those in the second band and you say, "Well,

 4    how many more do I need to hire or promote and then how

 5    many are in the second band?" and then you might take

 6    all or only some of them.  So the only time banding

 7    works is when you have more people in a given band than

 8    you have openings.  Then you can maybe take somebody, a

 9    minority lower in the band, before a majority person

10    higher in the band, but that requires you to kind of

11    justify it somehow.

12         THE COURT:  Well, I -- as soon as you say that I

13    don't -- and you're experienced here, but I don't think

14    the judicial role here is to engage in any sort of

15    affirmative action, it's to (1) find out if there's

16    disparate impact and if there is disparate impact,

17    because the justifiable goal of our society is to give

18    everyone an equal shot, then to go on and see if I've

19    got a valid test.  And then if I do have a -- well, if I

20    have an invalid test, then I've got to get a valid test.

21    But if I have a valid test, then the goal, and it's a

22    difficult one, and I'm being aided by the presentations

23    I have here, but then I've got to figure out what's the

24    best test in the real world to get the best police

25    lieutenants and not to get more black police lieutenants

1    or any racial concern.

2          And now I'll ask you, though I'm supposed to be

3    the one who understands the law, but that's your

4    understanding of the law, right?

5          THE WITNESS:  Yes.  And so what it requires is

6    another selection procedure to select people within the

7    band hoping that they'll be less adverse impact with

8    that other selection procedure.

9          THE COURT:  All right.  Now, if we sort it all the

10   way through that, I've got another problem that you're

11   not being asked about with these specific plaintiffs,

12   would they have -- if I get that far, would they have

13   been advantaged had this been done and then that may

14   follow with respect to what should happen to them?  But

15   I have to get through the first three before I even

16   consider that.  And -- well, I'm making a statement and

17   I won't even ask for comment.

18         Go ahead, Mr. Simon.

19         Counsel will understand that that's what I think

20   I'm doing here.  But go ahead.

21         MR. SIMON:  Thank you, your Honor.

22   Q.    Okay.  Are there other limits to banding,

23   Dr. Campion?

24   A.    Let me just look at my notes and see if there's --

25   yeah, I think the difficulties are that the number of

1    candidates that might be additionally considered with

2    banding is small and then you need to come up with some

3    alternative selection procedures for selecting within

4    the band, and so we'd have to come up with some other

5    system, and if that system had a disparate impact, that

6    would be an issue.  And if we left it just to the

7    judgment of management, I wonder what would happen.  I

8    don't know, but I would guess if they're --

9         MR. LICHTEN:  Your Honor, I don't think guessing

10   is appropriate.

11        THE COURT:  Yes, it's not.  We'll stop him there.

12        THE WITNESS:  I'm sorry.

13   Q.   Okay.  Moving on.  The top of Page 33, you

14   discussed using a "multiple hurdles approach."  Again

15   this is a different use of the same procedure, correct?

16   A.   Yes.

17   Q.   Would you describe for us what a "multiple hurdles

18   approach" is?

19   A.   Well, that might be, for example, separating the

20   job knowledge exam from the English -- excuse me, the

21   experience and education and using them as successive

22   hurdles.

23        THE COURT:  So, yeah, I can follow that.  If, for

24   instance, you're worried that administering an in-box

25   test or a panel interview or something, that that's

1    costly, you've got to develop that and you've got to

2    recruit the outsiders and check that the examiners are

3    truly neutral, and those things, and that's expensive,

4    but if you set the qualifying score for an interview at

5    an appropriate level, you can reduce the expense to what

6    you think is acceptable and then go on to the interviews

7    for those who qualify on the test?

8         THE WITNESS:  Yes, very often.  The reason

9    multiple hurdles is used is to reduce costs.  So you'll

10   have -- the initial hurdle will be the low-cost phase-

11   like tests and then the second hurdle will be the

12   high-cost things like interviews.

13        THE COURT:  That sounds pretty good to me.

14        THE WITNESS:  That's real common.

15   Q.   And, Doctor, do you see there being any issues

16   with respect to the multiple hurdles approach?

17   A.   Well, it's just whether it would help.  The only

18   way it would help is if you have a low-cutting score on

19   the test which again reduces the value of the test.

20        THE COURT:  Well, I'm just concerned that we're

21   inflating or conflating the variables.  You can -- you

22   can construct a promotion process that's cost effective

23   by multiple hurdles, and we just talked about that, and

24   that's true, isn't it?

25        THE WITNESS:  Well, you can reduce the cost of

1    your panel interview by not interviewing everyone.  But

2    having a panel interview is more expensive than not.

