# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| BRUCE SMITH, PAUL JOSEPH, ) | Civil Action No.: 1:12-10291-WGY |
| MARTIN JOSEPH, KIM GADDY, ) | |
| BRIAN KEITH LATSON, MARWAN ) | |
| MOSS, LEIGHTON FACEY, ) | |
| LATEISHA ADAMS, KENNETH ) | |
| SOUSA and WILLIAM WOODLEY, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CITY OF BOSTON, MASSACHUSETTS ) | |
| ) | |
|     Defendant. ) | |
| _____) | |

## PLAINTIFFS' BRIEF ON REMEDY

## I.    INTRODUCTION

On October 28 through October 30, 2019, this Court held a three-day trial limited to the question of remedy after finding Defendant City of Boston ("Defendant" or "City") liable for employment discrimination in 2015, affirmed on reconsideration, after the First Circuit's decision in Lopez v. City of Lawrence, Mass., 823 F.3d 102, 124 (1st Cir. 2016) ("Lopez II"). See Smith v. City of Bos., 144 F. Supp. 3d 177, 181 (D. Mass. 2015), affirmed on reconsideration, 267 F. Supp. 3d 325 (D. Mass. 2017). Going into the trial, the City argued that it would use the results of the 2014 Lieutenant's exam to claim that no remedy/back pay should be awarded by the Court because those results allegedly showed that the Plaintiffs would not have been promoted even if the discriminatory 2008 exam had been valid. That argument unraveled at trial. Both experts – Dr. Wiesen testifying on behalf of the Plaintiffs and Dr. Silva testifying on behalf of the City – agreed that it is impossible to use the results of any particular

1

exam to predict with sufficient accuracy how a person would have done on another exam (or even the same exact exam) six years earlier. See, Section III(D)(i), infra.

Now, after years of protracted litigation, the City asks this Court to deny back pay to the Plaintiffs by ignoring 40 years of black letter law well-established by the U.S. Supreme Court and the First Circuit, based on a single sentence from out-of-context dicta in a Lopez II footnote, (which, in turn, cites a case not even remotely applicable here). The issue, addressed in only a footnote had never been briefed by the parties in Lopez II, relates to a different issue (prong 3) not applicable to this case, and, as interpreted by the City, would be wildly at odds with established law. Moreover, this Court has already rejected the premise of the City's argument, noting in its decision affirming liability on reconsideration, "**to assume that the First Circuit [in Lopez II] would change disparate impact law without so much as a comment seems somewhat at odds with reality**." Smith, 267 F. Supp. 3d at 333–34 (emphasis added). Thus, the City's assertion here – that this passing observation in a footnote changed forty years of unbroken case law on the issue of back pay in disparate impact litigation and discriminatory hiring/promotional cases – is meritless.[1] Moreover, to the extent the City's argument is based on its claim that Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2518, 192 L. Ed. 2d 514 (2015) somehow changed the law of disparate impact, this Court has already squarely rejected the City's position. See Smith, 144 F. Supp. 3d at 211, n.43.

In reality, the law of the land in a Title VII case after a finding of liability is clear and straightforward: plaintiffs are presumptively entitled to back pay. See Johnson v. Spencer Press

---

[1]     Further, this is not the first time "Boston [has] com[e] close [t]o willfully misreading Lopez II" in an effort to deny coming to terms with its discriminatory conduct. Smith v. City of Bos., 267 F. Supp. at 332, n.2.

of Maine, Inc., 364 F.3d 368, 379 (1st Cir. 2004) (internal quotes and citations omitted) ("back pay is therefore a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case."). The presumption applies equally in disparate impact and disparate treatment cases. See Thomas v. City of Evanston, 610 F. Supp. 422, 432 (N.D. Ill. 1985), quoting Liberles v. County of Cook, 709 F.2d 1122, 1136 (7th Cir.1983) ("While backpay is discretionary, a strong presumption, 'which can seldom be overcome,' favors backpay."); Catlett v. Missouri Highway & Transp. Comm'n, 828 F.2d 1260, 1267 (8th Cir. 1987) (qualified class members "are presumptively victims of discrimination absent proof."); Cowan v. Prudential Ins. Co. of Am., 852 F.2d 688, 690 (2d Cir. 1988) ("Under the dictates of Title VII, [Plaintiffs are] presumptively entitled to back pay for wages denied [them] as a result of [Defendant's] discriminatory promotion practices.")

The Court has asked the Parties to address the nature of the "presumption" requiring back pay. See Tr. (10/29/19) at 107-108. As demonstrated herein, this presumption, often referred to as the "Albemarle presumption" (see Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975)), actually shifts the burden of proof to defendants to prove that, in the absence of such discrimination, a plaintiff would not have been hired or promoted. This heavy burden "can seldom be overcome." Costa v. Markey, 706 F.2d 1, 6 (1st Cir. 1982), on reh'g en banc (May 23, 1982), quoting City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702, 719, 98 S. Ct. 1370, 1381, 55 L. Ed. 2d 657 (1978) (emphasis added). See also Cohen v. W. Haven Bd. of Police Comm'rs, 638 F.2d 496, 503 (2d Cir. 1980); ("When the defendant has attempted to prove the existence of a nondiscriminatory reason for the failure to hire but it remains uncertain whether the plaintiff would have been hired in the absence of the discriminatory practice, and the uncertainty flows from that practice, the issue should be resolved against the defendant, the party

responsible for the lack of certainty.").  Indeed, "while front pay is fully within the district court's discretion, back pay is a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case." Lussier v. Runyon, 50 F.3d 1103, 1110, n. 7 (1st Cir. 1995) (citations omitted); Orr v. Mukasey, 631 F. Supp. 2d 138, 155 (D.P.R. 2009) ("A prevailing Title VII plaintiff is presumptively entitled to back pay.").  As fully explained in Section IV, A (infra), the answer to the Court's question is simple: the presumption here shifts the actual burden of proof to the Defendant and if it does not carry this heavy burden – which it admittedly failed to do here (per its own expert) – back pay must be awarded to the Plaintiffs.

As is the case here, once the trier of fact has found a Title VII violation under a disparate impact theory, to establish the presumption to back pay, individual plaintiffs "need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of the proved ...discrimination.'" Robinson v. Metro–North Commuter R.R. Co., 267 F.3d 147, 159 (2d Cir.2001) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 362, 97 S. Ct. 1843, 52 L.Ed.2d 396 (1977)).  Here, it is undisputed that Plaintiffs either were not promoted at all or were promoted years after promotions were made from the 2008 list, thereby establishing an "adverse employment decision." See, e.g., also Osahar v. Carlin, 642 F. Supp. 448, 457, 454 (S.D. Fla. 1986) (awarding back pay for delayed promotions); Bradley v. City of Lynn, 443 F. Supp. 2d 145, 168–69 (D. Mass. 2006) (recognizing the harm of delayed discriminatory hiring in disparate impact cases, even where discrimination victims are eventually hired in the future). See also, Smith, 144 F. Supp. 3d at 194, citing Bradley, at 168 (at the liability stage, this Court "acknowledged that the delay in promotion will be relevant at the damages phase of the litigation" and that "it can also constitute disparate impact in the form of loss of pay, benefits, and seniority.").

Moreover, even if it were true (and it is not) that the Title VII standard for awarding back pay had somehow changed in the First Circuit, the remedy/back pay standard for state law claims under Chapter 151B has not changed.  Therefore, Plaintiffs are entitled to back pay on their state law claims, which this Court also adjudicated in their favor.  See Section IV, E(ii); See also, Harris and Spencer v. City of Worcester Police Dept., Massachusetts Commission Against Discrimination ("MCAD") Docket #s 94-SEM-0589 and 90 at 49 (Massachusetts Commission Against Discrimination order dated November 9, 2011 award back pay in a disparate impact police promotion case) (attached hereto as Ex. A).

In the Parties' joint pretrial brief (Dkt. 256) the City asserted that it could prove that the 10 Plaintiffs here would not have been promoted from the 2008 list even if a valid exam had been given at that time.  However, during the trial that claim quickly unraveled when the City's own expert testified that he could not provide such an opinion, as there was no evidence to support it.  By disregarding the presumption, the City effectively asks this Court to engage in gross speculation and to act in contravention of the bedrock principle in employment discrimination cases that "[a]ny uncertainty as to whether the plaintiff would have been hired is resolved against the defendant, since it is the defendant's discriminatory employment practices which are the source of the uncertainty."  E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus., 164 F.3d 89, 100 (2d Cir. 1998), citing Cohen, 638 F.2d at 502; Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 289 (2d Cir.1980).  There is nothing in this record that can serve as the basis to rebut the presumption in favor of back pay with respect to any of the 10 Plaintiffs.

 Further, to prevent any claim of overreaching Plaintiffs have agreed with the Defendant that the "loss of chance doctrine" would apply to this case.  See Ex. 86 at ¶ 2(c).  It is a remedial

doctrine developed by the Seventh Circuit that is comparable to the pro-rata apportionment method developed by other circuits, including the Eleventh, D.C., Second, and Eighth.  See Dkt. 268 (Pls' Pretrial Memo Relating to Remedies) at 17-18 (collecting cases).  The loss of chance doctrine already accounts for – indeed, it is designed to account for – concerns that courts cannot go back in time and determine exactly who would have been promoted had a legitimate non-discriminatory examination been administered.[2]  See Alexander v. City of Milwaukee, 474 F.3d 437, 449 (7th Cir. 2007) (supporting "loss of chance doctrine for evaluating damages due to a plaintiff in a competitive-promotion employment discrimination case" (citations omitted)); See also Dkt. 256 (joint pretrial memorandum) at 15 (where the City argued that if the Court is to award back pay the amount should be reduced by 63.7% (i.e., 36.3% of full back pay) under loss of chance doctrine).

The Parties' stipulation effectively resolves the question of how to calculate back pay. The stipulation provides that each Plaintiff is only to be awarded 36.26% of the full value of their back pay.  See Tr. (10/28/19) at 12; See Ex. 86 at ¶ 2 (c).  As the Eleventh Circuit has explained in the context of the comparable pro rata remedial approach:

> In endorsing [such an] approach, we have recognized that the only other relief alternatives would be unpalatable: either (1) randomly selecting several individuals from a large class for full "make-whole" relief, or (2) awarding no relief at all because specific individuals deserving of a "make-whole" remedy could not be identified from a victim class. As a result, we have observed that remedial relief does not require unrealistic exactitude, and that uncertainties in the relief process should be resolved against the discriminating employer.

