UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
BRUCE SMITH, PAUL JOSEPH, JOHN M. )
JOHNSON, ROBERT TINKER, MARTIN    )
JOSEPH, KIM GADDY, BRIAN KEITH     )
LATSON, LEIGHTON FACEY, KENNETH    )
SOUSA, WILLIAM WOODLEY, MARWAN     )
MOSS, and LATEISHA ADAMS,          )
                                   )
                   Plaintiffs,     )
                                   )        CIVIL ACTION
           v.                      )        NO. 12-10291-WGY
                                   )
CITY OF BOSTON,                    )
                                   )
                   Defendant.      )
_____   )
```

YOUNG, D.J.                                May 13, 2020

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

This litigation has spanned years and prompted the Court to issue two published opinions on the merits ruling in favor of the police-officer plaintiffs ("the Officers") against the City of Boston ("Boston") on their Title VII disparate impact claim arising from the 2008 lieutenants' promotional exam.  Smith v. City of Boston (Smith I), 144 F. Supp. 3d 177 (D. Mass. 2015); Smith v. City of Boston (Smith II), 267 F. Supp. 3d 325 (D. Mass. 2017).  Having determined that the test had an unlawful disparate impact, the Court must now decide the remedy.  The

issues in dispute are whether there is a binding presumption that entitles the plaintiffs to back pay and, if so, whether Boston has successfully rebutted that presumption by introducing evidence of scores from the new exam given in 2014.  The parties also debate the start and end dates of any back pay award.

For the reasons that follow, the Court rules that there is a binding presumption of back pay (notwithstanding the contrary dictum in a footnote in a recent opinion of the First Circuit in a related case) and that Boston has not rebutted this presumption.  Per the stipulation of the parties, back pay is limited to each plaintiff's "loss of chance" of being promoted as calculated by an agreed-upon formula.  The Court adopts the Officers' proposed start date and awards the Officers back pay in keeping with the stipulated calculation.  The Court also adopts the Officers' end dates, except for those plaintiffs who failed to mitigate damages by taking the 2014 exam and whose back pay therefore terminates on Boston's proposed end date.

### A.   Procedural History

After the Court ruled in favor of the Officers in Smith I in 2015, the First Circuit rejected a similar claim from a group of officers challenging Boston's 2008 sergeants' promotional exam.  Lopez v. City of Lawrence, 823 F.3d 102 (1st Cir. 2016), cert. denied, 137 S. Ct. 1088 (2017).  When the parties sought interlocutory appeal of Smith I, the First Circuit demurred on

October 11, 2016, with the suggestion that this Court take another look with the benefit of the Lopez case.  Smith II, 267 F. Supp. 3d at 328 (quoting ECF No. 229).  Finding that Lopez addressed a somewhat different set of facts and did not change the relevant law, this Court reaffirmed its decision on July 26, 2017.  Id. at 337.  The parties again sought interlocutory review and, on April 17, 2019, the First Circuit again denied it, this time without comment.  ECF No. 250.

From October 28-30, 2019, the Court held a three-day bench trial on damages.  ECF Nos. 292-294.  The Officers declined to seek any remedy other than back pay (potentially along with attorneys' fees and costs once a remedy is decided).  Trial Tr. Day 1 at 7:8-25, ECF No. 292; Pls.' Br. Remedy ("Pls.' Br.") 7, ECF No. 303.  Furthermore, the parties stipulated to a "loss of a chance" calculation of back pay, which fixes the lost chance ratio at 36.26% of the total value of each Officer's back pay (the promotion rate of the 2008 exam).  Joint Trial Stipulations, Trial Ex. 86; Joint Suppl. Trial Exs., Ex. A, Pls.' Calculations, ECF No. 301-1; id., Ex. B, Def.'s Calculations, ECF No. 301-2 (jointly, "Stipulated Calculations"); Def. City Boston's Damages Trial Br. ("Def.'s Br.") 24-26, ECF No. 302; Pls.' Br. 5-7.

### B.   Factual Background

This opinion presumes familiarity with the underlying facts of liability discussed in the Court's two previous published opinions in this case, Smith I and Smith II.   The crucial facts to recall from those opinions are that Boston's 2008 lieutenants' exam was deemed to have a disparate impact on minority candidates and to lack job-relatedness, in violation of Title VII and its Massachusetts analogue, Chapter 151B.   Smith I, 144 F. Supp. 3d at 212.   This Court did not reach the question whether any alternative selection tool might have had less discriminatory impact.   Id. at 211.   With that in mind, the Court turns to the factual questions aired at the damages trial.