3            THE COURT:  All right.  And you just made the

4    point that if you set the pass/fail too low, it reduces

5    the value of the test?

6            THE WITNESS:  Right.

7            THE COURT:  And you want the test to be valid.

8    And we've already talked probably at too great length

9    that you cannot assume that simply adding a second

10   hurdle or multiple hurdles is going to have the

11   desirable effect of reducing adverse impact?

12           THE WITNESS:  That's right.

13           THE COURT:  All right.  Go ahead, Mr. Simon.

14   Q.    Now, Dr. Campion, I'm going to direct your

15   attention to something you've alluded to before and

16   discussed a little about, but I'm on Paragraph 56 now.

17   Do you see where I am?

18   A.    Uh-huh.

19   Q.    You talk about adding alternatives?

20   A.    Uh-huh.

21   Q.    And you looked at that in this context?

22   A.    Yes, and I think we've covered that out of order,

23   but that's the whole issue of whether adding selection

24   procedures or changing their order will help.  And

25   research has been very frustrated by our inability to do

1    that.

2    Q.    Okay.

3    A.    Because of the mathematics that I was describing

4    earlier.  So that was my final point, I think.

5    Q.    Okay.  Dr. Campion, you've reviewed and evaluated

6    various testing alternatives that could have been

7    applied to the BPD's lieutenant promotional test in 2005

8    and 2008?

9    A.    Right.

10   Q.    And in light of that evaluation have you formed an

11   opinion to a reasonable degree of scientific certainty

12   about whether there was an alternative selection

13   procedure that the City could have employed in 2005 or

14   2008 that would have resulted in equal validity and less

15   adverse impact?

16   A.    Yes.

17   Q.    And what is that opinion?

18   A.    It does not appear to me that there's an obvious

19   alternative that would have achieved lower adverse

20   impact and a higher validity unless cost is no

21   consideration.  That should have been obvious to them at

22   the time.

23   Q.    Okay.

24         MR. SIMON:  May I have a moment, your Honor?

25         THE COURT:  Of course, you may.

1          (Pause.)

2          THE COURT:  But while he's consulting, the various

3     techniques that you have analyzed in your report, they

4     were all known in 2008?

5          THE WITNESS:  Yes.

6          THE COURT:  Because you're in an area of practical

7     yet very substantive academic studies I appreciate that

8     data is constantly being analyzed, published, and

9     reviewed by your profession, but at the level that he

10    has examined you on each of those possibilities it was

11    known in 2008?

12    A.    Yes, I believe they all were.  Yes.

13         THE COURT:  Go ahead, Mr. Simon.

14         MR. SIMON:  I have no more questions, your Honor.

15         THE COURT:  Mr. Lichten, anything for this

16    witness?

17         MR. LICHTEN:  Yes, I have many questions, your

18    Honor, but the agreement that the parties had made was

19    that I could begin my questioning or cross-examination

20    on Monday.

21         THE COURT:  And I'm fine with that.

22         So anything else for today?

23         MR. LICHTEN:  No.

24         THE COURT:  Split the time?

25         MR. LICHTEN:  Yes.

1          THE COURT:  That's fine.

2          MR. LICHTEN:  Could you give us an update on the

3     time, your Honor?

4          THE COURT:  I will in just one moment.  You may

5     step down.  Now, let me see.

6          (Pause.)

7          THE COURT:  Yes, the time now is, out of the 10

8     days available as it stands for the plaintiff, 2 days, 2

9     hours, 10 minutes, and for the defense, 2 days, 1 hour,

10    and 20 minutes.

11         Now let me -- since we're stopping a little early,

12    take just a moment, and I say this to help you.  We're

13    going into the weekend now.  I told you how I'm going to

14    proceed.  We're only going to do one day next week and

15    then you all get a break for good and sufficient reason.

16    And this is not to urge you to settle it, but to be of

17    assistance in that regard and also to give guidance with

18    respect to the rest of the case.  And we'll call this my

19    "ruminations."  And I form no opinions.  But I think

20    you're entitled to know what my reaction to all this is

21    after five days of trial, the case is half through.

22         And I'm going to take off from Judge O'Toole's

23    very careful findings and rulings in *Lopez*.  I've not

24    read them until recently, but I have, of course, read

25    them, and I am very impressed by Judge O'Toole's careful

1    understanding of the factual record before him and, um,

2    I understand his reasoning.

3        So let me just go through these three prongs.  I'm

4    not asking for comment, I'm not asking for argument, I'm

5    going to recess.  We're still in the midst of taking

6    evidence.