---

[2]    The Parties' stipulation strikes a fair balance between full back pay or no back pay.  It avoids forcing the Court into the "quagmire of hypotheticals" that multiple Circuit courts have found to be inappropriate.  See, e.g., Segar v. Smith, 738 F.2d 1249, 1290 (D.C. Cir. 1984) (where discrimination has occurred throughout the system "any attempt to reconstruct individual employment histories would drag the court into a 'quagmire of hypothetical judgments.'" (citations omitted)).

United States v. City of Miami, 195 F.3d 1292, 1299 (11th Cir. 1999) (internal quotation marks and citations omitted).  Moreover, Plaintiffs are not seeking back pay for any time period during which they would have been ineligible for back pay due to a retirement and/or resignation. Thus, the stipulation already accounts for the fact that some officers retired early or were forced to retire.

Finally, Plaintiffs note that back pay is not the only remedy available to them.  Front pay, emotional distress, and injunctive relief in the form of promotions are all remedies that are also available.[3]  See Dkt 268 (Plaintiffs' Pretrial Brief on Injunctive Relief, Back Pay, Front Pay and Promotion).  In addition, there is the issue of attorneys' fees and costs.  Nevertheless, in an effort to bring this case to conclusion and to avoid unnecessary litigation disputes, Plaintiffs confine themselves here to seeking back pay.  A petition for attorneys' fees and costs, would only be appropriate after the issue of remedy is decided.  See, e.g., Drumgold v. Callahan, 806 F. Supp. 2d 428, 434 (D. Mass. 2011) (motions for attorneys' fees are to be filed after a final judgment and any post-trial motions).

## II.    RELEVANT PROCEDURAL HISTORY

### A.    THE COURT'S INITIAL DECISION ON LIABILITY AND PRIOR REJECTION OF THE CITY'S ARGUMENTS ON RECONSIDERATION

The trial in this matter was bifurcated into a liability phase and a damages phase.  The Court held a ten-day bench trial on liability in December 2014 and January 2015, during which the Court admitted over 80 exhibits and admitted in evidence all the trial testimony and exhibits from Lopez v. City of Lawrence, No. 07-11693-GAO (D. Mass.).  On November 16, 2015, the

---

[3]    Plaintiffs are not presently seeking injunctive relief because of representations from the City that it will administer multi-component examinations moving forward.  See Tr. (10/28/19) at 7.  However, if the City seeks to administer a so-called "80/20" Lieutenants examination in the future, Plaintiffs reserve the right to seek injunctive relief.

Court granted judgment on liability in favor of the Plaintiffs, holding that the Court's "conclusion is simple: the Department's lieutenant-selection process—ranking candidates for promotion based on their scores on an exam administered in 2008 ("2008 exam")—had a racially disparate impact and was not sufficiently job-related to survive Title VII scrutiny. Accordingly, the Court imposes liability on the City." Smith, 144 F. Supp. 3d at 181.

Notably, the Court here entered liability on prong 2 of the disparate impact analysis. The Court explained that it "need not proceed to step three of the disparate impact analysis" because Plaintiffs won at prong 2. Smith, 144 F. Supp. 3d at 211. In reaching its decision, the Court specifically rejected the City's interpretation of dicta from Texas Dep't of Hous. & Cmty. Affairs, 135 S. Ct. at 2518, that the Plaintiffs were required to show that a less discriminatory alternative existed ("prong 3" burden). See Smith, 144 F. Supp. 3d at 211, n. 43. (holding that the Supreme Court in Texas Dep't of Housing "**was actually discussing the proper application of Prong 3 when it made [the] statement**" not requiring a plaintiff to meet a prong 3 burden where a plaintiff prevailed at prong 2; "The plaintiff bears no burden of demonstrating the existence of equally effective alternative practices unless the defendant has successfully met the requirements of prong two.").[4]  Thus, the City's theory (a theory it now presses again on remedy) that there are no suitable less discriminatory alternatives **is plainly irrelevant when an exam has been found to be invalid under prong 2**.[5]  See Smith, 144 F. Supp. 3d at 211. Here, the Court found that **there was no legitimate business justification.**

---

[4]    Having ruled that the 2008 exam was not valid under prong 2, this Court had no cause (and did not go on) to address the considerable evidence presented by Plaintiffs' experts that there were equally effective less discriminatory alternatives under prong 3 of the analysis.

[5]    It is ironic that the City of Boston almost gleefully emphasizes that its 2014 exam also had a significant disparate impact on minority candidates and that out of all of the promotions made off the 2014 Lieutenant's list, only one has been a minority. In doing so, the City highlights its use of strict rank order, despite the fact that this Court found such rigid rank order

The City of Boston pressed for reconsideration after the First Circuit's decision in Lopez II. On reconsideration, the City "essentially argu[ed] that Lopez II effected changes in disparate impact law that mandate a reconsideration of this Court's previous decision." Smith, 267 F. Supp. 3d at 331. However, this Court found "**no shift in the governing law in Lopez II** from that [it] had applied to the facts [it] found in Smith." Id. at 327. (emphasis added). The Court explained that "[n]or would any shift be expected" because "[a]bsent intervening Supreme Court precedent or legislative change, it is the practice in the First Circuit faithfully to adhere to the decisions of earlier panels of that court." Id., citing Peralta v. Holder, 567 F.3d 31, 35 (1st Cir. 2009) ("'We have held, time and again, that in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent.'" (quoting Muskat v. United States, 554 F.3d 183, 189 (1st Cir. 2009))).

Ultimately, this Court rejected all of the City's arguments on reconsideration and explained why the City's interpretation of Lopez II and its relevance to Smith were wrong:

> Both Lopez I and Smith are fact intensive cases. In Lopez I, Boston persuaded Judge O'Toole, albeit barely, that it ought prevail on prong 2. Smith is a different case, with a different evidentiary record, involving different expert testimony about a different and more demanding senior officer position. In Smith, Boston failed to convince me that it ought prevail on prong 2, an aspect of the case on which it bears the burden of proof.

> The Court of Appeals affirmed the district court's decision in Lopez I. In view of this affirmance, Boston seems to be arguing that it is now legal error to reach a contrary result in a significantly different case.[3] That's not how it works. Fact finding is the province of the district courts. In Lopez II, the Court of Appeals did what it always does—it carefully scrutinized the evidentiary record, giving due deference to the fact-finding role of the district judge, to see whether any of his conclusions were clearly

---

promotions to be unjustified. The City's entire argument on remedy rests upon the assumed validity of an exam that the Parties have never tried and that was taken by a small number of minority applicants (10 fewer than in 2008) and an even smaller number of Plaintiffs (years after the 2008 exam at issue).

erroneous. That's what it said it was doing. <u>See</u> <u>Lopez II</u>, 823 F.3d at 107–08. That's what it did. Should this <u>Smith</u> case be appealed, it will do the same for me.

<u>Smith</u>, 267 F. Supp. 3d at 337.

After this Court's affirmation on reconsideration, the Parties agreed to submit an interlocutory appeal to the First Circuit on the Court's decision on liability, prior to a trial on remedy, but the First Circuit rejected the interlocutory appeal. <u>See</u> Appeal No. 17-8030, Judgment denying petition for permission to appeal (dated April 17, 2019); Dkt. 250. Shortly thereafter, the matter of remedy was on course to be tried and the Parties prepared a final joint pretrial memorandum to the Court dated June 3, 2019. <u>See</u> Dkt. 256.

In the Parties' joint pretrial memorandum, the City argued that "[d]espite a prima facie presumption that a prevailing Title VII disparate impact plaintiff be awarded back pay, this presumption can be rebutted." <u>See</u> Dkt. 256 at 14, citing <u>City of Bridgeport</u>, 647 F.2d at 289. The City argued that Plaintiffs would not be entitled to back pay because a handful of Plaintiffs took a subsequent exam six years later (i.e., the 2014 Lieutenant's exam) and thus "the Court should not and cannot presume that any of the Plaintiffs would have been promoted had the 2008 exam been a multi-component, assessment style test." Dkt. 256 at 14. The City cited no case law to support this argument.

## III.    RELEVANT FACTS

### A.    THE PLAINTIFFS – BACKGROUND

There are 10 Plaintiffs in this case, all of whom were Sergeants in good standing at the time they took and passed the 2008 Lieutenant's exam that this Court found to violate the law. <u>See</u> Ex. 2 (2008 exam scores); Ex. 86(a). The Plaintiffs all received good scores on the 2008 exam, with the average score among Plaintiffs being 82.31. <u>See</u> Ex. 2. Several of the Plaintiffs scored in the high 80s. <u>Id.</u> Many of the Plaintiffs were promoted to Sergeant by virtue of their

scores on a multi-component exam given in 2002 (see Tr. (10/29/19) at 24; Ex. 86(a)); and

Plaintiff Facey was promoted to Captain based on his score on a multi-component exam in 2014.

See Tr. (10/29/19) at 26.  Most of the Plaintiffs have worked as Acting Lieutenants, which

occurs frequently in the BPD when the Lieutenant in a given district or division is not working.

See, e.g, Testimony of Gaddy Tr. (10/29/19) at 51-52; See also; Testimony of Smith Tr.

(12/17/14) at 92, 100-101 (estimates that he worked as Acting Lieutenant detective hundreds of

shifts).

At trial, Plaintiffs Paul Joseph, LaTeisha Adams, Leighton Facey, Marwan Moss, Kim

Gaddy, and Dr. Joel Wiesen testified for the Plaintiffs.  See Tr. (10/28/19) at 3, Tr. (10/29/19) at

3.  The City called Dr. Jacinto Silva and former Commissioner Evans.  See Tr. (10/29/19) at 3,

Tr. (10/30/19) at 3.

Paul Joseph is a Boston Police Sergeant with a bachelor's degree from the University of

Massachusetts, Amherst, a Master's in Criminal Justice, and a law degree from Suffolk

University.  See Joseph Testimony, Tr. (10/28/19) at 116-117.  He passed the state bar exam and

has been a licensed attorney since 2000.  Id. at 117. He was promoted to Sergeant in 1997.  Id. at

118.

Joseph served as President of the Massachusetts Association for Minority Law

Enforcement Officers from 2002 to 2005.  Id. at 118-119.  He is currently 56 years old.  Id. at

119.  In 2008, he took the Lieutenant's promotional examination and received the relatively high

score of 87.11.  Id.; Ex. 2.