The focus of the damages trial was the import, if any, of Boston's next iteration of the lieutenants' exam, administered in 2014.   There is no doubt that the 2014 exam was qualitatively far superior to the 2008 exam.   It included not only a written technical knowledge test (45% of the grade), but also an "in-basket" exercise (weighted at 25%) and two oral board exercises (the final 30% together).   Trial Tr. Day 1 at 78:2-79:8.   The 2014 exam was, in brief, a test significantly changed for the better, "in part due to a desire to increase diversity."   Smith I, 144 F. Supp. 3d at 190.   Yet, to the "surpris[e]" of both experts, the 2014 exam turned out to have had a greater adverse impact on black candidates than did the 2008 exam.   Trial Tr.

Day 1 at 100:15-23; Trial Tr. Day 2 at 130:4-5, ECF No. 293. Whereas five black candidates were promoted as a result of the 2008 exam, the 2014 exam landed only one black candidate in the top forty spots.  Def.'s Br. 23 (citing Trial Ex. 93 at 15-18).

Of the plaintiffs here, only four -- Paul Joseph, Martin Joseph, Bruce Smith, and Kenneth Sousa -- sat for the 2014 exam. Pls.' Br. 18-19; Aff. Edward P. Callahan -- Trial Ex. 85, Ex. 4, Boston PD 2014: Lieutenant Final Score Report ("2014 Results"), ECF No. 177.  Sergeant Paul Joseph received a score of 87 on the 2008 test and thought he would be promoted from that list. Trial Tr. Day 1 at 119:15-121:9.  He took the 2014 test anyway because, in his words, he "just wanted to see what the test was going to be about" -- but he "[a]bsolutely [did] not" study for it.  Id. at 122:3-6.  He scored a 71, next to last in the class. 2014 Results 3.  The other three officers in fact did marginally better on the 2014 exam than they had done in 2008, though still too low to be in line for a realistic promotion.  Sergeant Martin Joseph got an 80 (up from 77.49 in 2008), Sergeant Bruce Smith a 78 (compared with a 77.75 in 2008), and Sergeant Kenneth Sousa an 83 (78.41 in 2008).  Def.'s Br. 22 ns. 36-39.

## II.  ANALYSIS

The Officers' argument for back pay stems from the "Albemarle presumption," derived from the Supreme Court's holding "that, given a finding of unlawful discrimination,

backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975). Thus, the Officers contend, back pay is presumptively warranted, and Boston has done nothing to rebut that presumption. In response, Boston offers two arguments: (1) that the Albemarle presumption does not really exist, at least according to the First Circuit's recent decision in Lopez; and (2) alternatively, that Boston effectively rebutted the presumption with its evidence from the 2014 exam.

### A.   Is There a Presumption -- and What Does It Mean?

The term "presumption" does not appear in Albemarle itself, except in a footnote's passing reference to analogous case law under the National Labor Relations Act. Id. at 420 n.12 ("The finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer." (quoting NLRB v. Mastro Plastics Corp., 354 F.2d 170, 178 (2d Cir. 1965))). Nonetheless, the Supreme Court subsequently stated that "[t]he Albemarle presumption in favor of retroactive liability can seldom be overcome, but it does not make meaningless the district courts' duty to determine that such relief is appropriate." City of Los Angeles, Dep't of

Water & Power v. Manhart, 435 U.S. 702, 719 (1978); see Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 382 (1st Cir. 2004) ("Albemarle taught that backpay is a presumptive entitlement of a victim of discrimination and that the discriminating employer is responsible for all wage losses that result from its unlawful discrimination, at least until the time of judgment.").

The Supreme Court and First Circuit speak of a "presumption" in favor of back pay, and this word is at the core of the quarrel between Boston and the Officers.  What precisely does this "presumption" entail?  "No term has been more frequently or variously defined," one learned author bemoaned, to the point that "the whole subject seems an entanglement of definition and explanation, which leaves the mind in a hopeless state of bewilderment."  John Jay McKelvey, Handbook of the Law of Evidence § 39, at 93-94 (3d ed. 1924).  "Is it possible," another scholar wondered, "that for a century or longer judges, lawyers and jurists have not known what they are talking about when using the word 'presumption'?"  Otis Harrison Fisk, Presumptions in the Law: A Suggestion 1 (1921).  One more century of legal rumination behind us, here we are.

Boston contends that the Albemarle presumption is a mirage.  See Def.'s Br. 17.  Instead of "some 'substantive rule of law,'" Boston argues, "the so-called 'Albermarle presumption' boils

[7]

down to little more than the rather unremarkable proposition
that back pay is an available Title VII remedy that should be
awarded where appropriate."  Id. at 18 (citing Rosario-Torres v.