7        But in *Lopez*, on the first prong, the City

8    virtually conceded the disparate impact.  Not so here,

9    the City has vigorously contested it, and it's fair to

10   say they've poked some holes in the plaintiffs' case as

11   far as it's gotten so far.  And as I said in colloquy

12   with the witness, that's the first thing.  The Court

13   doesn't get into this area unless there's disparate

14   impact under the law, under the legal framework.  But

15   because the analysis is sequential, I'll go on and

16   ruminate and suppose that the plaintiffs satisfy the

17   Court in that regard.

18       I think the City's doing pretty well on the second

19   point.  I can say that without much hesitation.

20       Well, that makes the real battle ground the third

21   point, the third prong, and there it seems that issue is

22   very much joined, that's the point at which the City won

23   *Lopez,* that is the shortest part of Judge O'Toole's

24   analysis, which doesn't mean I take any issue with it,

25   simply that it is the least-developed analysis.  And I

1   don't know mean that critically because he had many

2   different municipalities to deal with and I think his

3   opinion is outstanding, but it does not bind me.

4        So on this third area I have in mind the case was

5   submitted to him in 2012, he issues his opinion based

6   upon his record in 2014.  Now my case, our case, the one

7   we're working on, comes up for trial late in 2014, um,

8   and unless it's settled we're not going to get to the

9   opinion until sometime in 2015, although I intend it to

10  be prompt unless you tell me to stay my hand.

11       And now I know that the City is engaged in a

12  different type of examination.  Well, I find that, I

13  will tell you, very interesting.  And the plaintiffs

14  point out a decision in another circuit which says

15  that's all right.  And surely I have not made error by

16  allowing such data as I already have and expect to have

17  in the record, but I continue to have a real concern

18  whether I can make anything of it.  Judge O'Toole didn't

19  have that advantage, but I do, or I'm asking, I guess,

20  but not today, I'm just saying, maybe I do, maybe I

21  don't, but I'm going to have the record covered.

22       And on this issue of whether these things were

23  known back in 2008 where the City has reacted when we

24  got talking about what happens today, saying, "Well,

25  these things weren't known back then," well, the record

1   appears to be that the techniques at least all were

2   known and that's from the City's own witnesses.  It

3   looks like Miami in 2006 was doing something along the

4   lines that the plaintiffs argue for.

5       And please don't think that I'm saying any more

6   than giving you a reaction.  Nothing more.  I haven't

7   made up my mind on anything.  But I have this question,

8   and it's not to be answered today.

9       But let us suppose, just for the purposes of

10  discussion, that the plaintiffs prevail on the first and

11  third prong and we get to the third prong and the

12  plaintiffs prevail to the extent of a declaration that

13  the City should have done something back in 2008

14  because, um, there was disparate impact and they could

15  have done it and did not.  Suppose such a declaration.

16  I just don't know where in terms of the practical

17  outcome of the case that leaves us.

18      And I assume that you people have -- the case was

19  bifurcated, I think, before I got it, but I don't

20  suggest any revision of that.  That makes perfect sense

21  to me.

22      But answering the question all the plaintiffs' way

23  doesn't mean the plaintiffs, as a practical matter, get

24  anything or any of them get anything, it would seem to

25  me, because I'm not at all clear that any one of them --

1   and I have individual plaintiffs, would have been

2   advantaged.

3          So at some stage, final argument, or in the

4   afternoon, or at some stage, I need to be advised about

5   that.  Where, should we even get that far, and we may

6   not get any further than the first prong, but if we get

7   that far, how do I address that issue?

8          You've given me an opportunity to do no more than

9   ruminate and believe me that's all I'm doing.  Nothing

10  more.  If these ruminations assist you in considering

11  mediation or settlement, so be it, but I don't say any

12  of them for that purpose, they are my straightforward

13  reactions and I say them only to be of assistance.

14         I wish you all a fine weekend.  We have one day

15  next week and we will recess until that time, 9:00 a.m.

16  We'll stand in recess.  Thank you.  We'll recess.

17         (Ends, 12:30 p.m.)

18

19

20

21

22

23

24

25

1             C E R T I F I C A T E

2

3

4             I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Friday, December 19,

8     2014, to the best of my skill and ability.

9

10

11

12    /s/ Richard H. Romanow 02-19-15
      _____
13    RICHARD H. ROMANOW Date

14

15

16

17

18

19

20

21

22

23

24

25