Although he registered for the City's 2014 promotional examination, he expected to be

promoted prior to its administration because the City was still making promotions off of the 2008

list in 2014 and the Department had reached the "87s" by 2013, well before the next exam.  Id. at

120-121.  Based on this fact, he felt certain he would be promoted.  Id. at 121.  Given that Plaintiff Joseph expected to be promoted off of the 2008 list, a prospect he had discussed with former Commissioner Evans, he did not study for the 2014 exam.  Id. at 122.  He was not promoted from the 2008 list although many individuals were promoted with the same score (or just fractionally lower than his).  See Ex. 2 (2008 scores list); Ex. 94 (2008 promotions list with promotion dates).

Plaintiff Adams is a retired Boston Police Department Sergeant Detective who had a 20-year tenure with BPD.  See Testimony of Adams, Tr. (10/29/19) at 5-6.  She holds a bachelor's degree, a master's in criminal justice, and a certificate with honors from Suffolk University in public safety management and leadership.  Id. at 6.  She also received a silver medal from the Olympics Sports Festival in Taekwondo, and her connection with the sport led to her role as Deputy Commissioner and then Chair of the Massachusetts State Athletic Commission.  Id. at 11-12.

In March 2015, after 20 years of service, she retired due to a heart condition.  Id. at 7. She did not take the 2014 Lieutenant's examination because she knew that she would be retiring in 2015 due to her medical condition.  Id. at 7-8.  However, Plaintiff Adams did take the 2008 Lieutenant's examination, and received an 83.6.  Id. at 11.  She was not promoted to the position of Lieutenant.

Plaintiff Facey has a bachelor's degree and master's degree from Boston University.  See Testimony of Facey, Tr. (10/29/19) at 22.  Plaintiff Facey is currently a Boston Police Captain (Id. at 21), commanding District B-2, "the busiest district in Boston."  Id. at 27.  He is also the only black Captain with the Boston Police Department.  Id. at 27.  After joining the force in

1998, he took the 2002 Sergeant's exam, a multi-component exam, and was promoted to the position of Sergeant.  Id. at 23-24.

Plaintiff Facey took the Lieutenant's examination in 2008 and received a score of 88.23. See Ex. 2.  He was ultimately promoted off of that examination in January 2013, towards the end of the life of 2008 exam promotional list.  See Tr. (10/29/19) at 25.  Because he was promoted in January 2013, he had the requisite one year of service as a Lieutenant to be eligible for the 2014 Captain's examination – an exam he took and was promoted off of.  Id. at 25-26.  He received an 88 on that examination.  Id. at 26.  The 2014 Captain's examination, like the Sergeant's exam he took in 2002, was a multi-component examination.  Id.

Plaintiff Moss is currently a Lieutenant Detective with the Boston Police Department. See Testimony of Moss, Tr. (10/29/19) at 36.  He has been a BPD officer since 1995 and was promoted to the position of Sergeant in 2005 after taking a multi-component exam in 2002.  Id. at 37-38.  He previously took a so-called "80-20" Sergeant's exam in 1999 but was not promoted off of that list.  Id. at 38.

In 2008, Plaintiff took the Lieutenant's examination and received a score of 86.85 (which was apparently rounded up to 87).  Id. at 39; See Ex. 2.  He was promoted from the 2008 list to the position of Lieutenant in November of 2014, at the very end of that list's life.  Testimony of Moss, Tr. (10/29/19) at 40.  Given that Plaintiff Moss was promoted in November 2014 to the position of Lieutenant, he was not eligible to take the 2014 Captain's examination.  Id. at 41. However, around the time the 2014 exam was being administered, he was suffering from the effects of a medical condition known as trigeminal neuralgia ("the compression of the trigeminal nerve to the brain.").

Given his medical condition and the fact that "the Department had already begun to get

close to the band the [he] was in" he decided not to take the July 2014 Lieutenant's examination. Id. at 42. Ultimately, unlike Plaintiff Paul Joseph who was in the same score group, he was promoted to the position of Lieutenant.[6] Id. at 43.

Plaintiff Kim Gaddy is a retired Boston Police Officer who holds a bachelor's degree from Wheaton College and a master's and doctorate from Boston University. See Testimony of Gaddy, Tr. (10/29/19) at 47-48. She began her tenure with the BPD as a cadet in 1982 and became a patrol officer in 1985. Id at 49-50. She was promoted to Sergeant in 1992. Id. at 50. She received the ranking of Sergeant Detective thereafter, a rank she held until her retirement in 2018. Id. at 50-51. Although Dr. Gaddy was never promoted to the position of Lieutenant prior to her retirement, she frequently served as Acting Lieutenant. Id. at 51-52. She has expertise in the area of sexual assault issues and has lectured at various universities and colleges in the region as well as developed curriculum. Id. at 49.

In 2008, Plaintiff Gaddy studied for and took the Lieutenant's examination and received a score of 85. Id. at 52. However, notwithstanding this performance and her career with the Department, she was never promoted. In 2014, she elected not to take the Lieutenant's examination. Id. at 53. At that time, she was 54 years old and retired a few years later in 2018. Id. at 53, 51.

Plaintiffs Smith, Woodley, and Latson resigned with disciplinary charges pending years after the expiration of the 2008 exam promotional list. See Ex. 86(a). There is no evidence that any of these 3 Plaintiffs were under investigation during the time period where promotions were

---

[6]     Stanley Desmesmin, who has brought a related action seeking relief from the City's unlawful promotional process (See Desmesmin v. City of Boston, Case No. 1:19-cv12170), was also promoted off of the 2008 list and was in the same ranked group as Paul Joseph and Marwan Moss. See Ex. 2. Stanley Desmesmin did not take the 2014 examination. See Ex. 4 to Ex 85 (Callahan Decl.) (listing the names of each 2014 exam applicant and their results).

being made off of the 2008 list (i.e., from 2010-2014).  See Ex. 94.[7]

Most of the 10 Plaintiffs have advanced degrees.  Specifically, Plaintiffs Adams, Facey, Latson, and Smith hold at least a bachelor's degree, while Plaintiffs Woodley, Sousa, Paul Joseph, and Gaddy hold at least a master's degree.  See Ex. 86(a).  Only two of the Plaintiffs, Martin Joseph and Moss, do not hold a bachelor's degree presently (they have associate degrees). See Ex. 86(a).

As reflected by the City's collective bargaining agreements, the three key components of police officers' pay comprise their base wages or salary, overtime pay, and detail pay.  See, e.g., Ex. 88 (Superior Office Pay Scales); Ex. 90 (Detail Rates for Sgts. and Lts.); Ex. 91 (Collective Bargaining Agreements ("CBA") covering Boston Police Superior Officers); See also Testimony of Evans (10/30/19) at 37 (referring to governing terms in the CBA).  At trial, former Commissioner Evans explained that the Boston Police Department has "not even [been] close" to filling the City's need for details and that with regard to overtime "[t]he biggest complaint [h]e had [was] the officers don't want to work…there's way too much work."  Tr. (10/30/19) at 38. Officers are "continually getting ordered to work overtime."  Id.  Some officers, such as Plaintiff Paul Joseph, choose to work as much overtime and detail as possible.  Tr. (10/28/19) at 130. Specifically, Paul Joseph testified that he works as many hours as possible while considering his responsibilities as husband and father as well as his health.  Id.  Further, as Commissioner Evans explained, Sergeants, Lieutenants, and Captains have the opportunity to fill patrol details and their pay is dependent on "whatever rank they were" (as opposed to patrolmen's pay).  Tr. (10/30/19) at 41.

---

[7]      As such, in the Parties' stipulation, Plaintiffs have simply proposed that their back pay be cut off as of the date of their resignation.  See Ex. 86 at ¶ (2), Ex. 86(a) and Ex. 86(b).

### B.    THE PARTIES' PRETRIAL STIPULATION

In the days leading up to the trial on remedy in this matter, the Parties executed a joint stipulation that was entered into the record as Exhibit 86.[8]  This stipulation sets forth all of the back pay calculations "if the Court awards all or some of the Plaintiffs back pay in this case." Ex. 86 at ¶ 2.  Equally important, the Parties agreed that "if the Court awards back pay, the Court should apply a 'loss [of] opportunity' analysis as reflected in the calculations attached [to Ex. 86] as Exhibits B and C."  Ex. 86 at ¶ 2 (c).  In short, the Parties agreed on the methodology to calculate back pay and the actual numbers for the convenience of the Court, but they disagreed regarding: (1) entitlement to back pay in the first instance; and (2) when back pay should "start" and "end" with respect to each Plaintiff.

Exhibit 86(b) (as supplemented by Dkt. 301) consists of Plaintiffs' proposed calculations based on Dr. Wiesen's recommended "Start Date" and an "End Date" based upon each Plaintiff's retirement date, the trial date for the 8 non-promoted Plaintiffs, and the promotion dates of Plaintiffs Facey and Moss (the 2 Plaintiffs who were promoted).[9]  Exhibit 86(c) (as supplemented by Dkt. 301) consists of Defendant's proposed calculations based upon Dr. Silva's

---

[8]    This stipulation served to avoid a significant amount of disputed testimony regarding back pay calculations and reflected a true compromise.  The Parties have further stipulated to information that can be found in Exhibit 86(a), such as the dates Plaintiff Facey and Plaintiff Moss were each promoted to Lieutenant and the dates other Plaintiffs retired.

[9]    Although the trial on remedy commenced on October 28, 2019, as a matter of administrative practicality, the calculations were based upon an "End Date" of October 25, 2019 with respect to the 3 actively employed Plaintiffs who have not been promoted to the position of Lieutenant.  See Dkt. 301.01.  As explained in Ex. 86, Plaintiffs proposed that "with respect to entitlement to back pay for overtime and detail work (as opposed to base salary back pay), Plaintiffs who went on administrative leave prior to retiring would have their overtime and detail back pay calculations cut off as of the date of their administrative leave."  See n. 1 to Ex. 86.  At trial, Dr. Wiesen explained that Plaintiffs Facey and Moss should receive delay damages because they were "promoted to lieutenant [] long after the average date for white candidates to be promoted to lieutenant, and so they lost…the wages, the differential wage between Sergeant and Lieutenant for some period of time, for a year or two or so."  Tr. (10/28/19) at 7

recommended "Start Date" and an "End Date" of July 4, 2014.