Hernandez-Colon, 889 F.2d 314, 322 (1st Cir. 1989) (en banc),
which recharacterized the "presumptive remedy" for violations of
42 U.S.C. § 1983 as "not a substantive rule of law, but merely
an attempt at reformulation of the basic principle that . . .
courts should weigh and balance the equities").  In support of
this view, Boston relies heavily on a footnote in the First
Circuit's recent Lopez decision, which is worth quoting in full:

> The Officers' failure to explain how a particular
> alternative would have reduced disparate impact in
> 2005 and 2008 -- and by how much -- is particularly
> odd given the obvious mootness of their claim for
> injunctive relief.  Consequently, had the remedy phase
> of trial proceeded as the Officers would have hoped,
> each officer would have needed to show that, more
> likely than not, he or she would have been promoted
> had Boston used an equally or more valid selection
> tool with less impact.  See 42 U.S.C. § 2000e-5(g)(1)
> (authorizing "back pay" remedy for Title VII
> violation); Azimi v. Jordan's Meats, Inc., 456 F.3d
> 228, 235 (1st Cir. 2006) ("Injuries allegedly caused
> by the violation of Title VII . . . must be proven to
> the factfinder . . . which may reasonably find, within
> the law, that while there has been [injury], the
> plaintiff has not been injured in any compensable way
> by it.").  How any officer could have made such a
> showing without first securing a liability finding
> predicated on a specific alternative selection tool
> that would have been equally or more valid and
> produced less adverse impact is entirely unclear.

823 F.3d at 121 n.16 (alteration in original).

Boston asserts that Lopez's footnote 16 ("the Lopez
footnote") teaches that "Title VII disparate impact plaintiffs
must prove their back pay (and other) damages by showing that
'but for' the discrimination they would have obtained some
quantifiable financial gain."  Def.'s Br. 16.  This
demonstrates, Boston argues, that the First Circuit does not
read Albemarle as conjuring a substantive "presumption" that
would entitle plaintiffs to back pay in the absence of loss
proven by a preponderance of the evidence.  More pointedly, the
Lopez footnote specifies what each individual officer must prove
in this case: "that, more likely than not, he or she would have
been promoted had Boston used an equally or more valid selection
tool with less impact."

It is understandable that Boston would latch onto this
footnote in Lopez.  That footnote, however, is plainly dictum,
since it addresses a counterfactual scenario.  Moreover, because
Boston convinced the Lopez Court that its test was sufficiently
job-related, the footnote refers to a different theory of
liability than the one before this Court in Smith I.
Accordingly, the Lopez footnote is dictum that does not bind
this Court.[1]  Still, a district court ordinarily gives great

---

[1] The Lopez footnote cites Azimi, 456 F.3d at 235, but that
case was about harassment (not a refusal to hire or promote) and
the quoted passage deals with compensatory damages, see 42
U.S.C. § 1981a(a)(1), not Title VII's equitable remedy of back

weight to the dicta of its court of appeals, and that is especially appropriate when the dictum is uttered in a case so closely related to the one before the district court.  In a typical scenario, this Court would readily apply the dictum from Lopez to the present case.  The sticking point here is that the Lopez footnote is contrary to controlling authority.  Since this Court must follow precedent of the Supreme Court that is

---

pay.  The distinction is made clear in an Eighth Circuit case that Azimi relied upon, Bailey v. Runyon, 220 F.3d 879, 882 n.2 (8th Cir. 2000) ("The 1991 amendments [to Title VII], 42 U.S.C. § 1981a, added compensatory and punitive damages relief to the already existing equitable relief . . . .").  Were this a case of intentional discrimination, the Lopez footnote may have correctly stated the burden of proof for compensatory damages under § 1981a(a)(1) -- though it fails to acknowledge the availability of compensation for the lost chance of promotion, even if each plaintiff's chance was below 50% likelihood.  Cf. Alexander v. City of Milwaukee, 474 F.3d 437, 449-51 (7th Cir. 2007).  The equitable remedy sought in this case, however, stands on different footing than compensatory damages.

Boston argues that "the Azimi citation makes perfect sense as it reaffirms the First Circuit's general requirement that damages be proved and the nature of the proof required."  Def.'s Suppl. Mem. 5.  Yet, like the Lopez footnote, this argument fails to appreciate two critical distinctions: (1) between harassment and denial of promotion (a probabilistic injury); and (2) between compensatory damages and equitable remedies.  Here, back pay is needed to compensate the Officers for their lost chance of being promoted, even if none can prove she would likely have received that promotion.  See Biondo v. City of Chicago, 382 F.3d 680, 688 (7th Cir. 2004).  Moreover, as an equitable remedy back pay serves other purposes aside from compensation.  Indeed, the Supreme Court has explained that back pay is in part a deterrent and thus may sometimes be awarded even when no harm was inflicted (as when after-acquired evidence of an employee's wrongdoing would otherwise justify the adverse decision).  See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362 (1995).  The reliance on Azimi in the Lopez footnote is a head-scratcher.

inconsistent with the Lopez footnote, it cannot rely on the dictum in Lopez.