The cumulative back pay award covering the 10 Plaintiffs, if the Court adopts the Plaintiffs' proposed start and end dates, is: $398,243. The City's cumulative back pay calculations amount to $152,119.53. See Exs. 86(b) and (c).[10] **The back pay award due to each respective Plaintiff per the Parties' stipulation is as follows** (this chart also include pre-judgment interest calculations, which are outside the scope of the stipulation, but for which Plaintiffs are entitled to on their state law claims):[11]

| Plaintiffs' Entitlement to Back Pay, Overtime, and Detail Pay (Adjusted for Opportunity Loss of 36.26%) with Interest* | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiff** | **Back Base Salary For Each Candidate** | **OT Damages for Each Candidate** | **Detail Damages for Each Candidate** | **Total Damages** | **Interest Due** | **Total Damages Including Interest** |
| Brian Latson | $31,795.11 | $5,118.26 | $1,749.36 | **$38,662.73** | $36,760.31 | **$75,423.04** |
| Bruce Smith | $26,027.46 | $19,016.33 | $885.56 | **$45,929.36** | $43,669.38 | **$89,598.74** |
| Kenneth Sousa | $56,702.66 | $11,743.32 | $820.29 | **$69,266.27** | $65,857.99 | **$135,124.26** |
| Kim Gaddy | $25,762.03 | $4,296.37 | $3.63 | **$30,062.02** | $28,582.80 | **$58,644.83** |
| LaTeisha Adams | $13,451.51 | $2,785.70 | $235.71 | **$16,472.93** | $15,662.37 | **$32,135.29** |
| Martin Joseph | $48,268.13 | $16,270.03 | $9,414.07 | **$73,952.23** | $70,313.38 | **$144,265.61** |
| Paul Joseph | $55,648.16 | $8,408.79 | $8,310.92 | **$72,367.88** | $68,806.98 | **$141,174.86** |
| Marwan Moss | $10,918.42 | $3,414.50 | $0.00 | **$14,332.92** | $13,627.66 | **$27,960.58** |
| Leighton Facey | $6,887.66 | $1,649.43 | $0.00 | **$8,537.09** | $8,117.02 | **$16,654.11** |
| William Woodley | $22,104.59 | $5,382.33 | $1,172.77 | **$28,659.69** | $27,249.48 | **$55,909.17** |
| **Grand Total** | | | | **$398,243.11** | **$378,647.37** | **$776,890.48** |

---

[10]    During the hearing, counsel for Plaintiffs explained this stipulation to the Court, including the agreed upon 36.26% loss of opportunity analysis reflected therein and the City, upon being asked by the Court, confirmed this understanding. See Tr. (10/28/19) at 12.

[11]    Applying prejudgment interest to the City's proposed back pay calculations (based up the case filing date and a rough-estimated judgment date of 1/15/20) results in the total damages for the City becoming $296,503.89.

*Based Upon 12% annual interest from the date of filing the complaint (2/14/2012) and the date of judgment (here substituted as 1/15/2020). <u>See</u> Mass. Gen. L. ch. 231 § 6B.

### C.    BACK PAY "START DATES" AND "END DATES"

Dr. Wiesen calculated the back pay start date as the average promotional date of white candidates who were promoted from the 2008 examination. Tr. (10/28/19) at 35. This date is November 18, 2011 and has been adopted by Plaintiffs for purposes of calculating back pay. <u>See</u> Ex. 86(b). Dr. Silva calculated the start date by averaging the promotion dates of every individual who was promoted from the 2008 list (including black applicants). Tr. (10/29/19) at 112. This date is February 16, 2012 and has been adopted by the City for purposes of calculating back pay. <u>See</u> Ex. 86(c).

### D.    THE CITY'S 2014 BOSTON LIEUTENANT'S PROMOTIONAL EXAMINATION

The Plaintiffs strenuously objected to testimony regarding the 2014 exam as irrelevant and made a motion to exclude this evidence. <u>See</u> Dkt. 260. The Court denied the motion but indicated that it would reserve judgment on the relevancy and use of this evidence at trial. <u>See</u> Dkt. 278 (order denying Plaintiffs' motion in limine). The 2008 exam list was extended for an extraordinary 6 years because "Commissioner Davis requested that the promotional certification be extended due to the Lopez litigation" (<u>Smith</u>, 144 F. Supp. 3d at 189). Therefore, if the exam had gone its usual course and this litigation had not been brought, the adverse impact of the invalid 2008 exam would have been far worse than it was because most of the minorities who were ultimately promoted received their appointments years into the life of the list (e.g., Facey and Moss). <u>See</u> Ex. 94 (2008 exam promotions list with dates). In fact, if the list had only remained in effect for the usual 2 to 3 years, there would have been at most, one or two minority promotions. <u>Id</u>. In 2014 the City ultimately administered new promotional exams, including for the position of Lieutenant. <u>Smith</u>, 144 F. Supp. 3d at 189. Only Plaintiffs Paul Joseph, Martin

Joseph, Bruce Smith, and Kenneth Sousa took the 2014 examination. See Ex. 4 (2014 results) to Ex 85 (Callahan Decl.). As in prior years, promotions from the 2014 exam were made in strict rank order fashion. See Ex. 4 to Ex. 85. Similarly, the 2014 exam lacked a component assessing prior performance as a police officer, community involvement, etc. (e.g., a career board). See Wiesen Testimony, Tr. (10/28/19) at 40-41.

### i. Agreement of the Parties' Experts That It Would Be Impossible To Predict What Would Have Happened in 2008 Based on the 2014 Exam Results

Plaintiffs' and Defendant's experts agreed on one crucial point: it is impossible to make any prediction (let alone overcome a legal presumption) as to how Plaintiffs would have scored if a valid exam had been given in 2008. In Dr. Wiesen's expert report he concluded that:

> There is no professionally acceptable support for Defense's conjecture that the scores of the black candidates who took the 2014 exam indicate that the Plaintiffs would not have been promoted had a valid exam been given in 2008.

Ex. 92 at 31.

At trial, Dr. Silva testified that he agreed with Dr. Wiesen's conclusion. Specifically, Dr. Silva testified that: "**One cannot say that any specific individual plaintiff or group of plaintiff who scored too low to be appointed on the 2014 exam would have scored too low, based on a similar exam, had such an exam been given in 2008**." Testimony of Dr. Silva, Tr. (10/29/19) at 115. (emphasis added). Dr. Silva testified that test-retest reliability would impede "any kind of accurate measure of" a candidate's performance on the same exam administered at a different time. Id. "Test-retest reliability is defined by the American Psychological Association as 'a measure of the consistency of results on a test ... over time, given as a correlation between the first and second administrations.'" Ex. 92 (Wiesen Report) at 4, n. 9, quoting Zedeck, S. (2013) APA Dictionary of Statistics and Research Methods, page 315. High reliability indicates a strong correlation between test scores, while low reliability means that it

would be difficult to accurately predict how candidates would perform on an examination if they took it more than once. See Wiesen Testimony, Tr. (10/28/19) at 45-46.

At trial, Dr. Wiesen testified regarding multiple studies examining test/retest reliability in exams given months or one year apart. Id. at 50, 54. All of the "carefully done research" in the field of organizational psychology has found that test/retest reliability "over a one-year period…[was] 0.3 or lower." Id. at 56. As Dr. Wiesen explained, a reliability of 0.3 or lower is "very low..." Id. Simply put, because of low test/retest liability, one cannot predict individual performance on exams given at different time points. Id.[12] Furthermore, Dr. Wiesen explained that there are other complications associated with trying to retroactively predict scores had someone taken an examination **six years earlier in life**. Id. at 62-63. Individuals may experience cognitive decline or medical obstacles that arise over a period of years. Id. at 63. Individuals may also have different life and/or professional circumstances across time that could impact their performance on a test at different time points.[13] Id. at 62-63. In short, the scientific research does not support "generalizing of scores on the 2014 exam to the 2008 exam."[14] Id.

---

[12]    Relevant studies on test/retest (i.e., job knowledge tests) did not examine reliability over a much longer period of time – such as the 6-year gap at issue between the administration of the 2008 exam and 2014 exam. Id. at 63-64.

[13]    Indeed, Dr. Silva testified that "[a]nything at the individual level is going to be speculative, whether it's from technical knowledge status or from a previous multicomponent test, **it's always going to be speculative.**" Silva Testimony, Tr. (10/30/19) at 7. (emphasis added). Therefore, he explained that it would not be a valid approach to try to predict how the Plaintiffs who performed well on a multi-component examination in 2002 would have performed on a multi-component exam had they been provided one in 2008 (instead of the invalid exam). Id. at 7-8. In fact, it would be virtually impossible to predict how any of the individual Plaintiffs would have performed on a multi-component exam had one been given in 2008. Id. at 8. Thus, the City cannot use the 2014 exam results to predict how any of the Plaintiffs would have performed in 2008. If they could, Plaintiffs would be able to ask for a similar inference that they would have performed well based on their performance on the 2002 multi-component examination.

[14]    Dr. Wiesen also testified that to make generalizations regarding how the 2008 group of candidates would have performed based on the performance of another group at some other point

###### ii.     The Surprising Nature of the 2014 Exam Results Do Not Support Using Those Results to Make Any Scientifically Reliable Predictions

Dr. Silva testified that based on his experience, he would have expected the 2014 exam to produce better results in terms of reducing adverse impact.  See Tr. (10/29/19 at 129); See also Ex. 93 (Silva Report) at 24 (one would expect an improved, valid examination, to reduce adverse impact).  Given the surprising results, he does not know whether the results from the 2014 exam – which, he claims throughout his report, is more content valid than the 2008 exam (see Ex. 93 at 24) – constitute an anomaly.  See Tr. (10/29/19) at 136-138.[15]  Thus this testimony simply reinforces all of the expert testimony that it is impossible to predict how the Plaintiffs would have fared if a content valid multi-component exam had been given in 2008.  Such a prediction is not only impossible because of test/retest reliability and common sense, but also because it is more likely than not that had a valid exam been given in 2008, there would have been much less adverse impact than the "anomalous" 2014 exam."[16]

---

in time would require one "to make some inferences" that are simply "speculative and statistically not sound."  Id. at 75.

[15]     His report expressly provides that the 2014 exam results are "dependent on the specific group of candidates being tested."  Ex. 93 at 24.  A noticeably small number of black applicants took the 2014 examination in total. See Ex. 92 (Wiesen Report) at 18.  In 2008 there were 25 black candidates out of 91 (27.5%) total candidates.  Id. at 5.  In 2014, despite there being more total candidates, there were only 15 black candidates out of 111 (13.5%).  Id. at 17-18.  Moreover, only 9 of the 25 candidates who took the 2008 exam also took the 2014 exam.  Cf. Ex. 2 and Ex. 4 to Ex. 85 (listing 2008 and 2014 candidates, respectively).