The Supreme Court has repeatedly rejected "the basic contention" of the Lopez footnote and Boston here -- namely, "that if the [plaintiff] has not . . . already brought forth specific evidence that each individual was discriminatorily denied an employment opportunity, it must carry that burden at the second, 'remedial' stage of trial."  International Bhd. of Teamsters v. United States, 431 U.S. 324, 361 (1977).  The Supreme Court repudiated this view, explaining that "proof of the [discriminatory] pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy."  Id. at 362.  Thus, a plaintiff "need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination," at which point "the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons."  Id. (footnote omitted) (citing Franks v. Bowman Transp. Co., 424 U.S. 747, 773 n.32 (1976)).  Applying this reasoning, the Supreme Court expressly stated that "[o]n remand . . . every . . . minority group applicant for a line-driver position will be presumptively entitled to relief, subject to a

[11]

showing by the company that its earlier refusal to place the applicant in a line-driver job was not based on its policy of discrimination." Id. (footnote omitted) (emphasis supplied). Since the Officers are "presumptively entitled to relief," Albemarle demands that this relief must – once again, presumptively -- include back pay.[2]

It is true that Teamsters was a pattern-or-practice disparate treatment case, not a disparate impact case like the one before this Court.  Thus, it might be thought that disparate impact plaintiffs would not enjoy this presumption that their missed promotions are attributable to the unlawful employment practice.  Yet the reasoning of Teamsters undercuts this argument.  The Supreme Court offered three justifications for this presumption: (1) the plaintiffs' "prima facie case . . . create[s] a greater likelihood that any single decision was a component of the overall pattern"; (2) "the finding of a

---

[2] Somewhat confusingly, there are two separate "presumptions" at work here: Teamsters establishes a presumption that a particular adverse employment decision was the result of a general discriminatory policy and thus warrants individual relief, 431 U.S. at 362, while Albemarle creates a presumption that such relief must include back pay, City of Los Angeles, 435 U.S. at 719.  The Officers in this case must rely on the combination of these two presumptions.  Though Boston directs its fire at the "so-called Albemarle presumption," Def.'s Br. 18, its volley would more aptly be aimed at the Teamsters presumption regarding the hiring decision, for that is the presumption that sinks Boston's boat.  Despite filing two briefs on the presumptive damages question, Boston fails to reckon with or even mention Teamsters.

[discriminatory] pattern or practice changed the position of the employer to that of a proved wrongdoer"; and (3) "the employer was in the best position to show why any individual employee was denied an employment opportunity." Teamsters, 431 U.S. at 359 n.45.

All three reasons apply to disparate impact cases such as this one. First, the Officers' showing that the 2008 exam was unlawful and that they were not promoted after that exam increases the likelihood that each particular promotional failure is a result of that discriminatory exam. Second, Boston has violated the law (though it is admittedly far less culpable as "a proved wrongdoer" than are employers who intentionally discriminated). Finally, Boston has access to the trove of police department records and personnel, leaving it in the best position to proffer some lawful explanation for why an individual Officer would not have been promoted under a lawful selection process. Indeed, the weight of authority points to the conclusion that the Teamsters presumption applies in determining individual relief in disparate impact cases. See, e.g., Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 151-52 (2d Cir. 2012); Isabel v. City of Memphis, 404 F.3d 404, 414-15 (6th Cir. 2005); Crum v. Alabama, 198 F.3d 1305, 1315-16 (11th Cir. 1999); Sledge v. J. P. Stevens & Co., 585 F.2d 625, 637 (4th Cir. 1978); 2 Larson on Employment Discrimination § 31.02

(2d ed.) (noting that "it appears to be the rule that the [successful Title VII disparate-impact] plaintiff is entitled to back pay" unless the defendant "can show that the plaintiff was otherwise not qualified, or for some other legitimate reason would not have received the job or the promotion even in the absence of discrimination," and stating that "[t]his rule is parallel to that found in pattern or practice cases and class action disparate treatment cases").

Neither can _Albemarle_ itself be reconciled with the _Lopez_ footnote.  In the first place, the _Lopez_ footnote appears to draw a significant distinction between injunctive relief and back pay.  _Albemarle_ specifically rejected such a theory, for that would "open an enormous chasm between injunctive and backpay relief under Title VII" and "[t]here is nothing on the face of the statute or in its legislative history that justifies the creation of drastic and categorical distinctions between those two remedies."  422 U.S. at 423.

More fundamentally, the defendant-friendly evidentiary burden that the _Lopez_ footnote seeks to place on successful Title VII plaintiffs, "if applied generally, would . . . frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  _Id._ at 421. That is precisely what _Albemarle_ forbade courts from doing.  The

[14]

Second Circuit has cogently argued this point, explaining that
"to relieve an employer of the burden to show that it would not
have hired the plaintiff absent discrimination would contravene
part of Congress's intent in enacting Title VII, in that an
employer would be less likely to avoid or eliminate
discriminatory employment practices if it knew in advance that
it would never have to answer for those practices when faced
with a claim for back pay."  EEOC v. Joint Apprenticeship Comm.
of Joint Indus. Bd. of Elec. Indus., 186 F.3d 110, 123 (2d Cir.