[16]     Presumably the City put in evidence regarding the 2014 exam based on an unproven assumption that the exam was lawful under Title VII (i.e., that it is both content valid and there are no less discriminatory alternatives). However, that assumption is unproven and speculative. Dr. Wiesen testified as to alternatives that could have been adopted.  See Tr. (10/28/19) at 83. He testified that there were less discriminatory alternatives to the 2014 exam format that would have been equally effective.  Id. at 30.  Specifically, "it would have been possible to measure [past] job performance" using a career board given that candidates applying for a Lieutenant position have substantial experience as police officers to draw from.  Id. at 40-41.  In fact, the consultant who created the 2014 examination, EB Jacobs, actually recommended using a so-called "career board."  See Testimony of Dr. Silva, Tr. (10/30/19) at 14-16.  As Dr. Silva testified, his firm uses career boards "fairly often."  Id. at 17.  However, the City of Boston did

Indeed, Dr. Silva testified that his firm's whole business model is built around multi-component public safety promotional exams that are more content valid and that reduce adverse impact.  See also Silva Testimony, Tr. (10/29/19) at 140.  The City did not give such an exam in 2008.  Thus, predicting the results from a truly content valid examination, if one had been given in 2008, is simply unknowable, although both experts opined that they would have expected less disparate impact.

## IV.    ARGUMENT

### A.    THE DEFENDANT CANNOT AND HAS NOT OVERCOME THE PRESUMPTION REQUIRING AN AWARD OF BACK PAY

This Court requested both parties to address the question of how courts treat the "presumption" in favor of back pay in Title VII cases.  See Tr. (10/29/19) at 107-108. Specifically, the Court requested the Parties to brief whether the presumption is like: (1) the McDonnell Douglas [411 U.S. 792] burden shifting paradigm, where after establishing a prima facie case there is a presumption of discrimination which can then be rebutted by a defendant presenting nondiscriminatory reasons for its conduct (Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) (discussing McDonnell Douglas framework)); or (2) a more traditional actual evidentiary burden of proof placed upon the defendant, which if not proven, requires the award of back pay.

---

not agree to EB Jacobs' recommendation.  Id. at 18.  Instead of using a career board, the City deferred to its "standard [E] & E system."  See Wiesen Testimony, Tr. (10/28/19) at 40-41. Moreover, the E & E component, as in 2008, was given "virtually no weight in the 2014 exam." Id. at 42.  Dr. Wiesen believes that had the City measured job performance, it would have had "relatively little or perhaps no adverse impact on minorities."  Id. at 41. His conclusion is supported by organizational psychology studies that have found "smaller black/white differences [in job performance] than test performance by about on half" and that "there [has] been no indication from the [City] that…blacks do less well on the job than whites."  Id. at 41.

As demonstrated here, the answer is simple: it is a traditional burden of proof that the defendant must carry and that "can seldom be overcome." Costa, 706 F.2d at 6.  In other words, defendants must prove that in the absence of such discrimination the plaintiff would still NOT have been hired or promoted.  See Cohen v. W. Haven Bd. of Police Comm'rs, 638 F.2d at 503; Lengen v. DOT, 903 F.2d 1464, 1470 (11th Cir. 1990) (collectively standing for the principle that back pay should not be denied unless defendants can actually prove that the plaintiffs would not have been hired or promoted even in the absence of such discrimination); Davis v. City of Dallas, 748 F. Supp. 1165, 1173 (N.D. Tex. 1990) (applying the Second Circuit's Cohen standard and finding that the presumption of back pay can only be rebutted with validated definitive criteria that would have been applied "at the time the applicant applied for the job."). See also Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant, 491 F.2d 1364, 1374 (5th Cir. 1974) (emphasis added) ("[W]e conclude **as a matter of law** that the members of this class of discriminatees are **presumptively entitled to an appropriate award of back pay** unless evidence is adduced to establish as a matter of fact that such discriminatory practices did not adversely affect a particular claimant.").  By way of example, if in 2008 Boston police lieutenant candidates were required to be Boston residents, and during the remedy phase the City established that one or more of the plaintiffs were unambiguously not Boston residents at the requisite time, this definitive evidence would overcome the presumption. Conversely, where the evidence (as here) is wildly speculative, the defendant cannot sustain its burden of proof.  See City of Bridgeport, 647 F.2d at 289 (lack of direct proof as to how plaintiffs would have fared on examinations years earlier is the result of employer's discriminatory practices.  Thus, the uncertainty must be resolved against the employer).

Under the <u>McDonnell Douglas</u> framework, after a plaintiff makes a prima face showing, there is a "presumption" of discrimination. However, the employer can rebut this "presumption" merely by producing some evidence of "nondiscriminatory reasons" for the adverse employment decision at issue. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 502–03, 113 S. Ct. 2742, 2745, 125 L. Ed. 2d 407 (1993). Though an employer "satisfie[s] their burden of production and rebut[s] the presumption of intentional discrimination" fairly easily under this framework, "whether [the evidence proffered is] ultimately persuasive or not" is left to the trier of fact. <u>Id</u>. at 503.

The **<u>Albemarle</u>** presumption is nothing like the <u>pre-liability</u> burden shifting framework of <u>McDonnell Douglas</u>. In contrast to the <u>McDonnell Douglas</u> prima facie presumption, which the Supreme Court has made clear "is not the equivalent of a factual finding of discrimination" (<u>see</u> <u>Furnco Const. Corp. v. Waters</u>, 438 U.S. 567, 579, 98 S. Ct. 2943, 2951, 57 L. Ed. 2d 957 (1978)), <u>Albemarle's</u> presumptive entitlement to back pay after a finding of liability in Title VII cases does not even come into play until after the fact finder has found a violation of the law.

Under <u>Albemarle</u>, entitlement to back pay is presumed unless the discriminating employer can affirmatively rebut the presumption with non-speculative and concrete evidence, all ambiguities being resolved against the discriminating employer. <u>See</u> <u>E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.</u>, 164 F.3d at 100 (After establishing the presumption of back pay, an employer can only avoid its back pay obligation if it can prove that "the plaintiff would not have been hired even absent discrimination."). Crucially, "[a]ny uncertainty as to whether the plaintiff would have been hired is resolved against the defendant, since it is the defendant's discriminatory employment practices which are the source of the uncertainty." <u>Id</u>. (citing <u>Cohen v. West Haven</u>, 638 F.2d at 502; <u>City of Bridgeport</u>, 647 F.2d at

289). See also United States v. City of Warren, Mich., 138 F.3d 1083, 1099 (6th Cir. 1998) (finding that "the district court was correct in resolving the attendant ambiguity in favor of [plaintiff], the victim of discrimination in this case."); Goodyear Tire & Rubber Co., Synthetic Rubber Plant, 491 F.2d 1364 ("Any doubts in proof should be resolved in favor of the discriminatee giving full and adequate consideration to applicable equitable principles."); Houser v. Pritzker, 28 F. Supp. 3d 222, 235 (S.D.N.Y. 2014) ("If the employer cannot make such a showing [that a plaintiff "would not have been hired even absent discrimination"], or if the issue remains uncertain because the nature of the employer's hiring practices makes it impossible to determine a 'but for' outcome, the plaintiff is entitled to individualized relief, including backpay." (citations omitted)).  Thus, the Albemarle presumption "**can seldom be overcome**." Costa, 706 F.2d at 6.  (emphasis added).

Moreover, because *defendants* bear the burden of proof to rebut the presumption of back pay, it is insufficient for the City to argue that *Plaintiffs* failed to prove they would have been promoted and to proffer evidence that is purely speculative.  Indeed, here, where Plaintiffs have put forth clear evidence that they were otherwise qualified for promotion and have provided the stipulated data from which back pay can be calculated (in fact, all of that evidence has been stipulated to), they are presumptively "entitled to the amount of [back pay] claimed unless the defendant can prove otherwise."  Id. at 805 (internal quotation marks omitted), quoting E.E.O.C. v. Wilson Metal Casket Co., 24 F.3d 836, 841 (6th Cir. 1994); Costa, 706 F.2d at 6 (en banc), citing  Manhart, 435 U.S. 702 at 719; Albemarle, 422 U.S. at 421.[17]  See also Lussier v. Runyon,

---

[17]    As is the case here, "[w]here racial discrimination is found, '(the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" Isabel v. City of Memphis, 404 F.3d 404, 414 (6th Cir. 2005), quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S. Ct. 817, 13 L.Ed.2d 709 (1965).

50 F.3d at 1110, n. 7 (citations omitted) ("while front pay is fully within the district court's discretion, back pay is a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case.").  See also Johnson v. Spencer Press of Maine, Inc., 364 F.3d at 379 (citing Albemarle and concluding that "[d]espite its equitable nature, back pay is therefore 'a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case.'" quoting Thurman v. Yellow Freight Systs., Inc., 90 F.3d 1160, 1171 (6th Cir.1996)); See also Cowan v. Prudential Ins. Co. of Am., 852 F.2d at 690 ("Under the dictates of Title VII, [Plaintiffs are] presumptively entitled to back pay for wages denied [them] as a result of [Defendant's] discriminatory promotion practices.")

Indeed, as is the case here, once the trier of fact has found a Title VII violation under a disparate impact theory, to establish the presumption to back pay, individual plaintiffs "need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of the proved ...discrimination.'" Robinson v. Metro–North Commuter R.R. Co., 267 F.3d at 159, quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. at 362; Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012) ("If the trier of fact determines that the plaintiffs have established a disparate impact violation of Title VII, each person seeking individual relief such as back pay and compensatory damages need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of proved employment discrimination." (citations and internal quotation marks omitted)); Baxter v. Savannah Sugar Ref. Corp., 495 F.2d 437, 445 (5th Cir. 1974) (substantial doubts related to determining who would have been promoted under a racially neutral system "must be resolved in favor of the discriminatee who has produced evidence to establish a prima facie case. The discriminatee is the innocent party in these circumstances.").

26

Here, it is undisputed that all of the Plaintiffs either were not promoted or were promoted at least three-plus years after promotions were made from the 2008 list (see Ex. 94), thereby establishing an "adverse employment decision". See, e.g., also Osahar v. Carlin, 642 F. Supp. at 457, 454 (awarding back pay for delayed promotions); Bradley v. City of Lynn, 443 F. Supp. 2d at 168–69 (recognizing the harm of delayed discriminatory hiring in disparate impact cases, even where discrimination victims are eventually hired in the future); See also, Smith v. City of Bos., 144 F. Supp. 3d at 194, citing Bradley, supra, at 168 (at the liability stage, this Court "acknowledged that the delay in promotion will be relevant at the damages phase of the litigation" and that "it can also constitute disparate impact in the form of loss of pay, benefits, and seniority.").