1999); see Albemarle, 422 U.S. at 417-18 ("If employers faced
only the prospect of an injunctive order, they would have little
incentive to shun practices of dubious legality.  It is the
reasonably certain prospect of a backpay award that provide[s]
the spur or catalyst which causes employers and unions to self-
examine and to self-evaluate their employment practices . . . ."
(citation and internal quotation marks omitted)).  Nor would the
rule of the Lopez footnote make the plaintiffs whole, as
Albemarle requires, since the plaintiffs would need to prove
that they would in fact have been promoted -- not simply that
they could have been promoted, which is the "position [the
employee] would have been in absent the discrimination."
McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362 (1995)
(citing Franks, 424 U.S. at 764).  Under Title VII, the
diminished opportunity for employment is a distinct and

[15]

"concrete injury," even though it is "speculative" how the ultimate employment hiring or firing decision will shake out. Lorance v. AT&T Techs., Inc., 490 U.S. 900, 907 n.3 (1989) (citing Delaware State Coll. v. Ricks, 449 U.S. 250, 258 (1980)), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, § 112, 105 Stat. 1071, 1078-79); cf. Alexander v. City of Milwaukee, 474 F.3d 437, 449 (7th Cir. 2007) ("[W]hat [the plaintiffs] in fact lost was a chance to compete on fair footing, not the promotion itself."). Since each plaintiff suffered at least a diminished chance of employment as a result of the discriminatory test, they are all entitled to make-whole relief for the value of that job insecurity as a standalone injury.

In short, the test articulated in the Lopez footnote conflicts with Supreme Court precedent that this Court is not free to ignore.[3] Accordingly, the Court rules that the Officers,

---

[3] The Officers seek further support from a First Circuit case like this one, where disparate impact Title VII liability was predicated on a police-officer selection tool (a height requirement) that was not job-related, in which the panel held "that once a violation of title VII is proven, the successful plaintiff is presumptively entitled to back pay." Costa v. Markey, 706 F.2d 1, 6 (1st Cir. 1982), reversed on other grounds, 706 F.2d at 10 (1st Cir. 1983) (en banc); Pls.' Br. 32 (citing Costa). Yet Costa is not particularly helpful here, since the defendants in that case conceded "that plaintiff was rejected for appointment because of the application of the [unlawful] height requirement to her," and the district court found that "but for application of the height requirement . . . plaintiff would have been on the police force under a valid

in showing they were denied promotions on the basis of an unlawful exam, are presumptively entitled to back pay.

### B.    Boston Has Not Rebutted the Presumption

The next question is whether Boston has rebutted the presumption that the Officers would have been promoted but for the unlawful exam and are therefore entitled to back pay.  The standard for rebutting the presumption is mired in a decades-old circuit split.  See Cohen v. West Haven Bd. of Police Comm'rs, 638 F.2d 496, 502 n.10 (2d Cir. 1980) (citing cases).  Some circuits require "the employer to prove by clear and convincing evidence that the plaintiff, even absent the discrimination, would not have been promoted to that particular position." Johnson v. Brock, 810 F.2d 219, 224 (D.C. Cir. 1987) (citing Day v. Mathews, 530 F.2d 1083, 1085 (D.C. Cir. 1976) (per curiam)). The First Circuit appears to require only "proof by a preponderance of the evidence that the same [employment] decision would have been made absent the discrimination." Fields v. Clark Univ., 817 F.2d 931, 937 (1st Cir. 1987).  Yet the Fields case was discussing establishing liability for the underlying violation, not the issue of damages.  Since Fields nevertheless cited the D.C. Circuit's opinion in Day, which concerned damages, it is possible that Fields did not see a

_____

appointment."  LeBoeuf v. Ramsey, 503 F. Supp. 747, 756, 762 (D. Mass. 1980) (Keeton, J.).

meaningful distinction between liability and remedy in setting the standard for rebutting the presumption.[4]  In this case, it is not necessary to pin down the precise method of rebutting the presumption because Boston has failed under any conceivable standard.

Boston argues that it has rebutted the presumption that the Officers would have been promoted with evidence from the 2014 exam.  Def.'s Br. 23-24.  Boston's argument is that the 2014 exam was qualitatively better and yet, surprisingly, "had a much greater adverse impact on black/African American candidates than the 2008 exam."  Id. at 23.  On this basis, Boston's expert "Dr. Silva offered his considered opinion that had a content-valid, multi-component examination like that given in 2014 been used in 2008, it would still have had adverse impact, perhaps significantly so."  Id. at 24.  Boston contends that "this fact rebuts any presumption . . . that Plaintiffs suffered any harm whatsoever" from the 2008 promotional exam.  Id.