Contrary to whatever Defendant may argue, this case is no different (and in many ways is even more egregious[18]) than the myriad disparate impact public safety exam cases where back pay has been awarded. See, e.g., Costa v. Markey, 706 F.2d at 6; United States v. City of Warren, Mich., 138 F.3d at 1097; Segar v. Smith, 738 F.2d at 1290.

> **i.    Defendant's Arguments with Respect to the 2014 Exam Are Not Only Irrelevant, But They Are Also Unsupported by the Record, And Have Been Expressly Rejected by Every Circuit to Consider the Issue**

The City's pretrial brief asserted that "[g]iven that Plaintiffs scored poorly on the 2014 exam the Court should not and cannot presume that any of the Plaintiffs would have been

---

[18]    Here, the City has been aware of the severe adverse impact associated with its promotional process for 40 years. See Dkt. 144 at ¶¶ 16, 19, p. 18. The written multiple-choice promotional exam has had an overwhelming disparate impact on minority candidates for decades. Id. at 18. Indeed, the effects of utilizing multiple-choice tests has been recognized by the First Circuit since Bos. Chapter, N.A.A.C.P., Inc. v. Beecher, 504 F.2d 1017, 1021 (1st Cir. 1974). Clearly, when the City utilized the 2008 exam it knew for a virtual certainty that there would be severe disparate impact. Accordingly, there is simply no equitable purpose in not following the law in this case.

promoted had the 2008 exam been a multi-component, assessment-style test." Dkt. 256 at 14. This argument contains two **<u>fatal</u>** flaws. First, a majority of the Plaintiffs did not take the 2014 exam. Second, both experts agreed that it is impossible to retroactively predict the Plaintiffs' performance on a hypothetical validated multi-component test 6 years earlier. Indeed, Courts of Appeals have rejected precisely this argument. <u>Cohen</u>, 638 F.2d at 503; <u>Lengen</u>, 903 F.2d at 1470.

In <u>Cohen</u>, female plaintiffs failed a physical abilities test ("PAT") that was later found unlawful under a disparate impact theory. After the district court enjoined use of the discriminatory test, the defendant implemented a properly validated PAT. <u>Cohen</u>, 638 F.2d at 499. Two of the plaintiffs took and failed the validated test and the defendant argued that they were therefore not entitled to back pay. The district court agreed. However, the Second Circuit reversed, holding that the **district court erroneously concluded that failing the subsequent validated test was grounds to deny back pay** and that the district court had improperly analyzed the issue of how the presumption of back pay can be rebutted. <u>Id</u>. at 502. The Second Circuit held "that the results of the… test did not constitute the requisite proof that plaintiffs were disqualified at the time the City rejected them." <u>Id</u>. at 503. The court stated that the failure of a subsequent validated test could not be used to defeat entitlement to back pay, unless it was *proven* that had the validated test been given at the time of the discrimination, plaintiffs would have failed.[19] Since the City of West Haven could not prove plaintiffs would have failed the validated test if it had been administered when the unlawful test was given several years earlier,

---

[19]    For instance, if as part of the validated promotional process a candidate had to be fluent in Spanish both at the time the first exam was given and later, when the plaintiff was being considered for promotion, but the candidate had never been fluent, this would satisfy the <u>Cohen</u> standard.

the presumption against back pay could not be overcome.  Here, there is no proof that the

Plaintiffs (many of whom actually performed well on the 2008 exam (achieving scores in the

mid-to-high eighties), some of whom were promoted to Sergeant based on an exam similar to the

2014 exam, and one of whom was promoted to Captain from the 2014 exam) would have done

poorly on a validated test had one been given in 2008.  Defendant's speculation to the contrary

has been **rejected by its own expert** who agreed with Dr. Wiesen that it is impossible to predict

how any of the Plaintiffs would have performed on the 2014 exam had it been given in 2008.

See Silva Testimony, Tr. (10/29/19) at 115.

In Lengen, 903 F.2d 1464, the Eleventh Circuit adopted the same analysis.  At trial, the

plaintiff successfully proved his disability discrimination claim.  Thereafter, the district court

denied plaintiff back pay based on the defendant's argument that the plaintiff had never taken a

required training course.  The Eleventh Circuit reversed the denial of back pay, expressly

rejecting the district court's conclusion.  Id. at 1470.  The court found that the presumption could

not be rebutted because defendant could not conclusively demonstrate what would have

happened at the time the discrimination occurred.  The Eleventh Circuit explained that: (1) the

fact that the plaintiff did not successfully complete the course, after being given the opportunity

to do so years later, "is of no relevance to the question of whether he would have completed the

course successfully at the time he would have been offered a job" six years earlier; and (2) "it is

not clear that requiring [plaintiff] to take the course in 1988 would be an accurate indicator of

whether he would have completed it successfully in 1982."  Id.  Therefore, the court reversed the

district court's refusal to award plaintiff back pay as clearly erroneous.  Id. at 1471.

Other courts have followed the Cohen standard. See Davis v. City of Dallas, 748 F. Supp.

at 1173 (applying the Second Circuit's Cohen standard and finding that the presumption of back

pay can only be rebutted with validated immutable criteria that were applied "at the time the applicant applied for the job."). Here, even *assuming arguendo* that the 2014 exam is valid,[20] it cannot be used to rebut the presumption of entitlement to back pay where it is literally impossible to predict how the Plaintiffs, all of whom were Sergeants, all of whom successfully passed the 2008 exam, and most of whom received scores in the mid-to-high eighties (and two who were eventually promoted to Lieutenant in 2013 and 2014) would have fared if they had taken a validated exam in 2008. This is particularly true where all of the experts in this case and in Lopez testified that validated multi-component exams have been statistically proven to sharply reduce adverse impact. See, e.g., Trial Ex. 83, expert report of Dr. Leaetta Hough at 28-33 (discussing studies supporting this conclusion); Dec. 17, 2014 Hearing Transcript, Testimony of Dr. Wiesen at 28:14-19; Dec. 18, 2014 Hearing Transcript, Testimony of Silva at 73:10-19 (agreeing that differences in cognitive ability testing between whites and blacks is "large" but in measures of job performance are typically "small" to "medium"). See Silva Testimony, Tr. (10/29/19) at 135 (recognizing that oral testing components generally reduce adverse impact).

Defendant is unable to cite a single case supporting the proposition that a post-discrimination validated exam can be used to rebut the presumption of back pay. In the Parties' joint pretrial memorandum, the City cited Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d at 289. City of Bridgeport, however, actually supports the *Plaintiffs'* argument here. There, the district court found that a written exam had an unlawful disparate impact on minority firefighter candidates. The court enjoined its use and ordered

---

[20]    Moreover, to conclude that the 2014 exam is in fact valid (given that the Parties are not trying its legality in this case) would itself be to inappropriately draw a massive ambiguity in the City's favor. Doing so would be in contravention of the law.

remedial relief to candidates who were not offered a position, but only if they could demonstrate that they met all of the City's other hiring criteria – criteria that included easily provable facts, such as residence and education level, and also more subjective criteria such as physical and medical condition at the time the exam had been given.  Id. at 289.  The Second Circuit reversed the district court's holding because it had effectively placed the burden on plaintiffs to prove that they would have passed valid physical and medical hiring requirements in order to claim entitlement to back pay.  Id. at 290.  On appeal, the Second Circuit applied Cohen and instructed the district court to place the burden of proof on the *defendants*:

> With respect to most of the City's prerequisites i.e., those relating to the candidate's age, residence, education, and possession of a driver's license we would expect the allocation of the burden of proof to have little impact. However, two prerequisites relate to the physical condition of the candidate in 1971 or 1975, and the order would require that the nonofferee candidate prove that he would have passed the physical agility test and the medical tests that were administered.  Proof of prior health or physical conditioning may not be so readily available as would be proof of age, education, etc. If direct proof is unavailable on these questions, it is attributable to the discriminatory policies and practices of the City, which prevented the actual taking of such tests as would have been taken, absent the discrimination

Here, like in City of Bridgeport, the lack of direct proof as to how Plaintiffs would have performed had a non-discriminatory exam been given in 2008 "is attributable to the discriminatory policies and practices of the City, which prevented the actual taking of such tests as would have been taken, absent the discrimination."  Id. at 289.  For example, the notion that Dr. Gaddy, who performed well on the 2008 exam, would have performed poorly on a multi-component examination had she been provided one in 2008 is sheer speculation and devoid of any evidentiary support.  In short, City of Bridgeport underscores the difficulty of rebutting the presumption with post hoc evidence that is not immutable in nature.  It supports Plaintiffs' position.

## B.  DEFENDANT'S ARGUMENT THAT LOPEZ II CHANGED THE WELL-ESTABLISHED PRESUMPTION THAT PLAINTIFFS ARE DUE BACK PAY IS MERITLESS

The City also claims that Plaintiffs are not entitled to back pay based on its interpretation

of footnote 16 in Lopez II.  See Tr. (10/28/19) at 19.[21]  Of course, footnote 16 is clearly dicta that

cannot overrule binding precedent from the Supreme Court and the First Circuit (including En

Banc, in Costa v. Markey, 706 F.2d at 6.).  Footnote 16 is found in a section of the majority's

opinion (in a 2-1 split) pertaining to less discriminatory alternatives because the Lopez II

plaintiffs, unlike the Smith plaintiffs, failed on prong 2.  See Section "C. The Officers'

Alternatives," Lopez II, 823 F.3d at 120.  (Because plaintiffs failed on prong 2, "the pivotal

question on appellate review is whether the evidence compelled a finding that the employer

refuse[d] to adopt an available alternative employment practice that has less disparate impact and

serves the employer's legitimate needs." (citations and internal quotation marks omitted).

Specifically, footnote 16 follows a sentence providing that the Lopez plaintiffs' proposed

alternatives "fell short of th[e] mark" necessary to prove a clear error subject to reversal.  Id. at

121.  It reads:

> The Officers' failure to explain how a particular alternative would have reduced disparate impact in 2005 and 2008—and by how much—is particularly odd given the obvious mootness of their claim for injunctive relief. Consequently, had the remedy phase of trial proceeded as the Officers would have hoped, each officer would have needed to show that, more likely than not, he or she would have been promoted had Boston used an equally or more valid selection tool with less impact. *See* 42 U.S.C. § 2000e–5(g)(1) (authorizing "back pay" remedy for Title VII violation); *Azimi v. Jordan's Meats, Inc.,* 456 F.3d 228, 235 (1st Cir.2006) ( "Injuries allegedly caused by the violation of Title VII ... must be proven to the factfinder ... which may reasonably find, within the law, that while there has been [injury], the plaintiff has not been injured in any compensable way by it."). How any officer could have made such a showing without first

---

[21]    When the Court asked the City: "what do[es] [it] say to [Plaintiffs'] presumption that there is a presumption then that they get back pay?" the City responded that "while that may be true in some jurisdiction and in some circuits perhaps, um, but [the City] do[es] not] believe that that is true here in the First Circuit."  Id.

securing a liability finding predicated on a specific alternative selection tool that would have been equally or more valid and produced less adverse impact is entirely unclear.