The fatal blow for Boston, however, is a statement that both sides' expert witnesses agreed with: "One cannot say that any specific individual plaintiff or group of plaintiffs who

---

[4] In Johnson, the D.C. Circuit insisted that the distinction between liability and remedy mattered for the presumption, such that "the clear and convincing proof requirement of Day comes into play only after the plaintiff has established a statutory violation."  810 F.2d at 224.

scored too low to be appointed on the 2014 exam would have scored too low, based on a similar exam, had such an exam been given in 2008." Trial Tr. Day 2 at 115:1-17. Since the crucial question is whether the 2014 exam reveals how these plaintiffs would have performed on a counterfactually similar exam in 2008, and both experts agreed that the 2014 exam reveals nothing about how these plaintiffs would have performed, the presumption has not been rebutted.[5] For argument's sake, the Court credits the testimony of Dr. Silva, Boston's expert, that one may infer from the 2014 exam that, had a similar exam been given in 2008, "it would still have [had] adverse impact." Trial Tr. Day 2 at 120:3-8. Yet that fact does not rebut the presumption, because the critical question is whether these plaintiffs would have done as poorly as they did, and Dr. Silva agrees that the 2014 exam does not answer that question. The 2014 exam results are thus neither here nor there.

Indeed, the Second Circuit confronted a similar issue in Cohen, in which female police officers successfully challenged a physical agility test on the grounds that it had a discriminatory impact and was not job related. 638 F.2d at 499. The district court denied backpay, in part, because the female

---

[5] The Officers further observe that "a majority of the Plaintiffs did not take the 2014 exam," so its relevance (if any) is limited to those few plaintiffs who took it. Pls.' Br. 28.

police officers failed a newly devised physical agility 17 months after taking the first one.  Id. at 499-500.  The Second Circuit reversed, holding that "[t]here was no basis for concluding, as the district court did, that plaintiffs would have failed the new test at the earlier time."  Id. at 503.  Yet the Second Circuit also mused about the circumstances in which this sort of backward projection might be tenable:

> The reasonableness of such an inference will vary, depending principally on the nature of the qualities to be measured and the length of time between the refusal and the new test.  Thus although a test of general intelligence or knowledge, for example, may have retrospective validity for a substantial period of time, we have no such confidence in a test of physical agility.

Id. at 503 (footnote omitted).

Arguably -- indeed Boston so argues, Def.'s Suppl. Br. 7 -- the Second Circuit might have reached a different result in this case, since the 2014 exam was largely one of knowledge and intelligence, rather than physical agility.  Yet that seems highly doubtful.  It is eminently plausible that the Officers could have performed better on the updated exam had they taken it six years earlier.  Julius Caesar was "constant as the Northern Star,"[6] and the biblical God is said to "change not,"[7] but Title VII does not assume imperial or divine plaintiffs.

---

[6] William Shakespeare, Julius Caesar act 3, sc. 1.

[7] Malachi 3:6.

People change, as do their circumstances.  Illnesses grave and
mild, cognitive slippage, dips in professional motivation
(perhaps due to earlier disappointments), familial duties,
social distractions, and even last night's sleep or this
morning's breakfast[8] may explain why an employee might flunk a
test she would have aced years earlier.  There is little basis
in logic or fact to infer from the 2014 exam that these Officers
would have achieved similar mediocre results had they taken it
in 2008.  Boston has failed to rebut the presumptions described
by the Supreme Court in Albemarle and Teamsters.  Accordingly,
the Court rules that the Officers are entitled to back pay.

### C.   Chapter 151B Also Entitles the Officers to Back Pay

As an alternative ground for an award of back pay, the
Officers argue that the Commonwealth's anti-discrimination
statute, Mass. Gen. Laws ch. 151B, entitles them to back pay
even were such relief foreclosed under Title VII by the Lopez
footnote.  Pls.' Br. 41; see Smith I, 144 F. Supp. 3d at 212
(ruling that Boston violated both Title VII and Chapter 151B).
Boston contends, as it did with respect to Title VII, that "any

---

[8] See, e.g., Rachel Galioto & Mary Beth Spitznagel, The
Effects of Breakfast and Breakfast Composition on Cognition in
Adults, 7 Advances in Nutrition 576S, 580S-81S (Suppl. 2016),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4863263/pdf/an01023
1.pdf (reviewing studies and noting that "the preponderance of
work examining delayed recall tasks shows a benefit of eating
breakfast").

back pay damages under c. 151B must be proved and not just presumed." Def.'s Supp. Br. 9.