On its face, this dicta concerns the majority's mere musings on remedy under Prong 3 had that issue arisen (it never did).  Moreover, the court did not have the benefit of any briefing on remedy by any party or amicus (including the US Dept. of Justice, which filed a brief in support of the plaintiffs).  The City underscores a footnote that relates to assessing remedy only where an exam has *first been found to be valid*.  In such a case, the plaintiffs then bear the burden at the prong 3 stage of demonstrating less discriminatory alternatives.  See Smith, 267 F. Supp. 3d at 337 (emphasis in original), citing Lopez II, 823 F.3d at 110–11 ("a plaintiff who satisfies prong 1 will prevail either by the employer failing to meet their burden on prong 2, or by the plaintiff meeting their burden on prong 3.").

Equally troubling is that Judge Kayatta cites only one case, Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 235 (1st Cir. 2006), in support of the disputed sentence.  Yet Azimi is a harassment case and the question of the "back pay presumption" was not at issue.  That case stands for the simple proposition that in a harassment case the plaintiff cannot recover for emotional distress without first proving that he/she suffered such damages.[22]  Moreover, the Azimi plaintiff only prevailed on his harassment claim – not his discriminatory termination (i.e., hiring) claim.  As such, the Azimi decision was simply about whether a plaintiff must put forth evidence of damages associated with workplace harassment.  It says nothing regarding a plaintiff's burden of proving entitlement to back pay or an employer's burden in rebutting that presumption because Azimi lost his claim to back pay.[23]

---

[22]    Additionally, Azimi also "did not receive nominal damages…because he did not ask for them in a timely fashion."  Id. at 231.

[23]    In short, Azimi has absolutely nothing to do with the question of back pay after a finding of a discriminatory hiring or promotional practice.  Azimi concerned the unique question of

Moreover, it is inconceivable that the First Circuit would overrule the <u>Albemarle</u> presumption, which has been a bedrock principle of discrimination law for 40 years, in a footnote that contains mere <u>dicta</u> and relies on one case having nothing to do with the issue.  As this Court explained in a similar context (upon the City's urging of the Court to find that <u>Lopez II</u> overruled the well-established 3-prong disparate impact liability analysis):

> I detected no shift in the governing law in <u>Lopez II</u> from that I had applied to the facts I found in <u>Smith</u>. Nor would any shift be expected. Absent intervening Supreme Court precedent or legislative change, **it is the practice in the First Circuit faithfully to adhere to the decisions of earlier panels of that court**. <u>See, e.g.</u>, <u>Peralta</u> v. <u>Holder</u>, 567 F.3d 31, 35 (1st Cir. 2009) (" 'We have held, time and again, that in a multi-panel circuit, prior *328 panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent.' " (quoting <u>Muskat</u> v. <u>United States</u>, 554 F.3d 183, 189 (1st Cir. 2009))).

Indeed, as this Court has already found in rejecting Defendant's interpretation of <u>Texas Dep't of Hous & Cmty. Affairs</u>, <u>supra</u>, the City's interpretation of this footnote would eviscerate the "prong 2" and "prong 3" distinction in the disparate impact analysis.   <u>See</u>, <u>Smith</u>, 144 F. Supp. at 211, n. 43 ("[U]nder the current scheme, the plaintiff bears no burden of demonstrating the existence of equally effective alternative practices unless the defendant has successfully met the requirements of prong two."); <u>See also</u> <u>Smith</u>, 267 F. Supp. 3d at 337 (flatly rejecting the City's "call to collapse the inquiry of prongs 2 and 3" after <u>Lopez II</u>).  More importantly, the City is asking the Plaintiffs to bear an impossible burden of proving what would have happened more than a decade ago, if a less discriminatory test had been given.  Circumstances such as the

---

whether a jury was permitted to deny compensatory damages to a victim of unlawful workplace harassment where *the plaintiff lost on his discriminatory discharge claim (*<u>see Azimi</u> at 249) *and therefore had no claim to back pay.*  While it is true that plaintiffs in Title VII must prove entitlement to damages, the Supreme Court and this Circuit have long held that victims of discriminatory hiring and promotional practices are presumptively entitled to back pay and therefore meet their burden upon proving liability.   <u>See</u> <u>Costa</u> v. <u>Markey</u>, 706 F.2d at 6.

ones presented here are precisely why Title VII case law requires employers to suffer the consequences of the uncertainties associated with maintaining a discriminatory system. See City of Bridgeport, 647 F.2d at 289.  If employers could avoid remedying discriminatory practices by requiring plaintiffs to prove counterfactuals concerning old events, forcing courts into a quagmire of hypotheticals, disparate impact law would be quickly turned on its head.

A reasonable interpretation of footnote 16 in Lopez II does not support the conclusion that the Albemarle presumption has been overruled.  In sum, the City's interpretation of Lopez II Court's dicta in footnote 16, to borrow phrasing from this Court, "seems somewhat at odds with reality."  Smith v. City of Bos., 267 F. Supp. 3d at 334.

## C.    IT IS WELL-ESTABLISHED THAT BACK PAY INCLUDES OVERTIME AND DETAIL PAY UNDER THE CIRCUMSTANCES HERE

The law is well-established that back pay is not limited to salary; it includes all forms of compensation that can reasonably be expected to have been earned by an employee in the sought-after position.  See Davis, 748 F. Supp. at 1178, citing Willett v. Emory & Henry College 569 F.2d 212 (4th Cir.1978) ("back pay includes not only salary loss, but also compensation for lost overtime, shift differential, and fringe benefits (e.g., sick pay, annual leave, and vacation pay."); United States v. City of Warren, Mich., 138 F.3d at 1097 ("lost overtime is a well-established part of a back pay award under Title VII"); See also City of Waltham v. Waltham Police Patrol Officers' Union, Local 161, 87 Mass. App. Ct. 1130, 32 N.E.3d 369 (2015) (affirming an arbitrator's award that included back pay for "lost overtime and lost detail opportunity."); Warren v. United Parcel Serv., Inc., 495 F. Supp. 2d 86, 88 (D. Me. 2007), judgment entered, No. CIV.06 84 P H, 2007 WL 2137769 (D. Me. July 24, 2007), aff'd, 518 F.3d 93 (1st Cir. 2008) (affirming jury award of substantial overtime back pay based on plaintiff's testimony that he worked more overtime than other employees); Molloy v.

Blanchard, 115 F.3d 86, 90 (1st Cir. 1997) (affirming an award of damages that included plaintiff's "lost opportunity to earn extra income while suspended (for special details, overtime, etc.)").

Here, all of the evidence indicates that Plaintiffs would have had a significant amount of overtime and detail hours available to them had they been promoted to the position of Lieutenant. Former Commissioner Evans testified that there is more work available than the Boston Police Department can handle and that a common complaint is that officers are required to work too many additional shifts. See Tr. (10/30/19) at 38.

In this case, the Parties have stipulated and provided a chart to this Court which delineates the overtime and detail that each plaintiff actually worked as a sergeant during their backpay period. See Ex. 89 (reflecting the actual hours of overtime and detail worked by Plaintiffs during the relevant period). Further, while the City disputes that overtime and detail should be legally awarded, it does not dispute that the fairest way to calculate overtime and detail back pay is to simply take what each Plaintiff actually made in overtime and detail during the relevant back pay period, and to award each plaintiff the pay differential (assuming they would have worked the same amount of hours as Lts.) they would have received as Lieutenants. See Exs. 89; 86(b)and (c) (i.e., both Plaintiffs and the City have proposed back pay calculations based on the actual overtime and detail hours Plaintiffs worked as reflected in Ex. 89). The wage scales associated with the collective bargaining agreements (see Ex. 88, 2011 through 2019 wage scales) served as the basis to calculate overtime back pack pay based on pay differential between Lieutenants and Sergeants. Similarly, Ex. 90 provides the applicable wage differentials that were used to calculate detail back pay. All of the underlying documents supporting the individual back pay calculations reflected in Exhibit 86(b) have been submitted to the Court as part of

Exhibit 95 (as supplemented by Dkt. 301). As such, the stipulations are well-supported by the record evidence.

### D.    DELAY DAMAGES HAVE BEEN RECOGNIZED BY NUMEROUS COURTS AND ARE NECESSARY TO FULLY REMEDY DEFENDANT'S DISCRIMINATORY PRACTICES IN THIS CASE

As this Court well knows, the 2008 exam promotional list remained in effect for an extraordinary six years, while most exams remain active only for two or three. See Smith, 144 F. Supp. 3d at 189. As a result, only towards the very end of this period (2013 and 2014) were a few minority candidates promoted, two of whom are plaintiffs in this case. The law is clear that compensation for the delay damages should be presumed to the same extent as for back pay for failure to promote because a compensable injury occurs the day the first pool of candidates is promoted from an unlawful exam. See, e.g., Isabel v. City of Memphis, 404 F.3d at 410 (back pay should be calculated from the date the first pool of candidates were promoted); See also Osahar v. Carlin, 642 F. Supp. at 457, 454; Bradley v. City of Lynn, 443 F. Supp. 2d at 168–69 (recognizing the harm of delayed discriminatory hiring in disparate impact cases, even where discrimination victims are eventually hired in the future). Indeed, here, this Court's prior decision on liability recognized that the discriminatory process that commenced in 2008 resulted in delayed promotions. Smith, 144 F. Supp. 3d at 199 ("As explained above, the Plaintiffs have presented evidence of statistically significant impact on…delay in promotions). The first promotion from the 2008 list was made on January 30, 2010. See Trial Ex. 3 (listing initial groups of promotions from 2008 list). Plaintiffs Facey and Moss were promoted on January 26, 2013 and November 7, 2014, respectively. See Ex. 86(a). Thus, it is clear that the small number of minority applicants who ultimately attained the position of Lieutenant only did so years after dozens of white applicants had been promoted. See Testimony of Dr. Wiesen, Tr. (10/28/19) at 76 (explaining that Plaintiffs Facey and Moss should receive delay damages because they were

"promoted to lieutenant [] long after the average date for white candidates to be promoted to lieutenant, and so they lost…the wages, the differential wage between Sergeant and Lieutenant for some period of time, for a year or two or so.").