The Court agrees with the Officers that Chapter 151B independently entitles them to back pay in order to make them whole. As the First Circuit has explained, "Mass. Gen. Laws ch. 151B . . . mandates 'make-whole relief,' which encompasses damages which are 'the natural and probable consequences of the illegal conduct.'" McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals United, 140 F.3d 288, 306 (1st Cir. 1998) (quoting Conway v. Electro Switch Corp., 402 Mass. 385, 388, 523 N.E.2d 255 (1988)). Here, the Officers have demonstrated a lost chance of promotion as a result of the discriminatory 2008 exam and they ought be made whole through an award of back pay. The Court so rules.

D.   **Calculation of the Back Pay**

Helpfully, the parties have stipulated to the calculation of back pay in Joint Trial Exhibits 86(b)-(c), fixing the lost chance calculation at 36.26% of the total value of each Officer's back pay. Stipulated Calculations; Def.'s Br. 24-26; Pls.' Br. 5-7. The stipulation relies on the "loss of a chance doctrine." Alexander, 474 F.3d at 449; Biondo v. City of Chicago, 382 F.3d 680, 688 (7th Cir. 2004) ("[I]f a person would have had a 25% chance of promotion from lieutenant to captain, then preventing that person from becoming a lieutenant should

[22]

lead to a remedy equal to 100% of the benefits of being a lieutenant plus 25% of the incremental benefits of being a captain."). The Court honors the parties' stipulation.

They did not reach an agreement as to the start and end dates, however, since each side's expert witness chose different dates. For the following reasons, the Court generally adopts the Officers' proposed start and end dates, excepting the end dates for those Officers who failed to mitigate damages by taking (and studying for) the improved 2014 exam. The cut-off point for those Officers is the date of the 2014 exam.

### 1.   Start Date

"[U]nder a disparate-impact theory of liability, injury occurs and back-pay calculations commence when the employer uses the discriminatory practice for the first time." Howe v. City of Akron, 801 F.3d 718, 745 (6th Cir. 2015) (citing Lewis v. City of Chicago, 560 U.S. 205, 212 (2010)). The parties have agreed back pay ought begin from the average date of candidate promotion. Trial Tr. Day 1 at 35:1-12; Trial Tr. Day 2 at 112:3-8.[9] Yet they disagree as to the pool of candidates from which the average is drawn. The opposing experts differed on this point. Trial Tr. Day 1 at 35:4-12.

---

[9] But see Isabel, 404 F.3d at 410 (affirming back pay award starting from the "date that the first pool of candidates was promoted to lieutenant").

The Officers (following Dr. Weisen) contend that the start date should be fixed at the average promotional date of white candidates only (November 18, 2011), arguing that "[i]t would be patently illogical to adopt Dr. Silva's approach because the average promotion date of all candidates (including minorities) is premised on a process infected with discrimination." Pls.' Br. 40. In contrast, Boston (following Dr. Silva) urges the Court to adopt the average promotional date of all candidates irrespective of race (February 16, 2012). Def.'s Br. 25-26. Dr. Silva indicated that including white and black candidates captured the entire sample and would not "penalize" Boston for promoting black candidates. Trial Tr. Day 2 at 113.

Courts have wide discretion in exercising equitable powers in order to fashion the "most complete relief possible" for a Title VII plaintiff. See Albemarle, 422 U.S. at 421 (quoting 118 Cong. Rec. 7168); see also Franks, 424 U.S. at 764. Exercising this authority, this Court follows Dr. Weisen's approach in calculating the start date and rules that back pay starts from November 18, 2011. Smith I was clear in finding that the 2008 test had a discriminatory impact on black candidates. 144 F. Supp. 3d at 199. By excluding the lagging promotion dates of black candidates from the calculated average, this Court eliminates the test's adverse impact on the population of black candidates. Pooling all candidates will

perpetuate the effects of the unlawful 2008 exam on black candidates, which the Court declines to do.

## 2.   End Date

The end date is when the plaintiff's economic injury ceased.  See Howe, 801 F.3d at 745.  The Officers argue that the end dates should be the "retirement date, the trial date for the 8 non-promoted Plaintiffs, and the promotion dates of Plaintiffs Facey and Moss (the 2 Plaintiffs who were promoted)."  Pls.' Br. 16.  Boston urges this Court to determine July 4, 2014 to be the end date, because that is the date when the Officers "got the remedy they sought throughout this case -- a content-valid, multicomponent, assessment-center-style exam."  Def.'s Br. 26.[10]

The 2014 exam was in part a remedial measure to the 2008 exam, but that does not mean that the discriminatory effects of the 2008 exam ended when the new exam was used.  A black candidate denied promotion due to the unlawful 2008 exam would continue to be paid a lower salary, and not receive other associated benefits, even after the 2014 exam.  It is the duty of this Court to remedy the economic inequity created by the 2008 exam between black and white candidates, and this inequity did not cease on July 4, 2014.  See Berkman v. New York, No. CV-

---

[10] "The actual exam administration began on June 28, 2014. [Boston] used the later July 4, 2014 date as the end date because that was end of pay period, greatly simplifying its calculations."  Def.'s Br. 26 n.45.