Indeed, Plaintiffs Facey and Moss should receive back pay in order to fully remedy the discrimination at issue.  See Local 28 Sheet Metal Workers' Int'l Ass'n v. E.E.O.C., 478 U.S. at 465 ("Congress deliberately gave the district courts broad authority under Title VII to fashion the most complete relief possible."); United States v. City of New York, 717 F.3d 72, 95 (2d Cir. 2013) ("Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.").  A damages analysis based on loss of opportunity that considers promotional delays (and cuts off back pay for Facey and Moss as of their promotion date), balances all of the remedial interests and legal principles discussed herein.

### E.    THE PARTIES' STIPULATION RESOLVES THE QUESTION AS TO HOW BACK PAY SHOULD BE CALCULATED

While there are some disagreements regarding calculating back pay awards (most notably when back pay should "start" and "end"), the Parties have agreed to a methodology for calculating back pay that obviates the need for substantial discussion regarding back pay computations.  Assuming the Court concludes that the City has failed to meet its burden in rebutting Plaintiffs' presumptive entitlement to back pay, the stipulation dictates that the Parties will utilize a loss of opportunity analysis based on a promotion rate of 36.26%.  See Exs. 86, 86(b) and (c).  This simply means that each Plaintiff will be awarded 36.26% of the full value of the back pay they would be entitled to if it could be determined with absolute certainty that they would have been promoted absent discrimination.  See also Dkt. 256 at 15.  The 36.26% is simply reflective of the fact that out of 91 candidates in 2008, 33 (36.26%) were ultimately

promoted.  See Tr. (10/28/19) at 33.  Thus, the Parties stipulated that because 33 candidates were promoted based upon the discriminatory examination, each candidate would have had a 36.26% chance of being promoted (rather than a 100% chance).  Thus, because it is impossible to determine what would have happened if a valid exam had been given in 2008, back pay based on the lost opportunity of 36.26% is an equitable and appropriate remedy in this case.  See also City of Miami, 195 F.3d 1292, 1299 (finding that awarding no back pay or full back pay in a disparate impact case such as this would be untenable).

Here, the Court need only examine Exhibits 86(b) and 86(c) (Plaintiffs' and the City's proposed back pay calculations) and determine the more appropriate back pay award in view of the record evidence and the arguments of the Parties.

### i.    Plaintiffs' Proposed Back Pay Calculations Are Legally and Logically Sound

As explained by the Sixth Circuit, "[t]he first step when calculating back pay is to identify the starting and ending dates for the back-pay award period."  Howe v. City of Akron, 801 F.3d 718, 745 (6th Cir. 2015).  It is equally well-established that back pay calculations in disparate impact cases do not require (unrealistic) exactitude.  See City of Miami, 195 F.3d 1292, 1299.  See also, Hance v. Norfolk S. Ry. Co., 571 F.3d 511, 520 (6th Cir. 2009) ("Backpay should be awarded even where the precise amount of the award cannot be determined. Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer" (citations and internal quotation marks omitted)).  The Sixth Circuit has also found that "under a disparate-impact theory of liability, injury occurs and back-pay calculations commence when the employer *uses* the discriminatory practice for the first time."  Howe, 801 F.3d at 745. (emphasis in original).  In this case, that date would be the date

on which the City first hired any candidate from the 2008 exam list (i.e., January 30, 2010). See Trial Ex. 3; Isabel v. City of Memphis, 404 F.3d at 410.

However, here the Parties have proposed discrepant start and end dates (deriving primarily from the positions of their respective experts), and the Court should choose the more legally and logically reasonable of the Parties' competing proposals. Plaintiffs' proposed start and end dates are easily supported. Plaintiffs' back pay start date (per Dr. Wiesen) is the average promotion date of all white officers, whereas the City's back pay start state (per Dr. Silva) is the average promotion date of all candidates. It would be patently illogical to adopt Dr. Silva's approach because the average promotion date of *all* candidates (including minorities) is premised on a process infected with discrimination. Moreover, "Title VII permits an award of back pay starting two years before the date of the filing" of Plaintiffs' EEOC charge. Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 954 (1st Cir. 1995). Here, Plaintiffs first filed a complaint with the EEOC in March 2010. See Ex. 44. Thus, Dr. Wiesen's proposed "start date" of November 18, 2011 is inherently conservative and should be adopted under the unique facts of this case. See EEOC v. New Prime, Inc., No. 6:11-CV-03367-MDH, 2015 WL 8757318, at *2 (W.D. Mo. Dec. 14, 2015) (citations omitted) ("district court[s] ha[ve] broad equitable discretion to fashion back pay awards" under Title VII). The City argues that back pay should be cut off as of July 4, 2014 on the apparent rationale that the 2014 exam was administered around that time. However, this position lacks any support in the law. Back pay is intended to make victims whole for a lack of promotion. Back pay should not be cut off until the date of trial,[24] retirement, or until a plaintiff is promoted (e.g., Facey and Moss).

---

[24]    If anything, there is caselaw finding that back pay should extend beyond trial until the date of judgment. See Harding v. Cianbro Corp., 498 F. Supp. 2d 337, 340, n. 5 (D. Me. 2007) (collecting cases). Again, Plaintiffs' approach to back pay in the Parties' stipulation is eminently

### ii.    Plaintiffs Also Prevailed on Their M.G.L. chapter 151B Claims and May Obtain Full Back Pay Under Massachusetts State Law

The reasonableness of Plaintiffs' proposed back pay calculations is further supported by the fact that they prevailed on their state law claims (in addition to Title VII) and thus could appropriately seek to obtain a 100% back pay as a state law remedy.  See, Harris and Spencer v. City of Worcester Police Dept., Massachusetts Commission Against Discrimination ("MCAD") Docket #s 94-SEM-0589 and 90 at 49 (attached hereto as Ex. A) (a Massachusetts Commission Against Discrimination order dated November 9, 2011 awarding fully back pay in a disparate impact case after a finding of liability); See also City of Worcester v. MCAD, et. al (Appeal No. 2018-P-0576, Lower Court No: 1585cv01263), Memorandum and Order Dated October 22, 2019 (attached hereto as Ex. B).  MCAD decisions underscore the more liberal remedies available under Massachusetts state law compared to Title VII, which can even include emotional distress damages.  See MCAD v. Boston Housing Authority, Docket # 03-BEM-01131, 2008 WL 913281, at *11 (order dated March 20, 2008), citing Stonehill College v. MCAD, 441 Mass. 549 (2004); College-Town div. of Interco. v. MCAD, 400 Mass. 156, 169 (1987) ("Section 5 of Chapter 151B authorizes the Commission to award remedies to effectuate the purposes of the statute, including damages for lost wages and benefits and for emotional distress."); MCAD v. Town of Winthrop, Docket 02-BEM-03751, 2014 WL 318560, at *19 (order dated January 22, 2014) (finding that complainant was entitled to "the difference between the salary, overtime, retirement benefits, Quinn Bill benefits, longevity benefits, and any other income or benefits she earned as a patrol officer and that which she would have earned as a sergeant").

---

reasonable (and they could only calculate back pay up until trial since they do not know when the judgment date will be).

Here, it is important to remember that Plaintiffs prevailed on both their Title VII and state law claims.  As such, Plaintiffs' request for back pay here, based on a loss opportunity analysis, is wholly reasonable where Plaintiffs have grounds to seek full back pay on their state law claims.  However, in the interest of obtaining a key stipulation in these proceedings on remedy that should result in each Plaintiffs' recovery of significant back pay, Plaintiffs have foregone that argument.

Here, Plaintiffs' proposed calculations are supported by the law, and if anything, they are conservative calculations.  On the other hand, the City's proposed calculations (like the City's application of a footnote in Lopez II) are not supported by the law or record evidence.

### iii.    Plaintiffs Are Entitled to Prejudgment Interest Under State Law

As indicated, Plaintiffs prevailed on both their federal and state discrimination claims. As such, under state law, Plaintiffs are entitled to prejudgment interest.  See Freeman v. Package Mach. Co., 865 F.2d 1331, 1345 (1st Cir. 1988) ("[S]tate  law governs prejudgment interest vis-a-vis state claims, even when the basis for the district court's jurisdiction stemmed originally from the presence of a federal question.").  In Freeman, the First Circuit affirmed a district court award of prejudgment interest under state law where the plaintiff prevailed on his Chapter 151B claim and his federal age discrimination claim.  Id.  In discrimination claims under Chapter 151B, "plaintiffs are entitled to prejudgment interest on back pay awards from the date of the filing of the complaint."  Blockel v. J.C. Penney Co., 337 F.3d 17, 30 (1st Cir. 2003).  The applicable prejudgment interest rate is 12% and it applies through the date of judgment.  See Mendoza v. Union St. Bus Co., 876 F. Supp. 8, 12 (D. Mass. 1995).  Accordingly, Plaintiffs have set forth prejudgment interest calculations based upon Plaintiffs' proposed back pay calculations in the chart at p. 17 of this brief.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, the Court should: (1) award all Plaintiffs back pay in the manner discussed herein and identified in Exhibit 86(b); (2) order any other relief that the Court determines is warranted under the unique facts of this case (e.g., front pay); and (3) attorneys' fees and costs.[25]

DATED: January 15, 2020                   Respectfully submitted,
                                          BRUCE SMITH, et al.
                                          By their attorneys,

                                          /s/ Harold L. Lichten
                                          Harold L. Lichten, BBO#549689
                                          Benjamin Weber, BBO#673736
                                          Zachary Rubin, BBO#704485
                                          Lichten & Liss-Riordan, P.C.
                                          729 Boylston Street, Suite 2000
                                          Boston, MA 02114
                                          (617) 994-5800
                                          hlichten@llrlaw.com
                                          bweber@llrlaw.com

                                          Stephen Churchill, BBO# 564158
                                          Fair Work, P.C.
                                          192 South Street, Suite 450
                                          Boston, MA 02111
                                          (617) 607-3262
                                          steve@fairworklaw.com

---

[25]    Plaintiffs' petition for attorneys' fees and costs will be made after the Court rules on the question of remedy.

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document has been served on counsel for all parties through the ECF system on this date.


DATED: January 15, 2020                    */s/ Harold L. Lichten*
                                            Harold L. Lichten