79-1813, 1986 U.S. Dist. LEXIS 25570, at *8-9 (E.D.N.Y. May 13, 1986) (concluding that "the date on which defendants offered to administer the qualifying test to class members" does not necessarily coincide with the end of discrimination because the effects of the discrimination could continue past the remedial qualifying test).

The Court thus agrees with the Officers -- with one caveat explained below -- and rules that back pay ends with either the Officer's promotion date, retirement date if not promoted, or (if neither promoted nor retired before the trial) the trial date of October 25, 2019.[11]  Yet for those Officers who did not mitigate damages by taking the 2014 exam, the end date is July 4, 2014.  The same goes for Paul Joseph, who did badly on the new exam and, when asked whether he studied for it, testified: "Absolutely not."  Trial Tr. Day 1 at 122:5-6.  These Officers failed to mitigate damages and thus their award of back pay will be "offset by any wages that could have been earned with reasonable diligence."  Johnson, 364 F.3d at 379 (citing 42 U.S.C. § 2000e-5(g)(1); Quinones Candelario v. Postmaster Gen. of United States, 906 F.2d 798, 801-02 (1st Cir. 1990)).

---

[11] Though the trial began on October 28, 2019, the parties have agreed to use the date of October 25th for "administrative practicality."  Pls.' Br. 16 n.9.

Accordingly, drawing on the stipulated information in Trial Exhibit 86, Ex. A, this Court determines the following end dates:

1.    Brian Latson's end date is July 4, 2014, for failure to take the new exam.

2.    Bruce Smith's end date is January 2, 2018, when he retired.

3.    Kenneth Sousa's end date is October 25, 2019.

4.    Kim Gaddy's end date is July 4, 2014, for failure to take the new exam.

5.    LaTeisha Adams's end date is March 22, 2015, her date of retirement.  Though she did not take the 2014 exam, that was not a failure of reasonable diligence.  She reasonably opted not to take the exam because she was on the verge of retirement due to a heart condition.  <u>See</u> Trial Tr. Day 2 at 7-8.

6.    Martin Joseph's end date is October 25, 2019.

7.    Paul Joseph's end date is July 4, 2014, for failure to exercise reasonable diligence in mitigating damages by not studying for the new exam.

8.    Marwan Moss's end date is November 8, 2014, when he was promoted.

9.    Leighton Facey's end date is January 26, 2013, the date of promotion.

10.   William Woodley's end date is July 4, 2014, for failure to take the new exam.

### 3.   Overtime and Detail Pay and Prejudgment Interest

Overtime and detail pay are awarded according to the stipulated calculation through each plaintiff's end date as determined above, except for Bruce Smith, whose overtime and detail pay end when he was placed on administrative leave on June 28, 2017.  See Pls.' Br. 16 n.9; Trial Ex. 86, Ex. A.  The Court further awards the Officers prejudgment interest at a rate of 12% per annum starting from the commencement of the suit. See Mendoza v. Union St. Bus Co., 876 F. Supp. 8, 12 (D. Mass. 1995) (Lasker, J.).

## III. CONCLUSION

For the foregoing reasons, the Court awards back pay to the Officers in accordance with the stipulated calculation using the Officers' proposed dates, as modified above due to the failure of some plaintiffs to mitigate.

It behooves the Court to address one final matter.  Though it has properly ruled in favor of the Officers, the Court commends Boston's efforts in redesigning the promotional exam. Since the 2014 exam turned out to have a greater disparate impact than the 2008 exam, however, Boston argues that awarding back pay here "would cause the City to face a perpetual cycle of potential liability and damages for discrimination without any

[28]

reasonable alternative selection process." Def.'s Suppl. Br. 2.
The Court rejects the premise that Boston faces a perpetual
cycle of liability.  Now six years removed, no plaintiff has
attacked the 2014 exam and Boston elsewhere asserts that "[t]he
content-valid 2014 exam plainly passes muster under Title VII."
Def.'s Br. 26.  That being the case -- and the Court has no
reason (nor occasion) to disagree -- it is highly unlikely that
Boston faces "an endless cycle of damages." Def.'s Suppl. Br.
3.  If ever there emerges a disparate impact challenge to the
2014 exam, Boston would be on much sturdier legal ground than it
was in this litigation.

Boston adds that the higher-quality 2014 exam cost more to
run than did the 2008 multiple-choice exam, without comparable
gains.  Id.  The law sometimes imposes costs, and it is indeed
vexing that the diversity goals of the 2014 exam were not
realized here.  Yet it does not follow that the 2014 exam also
violated the law.  Nor does it follow that there was no gain.
The benefit of the improved promotional system ultimately
redounds to Boston, including its police officers and all its
citizens who seek their protection.

**SO ORDERED.**

/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

[29]